# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RODNEY GRANT, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| MARLIN GUSMAN, SIDNEY HOLT, COREY | )   Case No. 17-cv-2797-NJB-DEK |
| AMACKER, JAMES LEBLANC, TIMOTHY | ) |
| HOOPER, DOES 1-10, | )   *Jury Trial Demanded* |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

### I.    INTRODUCTION

1.   This case is about whether Louisiana jailors may imprison a man they know ought to be free.

2.   The United States Circuit Court for the Fifth Circuit has held, definitively, that jailors may not imprison inmates longer than their sentences. In fact, published and recent Fifth Circuit precedent recognized that **"There is a Clearly Established Right to Timely Release from Prison**."[1]

3.   Once a prisoner's sentence has expired, his jailor has a reasonable amount of time to process and release him. Federal courts have repeatedly held that the phrase "reasonable time" means some amount of time less than 48 hours. [2] In other words, an inmate who has already served his entire court-ordered sentence must be released within a reasonable time not to exceed two days. Any minute more is unconstitutional and illegal.

4.   A jury is often asked to decide whether an overdetention of *less* than 48 hours is constitutional,[3]

---

[1] *Porter v. Epps,* 659 F.3d 440, 445 (5th Cir. 2011) (emphasis in the original).

[2] *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin.*"). That is because once a detainee is ordered released, the public's interest in his prompt release is even greater, and the constitutional tolerance for "administrative delay" is substantially less than in the context of arrestees awaiting probable cause determinations – which must come within 48 hours. *See Berry v. Baca,* 379 F.3d 764, 771-72 (9th Cir. 2004); *Powell v. Barrett*, 376 F.Supp.2d 1340, 1353 (N.D.Ga. 2005),

[3] *Berry v. Baca,* 379 F.3d 764, 77072 (9th Cir.2004) (twenty-nine hour delay presented question for jury); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two and a half hour delay presented jury question).

1

and juries have found that delay of as little as thirty minutes is unconstitutional.[4] But federal courts across the country have held, unequivocally, that a detention *beyond* 48 hours of an inmate's known sentence is unreasonable and illegal. Indeed, "[t]he [United States District Court for the Northern District of Georgia] has been unable to find **any case**, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible."[5]

5.   Plaintiff Rodney Grant should have been a free man on June 30, 2016. But because of the Defendants' unconstitutional and illegal overdetention practices, Mr. Grant did not leave prison until July 27, 2016.

6.   Thus, Marlin Gusman *et al*. imprisoned Plaintiff Rodney Grant for more than 600 hours past the maximum reasonable time. As alleged herein, Gusman *et al*. were warned repeatedly that overdetention of inmates like Mr. Grant is unconstitutional and illegal. In Mr. Gusman's case, that warning was an in-person explanation from a federal judge. But still, and despite this knowledge, Gusman *et al.* held Mr. Grant for nearly a month past his release date.

7.   As federal district courts and federal courts across the country have held, Gusman *et al.*'s practices are unconstitutional and illegal. Mr. Grant files this lawsuit to prevent Gusman from DOING THIS AGAIN.

<u>**Rodney's Story**</u>

8.   On July 2, 2000, Rodney Grant was arrested in New Orleans on suspicion of simple burglary. He spent the next sixty-one days in Orleans Parish Prison without being charged with a crime. He was released on September 3, 2000, because the District Attorney failed to file a bill of information by the statutory deadline.

9.   On October 30, 2000, the DA filed a Bill of Information for simple burglary.

---

[4] *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004).
[5] *Powell v. Barrett*, 376 F.Supp.2d 1340, 1354 (N.D.Ga. 2005) (bolded emphasis added).

10. On November 10, 2000, Rodney was due to be arraigned, but the court was closed that day. An arraignment was reset for November 29, 2000, and a summons was mailed for him, but Rodney never received it. Because he didn't receive the summons, he didn't know to appear for the arraignment – but the court nevertheless issued a warrant for his arrest and set bond.

11. Years passed. The Bill of Information expired by operation of law. Rodney's arrest warrant, however, stayed in the system.

12. Between 2008 and 2015, Mr. Grant was incarcerated at Dixon Correctional Institute for a different crime. While there, he achieved Class A trustee status and worked at the state mental hospital.

13. On June 25, 2015, Rodney was released from Dixon. He got his life back on track, got an apartment, and got a job working at a group home. A year later, on June 27, 2016, Rodney was arrested while trying to obtain a driver's license – this time for the 2000 warrant, which was a decade and a half old by that time and predicated on a long-expired charge.

14. On June 30, 2016, Rodney appeared for arraignment in Orleans Parish Criminal District Court. Judge Camille Buras, seeing the injustice of his situation, allowed Rodney to plead guilty to a one year sentence, with credit for time served for the seven years he had just served at Dixon.

15. Because he completed his sentence, Rodney should have walked free that day or the next.

16. To ensure he was released without delay, the Judge contacted an attorney at the Orleans Parish Sheriff's Office ("OPSO") and requested that the Sheriff expedite processing for Rodney's release. The Sheriff's attorney then contacted several officials—including Sheriff Marlin Gusman and Major Sidney Holt —about expediting processing, stating that Rodney "really shouldn't have to actually serve any time once DOC processes it" and that his sentence was "one year DOC credit for time served from 2008-present."

17. But the Sheriff and his officials did not release Rodney. The Sheriff's Department  Defendants have an explicit policy of indefinitely detaining inmates ordered to the custody of the Department of Public Safety & Corrections ("DOC") until the Sheriff's Office receives word from the Department to

bring the inmate to Baton Rouge. In this case, the Sheriff Department Defendants knew that this policy would result in Rodney sitting in prison past the time of his release date. This is evidenced by a Thursday, June 30, email Defendant Corey Amacker wrote to Defendant Sidney Holt saying that he would "work on getting [Rodney's] packet sent to the DOC tomorrow but with the holiday weekend he will not get calculated till Tuesday most likely."

18. As a result of the Sheriff Defendants' policy of indefinite detention, Rodney sat at the Orleans Parish Prison for another week and a half. On July 12, 2016, the Sheriff handed Rodney over to the state DOC, who processed him at the Elayn Hunt Correctional Center.

19. Once they took custody of him, the DOC should have seen that his sentence was served and immediately released him. But the DOC did not release Rodney.  Instead, they sent him to the Madison Parish Correctional Center in Tallulah, Louisiana, operated by the private prison corporation LaSalle Corrections. At intake there, Rodney explained to an officer that his time was served. She looked at his sheet and agreed that it indicated "no sentence." However, LaSalle did not release Rodney.

20. Rodney's friend, Alfred, became concerned for Rodney. Alfred spoke to Judge Buras, who on or about July 15, 2016, called Sheriff Gusman and Warden Stinson of LaSalle to ask why Rodney had not been released.

21. On July 18, 2016, because Rodney was still not out, Judge Buras held another hearing. She vacated Rodney's sentence and replaced it with "CREDIT FOR TIME SERVED."

22. Despite having no legal authority to hold Rodney, the DOC and LaSalle still did not release him.

23. On July 25, 2016, Judge Buras called Irma Ray at the DOC. The Judge then called and emailed Kanedra Burton at the DOC.

24. Finally, several days later on July 27, 2016, Rodney was released. He was dropped off in Madison, Louisiana, and given a bus ticket back to New Orleans.



**Fig. 1: Timeline of Rodney's 2016 Overdetention**

**Defendants Have Been Warned That Overdetention is Unconstitutional, But Have Not Fixed It**

25. Overdetention is not a new problem in Louisiana. On June 18, 2009, community members sent a letter to Sheriff Gusman documenting an individual currently being unlawfully held for weeks in the Orleans Parish Prison on a ICE hold request. In a meeting in response to this letter, Sheriff Gusman acknowledged that ICE hold requests do not allow him to detain an individual for more than 48 hours after the resolution of their traffic, municipal, and/or state criminal charges.

26. Nonetheless, subsequent to this meeting Sheriff Gusman continued the practice of submitting to ICE hold requests and detaining individuals in custody beyond the 48-hour expiration of these requests. The pattern of overdetention continued.

27. In 2010, a judge of the U.S. District Court of Eastern Louisiana granted the writ of habeas corpus of Antonio Ocampo. Mr. Ocampo had been overdetained in Orleans Prison Parish for more than 90 days on an expired 48-hour ICE hold. His attorneys filed a writ of habeas corpus challenging the detention. In a November 15, 2010 hearing of the habeas petition, the Honorable Sarah S. Vance and counsel for the Sheriff had this exchange:

**Judge Vance**:       So far I have not heard anything that justifies the continued detention by your office based on the law that I have seen and the facts that I understand.

**Sheriff's Counsel**:   That's correct, Judge.  . . .

**Judge Vance**:   I'm not saying the sheriff is intentionally detaining a prisoner who was entitled to be released in blatant disregard of his rights. I'm not saying that. **I'm saying that if the prisoner was entitled to be released in August, to hold him past the due date of the detainer would violate his due process right because he was at that point entitled to be released.**

(Emphasis added.)

28. Over and over and over again, at both the Orleans parish and State levels, inmates are being held for dozens or hundreds of days past their court-ordered release dates.

29. It is so bad that this year, the Louisiana Attorney General made a public statement that there "**is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison.**"[6]

30. Jailors should not be capricious with the lives of those in their custody.  This suit seeks to end Defendants' caprice.

## II.   JURISDICTION AND VENUE

31. Plaintiff's claim arises under the Constitution and the laws of the United States. This Court has jurisdiction over Plaintiff's claims of federal rights violations, enforceable under the Fourteenth Amendment and 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's Louisiana false imprisonment claim in accordance with 28 U.S.C. § 1367.

32. The venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in Orleans Parish, Louisiana situated in the Eastern District of Louisiana.

## III.   THE PARTIES

*Plaintiff*

33. Plaintiff **Rodney Grant** is of suitable age and capacity to file this suit. At all relevant time during this suit (aside from his false imprisonment in Baton Rouge and Tallulah), Plaintiff was a

---

[6] Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018)

resident of Orleans Parish in the Eastern District of Louisiana.

*Defendants*

34. Defendant **Marlin Gusman** is the Sheriff for the Orleans Parish Sheriff's Office and a final policymaker. He is sued in his individual and official capacity. On information and belief, he is domiciled in Orleans Parish in the Eastern District of Louisiana.

35. Defendant **Corey Amacker** is the Classifications Deputy for the Orleans Parish Sheriff's Office. He is sued in his individual capacity. On information and belief, he is domiciled in the Eastern District of Louisiana.

36. Defendant **Sidney Holt** is Captain for the Orleans Parish Sheriff's Office. He is sued in his individual and official capacities. On information and belief, he is domiciled in Jefferson Parish in the Eastern District of Louisiana. (Collectively, Mr. Gusman, Mr. Amacker, and Mr. Holt are the "Sheriff's Office Defendants)

37. Defendant **James LeBlanc** is the Secretary for the Louisiana Department of Public Safety & Corrections and a final policymaker. He is sued in his individual and official capacities. On information and belief, he is domiciled in Calcasieu Parish in the Western District of Louisiana.

38. Defendant **Timothy Hooper** is the Warden of Elayn Hunt Correctional Center for the Louisiana Department of Corrections and a final policymaker. He is sued in his individual and official capacities. On information and belief, he is domiciled in Calcasieu Parish in the Western District of Louisiana.

39. Defendants **Does 1 to 10** are as-yet unknown individuals or entities involved in the overdetention of Rodney Grant. They are sued in their official and individual capacities.

## IV.   FACTS

## A.   Defendants Overdetained Rodney for Nearly a Month, Despite Actual Knowledge That He Should Be Free and Despite the Repeated Admonitions of a Judge

40. Plaintiff realleges and incorporates each and every foregoing paragraph.

41. On October 30, 2000, the Orleans District Attorney charged Rodney in a bill of information with

simple burglary.

42. On November 10, 2000, Rodney was due to be arraigned, but the court was closed that day. As a result, an arraignment was reset for November 29, 2000. A summons was mailed for him, but Rodney never received it. Because he didn't receive the summons, he couldn't appear for the arraignment—but the court nevertheless issued a warrant for his arrest.

43. Rodney was arrested on September 14, 2008. He served seven years at Dixon Correctional Institute until June 25, 2015, when he was released subject to probation until 2023.

44. On June 27, 2016, while trying to obtain a driver's license, Rodney was arrested pursuant to the nearly sixteen-year-old warrant. At his arraignment on June 30, 2016, Rodney pled guilty as charged to one count of simple burglary, and the Judge sentenced him to one year with credit for the seven years he previously served.

45. The same day of his arraignment, the Judge told the Sheriff's attorney, Blake Arcuri, to have OPSO expedite processing for Rodney's release. On June 30, 2016, Arcuri emailed OPSO officials— including Defendant Marlin Gusman, Defendant Carmen DeSadier, Defendant Sidney Holt, and Defendant Djuana Bierria—about the Judge's order, stating Rodney "really shouldn't have to actually serve any time once DOC processes it" and that his sentence was "one year DOC credit for time served from 2008-present."

46. In less than an hour and a half, Defendant Gusman responded to Blake Arcuri's email, stating that once Rodney enters a plea and is sentenced, they could have DOC compute his time. That same morning, Defendant Holt responded that he forwarded Arcuri's email to DOC Classifications Deputy for OPSO, Defendant Corey Amacker, and would "have him contact DOC and see what can be done."

47. Defendant Amacker emailed Arcuri that he would work on getting Rodney's packet to the DOC on July 1, 2016, which was the following day. Defendant Amacker notified the other Sheriff's Department Defendants that this would result in Rodney's overdetention. He wrote that he "work on getting [Rodney's] packet sent to the DOC tomorrow but with the holiday weekend he will not get

calculated till Tuesday most likely."

48. The Sheriff's Department has a policy of holding inmates in custody – regardless of whether they should be free or in custody – until the Department of Corrections says to bring them to Baton Rouge.

49. On July 7, 2016, the Department of Corrections sent the Sheriff's Department an inmate transfer request for Rodney with July 12, 2016, as the transfer date.

50. The Sheriff's Department did nothing to move this transfer date up, so Rodney remained at Orleans Parish Prison ("OPP") until July 12, 2016, when OPSO relinquished authority to DOC.

51. On July 12, 2016, Rodney underwent processing at Elayn Hunt Correctional Center in St. Gabriel, Louisiana, on July 12, 2016. During processing, Rodney explained he was granted credit for time served and should be released. Rodney received confirmation from an official that his sheet indicated "no sentence." However, the same day of processing, DOC transferred Rodney to Madison Parish Correctional Center  ("MPCC") operated by Defendant LaSalle Corrections ("LaSalle")  in Tallulah, Louisiana.

52. Rodney's friend Alfred Marshall became concerned for Rodney. On or around July 15, 2016, Alfred spoke with Judge Buras and let her know that Rodney was still in custody. Judge Buras then called the Sheriff and MPCC Warden Chris Stinson.

53. When that did not result in Rodney's release, the Judge waited three days and then vacated Plaintiff's previous sentence and resentenced him to only "CREDIT FOR TIME SERVED."

54. When that did not result in Rodney's release, the Judge called Corrections ARDC Specialist II Irma Ray on July 25, 2016. The Judge then called and emailed Kanedra Burton at the Department of Corrections.

55. Defendants finally released Plaintiff from MPCC on July 27, 2016. His release occurred twenty-seven days after the Judge ordered OPSO to expedite processing with DOC. (See Fig. 1, *infra*.)

**B.**  **The Orleans Parish Sheriff Has an Explicit Policy of Indefinite Detention**

56. The Orleans Parish Sheriffs Office Defendants have instituted a policy of indefinite detention for certain persons in their care.

57. When a criminal defendant is sentenced in Orleans Parish and ordered to the custody of the Department of Public Safety & Corrections, OPSO does not immediately turn that person over to the custody of the DOC.

58. Instead, OPSO puts together a packet of that person's paperwork and drives it to the Elayn Hunt Correctional Center outside of Baton Rouge. Typically that takes about a week, and paperwork is usually driven on Thursdays.

59. OPSO then detains the person *indefinitely* until the DPS&C tells them to bring the person to Baton Rouge – even when they know that person's sentence is complete. It is indefinite because OPSO takes no further action until it hears from the DOC.

60. Usually, about three to four weeks later, the DOC sends OPSO a list of 50 inmates that they will take, and OPSO picks approximately 25 of them for transport to Elayn Hunt to be processed by the DOC. Transport usually takes place once a week, on Tuesdays.

61.  The Orleans Parish Sheriff's Office Defendants implements this policy even when they know it necessarily results in overdetention – as with Rodney Grant. In Rodney's case, that policy of indefinite detention resulted in at least ten days of overdetention.

62. As a result, there is a whole class of people who are regularly and automatically being overdetained by the OPSO policy. Specifically, anybody in Orleans Parish who meets three criteria: (a) sentenced to DOC time; (c) in pre-trial detention for longer than the period of their sentence; and (c) given credit for time served; will *necessarily* be overdetained by the Sheriff's policy of indefinite detention.

63. Whether OPSO sends the paperwork quickly to Baton Rouge or not only changes *how long* an inmate is unconstitutionally overdetained, not *whether* the inmate is unconstitutionally overdetained.

64. As jailors, OPSO Defendants have a legal duty to timely release those in their custody. They had actual knowledge that Mr. Grant should be released. They thus acted unreasonably in neither releasing him nor transferring custody of him to the DOC in such a manner as would ensure his timely release.

65. Although it has a legal duty to ensure the timely release of inmates, it has a financial disincentive to do so – because it is paid by the DOC for each day.[7] In 2011, this came to more than $11 million per year.[8]

## C.     The Orleans Parish Sheriff Has Long-Running Pattern of Overdetention

66. Rodney's experience is not unique nor even unusual. OPSO Defendants have demonstrated a pattern of holding inmates past the time they are supposed to be released. The following are examples that highlight the pattern, and are only those known without the benefit of discovery.

67. Antonio Ocampo: On February 20, 2010, Antonio Ocampo was arrested in Orleans Parish. He plead guilty to two counts of simple battery, and was sentenced to two concurrent five-month sentences and given credit for time served. His sentence was completed on August 12, 2010. At some point, an ICE hold was issued for Mr. Ocampo, which could have extended his incarceration by 48 hours. But the Orleans Parish Sheriff continued to hold him until November 15, 2010, when a judge of the U.S. District Court of Eastern Louisiana granted the writ of habeas corpus of Antonio Ocampo. The judge held that the Sheriff had unlawfully detained Ocampo, and ordered Ocampo's immediate release. *Ocampo v. Gusman*, No. 10-04309 (Nov. 15, 2010). This Court held that "if the prisoner was entitled to be released in August, to hold him past the due date of the detainer would violate his due process right because he was at that point entitled to be released."  During the period of his overdetention, Mr. Ocampo filed repeated written grievances in which he requested to be released.

68. Mario Cacho: Mario Cacho completed his sentence for disturbing the peace, New Orleans Municipal Code 54-405, on August 21, 2009. Upon expiration of his criminal sentence, Orleans Parish

---

[7] La. R.S. 15:566.
[8] http://lensnola.wpengine.netdna-cdn.com/wp-content/uploads/2010/11/2011-budget-req-Sheriffs-Office.pdf

Sheriff Gusman continued to hold Plaintiff Cacho in his custody. Cacho remained in the custody of Orleans Parish Sheriff Gusman until February 5, 2010, on the purported basis of a 48-hour ICE hold. Despite filing a grievance with Orleans Parish Prison officials requesting release, Mr. Cacho was only able to secure his release from Orleans Parish Prison by filing a federal civil rights complaint with the Department of Homeland Security's Office for Civil Rights and Civil Liberties.

69. <u>Department of Justice Findings</u>**:** In 2012, the U.S. Department of Justice (DOJ) issued a findings letter which found that the Orleans parish sheriff's office had no tracking system to ensure that individuals were released after the 48-hour hold period of ICE holds. Rather, "staff members responsible for managing these holds appear to rely upon memory or handwritten notes on files." The DOJ expressed serious concern that the individuals were "falling through the cracks" because of the sheriff's submission to ICE hold requests.

70. <u>June 2013 Release of Overdetention Complaints</u>: In June 2013, Sheriff Gusman released the complaints of a number of other individuals who were found to be overdetained. The grievances confirmed that they had filed multiple complaints with jail staff seeking their release and that jail officials had ignored their pleas for freedom.

71. <u>Eddie Copelin</u>: On December 5, 2015, Eddie Copelin was arrested and placed in the custody of the Orleans Parish Sheriff's office. On October 14, 2016, Mr. Copelin was sentenced in Orleans Parish Case No. 527-992 to a two-year sentence, with one year suspended and one year executory, credit for time served. Thus, even without accounting for good-time credit or other sentence reductions, Mr. Copelin's sentence should have been completed as of December 5, 2016. But Mr. Copelin was not released at that time. On January 12, 2017, the Roderick & Solange MacArthur Justice Center filed a Petition for Writ of Habeas Corpus on Mr. Copelin's behalf. By the next day, Mr. Copelin was released.

72. <u>Jessie Crittindon</u>: On July 2, 2014, Jessie Crittindon was arrested and placed in the custody of the Orleans Parish Sheriff's office. On August 2, 2016, Mr. Crittindon was sentenced to two years in case number 521-975, and six months of concurrent time win Case No. 521-590, both with credit for time

served. Because Mr. Crittindon had been in custody for longer than two years, he should have been immediately released. Over the next six months, Mr. Crittindon's family repeatedly called the Orleans Parish Sheriff's office in an effort to secure his release. His mother contacted East Carroll Parish (where OPSO was holding him) approximately once a week. The family was told that Mr. Crittondon was eligible for release, but his paperwork was "being processed." On January 12, 2017, the Roderick & Solange MacArthur Justice Center filed a Petition for Writ of Habeas Corpus on Mr. Crittindon's behalf. By the next day, Mr. Crittindon was released.

73. <u>Others Similarly Situated to Copelin and Crittindon</u>: According to the Times-Picayune, "attorneys with the Roderick and Solange MacArthur Justice Center say they believe more than a 100 individuals who were sentenced in New Orleans but are being held out of parish at the Riverbend Detention Center in East Carroll Parish are similarly affected by paperwork problems. Some of those other individuals are being held past their release dates, like Crittindon and Copelin, the attorneys say, and others are being held without any legal classification."[9] Perry Stagg, Deputy Assistant Secretary of the Department of Public Safety & Corrections, acknowledged this, saying "we know there are others." *Id.*

74. <u>Phillip Dominick III</u>. Mr. Dominick was arrested in 2010. He was a pretrial detainee from 2010 to 2016. On Sept. 1, 2016, he was sentenced to serve five years DOC (state) time on September 1, 2016, in case no. 499077. The minute entry from this date explicitly provides that he is given credit for time served from June 1, 2010, through June 1, 2015. Because Plaintiff Dominick had been in custody for longer than five years, he was immediately entitled to release. Instead, OPSO sent him to River Bend. Defendants did not release Mr. Dominick until December 7, 2016.

75. <u>Donald Guidry</u>. On December 23, 2014, Mr. Guidry was arrested and placed in the custody of the Orleans Parish Sheriff's Office; this arrest is associated with Orleans Parish Criminal District Court

---

[9] Emily Lane, *2 freed after being illegally jailed, but 'over 100' others affected by missing paperwork: lawyers.* New Orleans Times-Picayune, Jan. 13, 2017.

case no. 523577. On July 12, 2016 the Orleans Parish Criminal District Court sentenced Mr. Guidry to serve five years DOC time, three years suspended. The Court awarded him credit for time served from December 23, 2014. Having been awarded credit for time served from his arrest, and being eligible for good time under state law, Mr. Guidry was entitled to release on September 4, 2016. But OPSO chose to "release" him to East Carroll Parish without taking the steps necessary to ensure his September 2016 release. In fact, OPSO did not process Mr. Guidry's "DOC letter of credit" until January 13, 2017. Defendants did not release Mr. Guidry until January 24, 2017.

76. <u>Leon Burse</u>. On July 8, 2015, Mr. Burse was arrested and placed in OPSO custody. On August 8, 2016, he was sentenced to serve five years DOC time, four years suspended in case no. 526057. The Court awarded him credit for time served. Because Plaintiff Burse had been in custody for longer than one year, he was immediately eligible for release. On August 18, 2016, ten days after Mr. Burse was entitled to release, the OPSO Defendants inexplicably transported Mr. Burse to the River Bend Detention Center. Defendants did not release Mr. Burse until January 11, 2017. Because of the actions and inactions of the Defendants, he was held in custody 156 days past his eligible release date.

77. <u>Monica Jenkins</u>: On December 7, 2016, Monica Jenkins was arrested in Orleans Parish on one count of misdemeanor aggravated assault. She came to a first appearance in municipal court on December 8, 2017, where she pled guilty and was ordered released. As of December 13, 2016, she was still in Defendants' custody. It is unknown when she was finally released.

78. <u>Garland Johnson</u>: On October 14, 2016, Mr. Johsnon was arraigned. The court ordered him released to a hospital because he mentally ill. Instead of taking him to the hospital, the OPSO rebooked him for an attachment related to a missed mental-health check-in and shipped him out of the parish for detention. OPSO stopped bringing him to court dates, and so Mr. Johnson sat in prison for six months– even though a judge ordered him released for mental health treatment. He was only released in March 2017 when his mother convinced attorneys intervene on his behalf.

79. <u>Jonathan Square</u>: On May 2, 2017, Mr. Square plead to probation. As of May 5, 2017, he was

still in Defendants' custody. It is unknown when he was finally released.

80. <u>Quinton Cruse</u>: On April 8, 2017, Mr. Cruse was to be released from Orleans Parish Sheriff Office's custody. As of May 15, 2017, he was still in OPSO custody at the East Carroll Parish Detention Center.  It is unknown when he was finally released.

81. <u>Lonnie Kent</u>: On September 18, 2017, Lonnie Kent (Folder: 2454366) was given a sentence that included 120 days in OPP.  He got credit for time served, and had already been in jail for three months. As a result, he should have been released on October `17, 2017. He was released on October 19, 2017, only after his attorney contacted the Sheriff's lawyer and filed a Petition for Writ of Habeas Corpus.

82. <u>Charles Manuel</u>: Charles Manuel was booked on August 3, 2017. He pled guilty on August 21 and was sentenced to time served. He was not released by OPSO, however, until after October 4, 2017.

**D.     The Department of Public Safety & Corrections Has a Publicly-Admitted Pattern of Overdetention**

83. The Department of Public Safety & Corrections also has a well documented pattern of overdetention. For example, in *Chowns v. LeBlanc*, La. 37th JDC 26-932, DOC employees testified as to the consistent overdetention they observed:

      a.  Tracy Dibenetto, a DOC employee, testified that DOC staff  have discovered approximately <u>one case of overdetention per week for the last nine years</u>. Ms.  Dibenetto also testified that inmates are sometimes incorrectly incarcerated for periods of up to a year.

      b.  Henry Goines, a DOC employee whose job was to review sentence computations for the assistant secretary, testified that he typically discovered "one or two [inmates] a week" who were eligible for immediate release.

      c.  Cheryl Schexnayder, a DOC records analyst, testified that in the course of her job, she had looked at inmates' sentences and found that they had been done wrong and the inmate was entitled to immediate release.

      d.  Sonja Riddick, a DOC employee, responded to the question: "Did you ever find a time when you looked at an inmate's records and you  say, this man should be out now?" with the answer: "<u>Oh yes</u>."

84. Specific persons overdetained by the DOC include the following:

    a. <u>Brian McNeal</u>. In 2017, Mr. McNeal was overdetained for 41 days because the DOC incorrectly handled his paperwork and release date. The DOC refused to release him even after he wrote to the Warden explaining that he was supposed to be free.

    b. <u>De'Juan Thomas</u>. From 2015 to 2017, Mr. Thomas was overdetained for 589 days because a DOC records clerk increased his sentence from a court-ordered two years to a new sentence of five years. *Thomas v. Gryder,* M.D. La. 17-cv-01595-SDD-EWD.

    c. <u>James Chowns</u>. DOC Record Analyst Cheryl Schexnayder calculated Mr. Chowns' sentence to be 10 years instead of the 5 years as set forth by the Court. As a result, Mr. Chowns was overdetained by 960 days. *Chowns v. LeBlanc,* Parish of Caldwell, 37th JDC, Suit No. 26,932.

    d. <u>Ronald Joseph</u>. In 2005, the State of Louisiana paid Ronald Joseph $25,000 because he'd been held past his release date.

    e. <u>Kenneth Owens</u>. Mr. Owens was overdetained by DOC for 1,256 days because of miscalculation in good time credit. The DOC settled with Owens for $130,000. *Owens v. Stadler,* W.D. La. 08-cv-00768-JTT-JPM.

85. Additional data points are found in a review of partial public records of payouts from the State of Louisiana's Department of Administration. Those records show in 2003, the State of Louisiana paid an inmate who had been held 1,213 days past a release date. In 2009 the State of Louisiana paid an inmate who had been held past a release date.  The State of Louisiana paid an inmate who was not released until November 17, 2011 which was approximately ten to thirteen months pass his court-ordered release date. In 2014, the State of Louisiana paid an inmate who had been held 90 days past a release date.

86. Most damningly, the DOC's own counsel has admitted to the DOC's pattern of overdetention. On March 8, 2018, Attorney General Jeff Landry wrote an op-ed conceding that there "**is a layer of incompetence so deep that the Corrections Department doesn't know** where a prisoner is on any given day of the week or **when he should actually be released from prison.**"[10]

---

[10] Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018) (emphasis added).

V.      **CLAIMS FOR RELIEF**

**Count One – Violation of Due Process Pursuant to U.S.C. 42 § 1983**
**(All Defendants)**

87. Plaintiff realleges and incorporates each and every foregoing paragraph.

88. The Fourteenth Amendment Due Process Clause is violated where a prisoner remains incarcerated after the legal authority to hold him has expired. *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980). No privilege enables a jailer to detain a prisoner beyond the period of his lawful sentence. *Whirl v. Kern,* 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

89. Once a prisoner's sentence has expired, his jailor has a reasonable amount of time to process and release him. That reasonable time, however, must be well short of forty-eight hours. *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin."*). That is because once a detainee is ordered released, the public's interest in his prompt release is even greater, and the constitutional tolerance for "administrative delay" is substantially less than in the context of arrestees awaiting probable cause determinations. *See Berry v. Baca,* 379 F.3d 764, 771-72 (9th Cir. 2004); *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir.2003); *Powell v. Barrett*, 376 F.Supp.2d 1340, 1353 (N.D.Ga. 2005).

90. Within the 48-hour period, however, it is often a question for juries what is reasonable or unreasonable. *See, e.g., Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (resulting in $100,000 jury verdict (upheld on appeal) for plaintiff for 1 hour overdetention at court holding cell and 2 ½ hours at jail after release order); *Barnes, supra,* ("[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."); Arline v. City of Jacksonville, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two and a half hour detention

following acquittal presented jury question under Fourth Amendment).

91. Here, the Judge clearly established Rodney's right to liberty on June 30, 2016, by sentencing him to one year in prison, credit for the seven years he previously served.

92. The Judge reaffirmed this right when she asked OPSO to expedite processing for Rodney's release.

93. For the third time, the Judge made his right to liberty unequivocally clear when the she called Sheriff Gusman and Warden Stinson to ask why Rodney had not been released.

94. That right was made quadruply clear when the Judge vacated Rodney's sentence and replaced it with "CREDIT FOR TIME SERVED."

95. It was quintuply made clear when the Judge called and emailed Irma Ray and Kanedra Burton at the DOC.

96. Defendants had knowledge of Rodney's liberty interest. The Sheriff's counsel, Blake Arcuri, wrote an email that was sent to Defendants Gusman, Holt, and Amacker, that Rodney "really shouldn't have to actually serve any time once DOC processes it."

97. But the Orleans Parish Sheriffs Office Defendants have instituted a policy of indefinite detention for certain persons in their care. When a criminal defendant is sentenced and ordered to the custody of the Department of Public Safety & Corrections, they do not immediately turn that person over to the custody of the DPS&C. Instead, they hold the person indefinitely until the DPS&C tells them otherwise. The Orleans Parish Sheriff's Office Defendants use this policy even when they know it results in overdetention – as with Rodney Grant. In Rodney's case, that policy of indefinite detention resulted in at least ten days of overdetention.

98. The fact that Rodney was not released for twenty-seven days after his sentence expired, after factoring in the reasonable amount of time to effectuate his release, means that he was overdetained for a period of more than twenty-five days.

99. As a result of the overdetention described in this Count, Rodney suffered loss of liberty, great

mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries.

100.    By depriving Rodney of his fundamental right to liberty, Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As Defendants were acting under the color of state law, Plaintiff's claims are actionable under 42 U.S.C. § 1983.

**Count Two – Failure to Adopt Policies**
**(James LeBlanc)**

101.    Plaintiff realleges and incorporates each and every foregoing paragraph.

102.    "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir.1992).

103.    Defendant James LeBlanc is the Secretary and final policy-maker of the Department of Public Safety & Corrections.

104.    Mr. LeBlanc has not adopted any policy for the DOC requiring the immediate calculation of inmates' sentences.

105.    As a result, inmate sentences are calculated in an *ad hoc* manner after the DOC receives custody. Sometimes it takes months for the DOC records staff to get around to calculating an inmate's sentence.

106.    But there is a whole class of inmates for whom their sentence must be calculated immediately to avoid overdetention – those who were sentenced to credit for time served and who spent at least that much time in jail before trial.

107.    Therefore, it is the obvious consequence of Mr. LeBlanc's failure to adopt policy that a whole class of inmates would be overdetained. Rodney Grant was in that class.

108.    Unless Mr. LeBlanc fashions a new policy for the DOC, people will continue to be predictably illegally incarcerated in Louisiana prisons.

109.      This failure to adopt policy is corroborated by the Louisiana Legislative Auditor. On October 25, 2017, the Legislative Auditor released a report detailing an audit it had conducted into the Department of Public Safety & Corrections' management of inmate information. The report was entitled "Management of Offender Data: Processes for Ensuring Accuracy."  Rec. Doc. 45-2. The Auditor found that the "DOC does not have any policies, procedures, manuals, or agency-wide guidance that details the correct ways to calculate release dates." *Id.* at 13.

110.      In failing to adopt policy to prevent predictable overdetention, Mr. LeBlanc acted with deliberate indifference. This is evidenced by the fact that each week, for year after year, his staff would discover inmates that were supposed to be free – and yet Mr. LeBlanc did not create policy to fix the problem.

## Count Three – Failure to Train
### (James LeBlanc Only)

111.      Plaintiff realleges and incorporates each and every foregoing paragraph.

112.      A supervisor may be liable for failure to supervise or train if: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009).

113.      Mr. LeBlanc did not train or supervise his subordinates in such a way as to require the immediate calculation of inmates' sentences.  Nor did he train or supervise them in such a way as to triage inmates, focusing staffing resources on those inmates who had been sentenced with credit to time served.  Nor did he train or supervise them to immediate issue a certificates of release for qualifying inmates upon receipt of paperwork from sheriffs departments of inmate paperwork, thus avoiding the need to bring inmates physically into DOC custody who should be released.

114.      As a result, inmate sentences are calculated in an *ad hoc* manner after the DOC receives custody. Sometimes it takes months for the DOC records staff to get around to calculating an inmate's

sentence.

115.     But there is a whole class of inmates for whom their sentence must be calculated immediately to avoid overdetention – those who were sentenced to credit for time served and who spent at least that much time in jail before trial.

116.     Therefore, it is the obvious consequence of Mr. LeBlanc's failure to train and supervise that a whole class of inmates would be overdetained. Rodney Grant was in that class.

117.     In failing to adopt policy to prevent predictable overdetention, Mr. LeBlanc acted with deliberate indifference. This is evidenced by the fact that each week, for year after year, his staff would discover inmates that were supposed to be free – and yet Mr. LeBlanc did not change his training or supervision to fix the problem.

### Count Four - Violations of the Louisiana Constitution
### (All Defendants)

118.     Plaintiff realleges and incorporates each and every foregoing paragraph.

119.     Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

120.     By reason of the same conduct that violated Rodney's federal constitutional rights, Defendants violated his state constitutional rights to liberty and due process.

121.     This conduct resulted in Rodney's overdetention and caused the physical, emotional and pecuniary damages as described above and below.

### Count Five – State Law False Imprisonment
### (All Defendants)

122.     Plaintiff realleges and incorporates each and every foregoing paragraph.

123.     June 30, 2016, legal authority to detain Rodney expired when the Judge sentenced him to credit for time previously served. The time Rodney previously served exceeded the duration of the sentence the Judge imposed. Several Defendants were put on actual notice that Rodney "really shouldn't have to actually serve any time once DOC processes it."

124.     Defendants intentionally detained Rodney when they held him in OPP until July 12,

2016, and then from July 12, 2016, to July 27, 2016, in  Elayn Hunt Correctional Center and MPCC.

125.     Defendants falsely imprisoned Rodney when they unlawfully detained him.

**Count Six – State Law Negligence**
**(All Defendants)**

126.     Plaintiff realleges and incorporates each and every foregoing paragraph.

127.     Defendants' conduct of overdetention described above caused Rodney's harms as

described above and below.

128.     Due to their professional roles as jailors, Defendants owed duties to avoid overdetention

to the persons in their custody, including Rodney. *Porter v. Epps,* 659 F. 3d 440, 445 (5th Cir. 2011) (a

jailor has "not only the duty to protect a prisoner, but also the duty to effect his timely release.")

129.     These duties were breached by Defendants' acts and omissions, including the failure to

timely release Rodney even after repeated inquiries by the Judge.

130.     The risks and harms that the Defendants caused were within the scope of protection

afforded by the duties they owed to Plaintiff.

131.     As a result of Defendants' acts and omissions, Rodney suffered actual, forseeable harm.

**Count Seven – Failure to Intervene**
**(All Defendants)**

132.     Plaintiff realleges and incorporates each and every foregoing paragraph.

133.     In the manner described above, during the constitutional violations described herein, one

or more of the Defendants stood by without intervening to prevent the violation of Rodney's

constitutional rights, even though they had the opportunity to do so.

134.     As a result of the Defendants' failure to intervene to prevent the violation of Rodney's

constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. Defendants had

ample, reasonable opportunities to prevent this harm but failed to do so.

## Count Eight - *Monell* and Supervisory Liability
### (Sheriff Gusman and Secretary LeBlanc)

135.     Plaintiff realleges and incorporates each and every foregoing paragraph.

136.     The misconduct described above was caused by the policies, practices, and customs of Defendants, in that their employees and agents regularly overdetain persons who are subject to release.

137.     The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

138.     The policies, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

139.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents.

140.     Furthermore, the Orleans Sheriff Defendants have an explicit policy of indefinite detention of inmates, regardless of their release date, until they receive word from the Department of Public Safety & Corrections to bring the inmates to Baton Rouge.

## Count Nine – *Respondeat Superior*
### (Sheriff Gusman and Secretary LeBlanc)

141.     Plaintiff realleges and incorporates each and every foregoing paragraph.

142.     While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of Sheriff Gusman and Secretary LeBlanc  within the scope of their employment.

143.     Defendants Sheriff Gusman and Secretary LeBlanc are therefore liable as principals for all torts committed by their agents.

**Count Ten – Indemnification**
**(Sheriff Gusman and Secretary LeBlanc)**

144.    Plaintiff realleges and incorporates each and every foregoing paragraph.

145.    Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

146.    While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of Sheriff Gusman and Secretary LeBlanc within the scope of their employment.

147.    Sheriff Gusman and Secretary LeBlanc are therefore obligated by Louisiana statute to pay any judgment entered against its employees.

## VI.    <u>RELIEF REQUESTED</u>

148.    The Plaintiff requests a trial by jury.

149.    Wherefore Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

a.   Declaratory relief;

b.   Judgment against Defendants for Plaintiff's asserted causes of action;

c.   Injunctive relief against Defendants to end their practice of overdetention;

d.   Award of compensatory damages;

e.   Award of special damages;

f.   Award costs and attorney's fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 28 C.F.R. § 35.175, and 29 U.S.C. § 794a(b);

g.   Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

RODNEY GRANT, by and through his counsel,

/s/ William Most_____
WILLIAM MOST
La. Bar No. 36914
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
Email: williammost@gmail.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2018, a copy of the Plaintiff's *Second Amended Complaint* was

filed electronically with the Clerk of Court via the CM/ECF system.  Notice of this filing will be sent to

all counsel of record by operation of the court's electronic filing system.

_/s/William Most_____
William Most