UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RODNEY GRANT, <br><br> Plaintiff, <br> v. <br><br> MARLIN GUSMAN, *et al.*, <br><br> Defendants. | Case No. 17-cv-2797-NJB-DMD |

**Memorandum in Support of Plaintiff's Motion for Sanctions, or in the Alternative, to Compel Preservation and Production of Documents**

Plaintiff files this motion to address the Department of Public Safety & Corrections ("DOC") Defendants' spoliation of evidence. This is a case about Defendants' practices of overdetaining people incarcerated in the State of Louisiana.

In discovery, Defendants denied that they had any documents showing a pattern of overdetention. But that was false – they did have such documents. Through public records requests, Plaintiff learned that the DOC was using those documents to ask the federal government for money to address the problem of overdetention.

Now, Plaintiff has learned that DOC Defendants has been destroying their data regarding their overdetention of people incarcerated in Louisiana. Specifically, Defendants' counsel explained that:

> the information is constantly "overwritten" with new information as it is inputted into DOC's wider database. The previous information that has been overwritten is not stored in any sort of archive, and no changes to these fields are tracked. **As such, all past information is no longer available**.[1]

Because DOC Defendants have engaged in spoliation throughout the entirety of the discovery period, Plaintiff respectfully requests, (1) an adverse inference in favor of Plaintiff on

---

[1] Ex. 6 (emphasis added).

1

the issue of a pattern of overdetention and (2) monetary sanctions for the fees and costs of discovery and the legal costs of this motion. In the alternative, Plaintiff requests that this Court compel Defendants to produce the data in question and, if necessary, extend the discovery deadline for the limited purpose of allowing Defendants time to produce the data.

## I.     BACKGROUND

**A.     The DOC Failed to Identify or Produce Documents in Their Possession Related to Overdetention – But Used them to Ask the Federal Government for Money.**

In discovery in this case, Plaintiff asked for "All documents regarding or related to DOC prisoners overdetained, held past their legal release date, and/or who had their sentences calculated incorrectly and as a result served longer than their sentence, from 2010 to the present."[2] Defendants denied that they had any pattern of overdetention,[3] and declined to turn over any documents showing a pattern.[4] They also did not identify any documents related to a pattern of overdetention in their initial disclosures.[5]

But although they refused to identify them or produce them, the DOC <u>did</u> have documents showing a pattern of overdetention. And they were using those documents to ask the federal government for money to address the pattern of overdetention.

Plaintiff's counsel obtained a clue about these hidden documents from the DOC's public comments on television. In March 2019, the DOC's counsel Jonathan Vining appeared on Louisiana Public Broadcasting and provided comment about the overdetention problem.[6] Mr.

---

[2] Ex. 9 at RFP 20.
[3] Ex. 8 at Request for Admission 58 (denying that "Over the last ten years, there has been a pattern of overdetention of inmates by the Louisiana Department of Public Safety & Corrections.")
[4] Ex. 9 at RFP No. 20.
[5] Ex. 10.
[6] Louisiana Public Broadcasting, Louisiana: The State We're In, Season 42, Episode 25 (March 1, 2019), available online at https://video.lpb.org/video/louisiana-the-state-were-in-312019-v4fnii/

Vining acknowledged that inmate release needs to "happen better" and in a "more efficient way," and referenced a federal grant the DOC had applied for to address the problem.[7]

Plaintiff's counsel requested and obtained the DOC's grant application through a public records request.[8] The grant application admitted a pattern of overdetention, explaining that:

> In 2017, DPS&C had an average of 200 cases per month considered an 'immediate release' due to these deficiencies. . . A review of these releases indicate the offenders were held in custody an average of 49 days past the date that they would have been eligible for a diminution of sentence release.[9]

Based on the information in the grant application, Plaintiff's counsel submitted further public records requests which resulted in the DOC turning over more documents (none of which had been provided in discovery). One such document was a 2012 DOC investigation that found <u>more than 2,000 inmates per year</u> were being held an average of 71.7 days past their release date.[10] The Secretary of the Department of Public Safety & Corrections admitted that he had been personally informed of the results of the investigation:[11]

```
Q.   But you learned that thousands of people in
     the custody of the Department of
     Corrections for whatever reason were being
     held past their release date, correct?
A.   I did.
```

The other document, most relevant to this motion, was a February 2019 "pull" document.[12] The February 2019 pull document is a printout of data gathered from CAJUN, the DOC's electronic record management system. It lists data about the release dates of two hundred and

---

[7] *Id.*
[8] Ex. 1.
[9] *Id.* at 4.
[10] Ex. 2 at 18.
[11] Ex. 11 (Deposition of Secretary LeBlanc) at 48.
[12] Ex. 3. The DOC redacted names and DOC numbers from this version of the pull document.

3

thirty-one DOC inmates held past their release date in one month, with an average of 44.69 "days over." Counsel for the DOC described the document as follows:

> Last month, the department of corrections said, 231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free, with most of the delay coming while DOC waited on paperwork from local officials, according to Vining.[13]

On July 31, 2019, DOC counsel confirmed that for some inmates, the "days over" data in the pull document can "give some insight into how many days he was incarcerated past his legal release date."[14]

The DOC was made aware that this data is relevant to currently pending lawsuits in at least three ways: (1) communications between counsel,[15] (2) descriptions of the data in the complaints of some overdetention lawsuits,[16] and (3) references to the data by a federal judge in an order in an overdetention case.[17]

## B. The DOC Is Deleting Much of Its Overdetention Data "On an Ongoing Basis Without Any Backup," and Has Refused to Stop Deleting It.

Because of the relevancy of this data, Plaintiff propounded discovery requests for additional pull documents for months other than February 2019.[18] Data regarding the on-going nature of the overdetention problem is relevant to Plaintiff's claim for injunctive relief and punitive damages. But on December 13, 2019, DOC counsel explained providing such data would be impossible because:

> DOC's preclass record, master record, description record, and time computation records continuously update with new data and do not catalog past information. If you will, the information is constantly "overwritten" with new information as it is inputted into DOC's wider database. **The previous information that has been**

---

[13] Emily Lane and Richard Webster, *Edwards, prison officials pledge fix to stop people being detained past their release date*. Times-Picayune (March 28, 2019).
[14] Ex. 4.
[15] E.g., Ex. 18 (describing the pull document data as useful, and making definitional inquiries).
[16] *See, e.g.*, *Hicks v. DPS&C*, 19-cv-00108-SDD-RLB, R. Doc. 16 (May 15, 2019) at ¶ 61.
[17] *Traweek v. Gusman*, 2019 WL 5430590, fn. 10 (E.D. La. 10/23/2019)
[18] Ex. 5 (Responses to Requests for Production).

>  **overwritten is not stored in any sort of archive**, and no changes to these fields are tracked. As such, **all past information is no longer available.**

Ex. 6 (emphasis added).

Two hours later, Plaintiff's counsel identified this as a spoliation issue, and asked that the DOC "start preserving and producing that data each month into a Pull Document, the way that Jonathan did in February."[19] The DOC declined, citing a case interpreting Fed. R. Civ. Proc. 34 and stating, "it is my understanding that this is not something my client is obligated to do. Specifically, capturing and compiling this data essentially amounts to a request that we create documents that do not exist. A request such as this is impermissible."[20]

Plaintiff's counsel responded by explaining that the issue was one of preservation and spoliation, not interpretation of a discovery request.[21] Specifically, Plaintiff asked the DOC to:

1. Confirm to me by 5:00 p.m. tomorrow that the data is no longer being overwritten;

2. Provide to us a snapshot of the current state of the data, along the lines of the February 2019 data pull, and a snapshot for each month going forward;

3. Provide any reasons why we should not seek spoliation sanctions.[22]

At that point, the DOC backtracked. On December 20, 2019 the DOC counsel said that the data "is not deleted, or 'impossible' to obtain."[23] (Compare with his statement two days prior that the data was "overwritten" and "all past information is no longer available."[24])

---

[19] Ex. 7.
[20] Ex. 14.
[21] Ex. 13.
[22] *Id.*
[23] Ex. 17.
[24] Ex. 6.

5

On December 23, 2019, Plaintiff submitted a discovery request asking for "All data for all DOC inmates who meet the criteria for inclusion in the February 2019 Pull Document, but for all other months from January 2012 to the present."[25]

On January 3, 2020, the parties held a telephonic meet and confer. Defendants' counsel said, "Yes, there were people were past their release dates, and that's always happened. And yes that's a constitutional violation, no question."[26] But she contended that there are many reasons why people are being overdetained, and not all of them may fit within an overall pattern.[27]

Plaintiff's counsel asked if the DOC would provide the data underlying the pull document. The DOC said no. Plaintiff's counsel asked if the DOC would provide access to the database, so that Plaintiff's counsel could pull the data themselves. The DOC said no.[28] So as a third alternative, Plaintiff's counsel asked:

> whether the DOC would create pull documents once a month, similar to the Feb 2019 one, as a compromise way of preserving the information. This would be less burdensome than providing the full CAJUN dataset, and would be less burdensome than doing daily pulls.[29]

On January 16, 2020, the DOC said it would not do that either.[30] The DOC also confirmed that "some of the data in that pull document **is being deleted on an ongoing basis without any backup**. And the rest of the data is only backed up on paper, in a form that renders it prohibitively difficult to recreate."[31]

On February 3, 2020, Plaintiff took the deposition of a DOC 30(b)(6) representative regarding the spoliation. She confirmed that the data source for the pull document, the DOC's

---

[25] Ex. 12 at RPD 36.
[26] Ex. 15.
[27] *Id*.
[28] *Id.*
[29] *Id.*
[30] Ex. 16.
[31] Ex. 16 (emphasis added).

6

electronic CAJUN system, overwrites data without saving a copy. She testified that some of the data may be printed out and saved in paper form, but she wasn't sure.[32]

She also testified that a pull document of this type needs to be created as close to the time frame as possible to ensure the greatest accuracy. She testified that "the closer we are to the time frame, the more accurate the [pull] document will be," because as time passes, the incarceration period changes, and the "records [in CAJUN] would be for the current incarceration period rather than the previous incarceration period." If, today, the DOC created a pull document for six months ago, for example, "it would either be inaccurate or [someone would] have to go back and get all the paper records," which "would be laborious," "much, much more work than [] just looking at the most recent month," and would require "a whole team of people."

C. **The DOC Is Refusing to Provide the Relevant Data or Access to the Database — and They Continue to Delete the Data**

On January 22, 2020, Defendants formally refused to provide any further pull documents, objecting on grounds of vagueness, particularity, undue burden, and "the defense of Qualified Immunity."[33] (But see this Court's ruling that "Plaintiff has met his burden in demonstrating that Secretary LeBlanc is not entitled to qualified immunity in this case."[34])

That same day, Plaintiff's counsel called Defendants' counsel to conduct a meet and confer regarding the refusal to produce the pull documents. Defendants' counsel declined to discuss that topic by telephone, and asked that the meet-and-confer occur in writing. So Plaintiff sent a meet and confer email in an effort to resolve Defendants' objections.[35] Defendants never responded.[36]

---

[32] Plaintiff will supplement this motion with the deposition transcript once received.
[33] Ex. 19 at 2-3.
[34] Rec. Doc. 66 at 23.
[35] Ex. 20.
[36] Ex. 21 at ¶ 9.

In sum, as of the date of filing of this motion, the following facts are true:

- The DOC agrees that the data underlying the pull document "give some insight into how many days [an inmate] was incarcerated past his legal release date."[37]

- Some of that data is "being deleted on an ongoing basis without any backup." The rest is "backed up on paper, in a form that renders it prohibitively difficult to recreate."[38]

- Plaintiff has asked that the DOC preserve that data, and has requested it be provided in discovery.[39]

- The DOC refuses to provide the data.[40]

- The DOC refuses to provide access to the database.[41]

- The DOC refuses to preserve the data in pull document form.[42]

Accordingly, Plaintiff files this motion for sanctions or, in the alternative, to compel the preservation and production of the data in question.

**D.    Procedural Background.**

Mr. Grant filed his complaint on April 2, 2017.[43] On April 10, 2018, he filed the currently-operative Second Amended Complaint.[44] Mr. Grant alleges that the DOC and Secretary LeBlanc committed the torts of false imprisonment and negligence, and violated his state and federal due process rights by imprisoning him beyond his court-ordered sentence.[45] He also alleges that Secretary LeBlanc caused the torts and constitutional violations via the failure to adopt proper policies and conduct proper training of employees,[46] and is liable pursuant to *Monell* for the

---

[37] Ex. 4.
[38] Ex. 16 (emphasis added).
[39] Ex. 7, 12, 13.
[40] Ex. 16
[41] Ex. 16.
[42] Ex. 16
[43] Rec. Doc. 1.
[44] Rec. Doc. 48.
[45] Rec. Doc. 48 at ¶¶ 88 to 125.
[46] Rec. Doc. 48 at ¶¶ 101 to 117.

constitutional violations and *respondeat superior* for the state torts.[47] He also pleads claims against the Orleans Parish Sheriff's Office.

On April 24, 2018, DOC Defendants filed a motion to dismiss.[48] On August 14, 2018, the Court granted the motion in part as to "Plaintiff's federal law claims against Warden Hooper," but denied the motion as to Secretary LeBlanc.[49] The Court further ruled that "Plaintiff has met his burden in demonstrating that Secretary LeBlanc is not entitled to qualified immunity in this case."[50] From January 7, 2019 to June 4, 2019, the case was stayed due to DOC counsel's military service.[51]

## II.  DISCUSSION

Plaintiff respectfully requests that this Court (A) impose sanctions on Defendants for spoliation of evidence, or, in the alternative, (B) compel Defendants to preserve and produce the data pull documents that Plaintiff has requested.

### A.  Sanctions Are Appropriate Because the DOC Has Spoiled, and Continues to Spoil, Evidence that Is Relevant to Plaintiff's Claims, and the Spoliation is Intentional.

Rule 37(e) of the Federal Rules of Civil Procedure addresses the failure to preserve electronic information, and provides sanctions even in the absence of bad faith. The sanctions range up to the entry of a default judgment. Specifically, the rule provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

---

[47] Rec. Doc. 48 at ¶¶ 135-143.
[48] Rec. Doc. 49.
[49] Rec. Doc. 66.
[50] *Id*. at 23.
[51] Rec. Docs. 89-90.

>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

FRCP 37(e).

Here, Plaintiff seeks the sanction of an adverse inference (as well as fees) against the DOC because (i) the DOC is actively engaged in spoliation of evidence relevant to Plaintiff's claims, and (ii) the spoliation is intentional.

**B.    The DOC Is Destroying Evidence Relevant to Plaintiff's Claims**

The DOC's routine and continuing deletion of the relevant data amounts to spoliation because (a) it had and has a duty to preserve the information, (b) it has culpably breached that duty, and (c) that breach results in prejudice to Plaintiff.[52]

    a.    <u>The DOC Had and Has a Duty to Preserve the Data</u>

A party's duty to preserve evidence "arises when the party has notice that the evidence is relevant to litigation."[53]

Here, the DOC had and has a duty to preserve the data in question because Plaintiff has provided them with notice on multiple occasions and in multiple forms that the evidence in the data is relevant to this litigation. Plaintiff's counsel described the data as "crucial" and specifically requested that it be preserved going forward in emails dated December 13 and 18, 2019,[54] and the

---

[52] *Hunt v. Marquette Transp. Co. Gulf-Inland, LLC*, No. 09-6055, 2011 U.S. Dist. LEXIS 100401, at *3 (E.D. La. Aug. 4, 2011).

[53] Connelly v. Veteran's Adminsitration Hospital, 12-cv-02660-NJB-KWR, Rec. Doc. 48 at *8 (E.D. La., May 15, 2014); see also *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006) (A party's duty to preserve "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.")

[54] Ex. 7, 13.

10

DOC conceded that the data can "give some insight into how many days [an inmate] was incarcerated past his legal release date."[55]

Additionally, descriptions of the data were included in the complaints of other overdetention lawsuits in Louisiana, and a federal judge referenced the data in an order in a similar overdetention case.[56] Moreover, the DOC should have suspended its routine data deletion policy to ensure the preservation of relevant data from the time that Plaintiff alleged a pattern of overdetention in Louisiana.[57] Because the DOC has had extensive notice that the data in the pulls is relevant to this litigation, it had and has a duty to preserve that data.

> b. The DOC Has Culpably Breached, and Continues to Breach, Their Duty to Preserve the Data.

Because Plaintiff's counsel has explicitly informed the DOC on multiple occasions that the data is relevant (even "crucial") to the litigation and explicitly requested that the DOC not continue to delete the data without preserving it in some usable form, Plaintiff has cause to believe that the DOC is acting "a desire to suppress the truth," and is therefore culpably breaching its duty to preserve. *Consol. Aluminum Corp.*, 244 F.R.D. at 344. The continued deletion cannot be said to be merely the result of routine practices or oversight in light of Plaintiff's repeated insistence that the data is relevant and must be preserved. Therefore, the breach is intentional.

The fact that some of the data is being preserved in paper format does not absolve the DOC or protect Defendants from spoliation sanctions. The DOC has indicated that the data preserved in paper format is "in a form that renders it prohibitively difficult to recreate."[58] Therefore, because

---

[55] Ex. 4.
[56] *See, e.g.*, *Hicks v. DPS&C*, 19-cv-00108-SDD-RLB, R. Doc. 16 (May 15, 2019) at ¶ 61; *Traweek v. Gusman*, 2019 WL 5430590, fn. 10 (E.D. La. 10/23/2019)
[57] *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y.2003) (*"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."*)
[58] Ex. 16.

the data that is backed up on paper is "inaccessible," it is spoliated even though it is not completely destroyed or deleted.[59]

      c.      <u>The DOC's Breach Results in Prejudice to Plaintiff</u>

The DOC's deletion of the relevant data prejudices Plaintiff because the data is crucial in proving a pattern of overdetention in Louisiana, a central claim in Plaintiff's second amended complaint. Defendants have denied that "[o]ver the last ten years, there has been a pattern of overdetention of inmates by the Louisiana Department of Public Safety & Corrections."[60] The pull documents (or the data used to produce them) would prove such a pattern. Further, for Plaintiff's injunctive relief claim requires proof that the problem is ongoing. Therefore, the DOC's refusal to preserve that data greatly prejudices Plaintiff.

      d.      <u>An Adverse Inference is an Appropriate Sanction Because the DOC's Spoliation Is Being Committed Intentionally</u>

This Court has held that when evidence is "intentionally destroyed," an adverse inference is the "preferred sanction."[61] This adverse inference rule "derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction."[62] Accordingly, to restore the prejudiced party, an adverse inference "plac[es] the risk of an erroneous judgment on the party that wrongfully created the risk."[63]

---

[59] *In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. MDL No. 6:11-md-2299, 2014 U.S. Dist. LEXIS 13307, at *94-95 (W.D. La. Jan. 27, 2014) (concluding that "all evidence destroyed or lost **or rendered inaccessible** for any reason . . . constitutes spoliated evidence") (emphasis added).
[60] Ex. 8 at Request for Admission 58.
[61] *Connelly v. Veteran's Adminsitration Hospital*, 12-cv-02660-NJB-KWR, Rec. Doc. 48 at *8 (E.D. La., May 15, 2014), *citing Vodusek v. Bayline Marine Corp.*, 71 F.3d 148, 155–56 (4th Cir. 1995); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3rd Cir. 1994) (reviewing the historical development of the spoilation of evidence doctrine).
[62] *Connelly, supra, citing Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), *cert. denied*, 531 U.S. 1078 (2001).
[63] *Id.*

In this instance, an adverse inference is an appropriate sanction because (1) the DOC is entirely at fault for the spoliation and is spoiling intentionally, (2) Plaintiff suffers a great degree of prejudice as a result, and (3) a lesser sanction will not avoid substantial unfairness to Plaintiff.[64] As explained above, Plaintiff's counsel has explicitly and repeatedly informed the DOC that the data is relevant and must be preserved — thus, the DOC is entirely at fault and is continuing to delete the data intentionally. The DOC's spoliation prejudices Plaintiff because the data being spoiled is crucial in proving a claim that Defendants have denied, and without the sanction of an adverse inference, Plaintiff will incur greater cost in showing that there is a pattern of overdetention in Louisiana.

Furthermore, Defendants have engaged in bad faith in their objections. One of their grounds for refusing to provide the requested data is that "the defense of Qualified Immunity has been raised."[65] But in 2018, this Court <u>denied</u> qualified immunity, ruling that "Plaintiff has met his burden in demonstrating Secretary LeBlanc is not entitled to qualified immunity in this case."[66] When Plaintiff asked whether Defendants "have any authority suggesting that the invocation of qualified immunity is a bar to discovery even after it is denied," Defendants did not even respond.[67]

And Defendants have also engaged in bad faith more broadly. In this lawsuit, Defendants denied that "there has been a pattern of overdetention of inmates by the Louisiana Department of Public Safety & Corrections."[68] But the DOC admitted the pattern in detail when asking the U.S.

---

[64] See *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. at 339-40; *see also Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005) ("The Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith' or 'bad conduct.'").
[65] Ex. 19 at 2-3.
[66] Rec. Doc. 66 at 23.
[67] Ex. 20.
[68] Ex. 8 at RFA 58.

Department of Justice for money to address the problem.[69] It is definitionally bad faith to deny a problem in court to avoid liability, and then admit the problem privately to ask for money.

For all these reasons, Plaintiff respectfully asks this Court to impose sanctions for Defendants spoliation in the form of an adverse inference in Plaintiff's favor on the issue of the pattern of overdetention, as well as monetary compensation for the fees and costs of discovery and the legal costs of this motion.

**B.     In the Alternative, This Court Should Compel the DOC to Preserve and Produce the Documents that Plaintiff Requested.**

If this Court does not impose the sanction of an adverse inference against Defendants, Plaintiff requests that, in the alternative, this Court grant Plaintiff's motion to preserve and compel the production of documents responsive to Plaintiff's request for "data for all DOC inmates who meet the criteria for inclusion in the February 2019 Pull Document, but for all other months from January 2012 to the present."[70]

The above discovery request is relevant and proportional, as Plaintiff has alleged a pattern of overdetention in Louisiana over the past decade, and Defendants have denied that allegation.[71] After serving the request, Plaintiff's counsel met and conferred with Defendants' counsel and asked (1) whether the DOC would provide the data underlying the pull document, (2) whether the DOC would provide access to the database so that Plaintiff's counsel could pull the data himself, or (3) whether the DOC would create pull documents once a month moving forward. The DOC refused all three options.[72]

---

[69] Ex. 1 at 3 *et seq.*
[70] Ex. 12 at RPD 36.
[71] Ex. 8 at Request for Admission 58 (denying that "Over the last ten years, there has been a pattern of overdetention of inmates by the Louisiana Department of Public Safety & Corrections.").
[72] Ex. 15, 16.

Creating the pull documents going forward would not be outrageously burdensome to the DOC. The DOC's 30(b)(6) representative testified at deposition that, depending on which data was requested, creating a overdetention pull document for the most recent month would take her a few hours or perhaps one work day.

Plaintiff therefore respectfully requests an order requiring Defendants to respond to Plaintiffs' above-referenced discovery request prior to the close of discovery or prior to an extended discovery deadline set at this Court's discretion.

### III.  Conclusion

For the reasons above, Plaintiff respectfully requests that this Court impose sanctions on Defendants or compel them to respond to Plaintiff's discovery request.

> Respectfully submitted,
>
> /s/ William Most_____
> WILLIAM MOST, La. Bar No. 36914
> 201 St. Charles Ave., Ste. 114, # 101
> New Orleans, LA 70170
> T: (504) 509-5023
> Email: williammost@gmail.com