## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RODNEY GRANT, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 17-cv-2797-NJB-DMD |
| | ) |
| MARLIN GUSMAN, *et al.*, | ) |
| | ) |
| Defendants. | ) |

### Memorandum in Support of Plaintiff's Motion for Summary Judgment Against OPSO Defendants

### INTRODUCTION

It is black-letter law that a "jailer has a duty to ensure that inmates are timely released from prison."[1] Thus, "[n]o privilege enables a jailer to detain a prisoner beyond the period of his lawful sentence."[2]

But here, the Orleans Parish Sheriff Office ("OPSO") Defendants had a policy and practice of holding certain people indefinitely – even those they know should be free.

When a person in Orleans Parish was sentenced to the custody of the Department of Public Safety & Corrections ("DOC"), OPSO did *not* immediately hand that person over to the DOC. They did not even immediately hand the person's paperwork over the to the DOC. Instead, OPSO's explicit, written policy was – and is – to wait and drive the paperwork to the DOC only once a week, and only on Thursdays. The policy directs that:

> 9. An ISB deputy picks up the completed packets every Thursday for delivery to the Department of Corrections Headquarters in Baton Rouge, Louisiana.[3]

But OPSO admits that some people are eligible for immediate release upon sentencing.[4] As

---

[1] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).
[2] *Whirl v. Kern*, 407 F. 2d 781, 791 (5th Cir. 1968).
[3] Ex. G (OPSO Policy 501.13) at 6.

a result, the OPSO policy of driving paperwork only once a week *necessarily* results in a pattern of overdetention. ("Overdetention" is defined as a people being held in prison past their legal release date.[5])

Then, after sending the paperwork to the DOC, OPSO holds the sentenced people in jail indefinitely until the DOC sends for them. This sequence can take weeks or more, causing further overdetention for any person eligible for immediate release upon sentencing.

In 2016, Plaintiff Rodney Grant was one of these overdetained persons. On June 30, 2016, he plead guilty in Orleans Criminal District Court. Judge Camille Buras sentenced him to one year, with credit for time served for seven years he had already spent in prison.

According to Judge Buras, it was the "clear intention of all parties when the defendant plead guilty was to have this credit for time served sentence result in a release."[6] So she asked the Sheriff's Office to expedite Mr. Grant's processing. Sheriff Gusman was personally informed that Rodney Grant "really shouldn't have to actually serve any time once DOC processes [him]."[7]

Pursuant to their only-drive-paperwork-on-Thursdays policy, OPSO waited a <u>full week</u> before driving Mr. Grant's paperwork to the DOC. And then they held Mr. Grant another five days beyond that before delivering him to the DOC.

As a result, the undisputed facts show that Mr. Grant was held in the OPSO jail for twelve days past the end of his sentence. Accordingly, and for the reasons that follow, Mr. Grant is entitled to judgment as a matter of law against OPSO Defendants on two claims – false imprisonment and violation of his Fourteenth Amendment rights.

---

[4] Ex. B at RFA 20; Ex. C at 74 ("Q. So there are some persons sentenced to DOC time eligible for immediate release because they've been given credit for time served, and they  have already served that time? A. Right.")
[5] *See Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010) ("Plaintiff's claim falls into a category of claims which unfortunately have become so common that they have acquired their own term of art: 'overdetention,' " i.e., when "the plaintiff has been imprisoned by the defendant for longer than legally authorized, whether because the plaintiff's incarcerative sentence has expired or otherwise.")
[6] Rec. Doc. 129-22 (Judge Buras Emails) at 2.
[7] Ex. M at 1.

# I. Background

## A.   *Factual Background*

## 1.   OPSO Has a Duty to Ensure the Timely Release of the People in its Jail.

It is a jailer's "obligation is to see that the sentence imposed is the sentence served."[8] And

the jailer therefore "has a duty to ensure that inmates are timely released from prison."[9] Thus,

"[n]o privilege enables a jailer to detain a prisoner beyond the period of his lawful sentence."[10]

OPSO agrees; according to its 30(b)(6) representative:

- It is "the job of OPSO to protect all of the rights" of a person in its jail, "whether they're pretrial or sentenced to the custody of the parish or sentenced to the custody of the DOC."[11]

- It is "OPSO's responsibility to make sure there aren't any people in the jail that should be free."[12]

- "[I]f OPSO has someone locked up in the jail, OPSO needs to know that, in fact, they should be locked up."[13]

- "OPSO has a responsibility to ensure that they only incarcerate the persons that they have the legal authority to incarcerate."[14]

- "OPSO is responsible to release persons in their custody when their sentence is complete."[15]

## 2.   OPSO Had a Policy and Practice of Only Driving Inmates' Paperwork to the DOC Once a Week, and then Indefinitely Detaining the Inmates Thereafter.

Sheriff Gusman is the keeper of the jail of Orleans Parish.[16] As such, he is responsible for

---

[8] *State ex rel. Pierre v. Maggio*, 445 So.2d 425, 426 (La.1984).
[9] *Porter*, 659 F.3d at 445; *Whirl, supra*, 407 F. 2d at 792 (A jailor's functions "include not only the duty to protect a prisoner, but also the duty to effect his timely release.")
[10] *Whirl, supra*, 407 F.2d at 791.
[11] Ex. C at 21:16-23 ("Q. It's the job of OPSO to protect all of the rights of the person in the jail, not just some of the rights, correct? A. Correct. Q. That's true whether they're pretrial or sentenced to the custody of the parish or sentenced to the custody of the DOC in this jail, correct? A. Correct.").
[12] *Id.* at 22:21-23:2 ("Q. It's OPSO's responsibility to make sure there aren't any people in the jail that should be free, correct? . . . The Witness: Correct.")
[13] *Id.* at 23:4-7 ("Q. So if OPSO has someone locked up in the jail, OPSO needs to know that, in fact, they should be locked up, correct? A. Correct.")
[14] *Id.* at 24:21-24 ("Q. OPSO has a responsibility to ensure that they only incarcerate the persons that they have the legal authority to incarcerate, correct? A. Correct.")
[15] Ex. C at 24:21-25 ("Q. OPSO is responsible to release persons in their custody when their sentence is complete, correct? A. Correct.")
[16] Ex. F (Dep. of Sheriff Gusman) at 24:20-23.

the "care, custody, and control of incarcerated subjects, execut[ing] all the writs and orders of the courts, [and] conduct[ing] lawful investigations."[17]

At all times relevant to this case, Sheriff Gusman had a sheriff's deputy in each courtroom of the Orleans Parish Criminal District Court.[18] At the end of each day, those deputies would carry the paperwork from the courtroom back to the Sheriff's Office.[19] That same day, an OPSO employee would generate a "Letter of Credit" – a document showing how many days a person spent in jail awaiting trial.[20] (Also known as "jail credit.") Thus, "on the day of someone's sentencing, the sheriff's office has both the sentencing paperwork and has generated a Letter of Credit."[21] On the same day or the next day, the sentenced person would be processed by a deputy at the sheriff's office who fingerprinted them and entered their information into an electronic system.[22] That information included their sentence and jail credit.[23]  If the "jail credit is more than the sentence," the deputy would see it.[24]

But despite having just input the information into an electronic system, the information was not electronically transmitted to the Department of Corrections. Instead, the physical paperwork would be put into a box.[25] An OPSO deputy would pick up the paperwork from the box and – only once a week – drive it to the DOC headquarters.[26] This was pursuant to an explicit, written OPSO policy directing that a "deputy picks up the completed packets every Thursday for delivery to the Department of Corrections Headquarters in Baton Rouge,

---

[17] *Id*. at 24:14-19.
[18] Ex. C (OPSO 30(b)(6) Dep.) at 38:10-16.
[19] *Id*. at 38:17-25.
[20] *Id*. at 39:21-40:4.
[21] *Id*. at 40:5-12.
[22] *Id*. at 40-42.
[23] *Id*. at 51:11-20.
[24] Ex. C at 51:21-52:2.
[25] *Id*. at 43:6-12.
[26] *Id*. at 43:13-44:1. In 2016, at the time of Mr. Grant's sentencing, OPSO had the equipment to scan and email the packets to the DOC, but did not use it. *Id*. at 46:14-17.  Two years later, in September 2018, the process changed – OPSO began emailing the packets to the DOC. *Id*. at 43:19-22. The written policy, however, remains the same – it

4

Louisiana."[27]

At that point, OPSO would then hold the person until receiving a transfer document from the DOC.[28] This was literally indefinite detention; the OPSO representative testified that:

> Q.   OPSO just holds that person until they get the document from the DOC regardless of how long that takes, correct?
> A.   Correct.
> Q.   Could be a day, could be a week, could be a couple of weeks?
> A.   Yes.  There is no time frame, basically.
> Q.   It's an indefinite period of time, correct?
> A.   Correct.                                         [29]

Once OPSO received the transfer document from the DOC, OPSO would drive the sentenced person to the DOC's Elayn Hunt prison near Baton Rouge, on the date indicated by the DOC.[30] The sentenced person thus traveled to the DOC separately from their paperwork.[31]

**Fig. 1: OPSO 2016 Practice of Processing Inmates Sentenced to DOC Custody.**



OPSO receives sentence paperwork and creates letter of credit.

OPSO fingerprints and enters data into electronic database.

OPSO drives physical paperwork to DOC headquarters.

OPSO drives inmate to DOC.

**Date of Sentencing**  **By Next Day**  **The Next Thursday**  **Whenever DOC Directs**

---

still says only drive paperwork on Thursdays. *Id*. at 49:19-50:2. Even now that they email the packets, it still sometimes takes OPSO more than two days to send the information to the DOC. *Id*. at 59:16-60:8.
[27] Ex. G (Policy No. 501.13) at 6.
[28] Ex. C (OPSO 30(b)(6) Dep.) at 49:1-18 ("Q. It's an indefinite period of time, correct? A. Correct.")
[29] *Id*. at 49:9:17.
[30] *Id*. at 50:3-6.
[31] *Id*. at 50:12-14 ("Q. So it's just the inmate without their paperwork, correct? A. Correct."). *But see* Code of Crim. Proc. Art. 892 (C) ("All statements and documents required by this Article shall physically accompany any defendant when said defendant is transferred to a penal institution").

This policy applied to all inmates sentenced to the custody of the DOC. OPSO admits it had no process for "identifying those inmates who might be subject to earlier . . . release and prioritizing them," unless flagged by a judge or OPSO attorneys.[32] But although it did not do so, OPSO *could* identify those inmates. It had a calculator in its electronic system that would compare a sentence to jail credit and, if the latter is more than the former, would "show that person is eligible for release."[33] OPSO testified that there is no reason it could not use that calculator for persons sentenced to the custody of the DOC:

> Q.   Is there any reason OPSO couldn't use that also for people sentenced to the custody of the Department of Corrections?
> A.   No, sir.[34]

**B.      OPSO Concedes its Paperwork-Transfer Policy Violates State Law and DOC Guidelines.**

OPSO's chosen process – driving paperwork once a week to the DOC, and then separately transporting the inmate once they hear back from the DOC – violates both state law and the DOC's guidelines.

Louisiana Code of Criminal Procedure, Art. 892 (C), explicitly requires that an inmate's paperwork travel <u>with the inmate</u>. That article specifies that: "All statements and documents required by this Article shall physically accompany any defendant when said defendant is transferred to a penal institution."[35]

OPSO's chosen process also violates the DOC's Basic Jail Guidelines. Those guidelines define the handling of DOC inmates in parish custody, and were established to "assure that the fundamental constitutional rights of [DOC] offenders housed in local jails would not be

---

[32] Ex. C at 58:25-59:15.
[33] *Id.* at 72:22-73:13.
[34] *Id.* at 73:10-13.
[35] Code of Crim. Proc. Art. 892 (C).

6

jeopardized."[36] The Basic Jail Guidelines specify that "The offender records shall be transferred with the offender <u>at such time</u> the offender is transferred to another local or [DOC] facility."[37]

Thus, both state law and the DOC have instructed the sheriff to send the inmate at the same time as the documents. But that's not how OPSO does it.[38] Instead Sheriff has chosen a process that violates the law and the state guidelines – he sends the paperwork, and then waits an indefinite period of time before sending the inmate without their paperwork.[39] OPSO concedes that in doing so, it is not following the law:

```
        Q.   So OPSO isn't following the law related
    to prison transfer, is it?
        A.   Based on that, I guess not.
```
[40]

3.    **On June 30, 2016, Rodney Grant was Sentenced and Eligible for Immediate Release. But OPSO Took Seven Days to Drive his Paperwork to the DOC. And They Took Another Five Days Before Driving Mr. Grant to the DOC.**

On June 27, 2016, Plaintiff Rodney Grant was arrested on a fifteen-year-old-warrant.[41] On June 30, 2016, Mr. Grant plead guilty in Orleans Parish Criminal District Court.[42] Judge Camille Buras sentenced him to a one-year DOC sentence, with "credit for time served from 9-14-08 to 2015."[43] From 2008 to 2015, Mr. Grant had been incarcerated for approximately seven years,[44] and the judge gave him credit for that time.[45]

---

[36] Ex. D (Basic Jail Guidelines) at 2.
[37] *Id.* at 17 (emphasis added).
[38] Ex. C (OPSO 30(b)(6) Dep.) at 61:16-25 ("Q. That's not how OPSO does it? A. No, it's not.")
[39] *Id.* at 50:12-14 ("Q. So it's just the inmate without their paperwork, correct? A. Correct."); *Id.* at 49:16-18 ("Q. It's an indefinite period of time, correct? A. Correct.")
[40] Ex. C at 72:19-21.
[41] Ex. S (capias warrant issued November 29, 2000. Rodney Grant arrested June 27, 2016.)
[42] *Id.*
[43] Ex. H at 1 (minutes of court); Ex. B at RFA 3; Ex. P (Dep. of DOC 30(b)(6) witness) at 28:23-29:1.
[44] Ex. B at RFA 1; Ex. P at 29:25-30:4 ("Q. Would you agree that he spent multiple years in DOC custody between 2009 and 2015? A. Yes. Q. Definitely more than one year? A. Correct."); Ex. B at RFA 1 ("Defendant will admit that Exhibit K reflects that plaintiff was arrested on 09142008 and bonded on 06252015.")
[45] Ex. J (Sentencing Transcript) at 8-9.

According to Judge Buras, the "clear intention of all parties when the defendant plead guilty was to have this credit for time served sentence result in a release."[46] Accordingly, Judge Buras personally asked OPSO employee Blake Arcuri to expedite the processing of Rodney Grant's paperwork.[47] Mr. Arcuri agreed to relay this request to OPSO staff.[48] Judge Buras explained to Mr. Grant on the record:

> As I explained yesterday and I told you when I talked to Mr. Arcuri, he was here in court, he is going to try to expedite your paperwork so that it doesn't take the normal couple of weeks for classification. So I'm going to send him a picture of the plea form right now and we will get that going for you.[49]

As OPSO agrees, the Judge's expectation was that Rodney Grant "should be released as soon as possible."[50] But OPSO did not release Mr. Grant. Instead, they transported him back to the Orleans jail.

The same day, Mr. Arcuri wrote an email to Defendant Sheriff Gusman, Defendant Sidney Holt, and several other OPSO employees.[51] The email was forwarded to Defendant Amacker.[52] In the email, Mr. Arcuri explained about Mr. Grant that:

> Judge Buras has asked that we expedite this DOC processing. This is an inmate who had a capias out of criminal court a decade ago, but it was not entered into NCIC. He went to Lafayette, got convicted, served his sentence, and was released without ever coming to Orleans. He was picked up when getting a driver's license and is now pleading on the Orleans charge to a consecutive sentence. Thus, he really shouldn't have to actually serve any time once DOC processes it.[53]

---

[46] Rec. Doc. 129-22 (Judge Buras Emails) at 2.
[47] Ex. I at Response to Interr. No. 5 ("Judge Buras asked Blake Arcuri to request expedited processing of Rodney Grant's paperwork, and Blake Arcuri agreed to relay this request to OPSO staff."); Ex. B at RFA 5; Ex. L at 1.
[48] *Id.*
[49] Ex. J at 10.
[50] Ex. C at 100:10-12.
[51] Ex. M.
[52] Ex. L.
[53] Ex. M at 1 (emphasis added).

The phrase, "really shouldn't have to actually serve any time once DOC processes it" meant that once DOC processed Mr. Grant, he would be eligible for release.[54] Thus, everyone who received the email from Mr. Arcuri – including Sheriff Gusman – was "informed that once the DOC did the calculation, Mr. Grant would be eligible for release."[55]

Sheriff Gusman responded that "Once he enters a plea and is sentenced, we can get DOC to compute his time."[56] Mr. Arcuri emphasized that OPSO did not need to move "with lightning speed," but that it should not take "longer than it has to."[57]

This all happened on a Thursday. Mr. Grant's paperwork was completed the next day.[58] And so, per OPSO Policy 501.13, he had to wait for a full week – until the next Thursday – for the next run of packets to the DOC.[59] On the next Thursday, July 7, 2016, the Orleans Parish Sheriff's Office drove Mr. Grant's paperwork to the DOC.[60]

Five days later, on July 12, 2016, OPSO drove Mr. Grant to the DOC to be processed.[61] Due to further delays caused by the DOC, Mr. Grant was finally released on July 27, 2016,[62] twenty-seven days after his legal release date. Twelve of those days of overdetention were in the physical custody of the Orleans Parish Sheriff's Office.

---

[54] Ex. C at 102:4-11 ("Q. So the phrase, "Really should not have to actually serve any time once DOC processes it," did that indicate that once DOC processed Mr. Grant, he would be eligible for release? . . . THE WITNESS: Correct.")

[55] Ex. C at 103:4-12 ("Q. So everyone on that e-mail chain was being informed that once the DOC did the calculation, Mr. Grant would be eligible for release, correct? . . . THE WITNESS: Correct.")

[56] Ex. M at 1.

[57] Ex. L at 1.

[58] Ex. R (Dep. of Corey Amacker) at 32:16-18 ("Q. So what steps did you take to pre-classify him? A. I did it the next day.")

[59] Ex. G (Policy No. 501.13) at 6.

[60] Ex. O (Pre-class packet stamped "RECEIVED Jul 7 2016"); Ex. P (Dep. of DOC 30(b)(6) Witness) at 44:20-25 ("Q. So that stamped received July 7th means the DOC got the PreClass packet on July 7th . . . ? A. Correct."); Rec. Doc. 129-18 (DOC admission that "On July 7, 2016, the DOC received a packet of Rodney Grant's documents."); Ex. R (Dep. of Corey Amacker) at 18:13-21 ("It says that 'The Pre-class packet without the Bill of Information was received on July 7, 2016,' is that correct? A. Correct. Q. Do you have any reason to believe that Warden Hooper is incorrect in stating that that's when he received the packet? A. I don't have any reason to believe that, no."), 33:17-34:1 ("Q. So you said you have no way to verify when the packet got to DOC? A. I don't have -- you asked me when I got it up there. I don't remember exactly what the date was or what day we sent it up. Q. Okay. We can look at the calendar, which might help to jog your memory. A. July 7.")

[61] Ex. B (OPSO RFAs) at RFA 11; Rec. Doc. 129-18 (DOC RFAs) at RFA 21.

[62] Ex. B at RFA 13.

**Fig. 2: OPSO Handling of Rodney Grant.**



**B.     Procedural Background**

Rodney Grant filed a complaint on April 2, 2017 against OPSO Defendants Sheriff Marlin N. Gusman, Chief Carmen Desadier, Major Sidney Holt, and Captain Djuana Bierria.[63] On June 14, 2017, Plaintiff filed a First Amended Complaint releasing Chief Desadier and Captain Bierria from the case, and adding Corey Amacker.[64]  On April 10, 2018, he filed the currently-operative Second Amended Complaint.[65]

In that complaint, Mr. Grant alleges that the OPSO and Sheriff Gusman committed the torts of false imprisonment and negligence and violated his state and federal due process rights by imprisoning him beyond his court-ordered sentence.[66] He also alleges that Sheriff Gusman caused the torts and constitutional violations via the failure to adopt proper policies and conduct proper training of employees,[67] and is liable pursuant to *Monell* for the constitutional violations and *respondeat superior* for the state torts.[68] He also pleads claims against Secretary LeBlanc of the DOC.

---

[63] Rec. Doc. 1.
[64] Rec. Doc. 16.
[65] Rec. Doc. 48.
[66] Rec. Doc. 48 at ¶¶ 88 to 147.
[67] Rec. Doc. 48 at ¶¶ 101 to 117.
[68] Rec. Doc. 48 at ¶¶ 135-143.

10

On August 14, 2018, this Court granted in part and denied in part OPSO's motion to dismiss.[69] The Court granted with regard Plaintiff's Section 1983 claims for monetary relief against OPSO Defendants in their individual capacities and denied all other parts of the motion.[70]

As a result, there are currently state law damages claims against the three OPSO Defendants (Gusman, Amacker, and Holt), as well as Section 1983 declaratory and injunctive relief claims against Sheriff Gusman in his individual and official capacities. There are also Section 1983 damages claims against Sheriff Gusman in his official capacity via *Monell*.[71]

From January 7, 2019 to June 4, 2019, the case was stayed due to DOC counsel's military service.[72]

## II. Legal Standard

### A.  *Legal Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[73] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[74] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[75] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists, and the moving party is entitled to judgment

---

[69] Rec. Doc. 67.
[70] *Id*. at 25.
[71] *See* Exhibit A (Table of Claims).
[72] Rec. Docs. 89-90.
[73] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[74] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398–99 (5th Cir. 2008).
[75] *Galindo v. Precision Am. Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075

as a matter of law.[76]

"[A] nonmoving party is not entitled to rest on his pleadings, but must carry his burden of providing evidence of a genuine issue of material fact."[77] "That burden can be met by depositions, answers to interrogatories and admissions on file and affidavits."[78] The Fifth Circuit has "repeatedly held that self-serving affidavits, without more, will not defeat a motion for summary judgment."[79] However, a nonmovant's deposition testimony is often considered by a court in recognizing that a genuine issue of material fact exists, which precludes summary judgment.[80] The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[81] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[82] To withstand a motion for summary judgment, the nonmoving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[83] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[84] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that

---

[76] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

[77] *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992) (*citing Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)); *see also Celotex*, 477 U.S. at 325.

[78] *Id.* (*citing* Fed. R. Civ. P. 56(c)).

[79] *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed.Appx. 306, 307 (5th Cir. 2011) (per curiam) (citing *DirectTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005); *United State v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001)).

[80] *See, e.g., Vetter v. Frosch*, 599 F.2d 630 (5th Cir. 1979); *see also, e.g., King*, 974 F.2d at 656 (5th Cir. 1992).

[81] *Celotex*, 477 U.S. at 323.

[82] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

[83] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1996)).

cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[85]

### III.   Argument

**A.   OPSO Defendants Committed the Tort of False Imprisonment When They Held Rodney Grant Past the End of his Sentence.**

The tort of false imprisonment occurs when one "restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority."[86] In Louisiana, false imprisonment is not an intentional tort.[87] As a result, "[m]alice is not a necessary element of the tort of false imprisonment and is immaterial except as it may affect the question of damages."[88] Thus, the elements of false imprisonment under Louisiana law are: (1) proof of imprisonment, and (2) lack of legal authority to detain.[89]

In regard to intent, there "is no requirement of proving that the confinement be intentional."[90] Specifically for jailers, there is no requirement for knowledge or intent because a jailer has the "obligation is to see that the sentence imposed is the sentence served."[91] A jailer need not have any personal knowledge that the prisoner is being held unlawfully:

> The fact that the jailer is without personal knowledge that the prisoner is held unlawfully does not constitute a defense to an action for false imprisonment. . . . . In such circumstance, as in the one before us, ignorance of the law is no excuse."[92]

---

[84] *Little*, 37 F.3d at 1075.
[85] Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987)
[86] *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La., 1977); *see also Miller v. Desoto Regional Health Sys.*, 128 So.3d 649, 655-56 (La. App. 3d Cir. 2013).
[87] *McMasters v. Dep't of Police*, 172 So.3d 105 (La. App., 2015) ("We have, moreover, on prior occasion indicated that civil false imprisonment is not an intentional tort.")
[88] *Edmond v. Hairford*, 539 So.2d 815, 817 (La. App. 1989).
[89] *McMasters*, 172 So.3d at 116.
[90] *Prisk v. Palazzo*, 95–1475, pp. 4–5 (La.App. 4 Cir. 1/19/96), 668 So.2d 415, 417.
[91] *State ex rel. Pierre v. Maggio*, 445 So.2d 425, 426 (La.1984).
[92] *Whirl v. Kern*, 407 F. 2d 781, 791 (5th Cir. 1968), *cert. denied*, 396 U.S. 901 (1969).

Further, a jailor is on <u>constructive notice</u> of court proceedings.[93] Thus, a jailer who lacks legal authority to detain is sufficient for the second element of false imprisonment: "There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence."[94]

The Fifth Circuit instructed that if is undisputed that a person was held past their legal release date, a district court should issue a "directed verdict as to liability, and [leave] for the jury only the issue of damages."[95] That is the case here, and both elements of false imprisonment have been met.

The first element of false imprisonment (proof of imprisonment) is met here because OPSO agrees that Mr. Grant was in its custody from June 30, 2016, after sentencing, to July 12, 2016.[96] OPSO agrees that it was "Rodney Grant's physical jailor between the date of his arrest and date of transfer to DOC."[97]

The second element false imprisonment (lack of legal authority to detain) is met because Mr. Grant's sentence with credit for time served was complete on the day of his sentencing. He was given a one-year sentence, with credit for the seven years he served between 2008 and 2015.[98] As Judge Buras explained, this sentence was supposed to "result in a release."[99] The

---

[93] *Whirl, supra*, 407 F.2d at 793 ("We find on the record before us that Sheriff Kern was chargeable with constructive notice of the termination of all proceedings against Whirl, or alternatively, that absence of such notice was not a legal justification for Whirl's continued imprisonment.")

[94] *Whirl, supra*, 407 F.2d at 791 ("[N]on-malicious restraint is no sweeter than restraint evilly motivated, and we cannot sanction chains without legal justification even if they be forged by the hand of an angel. . . . Sheriff Kern had an unyielding duty to know his prisoner's sentence time, and this duty was not discharged.") *See also Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) ("[A] jailer has a duty to ensure that inmates are timely released from prison.").

[95] *Whirl, supra*, 407 F.2d at 793.

[96] Ex. B (OPSO Responses to Requests for Admission) at No. 11 (Admitted that "On July 12, 2016, the DOC took custody of Rodney Grant from OPSO.")

[97] Ex. I at RFA 15. Furthermore, it is undisputed that Mr. Grant was held against his will. *See* Ex. N at 2 (Grievance by Mr. Grant that "Im being held on a 16yr. old warrant i was arrested 6/27/16 i need to be placed on the court docket ive got a job im trying to keep i cant afford to wait 30 days to be placed on the court docket.Thank You." (*sic.*))

[98] Ex. H (court minutes) at 1; Ex. J (sentencing transcript).

[99] Rec. Doc. 129-22 (Judge Buras emails) at 2; *see also* Ex. F (Dep. of Sheriff Gusman) at 67:7-68:3 ("A. If they spent a year in our facility and they got sentenced to a year, and they got credit for time served, it would seem that that – that year is complete, yes. Q. And the Sheriff's office has the information to see that, correct? A: Yes.") (objections omitted).

Sheriff agrees that such a person "is eligible for release upon sentencing,"[100] and if they were "entitled to be released" the Sheriff would not "have the legal authority to continue to detain them."[101] Indeed, once the DOC calculated Mr. Grant's time, it determined that he must serve <u>negative</u> 2,329 days,[102] because his "his jail credit is thousands of days longer than his sentence."[103] Thus, Mr. Grant was eligible for release on June 30, 2016.

With both elements met pursuant to undisputed facts, Mr. Grant is entitled to a judgment as a matter of law on the allegation that OPSO Defendants falsely imprisoned Plaintiff.

OPSO has, in the past, argued for a <u>new</u> element of false imprisonment – that a plaintiff must show the jailor received a "valid release order" from a third party. In their motion to dismiss, OPSO Defendants argued that "the Orleans Parish Sheriff's Office was stripped of any power to release Rodney Grant absent a valid release order received from the Department of Corrections."[104] However, this is simply the converse of having legal authority to detain, and it is undisputed that OPSO had no legal authority to detain Mr. Grant.

Further, this Court has already rejected that argument. In denying OPSO's motion to dismiss, this Court found that Plaintiff stated a claim by alleging that OPSO's retains persons sentenced to the custody of the DOC even after the end of their sentence.[105] Federal law also flatly contradicts OPSO's argument: according to the Fifth Circuit a "jailer has a duty to ensure that inmates are timely released from prison."[106] Nor can a jailer delegate ensuring liberty to a

---

[100] Ex. F at 75:18-76:1.
[101] Ex. F at 84:6-85:8.
[102] Rec. Doc. 129-26 (Time Computation Worksheet).
[103] Ex. P at 87:19-22 (emphasis added).
[104] Rec. Doc. 25-1 at 7.
[105] Rec. Doc. 67 at 23-24.
[106] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011); *Douthit v. Jones*, 619 F.2d 527, 535 (5th Cir. 1980) (quoting *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) ("a jailer . . . most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.")

third party.[107]

Also, OPSO's precise argument was rejected by the Fifth Circuit in *Jauch v. Choctaw County*.[108] In that case, the defendant sheriff argued that another entity – the court that issued the warrant – was the party truly responsible for plaintiff's overdetention.[109] The Fifth Circuit's response was unambiguous: "This is simply wrong. Sheriff Halford is responsible for those incarcerated in his jail . . . and the capias did not require him to impose the unconstitutional detention policy."[110] And even if the Sheriff were correct in his novel legal theory, that still would not excuse the week-long period that it took for OPSO to deliver Mr. Grant's documents to the DOC.

OPSO Defendants falsely imprisoned Plaintiff. Summary judgment should issue.

**B.    OPSO Defendants Were Deliberately Indifferent to Rodney Grant's 14th Amendment Rights by Approving and Carrying-Out Policies that Necessarily Resulted in the Overdetention of Mr. Grant.**

The Fourteenth Amendment forbids states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]"[111] To prove a Fourteenth Amendment violation, a plaintiff must show a defendant acted with deliberate indifference to the deprivation of

---

[107] *See Blumel v. Mylander*, 954 F. Supp. 1547, 1556–57 (M.D.Fla. 1997) (corporate policy of private jail operator not to release anyone without a judge's order, even if there has been no probable cause determination, was deliberately indifferent to constitutional rights); cf. *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705 (11th 1985) ("Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service. In that sense, the county's duty is non-delegable"; characterizing *Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir.1982) as making "clear that where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy"); *Gil v. Vogilano*,131 F.Supp.2d 486, 493 (S.D.N.Y. 2001) ("a municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care", citing *Ancata, supra*); *Henderson v. Harris*, 672 F.Supp.1054, 1064 (N.D.Ill. 1987) (holding U.S. liable under FTCA for inadequate medical care of prisoner; "[c]ontracting with private health services agencies will not relieve the federal government from its constitutional obligation. The non-delegability of this duty applies to both state and federal governments"). *See also McCormick v. City of Wildwood*, 439 F.Supp. 769, 776 (N.J.1977); *Covington v. Westchester County Jail*, 1998 WL 26190, 3-4 (S.D.N.Y.1998).
[108] 874 F.3d 425 (5th Cir. 2017).
[109] *Id*. at 436.
[110] *Id*. at 436-37.
[111] U.S. Const., Amend. XIV.

constitutional rights.[112] Here, OPSO Defendants deprived Mr. Grant of his constitutional right to a timely release from prison. And OPSO Defendants exhibited deliberate indifference both by their subjective knowledge of Mr. Grant's overdetention and also by establishing policies and procedures that would necessarily result in overdetention.

1. <u>OPSO deprived Mr. Grant of his established constitutional right to timely release from prison.</u>

The due process clause of the Fourteenth Amendment  is "implicated in cases of continued incarceration… beyond the term of a court-ordered sentence[]."[113] The Fifth Circuit has interpreted the Fourteenth Amendment to mean that "there is a clearly established right to timely release from prison."[114] Thus, "over detention, or detention absent (or beyond the expiration of) legal process, violates an incarcerated person's right to due process."[115]

 Once a court has issued a sentence, the person has a constitutional right to not be held beyond that sentence.[116] That does not mean, however, that a jailor is "instantly liable" or must release an inmate within the same moment the sentence ends.[117] Instead, the jailor is allowed a <u>reasonable time</u> to effect the release.[118]

---

[112] *Porter*, 659 F. 3d at 446.

[113] *Terry v. Hubert*, 609 F.3d 757, 763 (5th Cir. 2010),

[114] *Porter*, 659 F.3d at 445 (5th Cir. 2011); *see also* Rec. Doc. 66 (denying qualified immunity to Secretary LeBlanc) at 25.

[115] *Traweek v. Gusman*, 19-cv-01384-MLCF-JVM, 2019 WL 5430590, *6 (E.D. La., Oct. 23, 2019), *citing Jauch* v. *Choctaw County,* 874 F.3d 425 (5th Cir. 2017), *Terry v. Hubert, 609 F.3d 757, 763 (5th Cir. 2010), and Whirl* ("There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence.")

[116] *Terry v. Hubert, supra; see also Douthit, Whirl, supra; Sandin v. Conner*, 515 U.S. 472 (1995) (States may "create liberty interests which are protected by the Due Process Clause."); *Shorts v. Batholomew*, 255 Fed Appx 46, *52 (6th Cir. 2007) (inmate's 14th Amendment due process rights violated when he was held  past the term of his credit-for-time-served sentence).

[117] *Traweek v. Gusman*, 2019 WL 5430590 (E.D. La., Oct. 23, 2019) (one day period of over detention – failing to effect release "until the afternoon of the following day" – states claim and is sufficient to defeat qualified immunity).

[118] Rec. Doc. 46 at 21 (Order Denying Motion to Dismiss), *quoting Whirl, supra*, 407 F.2d at 792 (a jailer's "duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained.")

Courts interpret "reasonable time" as very short – on the order of thirty minutes to a few hours and in some circumstances a day or two.[119] Thus, courts have held that overdetention beyond two days is presumptively unreasonable. If the release is within forty-eight hours, reasonableness is a jury question.[120]

This Court previously pointed to *Baker v. McCollan* as suggesting that perhaps more than a few days might be reasonable. But as this Court pointed out, *Baker* was about a person "stopped for a routine traffic violation and arrested on a facially valid warrant."[121] Thus, *Baker* was not a case of overdetention at all – it was instead a case about law enforcement's "failure to institute adequate identification procedures."[122]  (Because *Baker* is not an overdetention case, the court in *Douthit v. Jones*[123] cited *Baker* only for the purpose of distinguishing its facts from *Baker*. The case is not cited at all in Fifth Circuit overdetention cases like *Porter v. Epps*[124], *Terry v. Hubert*[125], *Jones v. Lopez*[126], etc.)

Thus, *Baker* does not disturb the general pattern that a constitutional violation occurs

---

[119] *See Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir.1988) ("We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish — in this case perhaps a number of hours."); *Driver v. Marion County Sheriff*, 859 F.3d 489, 491 (7th Cir. 2017) (granting class cert in overdetention claim because "[e]vidence in the record indicates that the average time period to effect such a release is 2–4 hours in counties in general, and up to 6 hours if problems are encountered, but even if we doubled those times, release still would be accomplished within 12 hours"); *Arline v. City of Jacksonville*, 359 F. Supp. 2d 1300, 1310 (M.D.Fla. 2005) (two and a half hour detention following acquittal presented jury question).

[120] *See Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin*. . . . '[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment.'" quoting *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir.2004); *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (jury verdict for plaintiff for half-hour overdetention at court holding cell and two and a half hours at jail after release order ); *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (whether 11 hours was reasonable was a question of fact for jury); *Green v. Baca,* 306 F.Supp.2d 903, 918 (C.D.Cal.2004) (12 ½ hour delay not reasonable as a matter of law; summary judgment denied); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994) (3 hours); *Parilla v. Eslinger*, 2005 U.S. Dist. LEXIS 34747 (D. Fla. 2005) (approximately 5 hours after court ordered released and 14 hours after family paid bond*); Muick v. Jasso*, No. 3:02-CV-1089-L, 2003 WL 22054226, at *1 (N.D. Tex. Apr. 3, 2003) (labeling plaintiff's claim for fifty-minute overdetention as nonfrivolous).

[121] Rec. Doc. 47 at 23.

[122] 443 U.S. 137, 142 (1979).

[123] 619 F.2d 527, 532 (5th Cir. 1980), reh'g denied 641 F.2d 345, 346 (5th Cir. 1981).

[124] 659 F.3d 440 (5th Cir. 2011).

[125] *Terry v. Hubert*, 609 F.3d 757 (5th. Cir., 2010).

[126] 262 F. Supp. 2d 701 (W.D. Tex. 2001).

after a reasonable period of overdetention, not to exceed 48 hours. As one court found in a wide-ranging survey:

> The Court has been unable to find *any case*, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible. . . . Accordingly, based on the arguments and record currently before the Court, dismissal of Plaintiffs' over-detention claims on qualified immunity grounds would be improper.[127]

As these courts establish, for a jailer to detain a person for more than 48 hours after their legal sentence is a presumed constitutional violation. Under 48 hours, it is a jury question. As such, the fact that Mr. Grant was held in OPSO custody for 600% of the threshold (12 days) is a deprivation of his right to timely release.

2. OPSO exhibited deliberate indifference both by subjective knowledge of Mr. Grant's right to be free and by establishing policies and procedures that would necessarily result in the deprivation.

"Deliberate indifference requires that the official have subjective knowledge of the risk of harm."[128] And a "failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[129] Knowledge can be shown through either "actual or constructive notice."[130] However, in the end, a jailor is "chargeable with constructive notice of the termination of all proceedings" against an inmate.[131]

Here, OPSO had subjective knowledge of Mr. Grant's risk of overdetention and also adopted policies that would necessarily result in overdetention.

a. *OPSO had subjective knowledge of Mr. Grant's risk of overdetention*

---

[127] *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005) (emphasis added); *see also Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin.*")

[128] *Blank v. Eavenson*, 530 F. App'x 364, 368 (5th Cir. 2013) (*citing Wagner v. Bay City Texas*, 227 F.3d 316, 324 (5th Cir. 2000)).

[129] *Porter, supra*, at 446 (5th Cir. 2011) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir.1992)).

[130] *Id.* at 447, *quoting Connick v. Thompson*, 563 U.S. 51 (2011).

OPSO Defendants had both subjective and constructive knowledge that Mr. Grant was at risk of overdetention. OPSO knew that Mr. Grant was sentenced to time served, and had a copy of his sentencing paperwork. Mr. Grant was also specifically flagged to the Sheriff and other OPSO Defendants by their counsel's email that Mr. Grant "[r]eally should not have to actually serve any time once DOC processes it."[132] According to OPSO, Mr. Arcuri's phrase, "[r]eally should not have to actually serve any time once DOC processes it" indicated that once DOC processed Mr. Grant, he would be eligible for release.[133] The Sheriff personally confirmed this is his understanding:

> Q.    Okay. Well, what -- now that you've had a little bit more time to look at this email, what does that phrase mean to you, "really shouldn't have to actually serve any time once DOC processes it"?
>
> A.    I think once DOC processes it, then he would be released.
>
> Q.    Huh-huh.
>
> A.    That's what I understand from it.
>
> Q.    Yeah. So once they calculate his time, they'd see his sentence is up, they'd send a release, and he'd go free, correct?
>
> A.    Right. Well we call it emergency releases.
>
> Q.    And you responded, "we can get the DOC to compute his time," because you saw that this was someone who had a need to be expedited because they would be able to get out once their time is calculated, right?
>
> A.    Right, and the Judge asked that we expedite this DOC processing.[134]

But OPSO did not expedite Mr. Grant's processing. Instead, they followed the policy approved by the Sheriff. Per the policy, Rodney Grant's paperwork was driven to the DOC seven days later, on the next Thursday.[135] And then he was held another five days as OPSO waited to

---

[131] *Whirl, supra*, 407 F. 2d at 793.
[132] Ex. M.
[133] Ex. C at 102:4-11.
[134] Ex. F at 108:7-109:1.
[135] Ex. O; *see* Fn. 59, *supra*.

receive paperwork from the DOC.[136]

OPSO knew specifically that Mr. Grant was at risk of overdetention and deprived him of timely release anyway.

  *b. OPSO chose policies that necessarily resulted in overdetention.*

Even with specific knowledge of Mr. Grant's risk, OPSO followed their standard procedures. However, overdetention is a necessary consequence of the standard procedures for anyone whose time-served is equal to or longer than their sentence.[137] And Sheriff Gusman failed to set up any system to avoid this obvious risk of overdetention.

Per his written policy, paperwork was driven only once a week from New Orleans to Baton Rouge. Then, OPSO would wait indefinitely to receive a transfer document, and then would transport the inmate to DOC custody.  And the system was slow – according to OPSO employee Monique Fillmore, the "whole process takes about 2 weeks."[138] (Ms. Fillmore's response to learning an inmate "detained past his release date" was the following: "He has to wait!!!!"[139])

Thus, three specific elements of OPSO policy and practice necessarily resulted in overdetention for anyone whose time-served is equal to or longer than their sentence:

1. OPSO's choice not to release someone even after they know they have served more time than their sentence;

2. OPSO's choice to drive the paperwork to the DOC only once a week;

3. OPSO's choice to wait indefinitely to send that person to the DOC.[140]

It is obvious that such a system that could take "about two weeks" would always overdetain a

---

[136] Ex. B at RFA 11.
[137] Ex. B at RFA 20; Ex. C at 74:12-16 ("Q. So there are some persons sentenced to DOC time eligible for immediate release because they've been given credit for time served, and they have already served that time? A. Right.")
[138] Ex. K (Email from Monique Fillmore).
[139] *Id.*

person who is sentenced to time served and is eligible for release on the day of sentencing. It is also obvious that a system that takes "about two weeks" will lead to the likely consequence that such a person is overdetained by more than 48 hours.

Sheriff Gusman failed to set up a system by which persons sentenced to DOC time were quickly transferred to DOC custody. He failed even to set up a system by which their *paperwork* was quickly sent to the DOC, flag the paperwork as "ready for release," or flag the paperwork for expedited processing. He failed to set up any system that could allow for inmates sentenced to time served to be released in less than 48 hours.

Why did OPSO have this system? Why didn't OPSO release someone like Rodney Grant when they saw "the jail credit is more than the sentence"?[141] Because OPSO "speculat[es] that there might be something the DOC has that makes it more complicated than that."[142] Did OPSO have anything more than speculation? No – OPSO did not "know of anything that the DOC has to calculate in addition to those things" or anything that "makes it more complicated than" comparing the sentence to the jail credit.[143] Even if a person's sentence is just "time served," OPSO would not release them.[144]

But OPSO does not even know what the legal authority is to hold these people, or *if* there is any such authority:

---

[140]*Cf. Jauch v. Choctaw County*, 874 F. 3d 425, 435 (5th Cir. 2017) (it is "obvious that the indefinite detention procedure caused the due process violation Jauch complains of—indefinite detention.")
[141] Ex. C (OPSO 30(b)(6) Dep.) at 51:21-52:2.
[142] Ex. C at 54:9-17.
[143] Ex. C at 54:6-8.
[144] Ex. C at 55:5-56:13.

> Q.   Do you know what the legal authority is
> for the sheriff to continue to hold that person?
> A.   No, sir.
> Q.   Do you know if there is any legal
> authority for the sheriff to hold that person?
> A.   No, sir. [145]

OPSO knows that there are some persons sentenced to DOC time eligible for immediate release when those persons have been given credit for time served, and they have already served that time.[146] It knows that some of these people may be in its jail.[147] And yet it doesn't do *anything* to figure out whether these people are in its jail.[148] This is true even though OPSO concedes it is its "responsibility to make sure there aren't any people in the jail that should be free"[149] Sheriff Gusman also testified that "no individual can be held in jail in absence of legal authority to keep them there."[150]

As such, OPSO failed to adopt policies to cure the obvious consequence of overdetention as a result of its standard policies. Further, OPSO had subjective knowledge of Mr. Grant's risk of overdetention and still deprived him of a timely release.

c.   OPSO cannot benefit from a "good faith" defense.

Even under a deliberate indifference framework, subjective "good faith" is no excuse. As the Fifth Circuit explained in *Whirl,*

---

[145] Ex. C (OPSO 30(b)(6) Dep.) at 81:18-23.
[146] Ex. C (OPSO 30(b)(6) Dep.) at 74:12-16; Ex. B at RFA 21.
[147] Ex. C at 74:19-22.
[148] Ex. C at 75:4-76:1:

> Q. But OPSO isn't doing anything to do its own investigation to figure out whether there is any
> people in the jail sentenced to DOC time who are eligible for immediate release, correct?
> A. Correct.
> . . .
> Q. OPSO doesn't have any policies or practices to identify those people, correct?
> A. Correct.

[149] Ex. C at 22:21-23:2.
[150] Ex. F at 35:1-4.

> We do not find any cases nor are we referred to any by counsel which provide that "good faith" is a defense to an imprisonment that is not only without valid process, but contrary to it. Nor do we believe as a matter of federal policy that such a defense should be available to a jailer in circumstances like those before us. The responsibility for a failure of communication between the courts and the jailhouse cannot justifiably be placed on the head of a man immured in a lockup when the action of the court has become a matter of public record. Ignorance and alibis by a jailer should not vitiate the rights of a man entitled to his freedom. A jailer, unlike a policeman, acts at his leisure. He is not subject to the stresses and split second decisions of an arresting officer, and his acts in discharging a prisoner are purely ministerial. Moreover, unlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries. While not a surety for the legal correctness of a prisoner's commitment, he is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.[151]

Thus, the jailer is responsible for imprisonment without legal authority and "good faith" detention is no excuse to failure to execute a timely release.

And the fact that the OPSO has many inmates handle is no excuse. As the Fifth Circuit observed, "[t]he large number of incarcerated persons about whom [the jailer] must make decisions, while increasing his administrative burden, does not affect the scope of his narrow discretion to hold or release the individuals in his custody."[152] Accordingly, the Fifth Circuit issued this succinct directive:

> [W]e must never forget that we are dealing with a man's liberty, and a game of who has the paper and who saw the paper is not constitutionally playable.[153]

### CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court grant Plaintiff's Motion for Summary Judgment on two claims – the tort of false imprisonment and a 14th Amendment constitutional violation – against OPSO Defendants in their personal capacities, and Sheriff Gusman also in his official capacity.

---

[151] *Whirl*, 407 F.2d at 792 (internal citations omitted).

Respectfully submitted,

/s/ William Most_____
WILLIAM MOST, La. Bar No. 36914
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
Email: williammost@gmail.com

---

[152] *Douthit*, 619 F.2d at 535.
[153] *Whirl*, 407 F. 2d at 798.