1

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF LOUISIANA

3

4   RODNEY GRANT

5                          CIVIL ACTION
                           NO. 2:17-CV-2797
    VERSUS                 SECTION "G" (3)
6                          JUDGE BROWN
                           MAG. JUDGE KNOWLES, III
7   MARLIN GUSMAN, CARMEN DESADIER, SIDNEY HOLT,
    DJUANA BIERRIA, JAMES LEBLANC, TIMOTHY HOOPER,
8   CHRIS STINSON, LASALLE MANAGEMENT COMPANY, JOHN
    DOES 1-10, and ABC INSURANCE COMPANIES 1-10
9

10

11

12      DEPOSITION OF **RODNEY GRANT, ORLEANS PARISH**

13   **PRISON**, TAKEN IN THE OFFICES OF ORLEANS PARISH

14   PRISON, 2800A PERDIDO STREET, NEW ORLEANS,

15   LOUISIANA 70119, ON TUESDAY, THE 11TH DAY OF

16   SEPTEMBER, 2018, COMMENCING AT 9:19 A.M.

17

18

19

20

21

22

23   REPORTED BY:

24    MICHELLE VIDRINE-CORONA, CCR

25    CERTIFIED COURT REPORTER

EXHIBIT

A

2

1    APPEARANCES:

2

3      LAW OFFICE OF WILLIAM MOST
       ATTORNEYS AT LAW
4      BY: WILLIAM BROCK MOST, ESQ.
       201 ST. CHARLES AVENUE, SUITE 114#101
5      NEW ORLEANS, LOUISIANA 70710
       (ATTORNEYS FOR RODNEY GRANT)
6

7

8      LOUISIANA DEPARTMENT OF JUSTICE
       LITIGATION DIVISION
       BY: SCOTT CENTORINO, ESQ.
9      BY: PALVIN JHITA, ESQ.
       1450 POYDRAS STREET, SUITE 900
10     NEW ORLEANS, LOUISIANA 70112
       (ATTORNEYS FOR DEPARTMENT OF JUSTICE)
11

12

13     ORLEANS PARISH SHERIFF'S OFFICE
       LEGAL DEPARTMENT
14     BY: LAURA CANNIZZARO RODRIGUE, ESQ.
       BY: FREEMAN (PETE) R. MATTHEWS, ESQ.
15     421 LOYOLA AVENUE, SUITE 403
       NEW ORLEANS, LOUISIANA 70112
16     (ATTORNEYS FOR ORLEANS PARISH SHERIFF'S
       OFFICE)
17

18

19

20

21   ALSO PRESENT:
       REYNALDO KING, DEPUTY
       KIMBERLY LAZENAVE
22

23

24

25

3

1          E X A M I N A T I O N    I N D E X

2                                               PAGE

3    EXAMINATION BY MR. CENTORINO............5
     EXAMINATION BY MS. RODRIGUE..........102
4

5

6

7              E X H I B I T   I N D E X

EX. A MASTER PRISON RECORD...............14
8    EX. B COURT DOCUMENTS, CASE NO. 417-717,
         VIOLATION 14 62.2, JUNE 30, 2016 AND
9        JULY 18, 2016........................46

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michelle Vidrine-Corona, CCR
813 North Bengal Road, Metairie, Louisiana 70003
(504) 400-9321     micorona@cox.net

1                    S T I P U L A T I O N

2

3      IT IS STIPULATED AND AGREED by and between

4    counsel for the parties hereto that the

5    deposition of the aforementioned witness is

6    hereby being taken under the Federal Rules of

7    Civil Procedure, for all purposes, including

8    perpetuation, in accordance with law;

9      That the formalities of reading, signing,

10   certification and filing are specifically waived;

11     That all objections, save those as to the form

12   of the question and the responsiveness of the

13   answer, are hereby reserved until such time as

14   this deposition, or any part thereof, may be used

15   or sought to be used in evidence.

16

17             *    *    *    *    *    *

18

19     MICHELLE VIDRINE-CORONA, Certified Court

20   Reporter, in and for the Parish of Orleans, State

21   of Louisiana, officiated in administering the

22   oath to the witness.

23

24

25

1          **Rodney Grant,**

2    after having been first duly sworn by the

3    above-mentioned court reporter, did testify as

4    follows:

5    EXAMINATION BY MR. CENTORINO:

6          Q.    All right.   Mr. Grant, my name is Scott

7    Centorino.   I represent the state of Louisiana

8    and the state employees involved in this case.

9               Have you ever given a deposition before?

10         A.    Yes.

11         Q.    I'll give you some of the ground rules

12   just in case you've forgotten, one of them being

13   let's try not to speak over each other.   The

14   court reporter is going to write down everything

15   that both of us are saying and she can only write

16   down one of us at a time.   And as you just heard

17   her, try to speak up so that she can hear the

18   exact words clearly.

19               If you don't understand a question that

20   I ask, please ask me to repeat it or rephrase it.

21   I'm sure that will happen, so don't, you know, be

22   embarrassed or anything.   Let me know.   If you

23   don't ask me to do so, I'll assume that you do

24   understand the question.

25               If you need to take a break, just say

1   so, whether it's a bathroom break or otherwise.

2   I already said let's try and avoid talking over

3   each other.

4           At the end we'll go over the read and

5   sign procedures.  But otherwise, I'll go ahead

6   and just start with some housekeeping things.

7           So can you start by stating your full

8   name for the record?

9       A.    Rodney James Grant.

10      Q.    Where were you born?

11      A.    New Orleans, Louisiana.

12      Q.    Your date of birth?

13      A.    August 27, 1968.

14      Q.    Social Security number?

15      A.    ███████████.

16          MR. CENTORINO:

17              Did you want to redact certain parts

18  of it?

19          MR. MOST:

20              Yeah.  I mean, we have to by the

21  rules, so we'll have to redact it for the

22  deposition.

23  BY MR. CENTORINO:

24      Q.    Obviously, you're presently incarcerated

25  now and we'll get to that, but what was your

1    address, physical address before you were

2    incarcerated here at New Orleans Parish Prison?

3         A.    1801 Canal.

4         Q.    And how long did you live at 1801 Canal?

5         A.    14 months.

6         Q.    Do you have a driver's license?

7         A.    No, sir.

8         Q.    Are you married?

9         A.    No.

10        Q.    Have you ever been married?

11        A.    No.

12        Q.    Do you have any children?

13        A.    Yes.

14        Q.    What are their names?

15        A.    LaToya Russell.

16        Q.    Just the one?

17        A.    (Nods head affirmatively.)

18        Q.    And does she live in New Orleans as

19   well?

20        A.    No, sir.

21        Q.    Where does she live?

22        A.    Cleveland, Ohio.

23        Q.    Is she a Cav's fan?

24        A.    I don't know.

25        Q.    How about education, did you graduate

1    from high school?

2        A.    No, sir.

3        Q.    Where did you last attend school?

4        A.    Booker T. Washington.

5        Q.    Have you received any kind of trade,

6    licenses, or occupational licenses, or anything

7    like that?

8        A.    No.

9        Q.    Okay.  Let's get into the kind of the

10   meat of this.  I'm going to go through the

11   timeline.  I know it's kind of a complex

12   timeline, but I want to make sure I get your side

13   of it.

14            I'm going to go through it as it's

15   listed in your complaint here.  So I'll tell you

16   something and I want to make sure it's accurate,

17   and I want to kind of have your version of it.

18            So you've alleged that on July 2nd,

19   2000, so now 18 years ago, you were arrested in

20   New Orleans on suspicion of simple burglary; is

21   that correct?

22       A.    Yes.

23       Q.    An arrest warrant was issued but for

24   various procedural reasons you never stood trial;

25   is that correct?

1      A.    Yes.

2      Q.    And then between 2008 and 2015 you were

3  incarcerated at Dixon Correctional Institute for

4  a different crime; is that correct?

5      A.    Yes.

6      Q.    What was that underlying sentence or the

7  underlying crime?

8      A.    A 15-year sentence.

9      Q.    15-year sentence.  For what crime?

10     A.    Burglary.

11     Q.    Burglary.  Okay.  So that was not

12  related to the simple burglary from 2000?

13     A.    No.

14     Q.    Do you happen to know a case number from

15  that 2008 case?

16     A.    No.

17     Q.    Okay.  At the time of your sentencing in

18  2008 after which you went to Dixon on the 15-year

19  sentence, did you at any time -- and this is one

20  of the bad questions.  I'm going to start over.

21          So we've talked about two crimes here,

22  one from 2000 and one from 2008.  Was the crime

23  committed in 2008?

24          MR. MOST:

25               Objection.  It's a mis- -- it

10

1  mischaracterizes the witness's prior testimony.

2  I think we talked about alleged crimes rather

3  than actual crimes.

4  BY MR. CENTORINO:

5      Q.   The crime for which you were sentenced

6  to 15 years at Dixon, was that committed in 2008?

7      A.   Yeah.

8      Q.   At any point during the sentencing for

9  that crime which we just spoke about, did you

10  plead on a charge for the first crime from 2000?

11     A.   No, because that's two different

12  parishes.

13     Q.   Okay.  What parish was the --

14     A.   Iberia Parish.

15     Q.   Iberia.  Okay.

16          And the first one was in Orleans?

17     A.   (Nods head affirmatively.)

18     Q.   Is that correct?

19     A.   (Nods head affirmatively.)

20     Q.   You just need to verbalize so she can

21  write it.

22     A.   Yes.

23     Q.   Who represented you in the 2000 crime?

24     A.   I can't recollect.

25     Q.   Was it a public defender?

1       A.      Yeah.

2       Q.      What about the 2008 crime?

3       A.      Public defender.

4       Q.      Public defender.

5               Do you remember that person's name?

6       A.      No.

7       Q.      So going back to the first crime in

8    2000, obviously in your complaint, a lot of this

9    has to do with the procedure of that.  I know

10   that we've now said you never stood trial for

11   that.  But you were incarcerated for some amount

12   of time after the alleged crime in 2000, correct,

13   even if it was just for a couple of days?

14      A.      Re-quote.

15      Q.      Sorry.  For the simple burglary in 2000

16   which you were alleged to have committed, I know

17   you said -- or I know that an arrest warrant was

18   issued, and you said that's true.  Did you spend

19   any time in jail or prison for that crime in

20   2000?

21      A.      Yes.  61 days.

22      Q.      61 days.  Okay.

23              And where was that?

24      A.      Orleans Parish Prison.

25      Q.      Okay.  Thank you.

1          MR. MOST:

2               It might be easier just generally

3     when you're asking questions about crimes, if you

4     want to say alleged crimes because that might

5     just make things easier.

6          MR. CENTORINO:

7               Yeah.  I'm certainly not a

8     prosecutor.  I'm not accusing you of committing

9     any crime, but I'm just going by the convictions

10    that have occurred.  So whenever I say crime, I

11    mean alleged crime.

12               Is that all right?

13         MR. MOST:

14              Great.  I think that's easier.

15    BY MR. CENTORINO:

16        Q.   So in your complaint you state that on

17    June 25th, 2015 you were released from Dixon.

18    Was that on good time parole?

19        A.   Yes.

20        Q.   And I guess that makes sense because it

21    was a 15-year sentence and you got out on

22    good-time parole; is that correct?

23        A.   Yes.

24        Q.   All right.  Now, I'm not interested in

25    the merits of the charge currently against you,

13

1   but obviously, we are sitting in prison now.  Can

2   you explain why you're here?

3           MR. MOST:

4               Can I suggest you rephrase and just

5   say like, are you accused of a crime or something

6   like that?

7           MR. CENTORINO:

8               I'll rephrase.

9           MR. MOST:

10              Yeah.

11  BY MR. CENTORINO:

12      Q.    Are you currently charged with a crime?

13      A.    Yes.

14      Q.    What crime is that?

15      A.    Burglary.

16      Q.    Okay.  And the charge of burglary that

17  you're currently facing, did that occur in

18  Orleans Parish?

19      A.    Yes.

20      Q.    We're in New Orleans Parish Prison now,

21  correct?

22      A.    Correct.

23      Q.    How long have you been in Orleans Parish

24  Prison during this time for the burglary in

25  Orleans Parish?

14

1        A.    Since April 14th present date.

2        Q.    April 14th of 2018?

3        A.    Yeah.

4        Q.    So we now mentioned -- we've discussed

5   three crimes, three alleged crimes; one from

6   2000, one from 2008, and then one from 2018.   Are

7   there any other crimes for which you have been

8   convicted of?

9        A.    I can't remember.

10       Q.    I'm going to hand you a portion of your

11  master prison record with what I believe is a

12  complete list of your, quote, unquote, rap sheet.

13  But I'd like for you to go through it and confirm

14  it for me and make sure it's accurate.

15            MR. CENTORINO:

16            I'm going to mark this, because I

17  don't have any exhibit stickers, A in the upper

18  right-hand corner.

19  BY MR. CENTORINO:

20       Q.    And, Mr. Grant, if you could just take a

21  look at this and confirm for me that it's

22  accurate to your knowledge?

23            MR. MOST:

24            Objection as to ambiguous and

25  compound.   There's a lot of information on there.

1          MR. CENTORINO:

2               Okay.

3          MR. MOST:

4               But you can answer the question

5     after you take a look through it.

6          THE WITNESS:

7               This where you got marked with

8     possession of marijuana, what's this?

9     California, huh?

10    BY MR. CENTORINO:

11         Q.   Can you explain which part you're

12    looking at?

13         A.   I'm looking at the second column or

14    paragraph.

15         Q.   You think there's something wrong with

16    it?

17         A.   Yeah.  I don't possess no marijuana.  I

18    don't remember getting arrested for no possession

19    of marijuana in New Orleans.

20         Q.   Okay.  Take your time.

21              Aside from that possession of marijuana

22    in New Orleans, and it's like 1987 here, fourth

23    one, is that what you were mentioning?

24         A.   Yeah.

25         Q.   Right here?  So 1987, May 15th.  Well,

1     that says Iberia.

2              Can you just point out which part you

3     think was inaccurate again?

4         A.    The New Iberia, 1987.

5         Q.    You don't remember that?

6         A.    No.

7         Q.    Otherwise, is there something in

8     reviewing this Exhibit A that stands out as

9     inaccurate to you?

10        A.    Other than that, no.

11        Q.    Okay.  Let's talk about the reason we're

12    here, the alleged over-detention which occurred

13    in 2016, June and July.

14             MR. CENTORINO:

15                  Can you all hear me, by the way?

16             MS. RODRIGUE:

17                  Uh-huh.

18    BY MR. CENTORINO:

19        Q.    So it's my understanding that in -- on

20    June 27, 2016, this is what's alleged in your

21    complaint, that you were getting a driver's

22    license at the DMV when you were picked up for

23    outstanding arrest warrant for 2000; is that

24    accurate?

25        A.    It sounds like a misquote.

17

1    Q.   Okay.  Please explain what happened.
2  Did you go to the DMV?
3    A.   No.  I was going to police headquarters
4  to obtain a background check to obtain housing.
5    Q.   That's my misunderstanding then.
6         So was that on June 27, 2016?
7    A.   Yes.
8    Q.   So why were you going to -- you said to
9  obtain housing?
10   A.   Yes, for Housing Authority.  I was going
11  to get a background check for the Housing
12  Authority because I had already obtained a
13  background check, and it came back talking about
14  a positive ID.  And my case manager -- was sent a
15  notification to my case manager, and my case
16  manager told me you need a positive ID.
17   Q.   Who is your case manager?
18   A.   Miss Camilla Hill, Volunteers of
19  America.
20   Q.   And I'm sorry, where did you go for this
21  background check?
22   A.   On Broad Street, foot of the Broad
23  bridge, police headquarters.
24   Q.   Okay.  And so you went in there, and
25  walk me through what happened when you walked in

1      the door, how this occurred, where it was

2      flashed.

3          A.    Went in there and I told them I needed a

4      positive ID, and the lady sent me upstairs

5      because I had my previous background check.  And

6      she sent me upstairs to the second floor, and the

7      second floor sent me downstairs to the police

8      officer on the first floor where I was handcuffed

9      to a chair and he brought the -- brought the

10     reason I'm being handcuffed to my attention.

11         Q.    How long were you in the building before

12     you were handcuffed?

13         A.    Give or take 20 minutes, less than 20

14     minutes.

15         Q.    You said previous background check?

16         A.    Right.

17         Q.    When did you have to do that before?

18         A.    Like in April.  I did that like in

19     April.  I had a background check like in April.

20         Q.    What was that for?

21         A.    For the same thing.

22         Q.    So why did you have to get another one?

23         A.    Because they seen the warrant on there.

24     I guess the warrant became active while they were

25     going through the -- you know, to finalize the

1    matter.  I don't know.

2        Q.   So were you asked to come to the police

3    headquarters or did you go to police

4    headquarters?

5        A.   I had to go to police headquarters to

6    get a background check for Housing Authority to

7    obtain housing.

8        Q.   I'm just confused.  So you said that you

9    went in April for the same thing?

10       A.   That's the first time.I went, April.

11       Q.   Were you not able to do that for some

12   reason in April?

13       A.   Yes, I was able to do it in April.  The

14   female -- you got the lady behind the desk, and

15   you got the -- what you call the senior officer.

16   She came from behind there and she called me.

17   And she brought to my attention that year in

18   question, the 2000.  I said, Ma'am, I've been

19   through prison.  I've been discharged.  And she

20   said, Yeah, I see all of that.  What are you

21   coming to get a background check for?  I said to

22   obtain housing.

23       Q.   And this was in April or June?

24       A.   This was in April.

25       Q.   So you actually -- when you went in

1    April, the matter of the 2000 arrest warrant

2    didn't come up?

3        A.   Yeah, it was on the thing because I'm

4    going to get a background check to obtain

5    housing.

6        Q.   I see.  Okay.  Do you know the name of

7    the person you spoke with?

8        A.   No.

9        Q.   And so you went to get the background

10    check, they said you got this outstanding arrest

11    warrant.  What happened next in April?

12        A.   She didn't say no outstanding arrest

13    warrant, she just seen that I was released from

14    prison.  I told her, Ma'am, I just come out of

15    prison, not a detention center.  And she said,

16    Yeah, I see that.  And she said, Well, I okayed

17    your background check.  Good luck with your

18    housing.  But you need to get them to take that

19    out the computer.

20        Q.   The 2000 charge?

21        A.   Yeah.  The court case.

22        Q.   Okay.  And so when you get a background

23    check like for that housing, do you come away

24    with a piece of paper that says you've been

25    cleared or something like that?

21

1     A.    Yeah.   You going to come away with the

2     state seal on there, and it's going to have all

3     of your convictions, what you've been convicted

4     for, what have you.

5     Q.    So did you walk out of the office in

6     April with that kind of piece of paper?

7     A.    That's how I obtained housing from the

8     start.

9     Q.    Okay.   I'm going to back up just a

10    little bit so I understand your timeline.

11          So you were released from Dixon on June

12    25th, 2015.   Where did you live between then and

13    April when you went into police headquarters for

14    the background check?

15    A.    Where I lived from then till April?   I

16    was staying with different people.

17    Q.    What were you trying to accomplish by

18    getting the background check in April for

19    housing?

20    A.    To be independent, be on my own.

21    Q.    Was there some place that you had in

22    mind to live, though?

23    A.    Yes.   I was staying on Canal Street,

24    1801 Canal Street.

25    Q.    Got you.   So when did you first move

22

1    into 1809 Canal Street?

2        A.    In April.

3        Q.    In April.  Okay.  Because you got that

4    background check?

5        A.    Yeah.

6        Q.    Okay.  I understand now.  Thanks.

7              So why did you have to go back again in

8    June for another background?

9        A.    For to get a positive ID, whatever that

10   consist of.

11       Q.    I see.  It's my mistake.  All right.

12   I'm remembering now having to go to the DMV

13   myself to get one of those positive ID things.  I

14   guess you can't -- I guess all the states but

15   four switched over, and Louisiana was one of the

16   four, or something like that.  I know what you're

17   talking about now.

18             So you had to go back in June, and you

19   said you were in there for 20 minutes until you

20   got handcuffed?

21       A.    Less than 20 minutes.

22       Q.    Less than 20 minutes.  All right.

23             Do you remember who you spoke with when

24   you were there in June at the police

25   headquarters?

23

1      A.    No.   But I'm more than sure his name was
2  on the arrest report.   He got arrest credit for
3  arresting me, detaining me, at least.
4      Q.    But in other words, you spoke with
5  another woman at the counter before that
6  happened?
7      A.    No.   They just sent me upstairs to the
8  second floor, and the second floor sent me back
9  to the first floor.
10     Q.    Do you know the name of the person who
11 sent you up to the second floor?
12     A.    No.
13     Q.    Do you know who you spoke with on the
14 second floor who sent you back down to the first
15 floor?
16     A.    No, I don't know to quote, but that's
17 the protocol.
18     Q.    Okay.   So after you were handcuffed,
19 where were you brought in June?
20     A.    I was brought here.
21     Q.    And it's my understanding, but correct
22 me if I'm wrong, that you were here for about
23 three days until June 30th when you went to
24 arraignment before Judge Buras; is that correct?
25     A.    Right.

24

1      Q.    Let's talk about that arraignment that

2   day, June 30th.  Can you walk me through what

3   happened when you appeared in the courtroom?

4      A.    Well, when I was in Camille Buras'

5   section, Judge Buras' section, I was in there

6   with Cardell Hayes accused of killing Will Smith.

7   And I just said, Damn.  I said, Man, like, this

8   ain't adding up to me because it's a 15-year-old

9   warrant, you know.

10          Like when they called my case, I was

11   like last or whatever, and I told my lawyer, I

12   said, Man, this is a 15-year-old -- well, it

13   wasn't Aaron, it was another lawyer.  And I told

14   him, I said, Man, this is a 15-year-old warrant

15   or whatever, and he brought it to the judge's

16   attention.

17          And she, like in open court, she was

18   saying we need to get this matter resolved.  I

19   don't even want this case on my docket.

20      Q.    What was the name of your attorney in

21   that?

22      A.    I don't know.  His name like on there,

23   like to start off or whatever, but Aaron Zagory

24   was like closed on the matter.

25      Q.    Was it with the public defender, though?

25

1      A.    Yes.

2      Q.    So did you ever speak in court that day?

3      A.    Yes, I spoke to the judge.

4      Q.    Did she ask you questions?

5      A.    Not really.  No.  Not really.

6      Q.    What did you say to Judge Buras when you

7   were given the opportunity to speak?

8      A.    I told her this was a 15-year-old

9   warrant or whatever.  I got a job, I work at a

10  group home sitting with the mentally and

11  physically challenged, and I just want to get

12  back to my life.

13     Q.    What did she say?

14     A.    She said okay.

15     Q.    So did she explain out loud what your

16  sentence would be?

17     A.    Yes.

18     Q.    What did she say?

19     A.    She gave me one year DOC credit for time

20  served.  And she asked me how long did I do in

21  prison.  I told her from 2008 to 2015.  And she

22  gave me all of that credit.  And I brought to her

23  attention, I said by this being a DOC center, I

24  got to be processed.  And I want -- I need to get

25  back to my life, my apartment and my job and

26

1    stuff.  She called somebody on the phone and

2    tried to expedite the matter in open court.

3         Q.    She made a phone call in open court?

4         A.    She made a few phone calls.

5         Q.    Okay.  Do you know who she called?

6         A.    I guess she called DOC.

7         Q.    Is that just your guess, or did she say

8    she was calling DOC?

9         A.    I'm assuming that's who it was because

10   they're the one that holds you for a sentence,

11   the judge imposes a sentence in DOC's facility.

12        Q.    Okay.  So you said that you explained to

13   the judge that you would have to be processed by

14   DOC?

15        A.    Yes.

16        Q.    Okay.

17        A.    By being a DOC sentence, I got to get my

18   time computed or whatever, you know, or whatever,

19   and I didn't need it to take no three weeks or no

20   month or nothing like that.

21        Q.    Did you explain that to the judge, the

22   time delay?

23        A.    She already knew that.  She's a judge.

24        Q.    Did she say she understood that delay?

25        A.    I don't know about that.  I don't

27

1    remember that.

2         Q.    Okay.   So after she explained that that

3    would be your sentence, you were taken somewhere

4    else.   Who took you somewhere else and where?

5         A.    They sent me to Tallulah.   Before --

6    once she gave me my sentence, she said -- she

7    said I'll be gone out of town next week.   She

8    said, but if you're still in custody, notify my

9    clerk of court or whatever.   And a week went by,

10   and like going into the week where she was due to

11   come back or whatever, they shipped me to

12   Tallulah that Monday morning.

13        Q.    Who is "they"?

14        A.    Orleans Parish.

15        Q.    Before you were shipped to Tallulah, did

16   you speak with anyone other than the judge or

17   your attorney about the processing of your

18   sentence?

19        A.    No.   I spoke with the lady that --

20   whatever, I forgot her job title or whatever, but

21   like when -- like when I was leaving, she was --

22   I think she was like with Internal Affairs for

23   the sheriff or whatever, and she asked about

24   deputies and stuff like that there.   And I said,

25   No.   I said but I don't have no problem with

1    that, but I got another question I need to ask

2    you.  And she said what.  And I asked her what

3    was my sentence, and she looked at the paper and

4    she said that you don't have no sentence.

5        Q.    Who was that?

6        A.    It was a female officer for the --

7    whatever, the integrity division for the

8    sheriff's department.

9        Q.    You don't know her name?

10       A.    No, I don't know her name.  But I'm more

11   than sure that's their protocol when you get

12   transferred, they ask you about deputies and all

13   of that stuff there.  They're like the Internal

14   Affairs over the deputies.

15       Q.    Did you talk to anyone else about that

16   issue before you got to Tallulah?

17       A.    There wasn't nobody else to talk to

18   because I got to go.

19       Q.    All right.  Other than Judge Buras and

20   that official you just spoke of, was there anyone

21   before you got to Tallulah who said that you

22   should be released very, very soon, almost

23   immediately?

24       A.    No.

25       Q.    You mentioned that when you were in

1   court, Judge Buras called DOC, or you presumed to

2   be DOC, but you're not sure, in court.  That's

3   correct?

4        A.    (Nods head affirmatively.)

5        Q.    Okay.  Do you know if Judge Buras called

6   anyone else?

7        A.    I don't know.  You would have to obtain

8   my court minutes or whatever.

9        Q.    In your complaint, you say that Judge

10   Buras contacted an attorney of the Orleans Parish

11   Sheriff's office?

12        A.    (Nods head affirmatively.)

13        Q.    What is that based on?  Or what is that

14   knowledge based on, I should say?

15        A.    That knowledge to me based on I'm in

16   Orleans Parish custody, and she called and

17   explained to them.  That's all I'm assuming.

18        Q.    How do you know that she made that call?

19        A.    Because she did it in open court.

20        Q.    I thought you said she called DOC?

21        A.    In open court.  Whoever she called, she

22   did it in open court.  She didn't call for no

23   recess or nothing, she immediately tended to the

24   matter.

25        Q.    So before we move to Tallulah and kind

1    of what happened next, I just want to make sure I

2    understand something.

3           You said that Judge Buras explained to

4    you that she wanted you to be released shortly

5    based on the time you had served, correct?

6    A.    Correct.  Correct.

7    Q.    What time do you believe she was

8    referring to?

9           In other words, you believe that she was

10   giving you credit for time served.  What time was

11   she talking about?

12          MR. MOST:

13              Objection.  Calls for speculation.

14   BY MR. CENTORINO:

15   Q.    What do you believe she was speaking

16   about?

17   A.    It's self-explanatory because she gave

18   me credit for time served from 2008 to 2015

19   present day or whatever, so.  That's like really

20   a turnaround seven times.

21   Q.    Do you have any reason to believe that

22   she was referring to any other time that you had

23   served in prison?

24          MR. MOST:

25              Objection.  Same objection.

1            If you know, you can answer.

2        THE WITNESS:

3            I don't know.

4    BY MR. CENTORINO:

5        Q.    All right.  So you were shipped to

6    Tallulah?

7        A.    Correct.

8        Q.    How long were you there?

9        A.    In Tallulah for about a month.  Probably

10   a month up until they released me.

11       Q.    Where did you go -- you were released

12   from Tallulah?

13       A.    Yeah.  They brought me somewhere in

14   Mississippi, at a bus station, Greyhound,

15   somewhere in Mississippi somewhere.

16       Q.    In your -- in your complaint, you allege

17   that you were processed at Hunt however.  Do you

18   remember being processed at Hunt?

19       A.    I think they brought us to Hunt and

20   like, I don't know, like a pit stop or whatever.

21   I can't remember.

22       Q.    On the way to Tallulah?

23       A.    Yeah.  Probably.

24       Q.    But you don't have any independent

25   memory of being in Hunt before going to Tallulah?

1    A.    I don't remember.  I was just -- I just

2    know I ain't want to go to no Tallulah.

3    Q.    Why is that?

4    A.    Because I heard about Tallulah from

5    being locked up, you know, before.  It's not a

6    good place to be.

7    Q.    And when you say Tallulah, it's the same

8    thing as Madison?

9    A.    Yes.

10    Q.    Okay.  Just making sure.  Madison Parish

11    Correctional Center.

12    A.    Yeah.

13    Q.    And it's my understanding that it's

14    operated by LaSalle -- I guess their title is

15    Prison Corporation at LaSalle?  Is that your

16    understanding or do you have any knowledge of

17    that?

18    A.    Something like that.  That's what they

19    call themselves, something.  Something like that.

20    Q.    Okay.  At Madison or Tallulah, did you

21    notify anyone there about what you believed your

22    sentence calculation should be?

23    A.    Yes.  I called a buddy of mine, Alfred

24    Marshall or whatever, and I talked to him and he

25    told me that -- you know, he talked -- talked to

33

1    Judge Camille Buras.  And she said if they don't

2    be in the computer, my time, that she was going

3    to call me back to court and vacate my sentence.

4         Q.    Who is Alfred Marshall?

5         A.    That's a friend of mine.  I grew up

6    under.  He works for the organizations Stand With

7    Dignity.  He's the organizer, Stand With Dignity.

8         Q.    What kind of organization is that?

9         A.    It's like a nonprofit organization.

10        Q.    But you knew him from back when you were

11   younger?

12        A.    Growing up, yes.

13        Q.    Before he ever worked for that

14   organization?

15        A.    Yes.

16        Q.    Okay.  Did you reach out to him or did

17   he reach out to you at Tallulah?

18        A.    I reached out to him.

19        Q.    Why is that?

20        A.    Because that's my buddy.  He stands for

21   something positive, you know.  He work with the

22   organization and stuff like that.  And I know I

23   would have got results.

24        Q.    Does Mr. Marshall have a relationship

25   with Judge Buras that you know of?

34

1      A.    Not to my knowledge, other than -- other
2  than the little foundation they founded, the
3  court clinic, to where if you got like a warrant
4  or something, and the warrant like a year, year
5  old or whatever, you can go to the court clinic
6  and stuff.  They started the court clinic amongst
7  other things.
8      Q.    What is Alfred's address, his physical
9  address?
10      A.    I don't know.  I might not be at liberty
11  to disclose that.
12      Q.    Where is that organization that he works
13  for located?
14      A.    It's on Prier.
15      Q.    On what?
16      A.    North Prier.  I don't know the hundred
17  block.  It's on North Prier right by Channel 6.
18  It's like beyond it, the house, the news.
19      Q.    Yes, I know about where that is.
20            While you were at Tallulah, did you
21  notify anyone else other than your friend Alfred
22  that you felt you were being over-detained?
23      A.    No.  I talked to the -- to the intake
24  personnel at Tallulah too when I first arrived
25  there.

1      Q.   Who was that?

2      A.   I don't know the intake personnel.  I

3  don't know specifically who, but the intake

4  personnel.

5      Q.   What did you tell that person?

6      A.   I told them that I was -- I wasn't

7  really supposed to be moved.  I'm like on a

8  turnaround.  I'm just waiting on the computer,

9  you know.

10      Q.   What did that individual tell you?

11      A.   He didn't really tell me nothing.

12      Q.   Did they say anything at all?

13      A.   Yeah.  They, you know -- how can I quote

14  this?  They, like, you know, extended their

15  condolences or whatever.  You know what I'm

16  saying?  It's like a hard pill to swallow, you

17  know.  They don't have nothing to do with that.

18  They don't compute no time.  The only thing they

19  do is to house you.  That's it.  And she's not a

20  classification officer or nothing like that.

21  They just intake.

22      Q.   So in your complaint, you allege that

23  Alfred spoke to Judge Buras who then on about

24  July 15, 2016 called Sheriff Gusman and Warden

25  Stinson at Tallulah to ask why you hadn't been

1    released; is that correct?

2         A.    Correct.

3         Q.    How do you know that?

4         A.    Because they got contraband in Tallulah,

5    cell phones and stuff.

6         Q.    So how exactly did you learn that Judge

7    Buras made the phone calls?

8         A.    Because I talked to Alfred.

9         Q.    Alfred told you that she had made those

10   two phone calls?

11        A.    Yes.

12        Q.    Did he tell you anything about the

13   content of those phone calls?

14        A.    No. Because I was like on borrowed time.

15   I was on somebody else timeline with the phone.

16        Q.    So you weren't on any of those phone

17   calls?

18              You weren't actually on the phone with

19   Judge Buras' phone calls?

20        A.    No.  No.

21        Q.    Okay.  In your complaint, you say that

22   on July 18th, 2016, Judge Buras held another

23   hearing in which she vacated your previous

24   sentence and replaced it with another.

25              Where were you on July 18th, 2016?

37

1       A.      I was in Tallulah.

2       Q.      So you weren't at the hearing

3   physically?

4       A.      No.  She waived my presence.

5       Q.      How did you hear about that hearing

6   first?

7       A.      How did I hear about it?

8       Q.      Yes, sir.

9       A.      Like a phone conversation.

10       Q.      Between Alfred and you or someone else?

11       A.      Yes, Alfred.

12       Q.      Was at Alfred at that hearing?

13       A.      No.  But I'm sure somebody from the

14   organization was there or whatever.

15       Q.      Do you remember if Alfred explained to

16   you how he heard about that hearing?

17       A.      No.

18       Q.      Were you ever given any explanation by

19   Alfred or Judge Buras as to why a new sentence

20   was handed out?

21       A.      Well, what I could remember about that

22   is he -- when I talked to him the first time on

23   the phone or whatever, he said -- he stated if

24   they don't be they going to process you by this

25   week, by time this week over with, she's going to

1    call you back and she going vacate your sentence

2    or whatever.

3        Q.    So is it your understanding that the

4    sentence, the first and second sentences, were

5    different in any way?

6        A.    Re-quote.

7        Q.    Sorry.  Bad question.

8              What is your understanding about the

9    differences between the first and the second

10   sentence?

11       A.    My understanding?

12       Q.    Yes, sir.

13             MR. MOST:

14                 Objection.  Calls for a legal

15   conclusion.

16                 You can go ahead.

17   BY MR. CENTORINO:

18       Q.    I'm just looking for your opinion.

19       A.    It's real simple, because a vacate a

20   sentence is a sentence a judge done took back or

21   whatever, so that there is no sentence.  So that

22   mean the due process is like resolved or whatever

23   with a vacated sentence.  It's like saying vacate

24   the premises for a house or whatever.

25       Q.    Based on your complaint, you allege that

1   after that hearing in which you weren't there and

2   the first sentence was vacated, you were not

3   immediately released; is that correct?

4        A.    Correct.

5        Q.    And you were still in Tallulah at this

6   point?

7        A.    Correct.

8        Q.    Later on in your complaint you say that

9   on July 25th, 2016, Judge Buras called someone

10   named Irma Ray; is that correct?

11        A.    Correct.

12        Q.    What do you base that knowledge on?  How

13   do you know that?

14        A.    Because my time was computed and I was

15   released.

16        Q.    Did someone tell you that Judge Buras

17   phoned Irma Ray?

18        A.    I don't remember.  I know it's

19   documented facts, though.

20        Q.    Why do you say that?

21        A.    It's documented facts.

22        Q.    Where is it documented?

23        A.    Because she -- they tended to my matter.

24        Q.    Irma Ray did?

25        A.    Yes.

40

1    Q.    Did you speak with Ms. Ray?

2    A.    No.  I don't have Irma Ray's phone

3    number.

4    Q.    Do you know who Irma Ray is?

5    A.    Yes, I know who she is.

6    Q.    Who is she?

7    A.    She's the lady, the big lady, the bigwig

8    at DOC.

9    Q.    When did you speak with her, or was it

10   more than once?

11   A.    I never spoke to her.

12   Q.    You never did.  Okay.

13   A.    Yeah.  But the name is up there when you

14   -- it's a protocol with everything.

15   Q.    So I just want to make sure I understand

16   what you're saying.

17          Is it your belief that Judge Buras

18   called Irma Ray just because that's who you would

19   call in a situation like this?  Or you believe

20   she called Irma Ray because you know she called

21   Irma Ray?

22   A.    I believe she called Irma Ray because my

23   buddy, Alfred Marshall, he rubs elbows with some

24   big people, and he know all the people.  So

25   that's how I know it's documented fact.

41

```
 1        Q.    But you don't know of any document
 2    somewhere that shows that the phone call was
 3    made?
 4        A.    I don't know.  Probably got to get their
 5    phone log or something.
 6        Q.    All right.  You also allege that Judge
 7    Buras called and e-mailed someone named Kyneidra
 8    Burton?
 9        A.    Kendra Burton.
10        Q.    Kendra Burton?  How do you spell that?
11        A.    K-E-N-D-R-A.
12        Q.    Does she also work for DOC?
13        A.    Yes.
14        Q.    What do you base that knowledge on?  How
15    do you know Judge Buras did that?  Is it the same
16    thing?
17        A.    I guess you could say I'm more than
18    certain because e-mail, you can't really like --
19    like encrypt no e-mail.
20        Q.    Have you seen that e-mail that Judge
21    Buras sent?
22        A.    No.  But I'm more than sure it exists.
23        Q.    Why do you say that?
24        A.    Because my buddy Alfred Marshall, he
25    told me he was going to do everything in his
```

42

1   power.

2      Q.   Did he tell you that that e-mail was

3   sent between Judge Buras and Ms. Burton?

4      A.   I don't know.  We didn't have plenty

5   conversations.  I don't remember.

6      Q.   You said that you're more than certain.

7   Do you have a basis for that certainty that that

8   e-mail was sent?

9      A.   That's because they go to court for like

10   a lot of people or whatever.

11      Q.   So you're basing that on your trust of

12   Mr. Marshall?

13      A.   Not really my trust, on his profession,

14   what he do.  He's an organizer.

15      Q.   Okay.  You said you never seen that

16   e-mail.  Do you know what the e-mail said?

17      A.   I don't know.

18      Q.   Did you ever file any kind of habeas

19   petition while you were incarcerated for this

20   time that we've been talking about?

21      MR. MOST:

22         Objection.  Calls for a legal

23   conclusion.  Not everyone is familiar with that

24   phrase.

25      THE WITNESS:

43

1              Yeah, I'm familiar with a habeas

2    corpus is.

3              But, no.  I done paid people to do

4    stuff for me, you know.

5    BY MR. CENTORINO:

6         Q.    Do you know if a habeas petition was

7    filed?

8         A.    I don't know.

9         Q.    So at what point were you released?

10        A.    What point I was released?  I was

11   released on June 25th when I signed out on a

12   vacated sentence.

13        Q.    And you were released from Tallulah?

14        A.    Yes.

15        Q.    And it's my understanding that they gave

16   you a bus ticket for New Orleans, and that's

17   where you went; is that correct?

18        A.    Yes.

19        Q.    Other than OPP and Tallulah and maybe

20   some very brief processing at Hunt, during that

21   time, between in June and July of 2016, did you

22   serve anywhere else?

23        A.    No.

24        Q.    Is there anyone else we have not talked

25   about, you and I, that you told at any of these

44

1    facilities about what you believed was a

2    situation of over-detention?

3       A.   No.

4       Q.   So how much time elapsed between Judge

5    Buras vacating the first sentence and issuing

6    another one and your release?

7          MR. MOST:

8             Objection.  Calls for speculation.

9          THE WITNESS:

10           I don't know.  I don't have my

11   little timeline or paperwork with me.

12  BY MR. CENTORINO:

13       Q.   So when you got back to New Orleans

14   after you left Tallulah, were you able to move

15   back into your place on Canal?

16       A.   Yes.

17       Q.   Did you have to go back to police

18   headquarters for another background check?

19       A.   Yes.

20       Q.   What happened when you went back?

21       A.   When I went back, I was good to go

22   because that present conviction for what I went

23   for, that's what showed up on my timeline as far

24   as like, you know, my background check.  It was a

25   present day conviction.

1      Q.    So you were able to get the positive ID?

2      A.    Yes.  And I had to go through a Housing

3   Authority hearing too due to that fact.

4      Q.    To what fact?

5      A.    Due to the fact that a conviction, by it

6   being a present day conviction.

7      Q.    When was that hearing?

8      A.    I can't remember, but I went to a

9   hearing, though, or whatever for that.

10      Q.    What was the result of that hearing?

11      A.    They like ruled in my behalf, because

12   like the female assistant that sits on the panel

13   for that or whatever, she is someone I knew or

14   whatever, and she explained to them what a

15   vacated sentence meant or whatever.  And that was

16   the conclusion of that.

17      Q.    I'm going to have you look at the two

18   sentences again.  I'm sorry, but I haven't...

19          So, Mr. Grant, I believe what you're

20   looking at were the two sentences that we're

21   discussing that Judge Buras issued on the 2000

22   charge of simple burglary.  The first one is on

23   top, the second one is on bottom.

24          I'd like for you to review those and

25   confirm to me that that's your understanding as

46

1    well.

2              MR. MOST:

3                   Objection.  Calls for a legal

4    conclusion.

5              MR. CENTORINO:

6                   Can you just limit the speaking

7    objections a little bit?

8              MR. MOST:

9                   Yeah.  But if you're asking -- he's

10   not a lawyer.

11             MR. CENTORINO:

12                  I understand.  I'm just looking for

13   his opinion.

14             MR. MOST:

15                  And can you provide us with a copy

16   of the exhibit afterwards?

17             MR. CENTORINO:

18                  Yes.

19                  I'm going to label those Exhibit B.

20   BY MR. CENTORINO:

21       Q.   So like I said, it's my understanding

22   that these are the two sentences that Judge Buras

23   issued for the 2000 simple burglary.

24                  Is that your understanding of what these

25   documents are as well?

47

1        A.    Yes.

2        Q.    So the first sentence -- I'm looking at

3    the first page of three pages here.  The first

4    page which is the first page of the first

5    sentence, towards the bottom before those little

6    stars next to "case process," shortly above that

7    there is a sentence that reads, This sentence is

8    concurrent with three counts; any other sentence.

9              Now, I'll be honest, I'm not as familiar

10   with criminal law.  It's not what I practice.  Do

11   you know what that sentence means?

12             MR. MOST:

13                  Same objection.

14             THE WITNESS:

15                  No.

16   BY MR. CENTORINO:

17        Q.    Do you have any understanding of what

18   concurrent sentences are?

19        A.    Yes.

20        Q.    What does that mean to you?

21             MR. MOST:

22                  Same objection.

23             THE WITNESS:

24                  To go with.  You know, that's like

25   saying I sentence you to such and such to run

1    concurrent with any sentence now or currently

2    serving.  Meaning, you get credit, credit for

3    that, past, present, or whatever, concurrent.

4    Consist of past or present tense.

5              MR. CENTORINO:

6                   Do you just want to just lodge a

7    general objection to any of my questions so we

8    don't have to keep doing the back and forth?

9              MR. MOST:

10                  Yeah.  I mean, any -- ques -- I'll

11   lodge a general objection to any questions you

12   ask him about the sentences.  Meaning, that it

13   calls for a legal conclusion, also as to

14   relevance.

15             MR. CENTORINO:

16                  Okay.

17   BY MR. CENTORINO:

18        Q.   Do you -- I'm just looking for your

19   opinion here.  I know you're not a lawyer.  I

20   understand that.

21                  Is it your understanding that there is

22   any difference between a concurrent sentence and

23   credit for time served?

24        A.   Yes.

25        Q.   Can you explain what you think that

49

1    difference is?

2         A.    Well, a concurrent sentence is, to me,

3    consist of, like she's saying -- like it's

4    still -- like it's still lingering, but time

5    served or whatever.  It's just finalized.  Time

6    served is like finalized or whatever.  It's over

7    with.  So when she like gavels, it's over with

8    (indicating).

9         Q.    Okay.  In the hearing when this first

10   sentence was given out by Judge Buras when you

11   were there physically in the courtroom, did she

12   discuss concurrence at all?  Did she say the word

13   "concurrent" at all to your memory?

14        A.    I don't remember.  I just wanted to get

15   back to my life or whatever because I felt the

16   injustice because by it being a 15-year-old court

17   case or whatever, it should have been finalized

18   then with my present day track record at the

19   time.

20             I obtained a job at the group home, I

21   had to get a background check for that, which I

22   paid $43 for.  And that's a state job.  I was

23   working at a group home by Tulane University on

24   State Drive.

25        Q.    So the idea of a concurrent sentence,

1    that was not addressed to your memory?

2          A.    I don't remember that.

3          Q.    So how many days elapsed between your

4    arrest at the police headquarters for this 2000

5    simple burglary and your release at Tallulah?

6    How many days passed?

7          A.    30 days.

8          Q.    30 days?

9          A.    (Nods head affirmatively.)

10         Q.    And I know you said way back in 2000 --

11   well, actually hold on.  I apologize.  I can't

12   remember.

13               In 2000, you said you served what, 60

14   days, 90 days --

15         A.    61.

16         Q.    -- waiting until you were released?

17         A.    (Nods head affirmatively.)

18         Q.    So are you saying for that 2000 simple

19   burglary charge, in total from the beginning of

20   time until sitting here today, you served about

21   90 days in prison?

22         A.    No.  Yeah, you could say that, 90 days

23   or whatever, up until me getting released or

24   whatever.  You can say 90 days.

25         Q.    There is no other time at any other

51

1      prison that you served for that crime?

2          A.    No.

3          Q.    Did anyone explain to you at any point

4      at Tallulah or after you were released, why Judge

5      Buras' second sentence affected your release?

6          A.    No, nobody at Tallulah explained nothing

7      to me because Tallulah is not even in our

8      district or whatever, as far as like the court

9      thing.  If I ain't mistaken, it's like the 24th.

10     They ain't got nothing to do with New Orleans

11     Parish Court.  The only thing they got is a

12     contract with housing and facilitating the

13     prisoners.

14         Q.    Do you believe you were over-detained?

15         A.    Yes.

16         Q.    Why do you say that?

17         A.    I was over-detained because I lost my

18     job and everything else because of that, because

19     of that.  I almost lost my housing situation too,

20     but my lawyer was going over there to the

21     Volunteers of America on Canal and explained to

22     the case manager or whatever that I would be

23     getting out, that I didn't have no sentence or

24     whatever, that I should be released shortly or

25     whatever.

52

1        Q.    What do you believe caused that

2    over-detention?

3            MR. MOST:

4                Objection.   Calls for speculation.

5            THE WITNESS:

6                Want me to respond to that?

7            MR. MOST:

8                Yes, you can respond.

9            THE WITNESS:

10                What do I believe caused that?

11    BY MR. CENTORINO:

12        Q.    Or who?

13        A.    I don't know.  I know they got a bad --

14    a bad, like, system as far as, like, documenting

15    stuff like that or whatever.

16        Q.    Who is "they"?

17        A.    DOC.   Period.   Because they are the ones

18    that calculate your time.

19        Q.    Why do you say they have a bad system?

20        A.    They do, because it haven't been fixed

21    yet.

22        Q.    What would be fixed in your mind?

23        A.    What would be fixed?  For somebody to be

24    -- time to be computed, you know, ample enough

25    time.  It don't take no three or four months to

53

1    compute your time.  Because if you go up state,

2    like if you leave Orleans Parish custody and you

3    go to Hunts, you're going to get a master prison

4    record or rap sheet within 48 hours, really 72

5    hours.  You are going to get a rap sheet letting

6    you know when you go home, this, that, and the

7    other.

8            But as long as you're in, like, parish

9    prison custody or whatever, it takes forever.  It

10   will take forever.  Not just in Orleans Parish,

11   all over the state of Louisiana it's like that.

12   And DOC got custody over all of that.

13        Q.   Do you know of any other inmates that

14   have been over-detained?

15        A.   Well, I know a few.

16        Q.   What are their names?

17        A.   I'm not at liberty to discuss their

18   names.

19        Q.   Why not?

20        A.   Because I choose not to.  A lot of

21   people don't like publicity.

22        Q.   We can seal records if that's an issue.

23   That's an option.

24        A.   No.

25             MR. MOST:

54

1          You want to -- can we go off the
2     record for a minute to discuss this?
3          MR. CENTORINO:
4          Yes.
5     (Discussion held off the record.)
6     BY MR. CENTORINO:
7          Q.   So I'm going to -- in a subsequent
8     interrogatory, I'll be more specific about the
9     names of other inmates who you believe were
10    over-detained, but I'm just going to ask a couple
11    of general questions.
12          How many inmates do you know that you
13    believe were over-detained?
14          A.   I don't know.  I can't really keep
15    count.  I've been locked up, like, going on five
16    months.  Quite a few.  I done heard quite a few
17    stories or whatever, but I don't too much listen
18    to their -- you know, it goes in one ear and out
19    the other, you know.  Like inadvertent
20    conversations, you just hearing people's
21    conversations, like that.
22          Q.   Okay.  And again, without asking
23    specific names, is this more gossip or do you
24    actually know someone, you know, Mr. X that you
25    believe was over-detained personally because

1    you've spoken to him about his over-detention?

2    Or is it more just stories you've heard?

3         A.    More stories.

4         Q.    Okay.  Do you know Brian McNeil?

5         A.    No.

6         Q.    What about Dejuan Thomas?

7         A.    No.

8         Q.    James Chowns?

9         A.    No.

10        Q.    Ronald Joseph?

11        A.    No.

12        Q.    Kenneth Owens?

13        A.    No.

14        Q.    The sort of the rumor mill of stories

15   that you hear about other inmates that you were

16   discussing, is there any -- never mind.  I won't

17   ask that.

18             Do you know who Secretary James LeBlanc

19   is?

20        A.    Yes.

21        Q.    Who is that?

22        A.    That's whose name on every DOC building.

23   If I ain't mistaken, it's on DOC building, James

24   LeBlanc, Secretary.

25        Q.    Did he have anything to do with your

56

1    over-detention?

2         A.    Probably so.

3         Q.    Why is that?

4         A.    Because he's the head honcho.  He the

5    big kahuna.

6         Q.    Did you ever speak to Secretary LeBlanc

7    about your case?

8         A.    No.

9         Q.    Have you ever met him personally?

10        A.    No.  I seen him a few times when I was

11   incarcerated at Dixon.

12        Q.    From a distance, or did you shake his

13   hand?

14        A.    From a distance.

15        Q.    If it makes you feel better, you've seen

16   him more times than I have.

17              So when you say you think he probably

18   had something to do with it, why?  I mean, other

19   than him being the secretary of the department?

20        A.    I guess he will be the one you go after

21   if you were to go after anyone.

22        Q.    Do you believe that Warden Hooper or any

23   other warden had anything to do with your alleged

24   over-detention?

25        A.    I don't know.  That's kind of -- that's

57

1   kind of hard to reply to or comment on, because

2   it's the only thing they doing is just following

3   protocol.  You're going from one custody to the

4   next or whatever, you know.  And once they -- I

5   feel like once they're aware of the problem or

6   whatever, and with what measures they took to

7   resolve it or whatever, or play a role in it to

8   me.

9        Q.   Do you believe that Warden Hooper took

10  any measures to resolve this?

11       A.   I don't know.  Who is Warden Hooper?

12  What facility is he over?

13       Q.   Do you believe any warden anywhere took

14  any measures to help you?

15       A.   I don't know.  I don't know.  Because

16  you got different wardens, you got different

17  wardens, you know.  You got parentheses wardens,

18  but you got different wardens.

19       Q.   Sure.  Sure.  But to your knowledge --

20  well, I already asked that.

21       A.   Probably so, because if it's a

22  clarification warden or whatever, yeah.

23       Q.   I know you mentioned Irma, Irma Ray?

24  And Kendra Burton.  Is there anybody else, named

25  classification, that you believe was involved in

1    your sentence calculation?

2         A.   I don't know.  I only know those are the

3    main two, to where the people move when they say

4    something.

5         Q.   Okay.  So let's talk a little bit

6    about -- I know you said that you lost your job

7    and it was difficult to get into housing after

8    you were released, so let's talk about that a

9    little bit.

10             I know you mentioned kind of what your

11   job was and where.  Can you just state what your

12   job title was and where for the record?

13        A.   I was, like, a sitter to the mentally

14   and physically challenged.

15        Q.   And this was before you -- this was

16   before June and July of 2016 while you were kind

17   of getting back on your feet after 2015?

18        A.   Right.

19        Q.   So where were you doing that work?

20        A.   We had a house on State Drive.

21        Q.   What was the name of that facility?

22        A.   The name of the facility is Crossroads.

23        Q.   Crossroads.  Okay.

24        A.   On 3727 General DeGaulle.

25        Q.   Did they have any kind of relationship

1    with DOC or any other -- any other entity that

2    worked with ex-offenders trying to rehabilitate

3    them or incorporate them back into society?

4         A.    I don't know.  I don't know about that,

5    but it's a state job.  I know that.  You got to

6    do a background check, you can't be no sex

7    offender or have any, like, battery charges,

8    stuff like that.  Any other -- they're not

9    worrying about any other convictions you had

10   other than those, omit you from it, you know.

11        Q.    So did you work with any other

12   ex-offenders?

13        A.    I don't know.  Everybody didn't talk,

14   you know.  Like, you know, like talk their

15   business or whatever, you know.  It's not no

16   complicated job, it's just, like, you're not

17   doing nothing but logging entries in a book or

18   whatever, you know, like in a group home or

19   whatever.

20        Q.    How did you hear about the job?

21        A.    A buddy of mine stayed at the building

22   where I was at, he worked there or whatever.  He

23   said, Man, you come get a job over there.  They

24   ain't worried about no record or nothing like

25   that, as long as you're not this, that, and the

1   other.  Over there you're nothing.  Ain't no sex

2   offenders or anything like that over there, so.

3       Q.    What was his name?

4       A.    Tracy Smith.

5       Q.    Where does he live?

6       A.    He is from Baton Rouge.  I don't know

7   where he resides at presently speaking.

8       Q.    But he works at that facility?

9       A.    He worked there.

10      Q.    Okay.

11      A.    And I wind up going down there filling

12  out the -- filling out the application and stuff,

13  and got the job.

14      Q.    Where does he work now, Tracy?

15      A.    I don't know.

16      Q.    How long between when you were released

17  in 2015 from Dixon and you got that job, how much

18  time passed?

19      A.    Like a year.

20      Q.    So you were you unemployed during that

21  time looking for work?

22      A.    No.  I was working.

23      Q.    Where were you working?

24      A.    I was working at Catty Car Corner.  It's

25  on Poydras.  It was under the job --

1    under-the-table job, dishwasher, prep cook, right

2    by the Hyatt Regency, not too far from Champion

3    Square.

4        Q.    How long were you working at Catty

5    Corner?

6        A.    About a year.

7        Q.    And why did you want to leave that job

8    to go to this other job?

9        A.    For a better opportunity.

10       Q.    What does that mean, more money, more

11   benefits?

12       A.    More benefits.  That was a job

13   under-the-table.  I was getting paid

14   under-the-table.

15       Q.    Less than minimum wage?

16       A.    No.  I was actually part time, 20 hours

17   a week, $9 an hour.

18       Q.    Got you.  So you been doing dishes and

19   stuff at Catty Corner and you got this other job

20   at Crossroads.

21            How long were you actually at Crossroads

22   before you went back into the police headquarters

23   the second time and you got handcuffed and this

24   all started?

25       A.    A month.

62

1          Q.     One month.   Okay.

2                 And you mentioned a little bit, but I

3     want to go in a little bit more depth.   What were

4     all of your jobs at Crossroads?

5          A.     Just sit with the physically and

6     mentally challenged.   It's a group home.   No more

7     than six people in a group home.

8          Q.     When you say sit, did you read with

9     them, did you just kind of talk with them, did

10    you watch them?

11         A.     No.   You just monitor them, watch them.

12    That's it.   Bring them to the store, stuff like

13    that.   Not all of them.   You know what I'm

14    saying?   But like the way I was, I bring all of

15    them to the store, let them stretch their legs,

16    you know.

17         Q.     Do you actually drive them somewhere or

18    you just walk with them?

19         A.     No.   We walk.   Right there by Tulane

20    University.

21         Q.     Got you.   Did you enjoy it?

22         A.     Yeah, it was all right for a job.   Quite

23    an experience.

24         Q.     What did you like about it?

25         A.     What I like about it?   They gave me an

1   opportunity to work.  That's what I liked about

2   it.

3      Q.   How much were you making at Crossroads?

4      A.   I was making, like, $7 and something,

5   like a little bit above minimum wage.

6      Q.   How many hours were you working?

7      A.   I was working, like, 40 hours week.

8      Q.   I know it was only a month, but did --

9   was it 40 hours every week, clock in, clock out,

10   that's how many hours, or was it more flexible

11   with overtime or anything like that?

12      A.   It was kind of, like, flexible because,

13   like, on the weekend, I had to work, like, a

14   12 -- a 12-hour shift.

15      Q.   Did you mostly work during days or

16   nights?

17      A.   Either/or.  It didn't matter.  I'm the

18   last one hired, so it's like a swing shift.  I

19   get the hours that people don't want.

20      Q.   You weren't under any kind of employment

21   contract with Crossroads, were you?

22      A.   I don't know the specifics to that, but

23   I'm more than sure by them hiring convicted

24   felons, they was on some sort of program or

25   something.  They was under some sort of grant.

64

1    I'm more than sure probably.

2        Q.    What was your -- did you have a

3    supervisor when you were at Crossroads, a boss?

4        A.    Yes.

5        Q.    What was his or her name?

6        A.    Tysheika, something like that.

7        Q.    You don't remember Tysheika's last name?

8        A.    No.

9        Q.    Do you remember anybody else you worked

10   with, their names?

11       A.    Not really.

12       Q.    None of your coworkers or anything?

13       A.    No.

14       Q.    Back at Catty Corner, who was your

15   supervisor there?

16       A.    Oh, Mr. Lin.  He owned Catty Corner.

17   Mr. Lin.

18       Q.    I'm sorry.  What was the name?

19       A.    Mr. Lin.

20       Q.    Lin?  L-I-N?

21       A.    Yes.

22       Q.    Do you remember his first name?

23       A.    No.

24       Q.    What about your coworkers there, any

25   names?

1      A.    No.

2      Q.    I'm sorry to make you repeat, but you

3  said you were paid under-the-table at Catty

4  Corner.  How much were you actually making?  I

5  know you said it was around minimum wage, but was

6  it more or less than you were making at

7  Crossroads?

8      A.    Probably was -- probably like a little

9  even, because Crossroads was biweekly.  And then

10  I had to deal with taxes being taken out and

11  stuff like that.

12      Q.    Tell me about it.  Okay.

13            After you were released from Tallulah in

14  July of 2016, you said you had difficulty getting

15  your job back; is that correct?

16      A.    (Nods head affirmatively.)

17      Q.    Can you explain why you said that?

18      A.    Because I was gone a month or whatever,

19  and, you know, like when you get -- I ain't going

20  to say "you know," but when I got booked, I only

21  got, like, certain numbers out of my phone or

22  whatever.  And I got this female number out of my

23  phone and I explained to her that I was in jail

24  or whatever, and I should be getting out pretty

25  soon or whatever, you know.  And I don't know if

1   she did it or whatever, but some kind of way they

2   had like little a scam, a little scam going to

3   where the guy Tracy, he was, like, going in,

4   like, on my hours, and they had him with beaucoup

5   overtime or whatever. And he got suspended and

6   stuff like that, and that probably was like an

7   infraction on my modify or whatever, because I

8   don't think she told them I was in jail.

9        Q.   So was Tracy kind of pretending to be

10   you, in other words?

11        A.   No.   Tracey was going in my slot working

12   my hours by me not being showing up or whatever.

13   She was, like, letting him, like, work my hours,

14   my schedule.

15        Q.   Okay.  And I'm sorry, what was her name?

16        A.   I can't remember her name.  It's like a

17   little funny name.  You know, they got them

18   little funny names, like Tyshieka and stuff,

19   something like that.

20        Q.   What was her relationship with

21   Crossroads?

22        A.   She is like the -- what you call it?

23   Like the shift leader or whatever.

24        Q.   Okay.

25        A.   Yes.

67

1     Q.    Do you remember her last name?

2     A.    No.

3     Q.    So did you end up getting your job back,

4 or no?

5     A.    No.

6     Q.    Did you apply to get your job back?

7     A.    No. I called them and they told me

8 they -- they told me something or whatever, and I

9 ain't much worry about it because they wanted me

10 to come way across the river, and I wasn't about

11 to go way across the river. Either I had the job

12 or I didn't have the job.

13     Q.    You mean they wanted you to go to a

14 different facility, in other words?

15     A.    Probably something like that. I ain't

16 certain. I ain't certain. When I got the job, I

17 specifically told them that I wanted to work at

18 the group home. I didn't want to be drifting,

19 like going abroad, here, there, here, there.

20     Q.    And so after you got out of Tallulah,

21 they said something about working on the west

22 bank or something? I'm trying to figure this

23 out.

24     A.    I can't recollect. I can't recollect.

25     Q.    They offered you to do something but it

68

1    just wasn't convenient?

2         A.    It wasn't stable.  It wasn't stable.

3         Q.    Because --

4         A.    As far as not stable, it wasn't

5    stationary spot.  It would have been like I would

6    have been drifting from here to there, here to

7    there, and you're getting paid biweekly.  From

8    uptown, off the east bank, I want to work.  I

9    need to work on the east bank at a stationary

10   spot.  They got quite a few group homes.

11        Q.    Okay.  So in terms of jobs, what did you

12   do at that point?

13        A.    What I did at that point?

14        Q.    Yes.

15        A.    I think we got a job, then the hurricane

16   -- the hurricane hit and we wind up going to

17   Grand Rapids, Michigan doing a water restoration

18   job.

19        Q.    Who is "we"?

20        A.    Everybody in the building.

21        Q.    What building, though?

22        A.    The VOA on Canal Street.

23        Q.    The VOA?

24        A.    Yeah.  The Volunteers of America.

25        Q.    So you got some kind of a gig with

69

1   Volunteers of America?

2       A.    Yeah.  But I almost got in trouble for

3   that too.

4       Q.    Why is that?

5       A.    Because I'm on parole.  Because we left

6   and we went to Grand Rapids, Michigan for to do

7   water restoration job on a high school.

8       Q.    So how much time passed between when you

9   had the phone call with the folks at Crossroads

10  and when you got a job with VOA?

11      A.    I don't know.  I can't remember.

12      Q.    Did you have to apply to get this job

13  with VOA?

14      A.    Yes.  We had to go, like, by the Elmwood

15  mall or something like that.

16      Q.    What was your job with VOA?

17      A.    VOA is where I reside.  It's not a job.

18      Q.    Oh, so you applied for what exactly with

19  VOA?

20      A.    No.  VOA is a place of residency to

21  where, like, you got all kind of different people

22  -- people there, and you like, you know, a lot of

23  residents to stay there.  Everybody got a

24  specific -- or occupation that they do when they

25  got jobs and stuff.  So like when a job come up,

70

1    they'll call the building and talk to the case

2    manager and say, look, they got such and such

3    over here.  They got like 40 jobs or whatever,

4    who in the building, you know, like that.

5        Q.   Okay.  So it was kind of erratic work

6    where maybe you get something, maybe you

7    couldn't?

8        A.   Right.  Right.

9        Q.   But you had a place to stay?

10       A.   Right.  Right.

11       Q.   How long did you live there?

12       A.   About 16 months.

13       Q.   Why did you end up leaving there?

14       A.   I just got tired, tired of being there

15   or whatever.  It's like -- like how can I quote

16   this?  It's like -- you, like, around a lot of

17   different, different caliber of people and stuff,

18   and some people like to get stuck there.  Before

19   I got incarcerated, came back to Louisiana and

20   got incarcerated, I was staying, residing in

21   California, northern California.  And when I come

22   back down here, I got knocked off and went to

23   prison and stuff.  And then I wind up, you know,

24   getting residency there or whatever, you know.

25            Like to me, it was like they

71

1    small-minded or whatever, you know.  I just had

2    to, like, make progress.  If I was -- I gave

3    myself, like, a certain amount of time.  If I

4    didn't make it here, I'm going, you know, leaving

5    here and going somewhere else.

6        Q.    So I know you said you went up to

7    Michigan, and then you just mentioned northern

8    California.  I'm not completely lost in the

9    timeline.

10           So when did you live in northern

11   California?

12       A.    Before I came back to Louisiana, in '08

13   and then got incarcerated.

14       Q.    Okay.  Back then.  You went up to

15   Michigan with VOA?

16       A.    Right.

17       Q.    Have you ever lived in any other states

18   other than Louisiana, Michigan, and California?

19       A.    No.

20       Q.    How long were you in Michigan?

21       A.    We stayed up there for, like, a month.

22       Q.    And that was with VOA?

23       A.    (Nods head affirmatively.)

24       Q.    Okay.  What did you do in Michigan for

25   VOA?

72

1       A.      Water restoration job.   It was a

2  hailstorm at a high school and we had to, like,

3  clean up from the mold and stuff like that,

4  before the mold.

5       Q.      So you were just a crew cleaning that

6  up?

7       A.      Right.   Right.

8       Q.      And then you came back down?

9       A.      (Nods head affirmatively.)

10      Q.      And you ended up living at the VOA for

11 about 16 months?

12      A.      Yes.

13      Q.      What other kind of work did you do

14 through the VOA?

15      A.      That's it.

16      Q.      That was the only job you ever got?

17      A.      Yeah.

18      Q.      I know you said people would call

19 looking for help.

20      A.      Right.   Right.   They got all kind of

21 little -- different little things or whatever.

22      Q.      But that was -- did you actually get

23 paid when you were in Michigan?

24      A.      Yeah.

25      Q.      How much did you make when you were in

1    Michigan?

2        A.   Well, they told us, like, $2500.  This

3    was supposed to be a like a 14-day job, but we

4    wind up staying -- staying like a little longer.

5    And then we had to, like, get at them for -- we

6    had to get -- how this went?  Like the labor

7    department or something because they was like

8    playing with our money and stuff.  They had,

9    like, illegal people working -- working with them

10   or whatever.

11            I don't know if you recollect, but they

12   had, like, an accident on the highway to where

13   this guy was driving a van or whatever, but he

14   worked for the people that we were working for

15   that contracted us or whatever.  He wind up being

16   an illegal immigrant and ain't had no license or,

17   you know.  It was a traffic fatality on the

18   highway or whatever.  They was, like, playing

19   with our money and stuff, you know.

20            So we left or whatever.  Man, we want to

21   leave, you know.  We gone or whatever.  So we

22   drove the van back from Michigan to New Orleans,

23   and they wind up putting our money, like, on a

24   little card or whatever trying to cheat us for

25   the hours and stuff until we threatened them with

1    the labor department and all of that stuff there.

2         Q.    So how much money did you end up walking

3    away with from your work in Michigan?

4         A.    Probably about 1100.  Because we got

5    paid -- we got paid -- I think we got paid weekly

6    or whatever, biweekly, something like that.  But

7    it didn't add up.  It didn't add up right because

8    we were getting, like, per diem and stuff.

9         Q.    And you said that was supposed to be 14

10   days but then it was just kind of extended?

11        A.    Right.

12        Q.    How long did you actually end up working

13   in Michigan?

14        A.    Probably like a month, 7 days a week, 12

15   hours a day.

16        Q.    And you say that the 1100 didn't add up.

17   Why do you say that?

18        A.    Because it didn't.  It didn't.  It was,

19   like, too much labor and far away from home and

20   stuff, you know, dealing with all of the stuff we

21   had to deal with.

22        Q.    So outside of that time in Michigan when

23   you are living at VOA in that about a year and a

24   half, you said that you didn't have any other

25   work.  Did you have any source of income other

1    than the $1100 in Michigan that you got?

2        A.    No.   My people send me money from

3    Oakland.

4        Q.    Who are your people?

5        A.    My godfather.

6        Q.    What are their -- or his name?

7        A.    Bernard.

8        Q.    Bernard what?

9        A.    Martin.

10       Q.    Martin.

11            MS. RODRIGUE:

12                What?  I'm sorry.  I didn't get

13    that.

14            MR. CENTORINO:

15                Martin.   Bernard Martin.

16    BY MR. CENTORINO:

17       Q.    Would he send you money regularly?

18       A.    Yeah.

19       Q.    Once a month, once a week, how did it

20    work?

21       A.    Probably every week, every other week,

22    something like that.

23       Q.    Did he send you the same amount?

24       A.    No.   It varied.

25       Q.    What was the general normal amount for

1    him to send?

2         A.    A hundred dollars.

3         Q.    A hundred dollars?

4         A.    (Nods head affirmatively.)

5         Q.    Okay.  Other than that money from

6    Mr. Martin and the $1100 you received from your

7    work in Michigan, during your time at the VOA,

8    the 16 months, did you have any other source of

9    income?

10        A.    No.

11        Q.    Did they charge you rent --

12        A.    Yeah, they charge you rent.

13        Q.    What was the rent?

14        A.    My rent was $50, but it was 480.

15   Housing Authority paid $430.  I was responsible

16   for $50.

17        Q.    A month?

18        A.    A month.

19        Q.    Okay.  And how did you pay for food and

20   anything like that?

21        A.    I was on food stamps.

22        Q.    Okay.  Had you been on food stamps

23   before you went to VOA?

24        A.    Yeah.

25        Q.    Were you on food stamps when you worked

1    at Crossroads?

2         A.    No.

3         Q.    You were paying for your own food?

4         A.    Yeah.

5         Q.    100 percent?

6         A.    Right.

7         Q.    What about when you worked for Catty

8    Corner?

9         A.    I was on food stamps.

10        Q.    So you got off food stamps when you went

11   to Crossroads?

12        A.    No.  When I was working -- working at

13   Catty Car Corner, I was on food stamps.  They,

14   like, started a new thing to where you had to go

15   down there, and so I told my case manager.  I

16   said, Look.  I said, I got a job.  I can't be

17   going down to no food stamp office for no class

18   and stuff like that there because it just didn't

19   add up or whatever.  And my case manager was

20   telling me, Well, don't tell them you got no job,

21   this, that, and other, you know.  And I was like

22   in between the rock and a hard place where they

23   say be honest and all of this stuff here, not

24   active in, you know, the life anymore.  So what I

25   got to lie for, you know?

1        And I told the people at the food stamp

2    place, and they told me, Well, that don't consist

3    of, like, full-time, like, employment, so I just

4    said, Well, you know, the heck with it.  Let it

5    run its course.  I'm not about to keep going

6    because you can buy food stamps from somebody or

7    whatever.

8        Q.    And that was while you were at Catty

9    Corner?

10       A.    Yeah.

11       Q.    And somehow you kind of managed when you

12   were at Crossroads in terms of food?

13       A.    Yeah.  I had a job, I was getting taxes

14   withheld on it.  It ain't going to add up.

15       Q.    What about health insurance?  Do you

16   have Medicaid?  Do you have any kind of health

17   insurance through Crossroads?

18       A.    Oh, I don't know.  I didn't stay

19   employed there long enough to exploit all of

20   those areas.

21       Q.    Did you have any kind of insurance when

22   you were at Catty Corner?

23       A.    No.

24       Q.    Medicaid at all?

25       A.    Obamacare.

1      Q.    Through the Marketplace?

2      A.    Huh?

3      Q.    You signed up online or somewhere else?

4      A.    Yeah.  That was the condition at

5  Crossroads or whatever.  You had to sign up for

6  the things.  So I talked to this lady, she's a

7  monitor over there, Ms. Sharon.  And she went

8  online and applied for it for me or whatever.

9      Q.    That was through the Obamacare Web site?

10     A.    Yeah.

11     Q.    You said you were at VOA for 16 months.

12 Did you live somewhere after VOA before you were

13 picked up for -- or charged with the crime you're

14 currently charged with?

15     A.    Re-quote.

16     Q.    Did you live anywhere between VOA and

17 OPP, is what I'm asking?  Or did you go straight

18 from VOA here?

19     A.    Yeah.

20     Q.    Okay.  After you were released -- and

21 this is why I was asking about the health

22 insurance.

23          After you were released from Tallulah in

24 July 2016, after the about 30 days that you were

25 there, did you see any medical professionals

1   about your time that you feel you were

2   over-detained?

3       A.   No.  But I had one of those scheduled

4   before I was arrested presently speaking.

5       Q.   What was that appointment for?

6       A.   That was, like, an assessment or

7   whatever because I was getting back in a riff

8   with the housing, the housing thing or whatever.

9   Because the place where I was at on Canal and

10  Derbigny, the VOA, my case management, Ms.

11  Camilla Hill and Ms. Denise, they got, like,

12  fired or whatever.  And so that, like, opened up,

13  like, a door for, like, you to get, like, back in

14  get, like, back in there or whatever because it's

15  under new management, under new management now

16  that I found out.

17            Like I qualify for permanent, low income

18  housing or whatever.  And it was just I just to

19  have an assessment and all of that other stuff,

20  sort of stuff there.  And I had an appointment

21  for that, like, May the 25th.

22      Q.   With the doctor?

23      A.   Yes.

24      Q.   What was the name of the doctor?

25      A.   Down on Simon Bolivar, the health

81

1    center.

2        Q.    Do you remember anything more, what the

3    name of the health center is?

4        A.    No.  It's on Simon Bolivar by Chicken

5    Mart.

6        Q.    You don't remember the doctor's name?

7        A.    No, I don't remember the name or

8    whatever, but I had an appointment confirmed for

9    May the 25th.

10       Q.    Okay.  Well, let's put it this way.

11   Between when you were released from Tallulah on

12   July 2016 and sitting here today, had you treated

13   with any physicians of any kind?

14       A.    No.

15       Q.    You haven't had any appointments with

16   any doctors, therapists, dentists, orthopedic

17   surgeon, any kind?

18       A.    Not yet.

19       Q.    You say "not yet."  Are you planning on

20   having an appointment?

21       A.    Yeah.

22       Q.    What kind of appointment are you

23   seeking?

24       A.    I guess all kind.

25       Q.    What kind?

1      A.    All.

2      Q.    All kind?

3      A.    Yeah.

4      Q.    What does that mean?

5      A.    Well, due that I'm kind of like --

6  presently speaking, I'm kind of like -- what you

7  call it?  Not really stressed out or whatever,

8  but it's just a lot that I'm dealing with.  Like

9  right now, like answering these questions and my

10  past being brought up and all of that stuff

11  there.

12      Q.    So are you going to seek some kind of

13  mental health professional?

14      A.    Probably so.  I'm, like, oppressed.

15      Q.    Can you explain that feeling with a

16  little bit more detail?

17      A.    Really ain't -- there really not nothing

18  to explain.  You got somebody constantly asking

19  you questions in a different manner, redirecting

20  questions and stuff like this here, you know.

21  It's kind of like oppressing.

22      Q.    From me?

23      A.    Just to me, period, or whatever, you

24  know.  It's like we brain wrestling or something,

25  you know.  The fact -- if the facts on the paper

83

1    or whatever.  You know what I'm saying?

2        Q.    Would you like to take a break?

3        A.    Yes.

4        MR. MOST:

5             Why don't we take five minutes.

6    (A short recess was taken.)

7    BY MR. CENTORINO:

8        Q.    All right.  Mr. Grant, before the break,

9    we were just talking about how this alleged

10   over-detention affected you mentally, and you

11   mentioned to me that you were discussing -- or

12   you were thinking about seeking out a mental

13   health professional.

14             Can you tell me when you made that

15   decision?

16       A.    I can't remember.  But I know I had a

17   confirmed appointment for May the 25th for a full

18   assessment.

19       Q.    Of 2018?

20       A.    Yes.

21       Q.    With who?

22       A.    With whatever the place is on Simon

23   Bolivar right by Chicken Mart.  Anybody familiar

24   with the landmark where I'm talking about, they

25   know where I'm talking.  I think that's Crescent

1    City, something like that, yeah.

2         Q.    So it's the same place that you had had

3    an assessment scheduled before you were picked

4    up?

5         A.    Right.

6         Q.    But you had an additional appointment

7    scheduled for May of this year?

8         A.    Yes.

9         Q.    What doctor?

10        A.    I don't know the doctor.  That would

11   have been confirmed to me once I would have made

12   it there.

13        Q.    How did you make that appointment?

14        A.    Over the phone.  They asked you some

15   questions over the phone.

16        Q.    Okay.  Do you have any documentation

17   from that scheduling of the appointment?

18        A.    No.  But I'm more than sure they can

19   give it to you if you ask.

20        Q.    Okay.  I know you said that you had an

21   appointment before you were picked up at that

22   same location, and then you had this May 2018

23   appointment there.  Had you ever actually gone to

24   that facility?  Have you ever actually been

25   treated or seen in that facility?

85

1      A.    I can't recollect.  I don't know.

2      Q.    Did you have any appointments with the

3 prison doctor at Tallulah while you were at

4 Tallulah?

5      A.    I don't think other than intake.  I

6 don't know.

7      Q.    Before the break you were telling me

8 that you were feeling oppressed by basically all

9 of this?

10     A.    I'm feeling what?

11     Q.    Oppressed, I believe is what you said?

12     A.    Yeah.

13     Q.    And we were about to get into sort of

14 the details about that feeling.  I want to

15 understand what that feeling actually is, what

16 that means.

17           Can you explain on a day-to-day basis

18 what that means to you?

19     A.    Just put yourself in my shoes.  I'm

20 asking you these questions and you respond.  How

21 would you feel?  That's how I'm going to reply to

22 that.

23     Q.    Are their other causes for that feeling

24 other than me?

25     A.    No.

86

```
 1        Q.    So before you walked in here, were --
 2   let's put it this way.
 3             I couldn't have caused you to try and
 4   schedule the appointment back in May because we
 5   hadn't met.  So what caused you to seek out the
 6   appointment in May of 2018?
 7        A.    Well, because I had a buddy of mine,
 8   Solomon, Solomon Nero, he like -- like told me to
 9   -- told me the specifics and all of that stuff
10   there.  And told me to -- for to call, that they
11   help you with housing and stuff like that, you
12   know.
13        Q.    So what was the purpose of the
14   assessment that you scheduled?
15        A.    For housing, to obtain, like, housing.
16        Q.    In May 2018?
17        A.    Yes.
18        Q.    Okay.
19        A.    On top of mental assessment and
20   everything else.  All of that is included with
21   the package of the assessment.  Period.
22        Q.    So you were going for the purpose of
23   housing?
24        A.    Everything.
25        Q.    When you say "everything," what else
```

1    were you hoping --

2        A.    Mental.  Everything.  Everything.

3        Q.    Okay.  I'm trying to get in the details

4    of it.  So when you say "mental," what were you

5    hoping to get out of it, this appointment in May

6    of 2018, in terms of mental health?

7        A.    An answer to everything like you're

8    trying to find out an answer to what you're

9    trying to find out specifically or whatever, you

10   know.  For being incarcerated.  It's basically

11   like if you would have been incarcerated like a

12   certain amount of time or you feel like you can't

13   get back right or whatever, I could talk to the

14   doctor about this or whatever.  You know what I'm

15   saying?

16            I know I'm not institutionalized or

17   nothing like that.  You know what I'm saying?  I

18   don't take no medicine or nothing.  Maybe I may

19   need to take some medicine.  I don't know, you

20   know.  That's what the assessment was basically

21   for.

22       Q.    Okay.

23       A.    Or whatever.  You ask your specific

24   questions, and then, you know, tell you, well, we

25   got an assessment for you scheduled for such and

1    such date, and, you know, such and such time or

2    whatever, you know.  In order to obtain housing

3    through Unity you have to have the assessment,

4    you know.

5         Q.    Would you be seeking mental health

6    professionals if you didn't have to seek an

7    assessment for housing purposes?

8         A.    Yes.  Based upon everything I went

9    through in life, yeah.  Probably would.

10        Q.    Can you explain why?

11        A.    Can I explain why?

12        Q.    In other words, we talked about how

13   you're hoping that the assessment would have

14   housing consequences and maybe help you out with

15   mental health.  You said maybe you might need a

16   prescription, you don't know.  If you put housing

17   out of the equation -- and I noticed you also

18   said that you're seeking -- you may seek mental

19   health help in the future.

20             As we sit here today, putting me --

21   taking me out of equation as much as you might

22   not like me, just talking about DOC and the --

23   about 30 days or short of 30 days that you spend

24   at Tallulah, what did that cause or what do you

25   believe that caused in terms of your medical

1    health sitting here today?  Do you understand the

2    question?

3        A.   Most definitely I understand the

4    question.

5        Q.   Okay.

6        A.   I feel as though all the other times,

7    just like you showed me my master prison record

8    with all of my convictions, I didn't have no sort

9    of discrepancies or none whatsoever up until this

10   present moment or whatever, you know.  I knew I

11   was supposed to be out, I wanted to be out back

12   to my job or whatever, you know.  That alone, it

13   was like 15-year old case or whatever.  You know

14   what I'm saying?  And they didn't want to resolve

15   it or whatever.

16            They was trying to mess over me, and the

17   judge give me the year and stuff like that saying

18   here, them sending to me to Tallulah and all.

19   You got people getting stabbed up there and

20   everything, man.  That's what I'm around.  I

21   wasn't even supposed to be on that tier with the

22   amount of time that I had.

23       Q.   Did you see something during that about

24   month at Tallulah that you hadn't seen ever in

25   prison before?

1     A.    Yeah.

2     Q.    Like what?

3     A.    Stabbings.

4     Q.    You had never seen a stabbing before you

5 were in Tallulah?

6     A.    No.

7     Q.    At any prison?

8     A.    No.

9     Q.    You saw someone get stabbed at Tallulah

10 or you just heard about it?

11     A.    I saw someone be stabbed at Tallulah

12 behind contraband, cell phones.

13     Q.    Who was stabbed?

14     A.    I don't know the individual.  But it

15 occurred.

16     Q.    Do you know who stabbed the individual?

17     A.    No.

18     Q.    But you saw it?

19     A.    Yeah.  You got, like, a hundred people

20 on the tier.

21     Q.    Nobody talked about it after the fact

22 about who was stabbed or who did the stabbing?

23     A.    (Shakes head negatively.)  Welcome to

24 Tallulah.

25     Q.    So you never heard any names?

91

1      A.    No.

2      Q.    Had you ever heard of anybody being

3  stabbed in prison before you went to Tallulah?

4      A.    Numerous times.

5      Q.    But you never saw it?

6      A.    Up until when I was there, presently

7  there.

8      Q.    Okay.  Did you know the people who were

9  stabbed or who was -- the person who was stabbed

10 at Tallulah?

11     A.    No.

12     Q.    Was there anything else at Tallulah that

13 you saw that you had never seen in prison before

14 that disturbed you?

15     A.    Yeah.  The amount of contraband.  The

16 mass contraband.

17     Q.    Like what?

18     A.    Cell phone, mojo, knives, you know.

19     Q.    How did those things disturb you?

20     A.    Well, they disturbed me in a major way

21 because if you -- to me, this is just my proof

22 from being incarcerated or whatever, and you go

23 somewhere that's already like close, close knit.

24 So you're like the last person to come there.  So

25 if they were to run and try to elude the people

1    and they throw the stuff, they're going to throw

2    it by your bed.  You're the new guy on the tier.

3    You know what I'm saying?  So you be the one,

4    like, stuck or whatever.  You know what I'm

5    saying?  In that aspect.  You know what I'm

6    saying?  Like that.

7         Q.    So it's a fear thing?

8         A.    No, not a fear thing.  It's just that

9    will I go home when I'm supposed to go home, if I

10   got to reside here any longer.

11        Q.    I'm assuming you had seen some

12   contraband before that time at some prison?

13        A.    Yeah, but not like over there.

14        Q.    Just in terms of volume?

15        A.    Yeah.

16        Q.    What was the prison before Tallulah that

17   you saw the most contraband at?

18        A.    Tallulah.  I ain't ever seen that much

19   contraband before because we're in a new era

20   right now.  Back then you didn't have no cell

21   phones and all that type of stuff there.  See,

22   now, a cell phone is like commonplace over there.

23   You know what I'm saying?  It was just like the

24   streets other than you just can't go to the

25   refrigerator or walk out the door.

Michelle Vidrine-Corona, CCR
813 North Bengal Road, Metairie, Louisiana 70003
(504) 400-9321    micorona@cox.net

1        Q.    So let's talk about cell phones for just

2    a second.   You said you were worried about maybe

3    something being thrown towards you in an

4    emergency or maybe you'd get blamed for the

5    contraband.

6              Was there any other aspect of the cell

7    phones that disturbed you other than possibly

8    being kind of framed with it?

9        A.    That's basically it, yeah.

10        Q.    Okay.   You mentioned mojo.   Any of the

11    other contraband that you saw that was there?

12    Any other fear from the contraband other than

13    just being framed with it?

14        A.    No.   Having to probably hurt somebody

15    once they lose their mind smoking mojo or

16    whatever.   That's about it.

17        Q.    Were you ever framed with contraband at

18    Tallulah?

19        A.    No.   I ain't never had no type of

20    contraband.   You got my master prison record in

21    front of you.

22        Q.    Obviously, being in any prison anytime

23    can be hard.   Other than the contraband issue

24    that we just discussed, were there any other

25    issues that made your time at Tallulah harder?

```
 1        A.    Yeah.   Just being away from home.   Just
 2   being up north, period, or whatever.   You know
 3   what I'm saying?   Just being up north, period.
 4             I went through one detention center when
 5   I first got incarcerated on the term that I
 6   served up in Jonesboro.   From New Iberia to
 7   Jonesboro.   From Jonesboro, I went to DOC.   I
 8   went to Camp Beauregard.   And from there I
 9   remained in DOC custody or whatever.
10        Q.    What was it about being up north that
11   made it hard?
12        A.    Just they call it the holiday camp.
13   Just being in them type of places, just the
14   contraband, period, cell phones and all of that
15   type of stuff.   Just a bunch of, you know -- it's
16   a bunch of chaos come with that, you know.
17        Q.    Anything other than the contraband?
18        A.    No.   Other than just being in a
19   warehouse, no.   It's basically the contraband.
20        Q.    When you say "warehouse," why do you
21   mention that?
22        A.    Because that's all it is.   It's a
23   warehouse.
24        Q.    More so than other prisons?
25        A.    Yeah.
```

95

Q.    Why?

A.    Because you're just stuck in there.  You

just stuck in there.  You ain't going to no chow

hall, none of that.

Q.    In other words, fewer amenities at

Tallulah than other prisons?  Is that what you're

getting at?  Fewer things to do?

A.    Yeah.  But that's what they -- they

pacify you with the contraband, cell phones and

narcotics and stuff like that.  And once all that

freeze up, it's total chaos.

Q.    Okay.  Other than most things, because I

want to get your full story here.  Other than

those things we just discussed, the contraband,

the warehouse element, were there other things

about your time at Tallulah --

A.    Yeah.  Just being up there and I know I

wasn't supposed to go up there.  You follow me?

Q.    I think so.

A.    By just being way up north.  And then

when I went to use the phone over there, it's not

secured.  That's some other kind of thing.  My

people done wasted money on the phone for my

little niece, to Alfred, or whatever.  You know

what I'm saying?

96

1      Q.   Why is that?

2      A.   Because that's a different -- that's a

3   different company.  That's up north.  But now, if

4   I'm not mistaken, they probably secure us now.

5   But back then or whatever, you know.  That was in

6   the newspaper too, where they was talking about

7   the phone thing or whatever, you know, how they

8   are monopolizing the situation with the phones

9   and stuff like that.  Yeah, all of that like

10  played a role in it.  You know what I'm saying?

11          Even when I knew somebody up there that

12  had access to a phone, but I'm on their timeline.

13  I just can't go at them, Man, I need to use the

14  phone, you know.  I ain't got no money at the

15  time to pay them.  You know what I mean?  For

16  that.

17     Q.   When you were at Dixon, did you ever

18  have anybody come visit you?

19     A.   No.

20     Q.   When you were at Tallulah, did anybody

21  visit you?

22     A.   No.  But it's just the principle of

23  being far away from home.  When I was in Dixon,

24  Dixon is a DOC camp or whatever.  That's down

25  south.  That's where I'm from, down south.  So

1   that wasn't the problem.  Then I had class A

2   trustee status on top of that, which I've

3   obtained in all of my terms I've served, class A

4   or B trustee status.

5        Q.   Between your release from Tallulah in

6   July of 2016 and being charged with the crime

7   that you're currently at OPP for, how did your

8   time at Tallulah affect your day-to-day

9   activities?

10       A.   Like you living on an edge, Man.  You

11   like on edge.  You never know what's going to

12   happen, you know.  And like we kind of stick

13   together.  Meaning, like, you know, us from New

14   Orleans, we, like, stick together.

15       Q.   Did your time at Tallulah between your

16   release and your current charge affect or disturb

17   you in any other ways that we haven't already

18   talked about?

19       A.   Yeah.  It had me like on the defense to,

20   like, I was just ready to just snap at any

21   moment.  You never know what's going to happen.

22       Q.   What are you worried is going to happen?

23       A.   Huh?

24       Q.   What were you worried was going to

25   happen?

98

1        A.      A gang fight.

2        Q.      No.  I mean after you were released?

3        A.      After I was released?

4        Q.      Yes, sir.

5        A.      Say that again.

6        Q.      Sorry.  I'm trying to get at what you

7   were feeling between your release from Tallulah

8   and being picked up again here.  Like, when you

9   were working at Cross -- no.  No.  I'm sorry.

10  Like, when you were working in Michigan or when

11  you were just at VOA, for example, how did your

12  time -- or did your time in Tallulah affect you

13  in a normal day while you were at VOA?

14       A.      Yeah, it affected me because I thought

15  about how I lost a job and everything, you know.

16  All of that.  How after doing time -- I had done

17  time in California too.  And when I come home off

18  of that, the statute of limitations had done been

19  met or whatever because I wasn't detained.  And I

20  come back to Louisiana in '08 or whatever, you

21  know.  Yeah, all of that, like, play a role, like

22  once you play the whole tape back or whatever,

23  you know.  When you got something, like, good

24  like going or whatever, and then your past like

25  come back to life, you know, out the sky blue and

1    haunt you.  It's very discouraging, you know.

2         Q.    And I just want to make sure I have

3    this.  When you were at Tallulah, were you

4    injured in any way?

5         A.    No.  Other than mentally scarred, no.

6         Q.    Okay.  You said you hadn't had any

7    appointments with any doctors since basically

8    your release from Dixon, correct?

9         A.    Correct.

10        Q.    Before you were incarcerated at Dixon,

11   did you have any kind of regular family doctor or

12   physician, either in California or Louisiana?

13        A.    No.

14        Q.    Do you take any prescriptions right now?

15        A.    No.

16        Q.    Or before you were incarcerated for the

17   current charge?

18        A.    No.

19        Q.    Have you ever undergone surgery of any

20   kind?

21        A.    No.

22        Q.    You said that at Dixon there hadn't been

23   any or hadn't been as much contraband as there

24   was at Tallulah and that you hadn't seen a

25   stabbing while you were at Dixon.  Were there --

1   what were some of the things you did see that

2   disturbed you at Dixon?

3       A.    Nothing really other than homosexuality.

4       Q.    How did that affect you?

5       A.    It's like it's -- I don't know.

6   Probably you're in a new era now.  I'm just going

7   to quote it like that.

8       Q.    Was that the worst thing you saw at

9   Dixon?

10      A.    No, I don't know because I was on a

11  whole different compound.  I was on a trustee

12  compound.  So I don't know.  We had to go, like,

13  to the main jail, like general population.  I

14  didn't go over there too much unless I was going

15  to school or something like that.

16      Q.    You ever see anybody get beat up?

17      A.    Yeah.  A few times.

18      Q.    Yeah?  Bad?

19      A.    Not really.

20      Q.    Did you ever get injured at Dixon or

21  hurt?

22      A.    No.

23      Q.    And by that, I mean even if another

24  inmate didn't cause it, if you just got hurt

25  doing work or anything like that?

1        A.    No.

2        Q.    Other than this lawsuit that we're

3   talking about here, have you ever been a

4   plaintiff in a lawsuit other than this?

5        A.    Not really.  Not really.  I went through

6   a deposition with RTA, but the female I was

7   messing with like at the time, we kind of, like,

8   fell out, and I was by my mom's house with the

9   people, the deposition people from RTA came to my

10  mom's house without sounding familiar with the

11  specifics of the deposition with that encounter

12  there.

13       Q.    When was that?

14       A.    That was a long time ago.

15       Q.    Early 2000s, '90s?

16       A.    '90s, early '90s.

17       Q.    Were you sued in that suit?

18       A.    No.  I was, like, a witness or whatever.

19  So that's what made me familiar with what a

20  deposition consist of, that they came and asked

21  me questions.

22       Q.    Okay.  What I'm going to do now,

23  Mr. Grant, I'm going to turn it over to them.  I

24  may have a couple more, but I want to give them

25  an opportunity.

1          MR. CENTORINO:

2               Thank you.

3          MR. MOST:

4               Do you want to take a break in

5     between or do you just want to keep going?

6          THE WITNESS:

7               Just keep going.

8          MS. RODRIGUE:

9               For the record, this is Laura

10    Rodrigue.

11    EXAMINATION BY MS. RODRIGUE:

12         Q.   Mr. Grant, I don't think we've ever met.

13    Have we ever met?

14         A.   No.

15         Q.   I want to ask you a few questions,

16    follow up with some of the questions that he had

17    asked you before.  Again, same thing applies.  If

18    you don't understand one of the questions I'm

19    asking, just let me know.  I can rephrase it.  Or

20    if you have any -- if I'm not explaining it well,

21    just let me know.

22              1801 Canal Street is the address that

23    you listed or you gave for where you were living

24    before you got -- let me ask you.

25              What is that address, 1801 Canal Street?

1          A.     That's the Volunteers of America.

2          Q.     Okay.  And when were you living there?

3     Give me all of the years in which you were living

4     there?

5          A.     I was living there from April of 2016

6     until June of 2018.

7          Q.     And where were you living before April

8     of 2016?  I know you were incarcerated, correct?

9          A.     (No response.)

10         Q.     Okay.  Tell me where you were living

11    before that, before the VOA?

12         A.     Before April of 2016, I was living with

13    people.  Like staying at people's houses,

14    different people's houses.

15         Q.     So were you homeless?

16         A.     Yes, you can quote that.

17         Q.     So you were homeless before you get

18    picked up on this warrant in 2016, correct?

19         A.     No.  I was residing at the Volunteers of

20    America.

21         Q.     But that's a place that they provide

22    temporary housing for people, kind of on a need

23    basis, correct?

24         A.     No.  I don't -- you probably got your

25    specifics like misinterpreted.

1      Q.   Okay.

2      A.   I just explained my rent was $50 and

3  Housing Authority was responsible for paying the

4  430.

5      Q.   Okay.  So you had a place to sleep at

6  the VOA from April 2016 leading up to June of

7  2018, correct?

8      A.   Yes.

9      Q.   And that's when you were arrested for

10  the simple burglary for which you're incarcerated

11  now, right?

12      A.   No.

13      Q.   Okay.

14      A.   You're talking about presently, what I'm

15  presently in jail for now?

16      Q.   Correct.  What are you in jail for now?

17      A.   I'm in it for simple burglary.

18      Q.   Correct.  And you got booked on that in

19  2018, correct?

20      A.   Yes.  April.

21      Q.   And at the time you were living -- up

22  until the time of that burglary, you were

23  sleeping where?

24      A.   I was sleeping at a shelter.

25      Q.   Okay.  So when do you stop living on

1    Canal Street?

2         A.    June of 2017.

3         Q.    Just a moment ago --

4              MS. RODRIGUE:

5                   Can you go back or --

6              THE WITNESS:

7                   I misinterpreted what you said.

8    Because the question you asked me, you're asking

9    me about my present day charges.  I'm thinking

10   you're talking about from when I was arrested for

11   the warrant.

12   BY MS. RODRIGUE:

13        Q.    Let me be clear.

14              Before you're arrested for the warrant,

15   where are you living?

16        A.    Before I was arrested for the warrant

17   for -- from 2000?

18        Q.    Right.  There's no warrant on this case,

19   right?

20        A.    Right.

21        Q.    You get picked up because somebody calls

22   the police or they see you out of their window,

23   correct?

24              MR. MOST:

25                   So can we -- can we go off the

1    record for a second?  Do you mind?

2              MS. RODRIGUE:

3                   Sure.

4    (Discussion held off the record.)

5    BY MS. RODRIGUE:

6       Q.    Okay.  When there is a warrant that is

7    outstanding that we know gets issued sometime in

8    2000, correct, the year 2000?  Okay?  That's when

9    you're going to hear me refer to a warrant.

10   You're with me?

11      A.    (No response.)

12      Q.    You have to answer.

13      A.    Yes.

14      Q.    Okay.  The case that you are in jail for

15   now, there was not a warrant lingering out there,

16   right?  You're arrested on the scene at the time

17   of the incident, correct?

18      A.    Correct.

19      Q.    Okay.  Leading up to that arrest on the

20   scene at the time of the incident for 2018, the

21   days before that, where were you living?

22      A.    I was homeless.

23      Q.    Okay.  What point did you stop living on

24   Canal Street and become homeless?

25      A.    June of 2017.

1        Q.    Okay.   So now when you're released from

2   Tallulah, you go to live on Canal Street,

3   correct?

4        A.    Right.

5        Q.    You have a place to live?  Had you been

6   living there before your -- before you went in

7   for this 30 days?

8        A.    Yeah.

9        Q.    Is that where you were living before?

10             Okay.  So you returned to the exact same

11   place that you had been living before?

12        A.    Right.

13        Q.    Everything's fine, correct?

14        A.    (Nods head affirmatively.)

15        Q.    And you stay there for a whole 'nother

16   year, correct?

17        A.    (Nods head affirmatively.)

18        Q.    You have to answer.

19        A.    Correct.

20        Q.    And then you said you kind of decided

21   these people were small-minded, you were going to

22   leave the Canal Street place, the facility,

23   correct?

24        A.    Correct.

25        Q.    So you decide to become homeless then?

```
 1        A.    No, I don't decide to become homeless.
 2   If you really want to know the truth to the
 3   matter, I absconded and left and went to Houston.
 4        Q.    Right.  And that's where you absconded
 5   from your parole and you were sort of on the run?
 6        A.    Yes.  Yes.  Which I'm not being charged
 7   for.
 8        Q.    Okay.  That's again between you and your
 9   parole officer.
10            But you kind of absconded, you flew to
11   Houston at that time, correct?
12        A.    Right.
13        Q.    Now, at the time that you flee to
14   Houston for what reason?
15        A.    Just to go to Houston.
16        Q.    What was there?
17        A.    To leave New Orleans.  Somewhere to
18   stay.
19        Q.    Okay.
20        A.    Around my family.
21        Q.    Who was in Houston that you knew?
22        A.    Friends.
23        Q.    Did you have a place to live?
24        A.    Yes.
25        Q.    Who were you living with?
```

1        A.      Friends.

2        Q.      Do they have a name?

3        A.      I don't want to give their name.

4        Q.      Why not?

5        A.      I prefer not to.

6        Q.      Is there a reason?

7        A.      Because I prefer not to.

8        Q.      Okay.  You say -- I know sometime in the

9   deposition you were saying you didn't want to

10  give certain people's names because some people

11  don't like attention or they don't like

12  publicity, correct?

13       A.      Right.

14       Q.      Do you like publicity?

15       A.      No, I don't like publicity.  I like

16  injustices to be exposed.

17       Q.      Okay.  So is that what you -- that's

18  what you think this is about, injustice is being

19  exposed?

20       A.      That's exactly what it's about.

21       Q.      Okay.  Let me ask you, when we talk

22  about injustices.

23              When you got -- first you say you go to

24  the police station.  Okay?  When you first -- the

25  first time you go -- let me get the date --

1          A.     That's April of 2015.  2016.

2          Q.     Correct.  April of 2016 you go, and

3     somebody tells you there you have -- and I'm

4     going to quote you on this.  You have a court

5     capias?

6          A.     No.  She didn't say it was a court

7     capias.  She said there's something in the

8     computer that's popping up.  And when she brought

9     the year up, I told her about it being 2015.

10    Ma'am, I just come home from prison.  And she

11    said, Well, what you coming to get a background

12    check for?  I said to obtain housing.  And she

13    said, Well, good luck with your housing.  I

14    okayed your background check.

15         Q.     Okay.  So she gives you a notice, right?

16    She tells you something pops up from 2000, right?

17         A.     Yes.

18         Q.     And you're thinking -- and you've used

19    this language before, you're thinking -- let me

20    see.  There's a statute of limitations, right?

21    This is 15 years.  Certainly I can't be --

22    they're not going to come after me for this

23    charge, right?

24         A.     No.

25         Q.     You didn't think that?

1     A.    No.

2     Q.    So you thought there was a possibility

3   they could want to still come after me for this

4   charge, right?

5     A.    I guess.

6     Q.    You did.  Okay.  So she tells you,

7   there's a court -- you used the word court capias

8   because, look, you've been through the system

9   dating back to the mid '80s.

10    A.    I used court capias because I found

11  that's what it was when I was detained, that

12  there was a court -- when I went across the

13  street, she told me, she said, you -- I told her,

14  Well, I'm on borrowed time right now.  I'll go

15  down there next week.

16          And when I went to the court on the

17  second floor or whatever and asked them, and they

18  told me ain't nothing showing up or whatever.

19  That's what they was telling me.  They said,

20  Well, you must be trying to get -- what they say,

21  something expunged.  I said, No.  I know what

22  expunged means.  I'm not trying to get nothing

23  expunged or whatever.

24    Q.    Okay.  So you say you actually go in

25  April, they tell you there is something.  You

1    realize somebody could be looking for you, there

2    could be a capias out there, and you go back two

3    weeks later.  You went back two weeks later?

4         A.    I would say, like, a week later.

5         Q.    Okay.  One week later?

6         A.    Yes.

7         Q.    To try and get that -- whatever is in

8    the system?

9         A.    To find out what it is.

10        Q.    Right.

11        A.    And they didn't have no record of it.

12        Q.    Okay.  So at that point I'm sure you

13   thought to call your friend who rubs elbows with

14   important people, right?

15        A.    No.  I didn't have to.

16        Q.    Why not?

17        A.    Because I had already got my background

18   check.  My background check came to haunt me like

19   two months later when they wanted the positive

20   ID.  That's when I went to jail for the court

21   capias that was brought to my attention.  You got

22   to see the judge.

23        Q.    Okay.  So you said you got -- basically

24   you got what you needed from housing, so you

25   didn't worry about the other thing anymore,

1    right?

2        A.    Right.

3        Q.    So when you go back to finalize the

4    housing, somebody is saying -- the same people

5    are telling you that told you two months before

6    that this is still in the system, right?

7        A.    No.   No.   Housing Authority don't have

8    nothing doing with the police.   The only thing

9    Housing Authority do is give you housing if you

10   got a clear background check.   By my background

11   check not being cleared, they had not submitted

12   their payments to the Volunteers of America.

13       Q.    Because it was never cleared?

14       A.    Because of my warrant.   Because it was

15   showing up I had a warrant or whatever.

16       Q.    Right.   And that's what they told you in

17   April?

18       A.    No, they didn't tell me that.   That's

19   what they told me, like, in June.   They just told

20   me a positive ID.   I guess the positive ID is a

21   code word for a warrant or something.   I don't

22   know.

23       Q.    Well, if you didn't know what it was,

24   why did you go back a week later to try and get

25   it cleared up?

```
 1        A.    I didn't try to get nothing cleared up.
 2   I was trying to find out what it was that's
 3   showing up on there from 2000 if I just did seven
 4   years on a 15-year sentence.  I wanted to know
 5   how a warrant becomes active after I done did --
 6   had class A trustee status and everything else
 7   and got a job at a group home and all of this
 8   here, how a warrant will become active a year
 9   into my freedom which makes eight years.
10        Q.    Right.  So you wanted to know?  You went
11   back a week later.  Because as you just said, you
12   wanted to know how a warrant became active for
13   something from so long ago, correct?
14        A.    Correct.
15        Q.    So at that point you realized there is
16   an active warrant for you?
17        A.    No.  No.  I'm not going to let you put
18   words in my mouth.
19        Q.    I don't need to, sir.  We have the
20   transcript.
21        A.    Yeah.
22        Q.    You go back in June, correct?
23        A.    Right.
24        Q.    Because they can't clear anything
25   because there is an active warrant there.  So you
```

1   have to go back in June, right?

2        A.    I don't know.

3        Q.    You don't know if you went back in June?

4        A.    I don't know what you're talking about.

5        Q.    Did you go back in June?

6        A.    Yeah, I went back in June.

7        Q.    Because you had to finalize the stuff

8   with the housing people, correct?

9        A.    Yeah.  So they could start paying me

10   $430 to the Volunteers of America.

11        Q.    Correct.  When you go back in June, they

12   book you on that active warrant, correct?

13        A.    Yes.

14        Q.    Okay.  You go into OPP at that time,

15   right?

16        A.    Right.

17        Q.    And you know why you're there?

18        A.    Right.

19        Q.    It's a case back from 2000.  And you

20   said, I served -- I've served a chunk of time at

21   this point, right?  This seems like an injustice,

22   right?

23        A.    No, I didn't say that.  That's what the

24   judge said.

25        Q.    And what does your lawyer say?

1      A.    My lawyer basically didn't say nothing

2  because the lawyer, this, like, name that's on

3  the -- my first lawyer at first or whatever, then

4  I wind up getting Aaron Zagory the next time I

5  went to court.

6      Q.    And that's who you have now?

7      A.    Yes.

8      Q.    So when you go to court, do you ask your

9  lawyer about the time limitations?

10          MR. MOST:

11               Objection.  Attorney/client

12  privilege.

13               Are you going to ask him about what

14  he talked to his lawyer about?

15          MS. RODRIGUE:

16               I'm going to ask him if he asked his

17  lawyer about time limitation.

18  BY MS. RODRIGUE:

19      Q.    Did you ever ask him, is this case

20  prescribed?

21          MR. MOST:

22               Objection.  Wait.  This is

23  attorney/client privilege.  You're asking for his

24  conversations with his attorney?

25          MS. RODRIGUE:

1           No.   I asked him what he asked his

2   lawyer.

3           MR. MOST:

4           Yes, that's covered by

5   attorney/client privilege.

6   BY MS. RODRIGUE:

7       Q.   Let me ask you this.   Did you ever

8   wonder if your case had been prescribed since it

9   had been 16 years since you had committed the

10  crime?

11      A.   Yes.

12      Q.   Did you ask him?

13      A.   Yes.

14      Q.   You wondered about that?

15      A.   Yes.

16      Q.   And did you ever get any answers about

17  it from anybody?

18      A.   Yes.

19      Q.   And what answers did you get?

20      A.   I get that's a court capias because I

21  had to see a judge.   That's the answers that I

22  got.

23      Q.   Okay.   So did the judge ever tell you

24  anything?   Did they just tell you just plead

25  guilty and get it over with?   Is that kind of

1    what the information you got?

2         A.    No, that wasn't the information.   At

3    first they tried to give me, like, seven years,

4    and Judge Camille Buras said no, you need to find

5    somebody who's authorized to make the deals or

6    whatever.   All of that is in open court in my

7    transcripts.

8         Q.    Okay.   So that's all out in the public

9    anyway?

10        A.    Yes.

11        Q.    So you decided you were going to admit

12   guilt, right?   You were going admit that you had

13   done this in 2000?   And you did that, right?   We

14   have the paperwork.   You signed the Boykin form.

15   You said, I plead guilty.   I waive my rights, I

16   acknowledge guilt, I'm pleading guilty because I

17   am, in fact, guilty, correct?

18        A.    No.   I pled guilty to resolve the

19   matter, period, to get back to my life.

20        Q.    Okay.   Fine.   You filled out that Boykin

21   form -- you know what a Boykin form is, right?

22        A.    Yes.

23        Q.    It says I'm pleading guilty because I

24   am, in fact, guilty.   You acknowledged that, you

25   sign it, correct?

1      A.    Correct.

2      Q.    You did that on all of the cases, you

3  pled guilty, right?

4      A.    Right.

5      Q.    So we don't need to talk about alleged

6  crimes or anything?  You pled guilty because you

7  were, in fact, guilty, correct?

8      A.    Correct.

9      Q.    All right.  Now, once you plead guilty,

10  you go -- you know in court y'all are discussing

11  with the judge that you're going to have to go

12  through processing, and you know that.  You've

13  been through the system many times.  Not just in

14  this state but in California too, right?

15      A.    It's a different system.

16      Q.    I understand, and I believe you.  But as

17  far as how Louisiana goes, you know that you get

18  booked and there is a processing period, correct?

19      A.    Correct.

20      Q.    Okay.  Because they have to process your

21  time, they have to calculate your time.  If

22  you're sentenced to the Department of

23  Corrections, there is a whole -- there is a

24  process that happens, right?

25           MR. MOST:

1                    Objection.  Calls for speculation.

2              MS. RODRIGUE:

3                    Well, he testified to it.

4    BY MS. RODRIGUE:

5         Q.    You said -- when you were in court, you

6    said, Judge, this is DOC time, right?

7         A.    Uh-huh.

8         Q.    And you know what that means?  What does

9    that mean?

10        A.    I don't know.

11        Q.    It's not parish time, right?

12        A.    Yes.

13        Q.    It's DOC time, you're going to the

14   Department of Corrections, right?

15        A.    You don't necessarily have to go to the

16   Department of Corrections, you're sentenced to

17   the Department of Corrections.

18        Q.    And when you said there is a processing,

19   you said, I'm going to have to go to processing,

20   what did you mean?

21        A.    I'm going to have to have my time

22   computed.

23        Q.    Who computes time?

24        A.    DOC.

25        Q.    So you were going to have to wait for

1  them to figure out what the computation of your

2  time was, right?

3      A.    I guess.

4      Q.    That's the process, right?

5      A.    Yes.  But it shouldn't be a process if

6  you get credit for seven years to a year.

7      Q.    And we're going to talk about that.

8      A.    That's no due process on it.  That's a

9  turnaround.

10     Q.    Right.  I understand what you're saying,

11  and I'm going to get to that point.

12          When you -- you understand that the DOC

13  is in charge of the processing at this point,

14  right?  Nothing to do with OPP anymore?  It's out

15  of their hands, correct?

16     A.    I don't know.  I ain't even going to

17  speak on that.  I don't know.

18     Q.    What is your understanding?

19     A.    My understanding is as long as I was in

20  Orleans Parish custody or whatever for however

21  long it may have been or whatever, they should

22  have took the reins and been able to do something

23  about it.

24     Q.    Do what?

25     A.    I don't know.  You should be able to do

1    something in your backyard.  If you're in your

2    own backyard, there's something you should be

3    able to do.

4         Q.    How long were you in OPP before you got

5    sent to the DOC?

6         A.    I can't remember.

7         Q.    So obviously it didn't bother you that

8    much, right?  You can't even remember.  It could

9    have been a day --

10        A.    I don't remember because the way you're

11   asking me these questions.

12        Q.    Okay.  That's fine.  You don't remember

13   how long you were in OPP.

14             So you get sent to the DOC at some point

15   and they start calculating your time, right?

16        A.    Right.

17        Q.    Now, the attorney asked you about

18   concurrent time.  Now, I know you know what

19   concurrent time means, right?  And you explained

20   it.  It runs the same, correct?

21        A.    Correct.

22        Q.    So if you come before the judge and

23   you've committed two crimes, different days, she

24   runs them concurrent and you're going to run

25   those sentences together, right?

123

1          A.     Right.

2          Q.     The difference is no inmate ever wants

3     to hear consecutive, right, because that means

4     you're going to run it -- they're going to tag it

5     onto the end, right?

6          A.     Right.

7          Q.     So everybody wants their concurrent

8     times.

9                 Now, your time wasn't going to be run

10    concurrent with your other one, correct, because

11    you had already served that, right?  It can't run

12    together with it?  You had already served it,

13    right?

14         A.     Right.

15         Q.     So it was impossible to have a

16    concurrent sentence with the sentence that was

17    long gone?  You did that time?

18                MR. MOST:

19                    Objection.  Calls for a legal

20    conclusion.

21                MS. RODRIGUE:

22                    No, it doesn't call for a legal

23    conclusion.  He understands what I'm saying.

24                THE WITNESS:

25                    No, I don't understand.

124

1          MR. MOST:

2               Speculative.

3          THE WITNESS:

4               That sounds like a broken plea

5     bargain to me.

6     BY MS. RODRIGUE:

7          Q.   And that may be.  It may be a total

8     disconnect in what the sentence was.

9          A.   Thanks for the information.  Thanks for

10    the information.

11         Q.   Very good.  Because the sentence is a

12    disconnect, correct?

13         A.   I don't know.  I'm learning right now.

14         Q.   And I agree.

15         A.   Thank you for the information.

16         Q.   Because they have to bring you back to

17    re-sentence you, right?

18         A.   I don't know.

19         Q.   So you're exactly right when you say

20    that sentence sounds like a total disconnect from

21    what I was actually supposed to be sentenced to,

22    right?

23         MR. MOST:

24              Objection.  Calls for a legal

25    conclusion.

125

1    BY MS. RODRIGUE:

2        Q.    Does that make sense to you?

3        A.    I don't know.

4        Q.    Well, you tell me.

5        A.    I don't know.

6        Q.    Do they have to bring you back to

7    re-sentence you?

8        A.    I don't know.

9        Q.    Do you plan to answer any of these

10   questions?

11       A.    I don't know.

12       Q.    Yes or no, did they bring you back to

13   re-sentence you?

14       A.    I don't know.

15       Q.    So you don't know anything that

16   happened?

17       A.    I don't know.

18       Q.    Was there any injustice that even

19   occurred here?

20       A.    Yeah.  Plenty injustice.

21       Q.    Is that the only question you can

22   understand or remember at this time?

23       A.    Probably.

24       Q.    How long have you had the problem with

25   drugs?

1      A.    A long time.

2      Q.    How many decades?  Since the '80s?

3      A.    I don't know.  I can't remember.

4      Q.    Since the '80s?

5      A.    I don't know.  I can't remember.

6      Q.    How many -- what kind of drugs?

7      A.    All kind of drugs.

8      Q.    Heroine?

9      A.    All kinds.

10     Q.    Heroine?  Yes or no?

11     A.    All kinds.

12     Q.    So I assume that's a yes unless I'm

13  corrected.

14           Cocaine?

15     A.    All kinds.

16     Q.    Yes, unless I'm corrected.

17           Marijuana?

18     A.    All kinds.

19     Q.    Yes, unless I'm corrected.

20           Did you use any drugs in jail?

21     A.    No.

22     Q.    So when you see the contraband, you've

23  never used any?

24     A.    No.

25     Q.    So part of the reason you go on the run

```
 1   and run to Houston is because you're just really

 2   using drugs all of the time at this point when

 3   you're out of jail, correct?

 4            MR. MOST:

 5                 Objection.   Relevance.

 6   BY MS. RODRIGUE:

 7        Q.   Correct?

 8        A.   I don't know.

 9        Q.   You don't know?  I'll take that to mean

10   a yes as well?

11        A.   I don't know.

12        Q.   Because drugs were cheap at that time,

13   right?

14            MR. MOST:

15                 Objection.   It mischaracterizes the

16   witness's prior testimony.

17   BY MS. RODRIGUE:

18        Q.   If you don't give the answer, it's going

19   to be assumed -- I'm going to say into the record

20   that I'm assuming the answer is yes.  You have an

21   opportunity to say --

22        A.   I don't even much know why you're

23   directing your questions coming from which has

24   nothing to do with why we're here.

25        Q.   Well, I think we're talking about
```

1    injustices.  And I'm trying to find out about

2    injustices and you said you're trying to find out

3    about injustices, so I'd like to see --

4         A.    And my injustice on your behalf.  If I'm

5    here for burglary, what does that got to do with

6    drugs?

7         Q.    Well, I'd assume the person who's the

8    victim of the burglary would find it to be a big

9    injustice too along with the other burglaries you

10   committed where you admitted those.  Those are

11   injustices, correct?

12        A.    I don't know.

13        Q.    You think the victim found those to be

14   an injustice?

15              MR. MOST:

16                   Objection.  Relevance.

17   BY MS. RODRIGUE:

18        Q.    Do you?

19              MR. MOST:

20                   Objection.  Calls for speculation.

21   BY MS. RODRIGUE:

22        Q.    Do you?

23              MR. MOST:

24                   Objection.  Asked and answered.

25   BY MS. RODRIGUE:

1      Q.    Do you?

2      A.    I don't know.

3      Q.    Okay.  So we've established now that you

4    agree that the sentence is a disconnect when they

5    try to give you a concurrent sentence?

6            MR. MOST:

7                 Objection.  It mischaracterizes the

8    witness' prior testimony.

9    BY MS. RODRIGUE:

10     Q.    Correct?

11     A.    We ain't established nothing.

12     Q.    You can't figure out how long you were

13   in OPP even after the time -- you can't remember.

14   It just doesn't even occur to you to remember

15   what even happened in OPP after your sentence,

16   correct?

17           MR. MOST:

18                Objection.  Confusing and ambiguous.

19   BY MS. RODRIGUE:

20     Q.    Is that correct?

21     A.    I don't know.

22     Q.    Okay.  You said you don't remember how

23   long you were in OPP.  Do you recall answering

24   that?

25     A.    No.

1    Q.    How long were you OPP?

2    A.    I don't know.  I don't remember.

3    Q.    Do you remember anything of the 30 days

4    that you were in the DOC?  Do you remember

5    anything that happened?

6    A.    Yeah, I remember that.

7    Q.    Okay.  So let's talk about that.

8          What do you remember happening?

9    A.    I ain't want to be there.

10   Q.    Well, I don't think you probably -- did

11   you ever want to be in jail any of the times

12   you've been in jail because you've been in a jail

13   a lot of times in your life, right?  Any time you

14   woke up and said it's great to be in here?  You

15   remember that ever happening?

16   A.    I don't remember that.

17   Q.    You don't remember ever wanting to be in

18   jail, do you?

19   A.    No.

20   Q.    No.

21         Let's go back to this time when you were

22   in the DOC.  You said you didn't want to be

23   there, right?

24   A.    Right.

25   Q.    You were waiting for the DOC to

1    calculate your time, right?

2         A.    Right.

3         Q.    Now, did you call your lawyer?

4         A.    No.

5         Q.    Why not?

6         A.    Why would have I to?

7         Q.    Did you want to get out or did you think

8    you should have been out earlier?

9         A.    I knew I was going to get out because my

10   podna Alfred Marshall assured me once I talked to

11   him on the phone.

12        Q.    Okay.  So you didn't really have any

13   concerns?

14        A.    I had plenty concerns.

15        Q.    You were fine?  You were sure you were

16   going to get out?

17              Okay.  What's Alfred Marshall's

18   nickname?

19        A.    I don't know.

20        Q.    Skin?

21        A.    Maybe.  I don't know.

22        Q.    Well, I would think you would know what

23   your friend's nickname is and what you call him,

24   yourself, correct?

25        A.    Then why would you ask me a question

132

1    that you already know the answer to?

2        Q.   Because you have to answer the

3    questions, sir.  This is a deposition.

4          Is that your friend Skin?

5        A.   Yeah.

6        Q.   Okay.  So now, when you say you were

7    sure that Skin was going to get you out, you

8    didn't need to call anybody else, correct?

9        A.   Correct.

10       Q.   And you did, in fact, according to you,

11   he ends up getting you out, correct?

12      A.   Correct.

13      Q.   You have to get -- you say you have to

14   get brought back, that he gets in touch with the

15   judge or sends somebody from his organization,

16   correct?

17      A.   Correct.

18      Q.   And you get brought back into court,

19   correct?

20      MR. MOST:

21        Objection.  Mischaracterizes the

22   witness' prior testimony.

23   BY MS. RODRIGUE:

24      Q.   You, yourself don't -- excuse me.  He's

25   correct.  Your presence gets waived.  But the

1    case gets brought back into court, correct?

2         A.    Correct.

3         Q.    And the sentence is corrected, correct?

4         A.    Oh, I don't know.

5         Q.    Does the sentence change?

6         A.    I don't know.

7         Q.    Well, how did you get out?  You

8    explained it pretty well before, that it went to

9    credit for time served.  Do you remember that?

10             MR. MOST:

11                  Objection.  Mischaracterizes the

12   witness' prior testimony.

13   BY MS. RODRIGUE:

14        Q.    Do you remember that?

15        A.    No.

16        Q.    Okay.  So you tell me then.

17        A.    Tell you what?

18        Q.    What changed?

19        A.    Oh, I don't know.

20        Q.    Why did you have to go back to court?

21   Why did your case have to go back to court?

22        A.    I don't know.

23        Q.    What did they tell you on the phone?

24   You talked to Alfred?

25        A.    I don't remember.

134

```
 1        Q.    Okay.

 2              MR. MOST:

 3                    Why don't we take -- can we take a

 4    break?

 5              MS. RODRIGUE:

 6                    I don't need a break.

 7              MR. MOST:

 8                    Would you like to take a break?

 9              THE WITNESS:

10                    I don't need no break.  She can keep

11    on.

12              MR. MOST:

13                    Okay.

14    BY MS. RODRIGUE:

15        Q.    Now, when you talked to Alfred on the

16    phone, you said that you were on borrowed time,

17    somebody else's borrowed time, right?

18        A.    (Nods head affirmatively.)

19        Q.    Whose folder were you using?

20        A.    Really?

21    (Court reporter asks for clarification.)

22              THE WITNESS:

23                    I said, Really?  That's my response,

24    really.

25    BY MS. RODRIGUE:
```

1      Q.     That's the person's name?  His name was

2  Really?

3      A.     "Really" to your question, your manner

4  of questioning.

5      Q.     That's my question.  Whose folder were

6  you using to make the phone call?

7      A.     They don't have folders up there.

8      Q.     Whose number were you using?

9      A.     I don't know.

10      Q.     What is the phone number of Skin?

11      A.     I don't know.

12      Q.     So if you picked up the phone on this

13  arrest and have it memorized, you just forgot it

14  in the last --

15      A.     I got it on speed dial.

16      Q.     From OPP?  They have a speed dial there?

17      A.     Yeah.

18      Q.     They have a speed dial in OPP?

19      A.     Yeah.

20      Q.     Okay.  Tell me how it works.

21      A.     I don't know.

22      Q.     So when you speed dial Alfred from OPP,

23  you're telling me you use a phone here and his

24  number automatically comes up?

25      A.     Yeah.

136

1      Q.    And how do you enter it?

2      A.    I don't know.

3      Q.    So you know you're lying to me right

4  now, right?

5      A.    Am I?

6      Q.    Well, I guess we'll have to decide and

7  we'll have to figure out -- do you plan to lie --

8  how many other questions have you lied?

9          MR. MOST:

10              Objection.

11              Laura, you're badgering the witness.

12  You're --

13          MS. RODRIGUE:

14              He's not answering the questions,

15  and I appreciate your comment but I'd like to

16  finish my question.

17          MR. MOST:

18              You're doing things like saying, if

19  you answer "I don't know," I'm going to assume

20  that's a yes.  That is badgering.

21          MS. RODRIGUE:

22              Well, you can instruct -- your

23  client has to answer the questions.

24          MR. MOST:

25              That's correct.  But he doesn't have

1    to say "I don't know" and have you say if you say

2    "I don't know," that's going to be a yes.

3            MS. RODRIGUE:

4                Well, I figured that would be a way

5    of informing him, as his attorney could also,

6    that the answers that he's given now can be

7    interpreted one way or another, and this is his

8    opportunity to give an explanation for his

9    answer.

10           MR. MOST:

11               If you're suggesting that his "I

12   don't knows" will become yeses in some way except

13   in your own mind, that is completely untrue.

14           MS. RODRIGUE:

15               Okay.  I think this is a --

16           THE WITNESS:

17               I watch enough TV.  I already know.

18           MR. MOST:

19               Mr. Grant, you're under oath here

20   and so you do have to answer her questions.  You

21   can answer to the best of your ability, you can

22   answer to the best of your memory.  But if she

23   says "I don't know" will be interpreted as a yes,

24   that is not true for anyone except for her.

25           THE WITNESS:

1          Yeah, I know because she already
2     come at me talking about the drugs, blaming it on
3     the drugs.  I don't remember it.
4     BY MS. RODRIGUE:
5          Q.    Blaming what on the drugs?
6          A.    My memory.
7          Q.    No, I didn't say -- do you have a memory
8     problem because of drugs?
9          A.    No.  I'm saying they are blaming my
10    memory on the drugs.
11         Q.    Is that -- did your drug use cause a
12    memory problem for you?
13         A.    Probably.
14         Q.    Probably?  So any of the questions that
15    you've answered thus far may not be correct
16    because you have a memory problem?
17         A.    I'm not going to let you put words in my
18    mouth.
19         Q.    That's why I'm asking you to put words
20    out of your own mouth.
21         A.    If I say I don't remember, I don't
22    remember.  That's the words out of my mouth, I
23    don't remember.
24         Q.    And is that because you have a drug
25    problem?

1        A.     Probably.

2        Q.     Okay.  And this is a decade's long drug

3    problem that you've had?

4        A.     I don't know.  That's what you say.

5        Q.     Have you been using drugs since the

6    '70s?

7        A.     Have you been using drugs since the

8    '70s?

9        Q.     Sir, when you -- if you ever depose me,

10   I'll answer that question truthfully.  I'm asking

11   you the question now.

12              Have you used drugs since the '70s?

13       A.     How I'm going to use drugs since the

14   '70s if I was born in '68.

15       Q.     Since the '80s?

16       MR. MOST:

17              You can answer the question.

18       THE WITNESS:

19              No.

20       MS. RODRIGUE:

21              You guys have that rap sheet?

22       MR. CENTORINO:

23              Yes.

24   BY MS. RODRIGUE:

25       Q.     So 1986 you were arrested for marijuana

140

1    in Iberia.  Marijuana.  Is that the '80s, a drug

2    charge for you?  You pled guilty to it.  You

3    admitted to it.

4         A.    Yes.  That was a plea bargain.

5         Q.    Okay.  So you pled -- as we discussed

6    before, when you sign the form, it says I'm

7    pleading guilty because I am, in fact, guilty,

8    correct?

9         A.    Plea bargains.  All of them are plea

10   bargains.

11        Q.    So you didn't do any of the crimes you

12   pled to?

13        A.    Plea bargains.

14        Q.    That's not my question, sir.  I'm very

15   well aware of what a plea bargain is.

16        A.    Yeah.

17        Q.    So you've committed the crimes that you

18   pled guilty to?

19        A.    Yes.

20        Q.    So you were using the drugs as late back

21   as 1986?

22        A.    No.

23        Q.    Okay.  So when did you start using

24   drugs?

25        MR. MOST:

1                    Objection.  Relevancy.

2              THE WITNESS:

3                    I can't remember.

4              MR. MOST:

5                    What's the relevancy?

6              MS. RODRIGUE:

7                    He said now that his memory is

8    impaired because of drug use.

9              MR. MOST:

10                   And so what's the relevance of

11   trying to figure out when that -- when he started

12   using drugs?  How could that be relevant to this

13   case?

14             MS. RODRIGUE:

15                   Because I'd like to know how

16   impaired his memory is.

17             MR. CENTORINO:

18                   You've lodged your objections.  It

19   doesn't stop him answering.

20             MR. MOST:

21                   Okay.  You can answer these

22   questions.

23   BY MS. RODRIGUE:

24        Q.   When did you start?

25        A.   Probably in the '80s.

1      Q.   So you did start using the drugs in the

2   '80s?

3      A.   (Nods head affirmatively.)

4      Q.   All right.  Now, when you say that --

5   let me back up.

6           Were you using them every day?

7      A.   Sometimes.

8      Q.   Sometimes more than once a day?

9      A.   Yeah.

10     Q.   Various drugs in a day?

11     A.   Yeah.

12     Q.   All the way through until, as far as I

13  can see, until this recent arrest, correct?

14     A.   Correct.

15     MR. MOST:

16          Objection.

17     MS. RODRIGUE:

18          Correct.  He already answered

19  correct.

20  BY MS. RODRIGUE:

21     Q.   So that is, would you say, led to many

22  of the charges for which you faced throughout

23  your life --

24     A.   No.

25     Q.   -- your use of drugs?

1    A.    No.

2    Q.    So what were you taking things in

3  burglaries for?

4    A.    I don't know.

5         MR. MOST:

6              Objection.  Relevancy.

7         THE WITNESS:

8              Probably for the adventure.

9  BY MS. RODRIGUE:

10    Q.    For an adventure?

11    A.    Probably.

12    Q.    When you got processed -- when you pled

13  guilty, you said that -- you said what you said

14  in your last questions was, you knew I got to be

15  processed.  Wasn't no one else to talk to because

16  I got to go.

17         You had to go to be processed, correct?

18    A.    What you mean?  Re-quote.

19    Q.    Wasn't no one else to talk to because I

20  got to go.  I got to be processed.  After you

21  pled guilty in front of Judge Camille Buras.

22         MR. MOST:

23              Objection.  There's no question

24  there.

25  BY MS. RODRIGUE:

1       Q.    Did you know you had to go to be
2   processed, right?
3       A.    I guess.
4       Q.    Okay.  How long did you think it was
5   going to take?
6       A.    48 hours.
7       Q.    48 hours?
8       A.    Yeah.
9       Q.    To get to Hunt and be released?
10      A.    Yeah.  To be processed, yeah.
11      Q.    Okay.  So you knew you were going to go
12  to Hunt first, right?
13      A.    You don't necessarily have to go to
14  Hunts to get processed.
15      Q.    Okay.  Where do you go to get processed?
16      A.    I don't know.  They could fax the
17  information or whatever.  It ain't nothing but a
18  docket number they're faxing and letting you know
19  the outcome of the proceedings.
20      Q.    Well, sir, they have to get your -- to
21  see if you're wanted anywhere else, correct?
22      A.    No.
23      Q.    That's part of the process?
24          MR. MOST:
25              Objection.  Calls for speculation.

1    BY MS. RODRIGUE:

2         Q.    You have a criminal record in

3    California, correct?

4         A.    Yes.

5         Q.    What is that charge for?

6         A.    Distribution.

7         Q.    Distribution of what?

8         A.    Marijuana.

9         Q.    And was it a weight?  What was the

10   amount?

11            MR. MOST:

12                Objection.  Relevance.

13            THE WITNESS:

14                Distribution.

15   BY MS. RODRIGUE:

16        Q.    How much?

17        A.    A couple of bags.

18        Q.    How much did it weight?

19        A.    I don't know.  Probably a 10th.

20        Q.    And what did you get?  What kind of

21   time?

22        A.    Probation.

23        Q.    How much?

24        A.    I think three years.

25        Q.    Suspended?

1       A.      (Nods head affirmatively.)

2       Q.      Three years suspended as well?

3       A.      Yes.

4       Q.      Three years suspended, three years of

5   active probation?

6       A.      Three years suspended sentence.

7       Q.      What year?

8       A.      I don't know.  2000-something.

9       Q.      2000-something?

10      A.      Yeah, 2000-something.

11      Q.      Were you on probation -- this burglary

12  was in 2000, and that would have been before you

13  went to California, correct?

14      A.      Correct.

15      Q.      Then you go to California.  When do you

16  come back?

17      A.      2008.

18      Q.      2008.

19              Were you still supervised at the time

20  when you picked up the burglary that you went to

21  DOC for?

22              MR. MOST:

23                  Objection.  Relevance.

24  BY MS. RODRIGUE:

25      Q.      When did you get -- pick up -- the

1    burglary that you spent the longest time in jail

2    for, you're with me?

3        A.    (Nods head affirmatively.)

4        Q.    When did you get charged with that?

5        A.    September 2008.

6        Q.    So were you still under supervision in

7    California, parole supervision?

8        A.    No.  No.

9        Q.    You had completed everything by that

10   point?

11       A.    Yes.

12       Q.    Did they use that to multiple bill you?

13       A.    Multiple bill me where?

14           MR. MOST:

15               Objection.

16   BY MS. RODRIGUE:

17       Q.    Did you get multiple billed on the

18   burglary in 2008?

19           MR. MOST:

20               Objection.  Calls for a legal

21   conclusion.

22           THE WITNESS:

23               No.

24   BY MS. RODRIGUE:

25       Q.    No, you did not?

1      A.     (Shakes head negatively.)

2      Q.     Do you recall another lawyer from the

3  sheriff's office coming into court and talking to

4  Judge Camille Buras at the time you pled guilty?

5      A.     No.

6      Q.     Do you recall what anybody from --

7  anything at Orleans Parish Prison after the time

8  of your plea before you're sent to DOC?

9      A.     No.

10     Q.     It was a short period of time?

11     A.     Re-quote.

12     Q.     Was it a short period of time?

13     A.     Short period of time for what?

14     Q.     Before you are sent from OPP to the DOC?

15     A.     Like, probably a week or two later.

16     Q.     Okay.  And nothing of substance or

17 nothing you recall occurring during two weeks,

18 correct?

19     A.     I don't remember.

20     Q.     Nothing memorable?

21     A.     Nothing memorable.

22     Q.     And you sort of figured this would be

23 part of the processing process?

24     A.     No.

25     Q.     What did you think?

1          A.    I was thinking what is taking them so
2     long.   That's what I was thinking.
3          Q.    And did you contact -- who did you
4     contact while you were at OPP?
5          A.    I contacted Alfred Marshall.
6          Q.    Okay.   And what did he say?
7          A.    I don't know.   I can't remember.   He
8     said he was working on it.   Don't worry about
9     nothing.
10          Q.    And so you felt like you had no reason
11     to worry at that point?
12          A.    Yes.
13          Q.    And so you went to DOC, contacted him
14     again?
15          A.    Yeah.
16          Q.    In DOC?   And then he told you he worked
17     it all out?
18          A.    No.
19          Q.    Well, what happened?
20          A.    He told me he was going -- he was going
21     to let the judge know that they moved me, that
22     I'm up in Tallulah where I can't use the phone
23     because he had done already put some money on the
24     phone to secure us, and that's a whole different
25     service carrier up there.

1        Q.    Who has service on their phone here for

2    you now from OPP?

3        A.    Nobody.

4        Q.    So who do you talk to?

5        A.    I don't talk to nobody.

6        Q.    You haven't talked to anybody on this

7    new charge?

8        A.    No.

9        Q.    You haven't made any phone calls?

10       A.    Yeah, I made a phone call.

11       Q.    Who did you call?

12       A.    Texas.

13            MR. MOST:

14                 Objection.  Relevance.

15    BY MS. RODRIGUE:

16       Q.    And who did you talk to?

17            MR. MOST:

18                 Objection.  Relevance.

19            THE WITNESS:

20                 A friend.

21    BY MS. RODRIGUE:

22       Q.    Who's your friend?

23       A.    No comment.

24            MR. MOST:

25                 Is there a relevance?  Is there any

1    relevance to this?

2                MS. RODRIGUE:

3                    Yes.

4            MR. MOST:

5                    What's the relevance?

6            MR. CENTORINO:

7                    It's been lodged --

8            MR. MATTHEWS:

9                    You don't have to get into that at

10   this point.  Just lodge your objections.

11           MR. MOST:

12                   Well, okay.  You know, I think

13   you're bordering on badgering the witness.  If

14   you're talking about these current -- people he's

15   currently calling --

16           MS. RODRIGUE:

17                   That's fine.

18           MR. MOST:

19                   This case has nothing to do with

20   something that happened back in 2016.  I don't

21   see any relevance.  I'm going to let you know, I

22   think this is bordering on badgering.

23                   You can go ahead and answer the

24   question and tell her.

25           THE WITNESS:

152

1                      I ain't have to tell her nothing.

2      She can look at the call log and let her dial

3      your arm band.  So I probably let some other

4      people use my arm band or something to make a

5      phone call.  Don't make no matter.  You can't

6      really calculate that anyway.

7      BY MS. RODRIGUE:

8           Q.    Who did you give your folder to?

9           A.    I don't know.  I don't remember.

10          Q.    So you don't remember whose --

11          A.    I don't know.

12          Q.    -- phone you were using in the DOC?

13          A.    I don't know.  I took my arm band off

14     and put it in my locker.

15          Q.    Okay.  So you only called one person,

16     and that was a friend in Texas?

17          A.    Yeah.

18          Q.    So you didn't talk to Skin?  Is that his

19     name?

20          A.    No.

21          Q.    You haven't talked to him since you were

22     in Orleans Parish Prison?

23          A.    No.

24          Q.    And everything you're saying today is

25     the truth, correct?

1       A.      Right.

2       Q.      So the person you're talking to in

3   Texas, is it a female or a male?

4       A.      Female.

5       Q.      Is that Phat?

6       A.      Yes.

7       Q.      And who is she to you?

8       A.      Friend.

9       Q.      Girlfriend?  Romantic?

10      A.      Girlfriend, friend.

11      Q.      Okay.  So did she discuss with you your

12  time that you were incarcerated this time as well

13  as a previous time?

14      A.      No.

15      Q.      So she never said to you, you know, that

16  basically your lifestyle and the way you were

17  running it on the street, you were better off

18  incarcerated?

19      A.      No, I don't remember that.

20      Q.      She didn't say that?

21      A.      No.

22      Q.      Did she talk to you about your language?

23      A.      I don't remember that.

24      Q.      Obscene language that you use?

25          MR. MOST:

1              Okay.  Relevance.

2         THE WITNESS:

3              I don't remember that.

4    BY MS. RODRIGUE:

5         Q.   You don't remember.  So when you told

6    her that -- when you said, when you talk about

7    how much drugs you were using and that you were

8    fine, you're fine back here in jail, would that

9    be true and accurate?

10        A.   I don't remember that.

11        Q.   Are you?

12        A.   I don't know.  Am I?

13        Q.   Are you using drugs in jail now?

14        MR. MOST:

15             Objection.  Relevance.

16        THE WITNESS:

17             That's what you got out of the

18   conversation you got recorded?  Whatever you got

19   out of the conversation, that's your answer.

20   BY MS. RODRIGUE:

21        Q.   Is that the truth, what was in the

22   conversation?

23        A.   No.

24        Q.   So when you discuss things with Phat,

25   that's not the truth?

1     A.   No.

2     Q.   So you lie to her?

3     A.   Sometimes.

4     Q.   Okay.  So when you told me that you

5 never talked to Skin on the phone, is that a lie?

6     A.   I don't know.  You got the recorded

7 conversation.  You tell me.

8     Q.   Is that a lie?

9     A.   I don't know.

10     Q.   Did you talk to him?

11     A.   Yeah, I talked to him.

12     Q.   So before when you said you didn't, that

13 was a lie?  Yes or no?

14     A.   I don't know.

15     Q.   Did you ever talk to any deputy or any

16 people in OPP during the time before you got sent

17 to DOC about your calculation of time?

18     A.   No.  They don't have nothing do with

19 that.

20     Q.   Right.  OPP really has nothing to do

21 with that?

22     A.   They're not the classifications office.

23     Q.   Right.  So you really had to just wait

24 for DOC?

25     A.   I guess.

1     Q.   Okay.  You said you were being taxed at

2 one of the places you worked at, Crossroads,

3 correct?

4     A.   Right.

5     Q.   Did you ever file any tax returns on any

6 of that?

7     A.   No.

8     Q.   How long was your parole for the crime

9 that you got released from the DOC?  What was

10 your parole period?

11     A.   Eight years.

12     Q.   And you obviously were not in compliance

13 with parole at the time you got picked up on

14 this, correct?

15     MR. MOST:

16         Objection.  Calls for a legal

17 conclusion.

18 BY MS. RODRIGUE:

19     Q.   Correct?

20     A.   I guess.

21     Q.   You hadn't even reported to them in

22 quite some time, correct?

23     MR. MOST:

24         Objection.  Relevance.

25     THE WITNESS:

1              I don't know.  Whatever your

2      paperwork says, that's what it is.

3      BY MS. RODRIGUE:

4          Q.   Well, you absconded to Houston, you said

5      that, correct?

6          A.   I don't know.  Did I?

7               MR. MOST:

8                  Objection.  Asked and answered.

9      BY MS. RODRIGUE:

10         Q.   Well, you said you did.  So did you or

11     did you lie about that?

12         A.   I don't know.

13              MR. MOST:

14                 Objection.  Argumentative.

15     BY MS. RODRIGUE:

16         Q.   All right.  So before you get booked on

17     the warrant, you were living on Canal Street,

18     correct, in the VOA?

19         A.   Yes.

20         Q.   You had a -- you had kind of odd jobs

21     back and forth.  One at the Catty Corner,

22     correct?

23         A.   Correct.

24         Q.   And then at the group home, correct?

25         A.   Correct.

158

1          Q.    You get out, you go to the exact same

2     place.  After the warrant, you get booked out of

3     OPP, you go to the exact same place to live,

4     correct?

5          A.    Correct.

6          Q.    They offer you a job, correct?

7          A.    Who offered me a job?

8          Q.    The Crossroads people offer you a job?

9          MR. MOST:

10              Objection.  Asked and answered.

11          THE WITNESS:

12              No.  That's after the fact.

13     BY MS. RODRIGUE:

14          Q.    Right.  After the fact they offered you

15     a different job?

16          A.    No.  Something like that.  It was

17     something.  I don't know what went on.  They

18     probably thought I had something to do with the

19     scheme to where the guy was working, working in

20     my slot and they had to pay him all of that

21     overtime or whatever.  And when they really, I

22     guess, investigated the matter, by it being a

23     state job and found out that I was incarcerated,

24     and they just tried to put me somewhere else.

25          Q.    So they offered you something else,

1    correct?

2         A.    Right.   But it was too much of an

3    inconvenience to accept.

4         Q.    So you declined?

5         A.    Yeah.

6         Q.    So you ended up doing what for work?

7         A.    All kind of little odd jobs, painting or

8    whatever.

9         Q.    Painting, wherever you could pick up

10   work --

11        A.    Yes.

12        Q.    -- you were able to get a few dollars

13   here and there?

14        A.    Yes.

15        Q.    You go to Michigan, correct?

16        A.    Yes.

17        Q.    And so eventually you pick up this

18   charge?

19        A.    Yes.

20        Q.    Nothing had changed as far as your

21   mental health situation, was pretty much the same

22   as it was before, everything is the same?  Picks

23   up where it leaves off basically, correct?

24        A.    I guess.  I don't know.

25        Q.    So in other words, you hadn't -- you

1    weren't taking any medication that you stopped

2    taking, correct?

3        A.    I don't take medication, period.

4        Q.    Exactly.

5        A.    I'm not prescribed anything.

6        Q.    Right.  So you were never visiting any

7    doctors or anything and you missed anything?

8        A.    Not yet.  Not yet.

9        Q.    Correct.  You've never set any of that

10   up.

11           You never -- there was the -- the

12   daughter that you have, you don't have any

13   contact with?

14       A.    She is in Cleveland, Ohio.

15           MR. MOST:

16               Objection.

17   BY MS. RODRIGUE:

18       Q.    And you have no contact with her?

19       A.    I didn't say that.

20       Q.    Do you have any contact with her?

21       A.    Sometimes.

22       Q.    How often?

23       A.    Periodically.

24       Q.    And what is -- once a year you talk to

25   her?

```
 1         A.    Probably two, three times a year.

 2         Q.    She probably didn't have any knowledge

 3  of any of this even happening, correct?

 4         A.    Correct.

 5         Q.    Are you -- before this arrest, were you

 6  back on food stamps?

 7         A.    Yes.

 8         Q.    Any other government assistance?

 9         A.    No.

10         Q.    Disability?  Anything?

11         A.    No.

12         MS. RODRIGUE:

13             No other questions.

14         MR. CENTORINO:

15             Ten seconds?

16         MR. MOST:

17             Yeah, yeah.  Take your time.

18         MR. CENTORINO:

19             That's it.  Thank you.

20  (Whereupon the deposition was concluded at 12:49

21  p.m.)

22

23

24

25
```

1          REPORTER'S CERTIFICATE

2

3      This certification is valid only for a
transcript accompanied by my original signature
4   and original required seal on this page.

5              I, Michelle Vidrine-Corona, Certified
Court Reporter in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that (Rodney Grant) to
7   whom oath was administered, after having been
duly sworn by me upon authority of R.S. 37:2554,
8   did testify as hereinbefore set forth in the
foregoing (162) pages; that this testimony was
9   reported by me in the stenotype reporting method,
was prepared and transcribed by me or under my
10  personal direction and supervision, and is a true
and correct transcript to the best of my ability
11  and understanding; that the transcript has been
prepared in compliance with transcript format
12  guidelines required by statute or by rules of the
board, and that I am informed about the complete
13  arrangement, financial or otherwise, with the
person or entity making arrangements for
14  deposition services; that I have acted in
compliance with the prohibition on contractual
15  relationships, as defined by Louisiana Code of
Civil Procedure Article 1434 and in rules and
16  advisory opinions of the board, that I have no
actual knowledge of any prohibited employment or
17  contractual relationship between myself and a
party litigant in this matter.  I am not related
18  to counsel or to the parties herein, nor am I
otherwise interested in the outcome of this
19  matter.

20

21

22

23  _Michelle Vidrine-Corona, CCR_

24   Michelle Vidrine-Corona, CCR, #96023
Certified Court Reporter

25