Transcript of the Testimony of

# Deputy Corey Amacker

July 17, 2019

Crittondon v. Gusman



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

Exhibit 1(d)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CASE NO. 3:17-CV-00512-SDD-EWD

JESSIE CRITTINDON, ET AL
VERSUS
MARLIN GUSMAN, ET AL

Deposition of DEPUTY COREY AMACKER, taken
at the Orleans Parish Sheriff's Office, 2800
Perdido Street, New Orleans, Louisiana 70119
on Wednesday, July 17, 2019 commencing at
1:04 p.m.

APPEARANCES:

RODERICK & SOLANGE MACARTHUR JUSTICE
CENTER
Attorneys at Law
BY:  EMILY WASHINGTON, Esquire
BY:  JAMES CRAIG, Esquire
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
ATTORNEYS FOR PLAINTIFFS,
JESSIE CRITTINDON AND
EDDIE COPELIN, ET AL

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA  70404   Fax 985.419.0799

```
 1    APPEARANCES (CONTINUED):
 2
 3            RODRIGUE & ARCURI LAW GROUP
              Attorneys at Law
 4            BY:  PETE MATTHEWS, Esquire
              201 St. Charles Avenue
 5            Suite 114-412
              New Orleans, Louisiana 70170
 6
                  ATTORNEYS FOR DEFENDANTS, ORLEANS
 7                PARISH SHERIFF'S OFFICE
 8
 9            USRY WEEKS & MATTHEWS
              Attorneys at Law
10            BY:  SHANE BRYANT, Esquire
              (Via telephone)
11            1615 Poydras Street
              Suite 1250
12            New Orleans, Louisiana 70112
13                ATTORNEYS FOR DEFENDANTS, EAST
                  CARROLL PARISH SHERIFF'S OFFICE
14
15
              LOUISIANA DEPARTMENT OF JUSTICE
16            Attorneys at Law
              BY:  JAMES G. "GARY" EVANS, Esquire
17            (Via telephone)
              1885 North Third Street
18            Floor 4
              Baton Rouge, Louisiana 70802
19
                  ATTORNEYS FOR DEFENDANTS, STATE OF
20                LOUISIANA, LOUISIANA DEPARTMENT OF
                  JUSTICE
21
22
23    REPORTED BY:
24            LORIE M. HOYT
              Certified Court Reporter
25            Registered Professional Reporter
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Deputy Corey Amacker   July 17, 2019

```
 1      JESSIE CRITTINDON, ET AL V. MARLIN GUSMAN, ET AL
        C/W EDDIE COPELIN, ET AL V. MARLIN GUSMAN, ET AL
 2            Deposition of DEPUTY COREY AMACKER
                    Taken on July 17, 2019
 3
 4                       EXHIBIT INDEX
 5
        Exhibit 71 -  Logbook entries
 6                    Crittindon001440 through
                      Crittindon001459
 7      Exhibit 72 -  Defendant Corey Amacker's
                      Objections and Responses to
 8                    Plaintiffs' First Set of
                      Interrogatories, Requests for
 9                    Production of Documents, and
                      Requests for Admission to OPSO
10                    Defendants
                      Crittindon000474 through
11                    Crittindon000761
        Exhibit 73 -  E-mail dated 10/11/16 to Corey
12                    Amacker from Glynn Stassi
                      Crittindon004735
13      Exhibit 74 -  E-mail dated 11/7/16 to Laura
                      Sevier from Corey Amacker
14                    Crittindon004732
15
                      EXAMINATION INDEX
16
                                          Page
17
18      Ms. Washington....................   5
        Mr. Byrant.......................158
19
20
21
22
23
24
25
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1                  S T I P U L A T I O N
 2             It is stipulated and agreed by and
 3        between counsel for the parties hereto that
 4        the deposition of the aforementioned witness
 5        is hereby being taken under the Federal Rules
 6        of Civil Procedure, for all purposes, in
 7        accordance with law;
 8             That the formalities of reading and
 9        signing are specifically waived;
10             That the formalities of sealing,
11        certification and filing are specifically
12        waived;
13             That all objections, save those as to the
14        form of the question and the responsiveness of
15        the answer, are hereby reserved until such
16        time as this deposition, or any part thereof,
17        may be used or sought to be used in evidence.
18                  *      *      *      *
19             LORIE M. HOYT, Registered Professional
20        Reporter, and Certified Court Reporter, in and
21        for the Parish of Orleans, State of Louisiana,
22        officiated in administering the oath to the
23        witness.
24
25
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

```
 1              DEPUTY COREY AMACKER,
 2   after having been first duly sworn by the
 3   above-mentioned court reporter, did testify
 4   as follows:
 5   EXAMINATION BY MS. WASHINGTON:
 6   Q. Good afternoon.
 7   A. Hi.
 8   Q. Would you please state your full name for the
 9      record?
10   A. Corey Amacker.
11   Q. And it's Deputy Amacker, correct?
12   A. Yes.
13   Q. Deputy Amacker, my name is Emily Washington.
14      I represent the plaintiffs in this litigation,
15      and I'm going to be the one taking your
16      deposition today.  Have you had your
17      deposition taken in the past?
18   A. For this?
19   Q. In general.
20   A. Yes.
21   Q. Okay.  And when you had your deposition taken
22      previously, was that in the context of your
23      job with the --
24   A. Yes.
25   Q. -- sheriff's office?
```



Deputy Corey Amacker   11/07/2019

1  A. Yes.

2  Q. Okay.  My guess is that when you had your

3     deposition taken before, they probably went

4     over some sort of basic ground rules.  I'm

5     going to do the same just so we're on the

6     same, I guess, same page about what we're

7     going to be doing here for the next couple of

8     hours.  Make sense?

9  A. Okay.

10 Q. We have a court reporter sitting at the end of

11    the table.  She's going to be taking down

12    everything that we say.  So it's just

13    important to speak up, have audible answers,

14    yeses and nos, rather than nodding or shaking

15    of the head and things that won't come out

16    very clean on the transcript.  Makes sense?

17 A. Yes.

18 Q. You just took an oath.  It's the same oath

19    that you would take as if you were testifying

20    in court, and so we're just looking for

21    truthful and complete answers today.

22 A. (Nodded head affirmatively.)

23 Q. If at any point today I ask a question that is

24    confusing or unclear or complicated, please

25    just let me know.  I'm happy to rephrase the

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        question or break it up or simplify it.  Does
 2        that make sense?
 3   A. Yes.
 4   Q. If you don't ask me to clarify my question,
 5        I'm going to assume that you understand the
 6        question that I'm asking and that that's what
 7        you're responding to.
 8   A. (Nodded head affirmatively.)
 9   Q. Our interest today is in figuring out
10        everything that you know about the facts and
11        events that have to do with this case, and so
12        if at any point during questions today you
13        remember something and want to supplement an
14        answer that you gave earlier or realize that
15        you misstated something before and want to
16        make a correction, please let me know so that
17        we can do that on the record.  Okay?
18   A. Okay.
19   Q. If you need to take a break at any point
20        during the day today or speak with counsel,
21        you're more than welcome to.  All I ask is
22        that if I have a question that's sort of out
23        on the table, that you provide me with your
24        answer to that question and we wrap that up
25        before we take a break.  Fair?
```

Amerson White®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   A. (Nodded head affirmatively.)
 2   Q. Is that a yes?
 3   A. Maybe.
 4   Q. Maybe?
 5   A. Maybe.  It depends on the question.
 6   Q. Okay.  Is there any medication or hardship or
 7      sleep depravation or anything that would
 8      prevent you --
 9   A. No.
10   Q. -- from giving accurate and truthful testimony
11      today?
12   A. No.
13   Q. Okay.  Well, let's get started.  Could you
14      give me a brief outline of your education?
15   A. High school education, some college.
16   Q. Okay.  When did you graduate from high school?
17   A. 2001.
18   Q. And was that here in Louisiana?
19   A. Yes.
20   Q. You mentioned that you have some college.
21      Tell me a little bit more about that.
22   A. I just briefly went to Louisiana Tech.  I was
23      going to play ball there.
24   Q. What years did you attend Louisiana Tech?
25   A. I went in 2001.  I never actually stayed
```



Deputy Corey Amacker 12/9/2019

```
 1          there.  I was injured and moved back home.
 2     Q. Okay.  Have you had any other vocational or
 3          trade school experience since that time?
 4     A. No.  Tons of law enforcement training, but not
 5          vocational trade school.
 6     Q. Okay.  Any military experience?
 7     A. No.
 8     Q. And you are currently employed by the Orleans
 9          Parish Sheriff's Office, correct?
10     A. Yes.
11     Q. When did you start with OPSO?
12     A. February 5th, 2007.
13     Q. Can you briefly walk me through any employment
14          that you had between 2001 and 2007 when you
15          started with the OPSO?
16     A. I was a manager of a nightclub for most of the
17          period of that time, and I spent about
18          18 months with the Washington Parish Sheriff's
19          Office.
20     Q. What were your job responsibilities when you
21          were with the Washington Parish Sheriff's
22          Office?
23     A. Inmate transportation and then I moved into
24          what was our psych unit where we picked up
25          PECs, mental patients and suicide risk
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        patients from their residence.
 2   Q. Were you a sworn officer when you worked --
 3   A. Yeah.
 4   Q. -- for the sheriff's office?
 5   A. Yeah.
 6   Q. Did you go through the POST academy with --
 7   A. I didn't --
 8   Q. -- Washington Parish?
 9   A. -- no.
10   Q. Okay.
11   A. I didn't go to the academy until I came here.
12   Q. Okay.  Did you do any work with the Washington
13        Parish Sheriff's Office related to intake and
14        processing or pre-classification like we're
15        going to talk about today?
16   A. I did intake and processing, but that's a
17        small agency, so everybody did that.
18   Q. Okay.  Any work with pre-classification with
19        Washington Parish?
20   A. No.  I believe that was prior to individual
21        agencies doing their own pre-classification.
22   Q. Okay.  What years were you with Washington
23        Parish?
24   A. I think '03, '04.
25   Q. Okay.  What is your current position with
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker - 11/7/2019

```
 1       OPSO?
 2   A. Full-time academy instructor for the POST
 3       academy.
 4   Q. And when did you start in that position?
 5   A. I think December of 2017.  That could be
 6       wrong.  I don't remember the exact date when I
 7       went over there.
 8   Q. Okay.  Could you give me a brief outline of
 9       what other positions you've held with OPSO
10       between 2007 and 2017?
11   A. Intake and processing.  I worked in our home
12       incarceration division for four years, four
13       and a half years, somewhere in there.  Then
14       DOC classification, pre-classification, and
15       training.
16   Q. Was the home incarceration assignment your
17       first assignment with the sheriff's office?
18   A. Second.
19   Q. Okay.
20   A. Lockup was my first, intake and processing.
21   Q. Okay.  What was your job with intake and
22       processing when you were in that unit?
23   A. There's no specific.  You get rotated around
24       in intake, so you learn every position in
25       intake.
```



Deputy Corey Amacker - 11/20/19

```
 1    Q. Okay.  How long were you in that position?
 2    A. From 2007 to, I believe, October of 2009.  So
 3       that would have been February of '07 to
 4       October of '09.
 5    Q. Okay.  And then you said you were with the
 6       home incarceration unit for about four years?
 7    A. 2009 until almost 2015, but it was from the
 8       end of one year until the beginning of
 9       another; so it was like four and a half years,
10       I believe.
11    Q. Okay.  Do you remember when you started as the
12       DOC classification manager?
13    A. I do not.  2014 was the year.  I don't
14       remember the month.
15    Q. Okay.  And that would have been the position
16       that you left in 2017 --
17    A. Yes.
18    Q. -- when you went to the training academy?
19    A. Yes.
20    Q. This litigation has to do with events in 2016
21       and 2017.  Am I correct that, during that
22       period of time before your current position,
23       you would have been the DOC classification
24       manager?
25    A. Yes.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1    Q. Am I correct that the DOC classification
 2       manager works within the intake and processing
 3       department?
 4    A. In records division, which is located next to
 5       intake and processing.
 6    Q. Okay.  How did you get the DOC classification
 7       manager position?
 8    A. I was asked to take the position by my current
 9       supervisor at the time.
10    Q. And who was that?
11    A. Major Rochelle Lee.
12    Q. Okay.  Had she also been your supervisor with
13       the home incarceration?
14    A. She was not.
15    Q. Okay.  Was Major Lee your direct supervisor
16       when you were working as the DOC
17       classification manager?
18    A. Yes.  She was the director of records at the
19       time.
20    Q. Okay.
21    A. Well, when I first took the position.
22    Q. In 2014?
23    A. Yes.
24    Q. Okay.  Did you have other direct supervisors
25       during your time as the classification
```



Deputy Corey Amacker 11/21/2019

Page 14

```
 1      manager?
 2   A. Yes.  Jerrod Spinney briefly, and then
 3      Sidney Holt and Djuana Bierria.
 4   Q. That's Major Spinney; is that correct?
 5   A. Yes.
 6   Q. Okay.  Was there anyone else that you reported
 7      to while you were in that position?
 8   A. No.
 9   Q. When you were the DOC classification manager,
10      did you supervise anyone?
11   A. No.
12   Q. Was there any other OPSO employee who assisted
13      you in those job responsibilities?
14   A. Several over the course of a few years.
15   Q. Okay.  What positions would those individuals
16      have been in?
17   A. Basically, the same position just kind of as
18      an assist -- I don't want to say an assistant
19      because they weren't an assistant.  We were
20      equal in working.  So I was doing most of the
21      transferring, putting together the list.  They
22      would do the, let's say, the AFIS portion of
23      it, AFIS machine fingerprinting portion of it.
24   Q. Walk me through what your job responsibilities
25      were as the DOC classification manager.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1   A. So records receives a sentence from courts.

2      They do a Letter of Credit for time

3      incarcerated with us.  That sentence Letter of

4      Credit goes to DOC classification, at which

5      time you put together a pre-classification

6      packet for Louisiana Department of

7      Corrections.  That packet consists of

8      fingerprint, AFIS booking, which would be the

9      actual sentencing within the state computer.

10     All of that gets printed out.  An interview

11     form is done face to face with the inmate,

12     which would be just demographics of family,

13     address, shoe size, height, weight, you know,

14     just basic demographics.  And that entire

15     packet once complete is sent to the Department

16     of Corrections for processing.  Those lists

17     are -- those inmates that are processed end up

18     on a transferable list, at which time we

19     submit to the Department of Corrections for

20     transfer.

21  Q. And we are going to talk about some of those

22     specific steps in a little bit more detail;

23     but just to make sure I understand what you

24     just said, you indicated that the records

25     department gets the sentence from the court

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

Deputy Corey Amacker - 7/26/19

```
 1        and also generates the Letter of Credit; is
 2        that correct?
 3   A.  Correct.
 4   Q.  And then you indicated that those documents
 5        are sent to the Department of Corrections; is
 6        that right?
 7   A.  After I finish the packet, they're sent to the
 8        Department of Corrections, yes.
 9   Q.  That was actually my question.  I wanted to
10        know whether or not those documents were being
11        sent directly by the records department or if
12        those became part of the packet that you sent
13        to the Department of Corrections.
14   A.  I'm not sure.  I can't answer that question.
15        I don't know if they send it directly to -- I
16        know DOC classification does.
17   Q.  Okay.  So it's possible that records sends
18        those documents independently that you don't
19        know about?
20   A.  It could be.  I just can't answer yes or no to
21        that.
22   Q.  Okay.  But those documents, the sentencing
23        information, the Letter of Credit are part of
24        the packet that, as the classification
25        manager, you put together; is that correct?
```

```
 1    A. Yes.
 2    Q. Okay.  What -- who was responsible for
 3       training you in the job responsibilities that
 4       you just described when you were the
 5       classification manager?
 6    A. Initially, Sonja Stewart, who now works for
 7       Louisiana Department of Corrections.
 8    Q. And what was her position at the time?
 9    A. She was in records, but she had previously
10       done the position I was taking, DOC
11       classification.  So she was in records.
12    Q. Did you directly take over the classification
13       manager position from her?
14    A. It was somebody there already.  There's always
15       two people typically assigned to it.
16    Q. Okay.  Who was already in the position when
17       you started?
18    A. I believe Latoya Armwood.
19    Q. What training did you receive from Ms. Stewart
20       when you started in that position?
21    A. It's just the process.  You're already trained
22       and certified on the AFIS machine.  It's just
23       typically how to put the packet together and
24       how to do the data entry into the AFIS
25       machine.  It's still an AFIS process.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Deputy Corey Amacker  11/7/2019

```
 1    Q. And you indicated that you were already
 2       trained on AFIS.  When did you receive that
 3       training?
 4    A. At Washington Parish Sheriff's Office.  And as
 5       well when I started here again.
 6    Q. Is the AFIS training part of the academy?
 7    A. No.
 8    Q. Okay.
 9    A. No.
10    Q. When do people receive training on AFIS?
11    A. If they're assigned to lockup, typically, is
12       the only ones that use it, as well as human
13       resources uses it, of course, for applicant
14       investigations.
15    Q. Okay.  So for individuals who are hired by
16       OPSO to work in units that utilize AFIS?
17    A. That require it, right.
18    Q. Okay.  And so you would have received that
19       when you first started in intake and
20       processing?
21    A. Yes.
22    Q. Okay.  While you were the DOC classification
23       manager, did you have any input into policies
24       or training or anything else having to do with
25       pre-classification?
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1   A. No.
 2   Q. At some point, you left the position of DOC
 3      pre-classification manager for the training
 4      academy, correct?
 5   A. Yes.
 6   Q. Why did you leave the classification manager
 7      position?
 8   A. I was already teaching part-time at the
 9      academy while assigned to classification.  I
10      was going there after I got off to do physical
11      fitness for the academy.  I was offered a
12      position.  I took it.  That's been where I --
13      my ultimate goal was to get there at some
14      point.
15   Q. Okay.  A lot of my questions today are going
16      to have to do with 2016 and 2017 when you were
17      the DOC classification manager.  I will try to
18      be specific about the timeline I'm asking
19      about, but just so you know as background.
20   A. (Nodded head affirmatively.)
21   Q. Generally speaking, what is the intake and
22      processing department responsible for?
23   A. Intake and processing is simply intake and
24      processing.
25   Q. Is records considered a separate division from
```

Amerson White®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker 07/20/19

```
 1        intake and processing?
 2   A. Yes.
 3   Q. Okay.
 4   A. They've always been kind of been -- they
 5        coincide because they are in the same place,
 6        but records is in the back, but it's a totally
 7        different set of, I guess, responsibilities.
 8   Q. And you indicated that pre-classification
 9        would fall more under records; is that
10        correct?
11   A. Yes.
12   Q. Okay.  I know I've already been using the term
13        "pre-classification," but before we sort of
14        move further, can you give me what your
15        definition of pre-classification is just so
16        we're speaking the same language today?
17   A. Pre-classification is simply putting in a
18        sentence given by a state court into an AFIS
19        machine, interviewing the inmate that will be
20        doing state Department of Corrections times,
21        putting together that packet for the
22        Department of Corrections to finish their full
23        classification process.
24   Q. So it's the steps that are taken after an
25        individual receives a sentence with the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        Department of Corrections in order to get
 2        information to the Department of Corrections
 3        to process them?
 4    A.  Correct.
 5    Q.  Okay.  Other than the training that you
 6        indicated you received from Ms. Stewart, is
 7        pre-classification a topic that's covered in
 8        the training academy?
 9    A.  No.
10    Q.  Are there any inservice or other regular
11        trainings that cover pre-classification?
12    A.  No.
13    Q.  Does the Department of Corrections or any
14        other outside agency provide the OPSO
15        classification manager with training?
16    A.  They did initially upon -- this -- agencies
17        didn't have pre-classification, and I don't
18        know what year they started it; but when I
19        started my career in law enforcement, the
20        Department of Corrections did all of the
21        classification.  In an effort to speed things
22        up, from my knowledge, they asked all
23        sheriffs' departments to create their own
24        pre-classification to try to speed up the
25        processing for the Department of Corrections.
```

1   Q. And did you indicate that you received
2       training from the Department of Corrections
3       when you started as the classification
4       manager?
5   A. Sonja was trained by the Department of
6       Corrections, who in turn trained myself.
7   Q. Okay.  She had been a previous employee of the
8       department?
9   A. Here?  Yes.  For many, many years.
10  Q. No.  I meant was Ms. Stewart previously
11      employed by the Department of Corrections?
12  A. No.  Initially, when they created all this,
13      people from each agency actually went to the
14      Department of Corrections to receive the
15      training.
16  Q. Okay.
17  A. From that point forward, it was delegated to
18      train within the agency.
19  Q. Okay.  So Ms. Stewart, as an OPSO employee,
20      received training directly from the Department
21      of Corrections?
22  A. Yes.
23  Q. And then she trained you when you started in
24      your position as the DOC classification
25      manager?



```
1    A. Yes.
2    Q. Okay.  Are there written guidelines or
3       policies or manuals that instruct how
4       pre-classification is performed by the
5       sheriff's office?
6    A. No.  It's written by the Department of
7       Corrections, not by the sheriff's office.
8    Q. And what is that written information?
9    A. The same thing I stated earlier.  It's the
10      steps and process, the requirements of a
11      packet.
12   Q. Is it a regulation that's published by the
13      Department of Corrections?
14   A. It's not a regulation.  It's simply a
15      guideline as to what needs to be in a packet.
16   Q. Is it a written document, I guess is my
17      question?
18   A. Yes, I believe it's a written document.
19   Q. Did you receive a copy of that?
20   A. Initially, yes.
21   Q. Which of the departments within OPSO is
22      responsible for releasing individuals from the
23      sheriff's office?
24   A. It depends on how they're released.
25   Q. Okay.  Can you outline for me what the
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        different forms or types of releases could be?
 2   A.  So an inmate leaving from here to go back to
 3        the pre-world is released by the records
 4        department.  An inmate leaving from here to go
 5        to Department of Corrections is released by
 6        DOC classification, pre-classification.  And
 7        they're just released from our custody to
 8        another agency's custody, not released to the
 9        public.
10   Q.  And am I correct that, as the DOC
11        classification manager, part of your job
12        involved the releases of individuals from OPSO
13        to another agency?
14   A.  Yes.
15   Q.  Okay.  Have you been involved in the release
16        of individuals to the community as part of
17        your work with OPSO?
18   A.  No.
19   Q.  That wasn't part of your job responsibilities
20        when you were with intake and processing?
21   A.  No.
22   Q.  Okay.
23   A.  That's very specific.  Only a handful of
24        people do releases.
25   Q.  And those are people who work within the
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1       records division?
 2   A. Records or lockup.
 3   Q. Okay.
 4   A. And it's just because of the very specific
 5       nature of reading those documents.
 6   Q. Who handles a release that's received from the
 7       Department of Corrections?
 8   A. It depends on, again, are they going to the
 9       public; are they going to another prison.
10   Q. I'm thinking about in the context of someone
11       who has completed a sentence and is a release
12       to the --
13   A. Records.
14   Q. -- public?
15   A. (Nodded head affirmatively.)
16   Q. Records?  Okay.
17   A. Well, standby.  Because the Department of
18       Corrections is the only person that can
19       release somebody from Department of
20       Corrections.  Now, they would send the
21       paperwork to us saying Louisiana Department of
22       Corrections is releasing said person.
23   Q. That's the situation I'm talking about.  Am I
24       correct that there are cases where the
25       Department of Corrections sends paperwork to
```

AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        the sheriff's office and the person is in a
 2        physical sense released directly from OPSO?
 3   A. From the Department of Corrections, yes.
 4   Q. Okay.  And that would be something handled by
 5        the records?
 6   A. Yes.
 7   Q. And the training that you received to handle
 8        the releases which are of an individual from
 9        OPSO to another agency, was that training part
10        of what you received from Ms. Stewart?
11   A. Yes.
12   Q. Was there any other training that was provided
13        on releases to you in your capacity as
14        classification manager?
15   A. No, not that I can think of.
16   Q. We talked about the DOC written directive
17        regarding pre-classification.  Are there any
18        written directives or policies or other
19        guidelines that have to do specifically with
20        the release processes that you were handling
21        as the classification manager?
22   A. No, not that I'm aware of.
23   Q. Okay.
24   A. Now, it may fall under the same guideline as a
25        release policy for OPSO's records.
```

1  Q. Okay.  I'm just asking for the information
2     that you have personally.  Was there any
3     written directive or guideline that you were
4     using as the classification manager in the
5     context of the releases that --
6  A. No.
7  Q. -- we were just discussing?
8  A. No.
9  Q. Okay.  And this may be a matter of word choice
10    or word usage; but when you were working as
11    the DOC classification manager, did part of
12    your job responsibility have to do with the
13    transfer of individuals from Orleans to other
14    agencies or facilities?
15 A. Yes.
16 Q. And is that the same process as the releases
17    that we were just talking about or is that
18    something different?
19 A. Not at all.
20 Q. Okay.  What types of transfers were you
21    responsible for as the classification manager?
22 A. Population management transfers.  So
23    basically, we're out of room, so we ask other
24    agencies to house out for us.  It's a common
25    practice in sheriff's departments in law

```
 1        enforcement.
 2   Q. And those transfers that you just discussed,
 3        are those transfers of pretrial detainees?
 4   A. Pretrial, probation and parolees and/or
 5        sentenced Department of Corrections inmates.
 6   Q. Are those transfers solely the responsibility
 7        of the DOC classification manager?
 8   A. They're -- as far as I know.  I don't think
 9        we're doing them now.  That was a temporary
10        thing that was being done here for bed space
11        usage, and at the time, no, it was not.  It
12        was very much a joint effort between medical,
13        mental health, classification and myself.
14   Q. And you indicated that you don't think that is
15        occurring anymore.  What is the general time
16        frame where such transfers were occurring?
17   A. I can't give specific dates, but it's -- this
18        jail opened in 2015, I believe, so
19        somewhere -- '15 to '17 probably, '15 to '18.
20   Q. Okay.  Did you receive training on the
21        transfer process for population management
22        that you just described?
23   A. There's no -- there was no training, no.
24        There was meetings and discussions on how it
25        was going to take place, but not any
```



```
 1       specific -- if you are referring to a training
 2       class, no.  I don't believe one exists.
 3   Q. And we'll probably talk a little bit more
 4       about the meetings and discussions that
 5       occurred, but was there any written guideline
 6       or memorandum or anything that was generated
 7       regarding this transfer of individuals?
 8   A. I have no idea.
 9   Q. Not that you're aware of?
10   A. Not that I'm aware of.
11   Q. I'm assuming you're familiar with the
12       Department of Corrections CAJUN system; is
13       that correct?
14   A. Correct.
15   Q. Do OPSO employees have access to CAJUN?
16   A. Very specific employees that are in records
17       do.
18   Q. Do you have access to CAJUN?
19   A. Not anymore.  I did at the time.
20   Q. And when you say "at the time," are you
21       referring to when you were the classification
22       manager?
23   A. Yes.
24   Q. Was your access cancelled when you moved
25       positions?
```



Deputy Corey Amacker - 11/26/19

Page 30

```
 1   A. Don't know.  I just no longer need it for
 2      training purposes, yeah.
 3   Q. You don't use CAJUN anymore?
 4   A. No.
 5   Q. Okay.  The access that you had to CAJUN when
 6      you were the classification manager, was it
 7      full access to edit CAJUN or was it --
 8   A. No, not at all.
 9   Q. -- a read ability?
10   A. Read only.
11   Q. Okay.
12   A. And to my knowledge, nobody can change CAJUN
13      except for the Department of Corrections.
14      That's their system.
15   Q. So was there any ability for you to input
16      information into CAJUN?
17   A. No.
18   Q. Okay.  Just read and print?
19   A. Just read.
20   Q. Okay.  So we just talked about there being a
21      period of time where OPSO was transferring
22      individuals to be housed outside of the
23      Orleans jail, correct?
24   A. Correct.
25   Q. And that would have included OPSO sending
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        individuals to East Carroll Parish for housing
 2        at River Bend?
 3   A. Yes.
 4   Q. Were you in your position as DOC
 5        classification manager at the time that that
 6        started?
 7   A. Yes.
 8   Q. You mentioned that there were meetings and
 9        discussions that were held about transferring
10        people to other facilities; is that correct?
11   A. Correct.
12   Q. Were you a participant in those meetings?
13   A. No.
14   Q. Did you receive information coming out of
15        those meetings or discussions?
16   A. Not really.  The meetings were basically with
17        the Department of Justice regarding we had to
18        move inmates prior to moving into this
19        facility because we had more inmates than we
20        had beds.
21   Q. Who within the sheriff's office would have
22        been participating in those discussions, to
23        your knowledge?
24   A. The sheriff.
25   Q. Okay.
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker - 07/26/19

1    A. And whoever else he had in the meeting.  Way
2       above me at that time.
3    Q. How did you learn that OPSO was going to be
4       transferring individuals to other facilities?
5    A. Everyone in records and lockup at that time
6       was notified because it was all a huge, joint
7       effort to try and get the inmates ready to go,
8       paperwork-wise, not physically.
9    Q. And you may have already answered this, but
10      what is your understanding of why the
11      sheriff's office arranged with other
12      facilities to house Orleans prisoners?
13   A. Bed space initially when we moved in.  I mean,
14      there were more inmates in OPSO custody than
15      there were beds in this facility.
16   Q. You said "initially."  Did that rationale
17      change at some point in time?
18   A. As to?  No.  I believe we were housing out due
19      to the population management simply because we
20      had more people in custody than we had
21      adequate space for.  Due to classification
22      guidelines -- not DOC classification -- due to
23      classification guidelines set by the DOJ
24      monitors at the time, meaning, we couldn't put
25      certain inmates together; therefore, we

1      couldn't put them on the same units, so we had
2      to move them.
3   Q. And when you mentioned classification in that
4      context, you're talking about decisions made
5      about how to house people internally to the
6      facility, correct?
7   A. Yes.
8   Q. At some point, it's my understanding that the
9      agreement to house Orleans individuals in
10      other facilities became formal arrangements
11      with other sheriffs' offices; is that correct?
12   A. I mean, it's always going to be a formal
13      arrangement to ask someone else to house an
14      inmate for you because, technically, by
15      billing purposes, I guess you would say,
16      they're still in our custody being housed by
17      another agency.
18   Q. And by "billing purposes," you mean that
19      Orleans Parish was billing or, I guess, the
20      other facility was billing Orleans Parish for
21      housing Orleans prisoners in another facility?
22   A. Billing the City of New Orleans, yes.
23   Q. Okay.  Specifically, with regard to the East
24      Carroll Parish Sheriff's Office and housing
25      prisoners at the Riverbend facility, were you

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker - 7/26/19

Page 34

1        involved in any discussions or meetings
2        regarding that particular arrangement?
3    A. Not at all.
4    Q. To your knowledge, was the agreement between
5        OPSO and East Carroll Parish Sheriff's Office
6        for the housing of pretrial detainees?
7    A. I don't know.
8    Q. Okay.
9    A. I mean, yes, they were pretrial detainees
10       there, but I'm not -- to specifically, if it
11       was going to be just pretrials, I have no
12       idea.
13   Q. Okay.
14   A. I will say that they are a DOC facility, as
15       well as a pretrial facility, at East Carroll
16       Parish Detention.
17   Q. But you don't know whether or not the
18       agreement between the Orleans Parish Sheriff's
19       Office and the East Carroll Parish Sheriff's
20       Office specified --
21   A. No, I'm not aware.
22            MS. WASHINGTON:
23                 Okay.  I'm going to hand you two
24            documents that have been previously
25            marked as exhibits in depositions in

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1              this case.
 2          (Documents tendered.)
 3      BY MS. WASHINGTON:
 4      Q. They're marked as Exhibit 3 and Exhibit 4, and
 5         if you could just take a look at both of them,
 6         and let me know whether or not you recognize
 7         them?
 8      A. I do not.
 9      Q. I will represent to you, and you can see from
10         the first page of both of them, that these are
11         Cooperative Endeavor Agreements or Memorandum
12         of Understanding between the East Carroll
13         Parish Sheriff's Office and the Orleans Parish
14         Sheriff's Office.  But am I correct in
15         understanding your testimony that you have not
16         seen these documents before?
17      A. I have not.
18      Q. Perhaps this is self-evident, but were you
19         involved in drafting these agreements at all?
20      A. No.
21      Q. Did you receive any information or did anyone
22         within the sheriff's office communicate with
23         you specifically about these agreements with
24         East Carroll Parish?
25      A. No.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 11/7/2019

```
 1   Q. When it was communicated to you that there
 2       were going to be individuals housed in East
 3       Carroll Parish, what was your understanding of
 4       what East Carroll Parish Sheriff's Office was
 5       going to be responsible for relative to those
 6       prisoners?
 7   A. Daily care and housing of inmates and
 8       transportation to court.
 9   Q. Anything else?
10   A. As to what, specifically?
11   Q. I'm just trying to understand what was
12       communicated to you about what East Carroll
13       Parish Sheriff's Office would be responsible
14       for.
15   A. Nothing was communicated to me.  Everything
16       was -- I mean, we were aware as an agency.  If
17       you worked here, you knew we were housing
18       inmates out.  It was very publically known and
19       in the news.
20   Q. What was your understanding of what East
21       Carroll Parish Sheriff's Office was
22       responsible for?
23   A. My understanding is they were housing inmates
24       for us and they were going to transport back
25       and forth to court.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   Q. And by the same token, what was your
2      understanding of what the Orleans Parish
3      Sheriff's Office would remain responsible for
4      having to do with those prisoners housed in
5      Riverbend?
6   A. We were going to maintain the records for them
7      because they're still technically, legally our
8      inmate.
9   Q. You indicated, when we were talking about the
10     types of prisoners that would be housed at
11     East Carroll, that Riverbend is a DOC
12     facility; is that what you said?
13  A. Correct.
14  Q. What did you mean by "DOC facility" in that
15     context?
16  A. Meaning they house sentenced Department of
17     Corrections inmates for the State of
18     Louisiana.
19  Q. Is OJC a DOC facility?
20  A. We do not house permanent DOC inmates here.
21     Every facility is going to have DOC inmates in
22     it at some point because they're sentenced and
23     classified, but as far as housing permanent
24     DOCs in OJC, no.  We have a DOC facility down
25     the street, which is a transitional work

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker - 11/26/19

Page 38

```
 1        program.
 2   Q. And you're referring to the temporary
 3        detention center?
 4   A. Yes.  But TDC -- that's kind of tricky because
 5        transitional work program is a DOC program
 6        that, I guess, falls inside of TDC.
 7   Q. Those individuals are currently being housed
 8        inside of TDC?
 9   A. Yes.
10   Q. Okay.  You are aware that, at some point in
11        time, the Orleans Parish Sheriff's Office
12        began releasing or transferring DOC-sentenced
13        prisoners to the Riverbend facility; is that
14        correct?
15   A. Not just Riverbend.  I mean, anywhere in the
16        State of Louisiana that houses DOC inmates.
17   Q. Was there a point in time, specifically
18        speaking about East Carroll Parish Sheriff's
19        Office, where OPSO began releasing or
20        transferring DOC-sentenced prisoners directly
21        to the Riverbend facility?
22   A. Yes.
23   Q. To your knowledge, when did that begin?
24   A. I can't answer that simply because I have no
25        idea what date that we began doing that.
```



866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1   Q. Do you have any sense of the year that that
 2      started?
 3   A. I don't.
 4   Q. Is it something that started when you were the
 5      DOC classification manager?
 6   A. Yes.
 7   Q. So sometime after 2014 based on your position;
 8      is that correct?
 9   A. Sometime after 2015.
10   Q. Okay.  And before we go on, I want to ask you
11      which term I should be using.  Would you
12      consider the process that OPSO was doing with
13      regard to DOC-sentenced prisoners in East
14      Carroll as a release, as a transfer?  I want
15      to make sure the record is clear by using the
16      right word.
17   A. So here's a -- I can clear that up some.
18   Q. Okay.
19   A. If I'm moving you as a pre-class inmate to
20      East Carroll to house out, that's a transfer,
21      and the reason I say that is because they're
22      housing as a courtesy for Orleans Parish
23      Sheriff's Office because we don't have enough
24      bed space, which that gets into billing with
25      the city and those things.
```

```
 1          If I release you to East Carroll Detention
 2     or Riverbend as a sentenced prisoner, that's
 3     because the Department of Corrections is
 4     responsible for your housing billing, and
 5     you're sentenced and belong to the State of
 6     Louisiana.
 7  Q. So to make sure I understand, transfer would
 8     be the appropriate term if what's happening is
 9     a pretrial Orleans detainee is being moved
10     from Orleans to be housed in Riverbend?
11  A. Right.  They stay in our computer active as an
12     inmate that it's location is Riverbend.  A
13     release comes all the way out of our system.
14  Q. And so release would be the terminology you
15     would use for moving a DOC-sentenced
16     individual from Orleans to Riverbend?
17  A. Correct.
18  Q. Were there discussions within OPSO when this
19     process of releasing individuals directly to
20     Riverbend started happening?
21          MR. MATTHEWS:
22               Let me object to the form of the
23          question.
24          THE WITNESS:
25               As -- I mean, you got to be more
```

Deputy Corey Amacker, 4/24/2019

```
 1              specific than that.  As far as what do
 2              you mean "discussions," with me or as a
 3              department?
 4   BY MS. WASHINGTON:
 5   Q. Were there discussions within OPSO, of which
 6      you were aware, as a department about the
 7      release of DOC-sentenced prisoners from --
 8   A. I'm not aware of any --
 9   Q. -- Orleans to Riverbend?
10   A. I wasn't part of any discussion as to whether
11      or not we were going to release inmates to
12      East Carroll.
13   Q. Okay.  How did you first learn that OPSO was
14      going to move DOC-sentenced prisoners to
15      Riverbend?
16   A. You're saying "move."  We didn't move OPSO --
17      they were already at Riverbend Detention
18      Center physically.  Therefore, if you're
19      sentenced and you're physically there, you can
20      be released if the Department of Corrections
21      allows it.  To that facility because at that
22      point, you belong to the Department of
23      Corrections.
24   Q. So let me make sure I understand that.  Am I
25      correct in understanding that OPSO was
```

Deputy Corey Amacker - 01/30/19

```
 1        releasing DOC-sentenced prisoners directly to
 2        East Carroll who were already being housed at
 3        Riverbend as pretrial detainees?
 4   A.  Yes.
 5   Q.  Am I also correct, though, that OPSO was
 6        releasing or moving DOC-sentenced prisoners to
 7        East Carroll Parish who had not been housed at
 8        Riverbend?
 9   A.  There were times when we did, but keep in
10        mind, the Department of Corrections had to
11        approve that.
12   Q.  So I am correct that there were individuals
13        who were moved to Riverbend as DOC-sentenced
14        prisoners by OPSO who were not at the time of
15        their sentence being housed at the Riverbend
16        facility?
17   A.  Could be, yes.
18   Q.  Are those releases that you would have been
19        responsible for as the DOC classification
20        manager?
21   A.  Yes.  If it was a DOC release to another DOC
22        unit, yes.
23   Q.  Okay.  And you indicated that DOC would have
24        to approve those releases; is that correct?
25   A.  This is where it's going to get kind of
```

```
 1        confusing.  Yes, but they're approving the
 2        transfer because they essentially, I don't
 3        want to say own because we're not talking
 4        about owning human beings here, but they're
 5        legally obligated for that inmate at that
 6        point because they belong to the State of
 7        Louisiana.  So they're saying, yes, we don't
 8        have a problem with he or she being placed at
 9        Riverbend Detention Center.
10   Q.   Okay.  And just to make sure I understand,
11        since we're talking a little bit about people
12        in two separate situations, was DOC needing to
13        approve the release of DOC-sentenced
14        individuals who were being housed at Riverbend
15        already when they took that sentence?
16   A.   They're notified that said person is at
17        Riverbend Detention Center.
18   Q.   And the other group of individuals that we
19        were talking about, people who are being
20        housed here in Orleans, are sentenced to the
21        Department of Corrections, and then OPSO is
22        releasing, moving those individuals to
23        Riverbend, the Department of Corrections had
24        to approve that physical movement of those DOC
25        individuals?
```

Deputy Corey Amacker - 7/26/19

```
 1    A. Not the physical movement.  It's kind of hard
 2       to explain because they're not approving us
 3       putting them on a bus and going to Riverbend
 4       Detention Center.  They're saying we
 5       acknowledge we have packets on these
 6       individuals and/or sentences or whatever it
 7       may be, and you can move them here, or if
 8       they're already there, they can stay there
 9       until DOC decides otherwise.
10    Q. But I'm correct in understanding that, for
11       people who have been sentenced to the
12       Department of Corrections, whether they're
13       physically located at Riverbend or physically
14       located in Orleans, when OPSO was releasing
15       these individuals, the Department of
16       Corrections was notified or had approved of
17       their release to the Riverbend facility?
18    A. They don't need to -- they're not sending an
19       e-mail saying we approve or here's your stamp
20       of approval.  The easiest way to explain it
21       is, if you're at East Carroll now and you've
22       been sentenced to time, all I have to do is
23       notify the Department of Corrections that
24       you're currently at East Carroll and you're
25       now an inmate of the State of Louisiana.  They
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1         acknowledge that.  They update CAJUN.  They
 2         update the records.  We don't -- we have
 3         nothing to do with that.
 4    Q.  Maybe a little more specifics will help me.
 5         How do you notify the Department of
 6         Corrections that a DOC-sentenced individual is
 7         physically at the Riverbend Detention Center?
 8    A.  Multiple ways.  One, they're going to bill the
 9         Department of Corrections, the state, for them
10         because they get paid by DOC for housing the
11         inmate; two, by e-mail or transfer list, DOC
12         records division.
13    Q.  And you indicated that the Department of
14         Corrections would somehow acknowledge that
15         that individual was DOC-sentenced and located
16         at Riverbend; is that correct?
17    A.  I guess it's going to fall -- it would fall
18         more on Riverbend to let the state know that
19         they're there simply because that's how they
20         get paid for the inmate.  That's a billing
21         thing that I don't have specific answers to
22         because I've never had anything to do with it.
23    Q.  Okay.  I may come back to a couple of
24         questions about this, but I think I understand
25         for where we are right now.
```

Deputy Corey Amacker 11/26/19

1          Prior to the agreement arrangement between
2     OPSO and the East Carroll Parish Sheriff's
3     Office to house individuals at Riverbend, be
4     they pretrial or the Department of
5     Corrections-sentenced individuals, to your
6     knowledge, had OPSO been releasing
7     DOC-sentenced prisoners directly to these
8     local facilities?
9  A. As far as I know, it's always happened, and
10    not just from here to other facilities.  It
11    happens throughout the State of Louisiana.
12 Q. I think that we agreed that the movement of
13    Orleans prisoners to Riverbend started some
14    time around 2015; is that correct?
15 A. Yes.
16 Q. Specifically, with regard to East Carroll
17    Parish prior to 2015, do you know whether or
18    not OPSO was releasing DOC-sentenced prisoners
19    directly to that facility?
20 A. I have no idea.
21 Q. Okay.
22 A. It's too -- I mean, for many, many, many
23    years, we released inmates to facilities
24    throughout the State of Louisiana, but solely
25    based on the fact that prior to Hurricane


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1        Katrina, there were 7,000 inmates here.
 2  Q. The release of DOC-sentenced prisoners by OPSO
 3      to the Riverbend facility, to your knowledge,
 4      who within OPSO directed the start of that
 5      practice?
 6  A. I have no idea.
 7  Q. Was it something that you started in your
 8      position as DOC classification manager?
 9  A. No.  I mean, we -- it's not something -- it
10      started long before me, as far as releasing
11      prisoners to other facilities that are
12      currently with other facilities, as well as
13      using what they call satellite camps
14      throughout the state to house DOC-sentenced
15      inmates, especially when DOC doesn't have a
16      place for them in a state facility.
17  Q. Were -- I guess my question is -- it's my
18      understanding that there wasn't a relationship
19      in sort of the large scale way that it
20      developed between OPSO and the East Carroll
21      Parish Sheriff's Office prior to, say, 2015;
22      am I correct in that?
23  A. Not that I'm aware of.
24  Q. Okay.  And so am I correct that, by 2015 and
25      in subsequent years, there was a pretty large
```

Deputy Corey Amacker - 01/16/19

```
 1        number, in the couple of hundreds, of Orleans
 2        prisoners that were being housed --
 3   A. Yes.
 4   Q. -- in Riverbend, correct?
 5   A. Yes.
 6   Q. Okay.  And as far as the release of
 7        DOC-sentenced prisoners by OPSO to the
 8        Riverbend facility --
 9            MR. MATTHEWS:
10                Excuse me.
11            MS. WASHINGTON:
12                Yes, Pete.
13            MR. MATTHEWS:
14                I want to check.  I think the call
15                dropped.  My secretary was checking.
16                Shane?
17            MS. WASHINGTON:
18                We can go off the record for a
19                minute.
20          (Recess was taken.)
21   BY MS. WASHINGTON:
22   Q. We were talking about the release of
23        DOC-sentenced prisoners by OPSO directly to
24        the Riverbend facility, and I guess my
25        question is, in your position as the DOC
```

```
 1        classification manager, you were responsible
 2        for the release of DOC-sentenced prisoners
 3        from OPSO directly to Riverbend?
 4   A.  Was I responsible, yes.
 5   Q.  Were you directed by OPSO personnel to release
 6        DOC-sentenced prisoners directly to Riverbend?
 7   A.  I can't remember specifically if I was
 8        directed or not.
 9   Q.  What I'm trying to understand is whether or
10        not you were instructed to release individuals
11        to Riverbend, or if you, as the DOC
12        classification manager, made the decision
13        yourself to --
14   A.  It's my responsibility to get rid of all DOC
15        prisoners.  Meaning we don't house permanent
16        sentenced inmates here in OJC.
17   Q.  And as part of the responsibility to --
18   A.  That -- excuse me -- that directive came from
19        the City of New Orleans, not anybody
20        specifically here.
21   Q.  Which directive?
22   A.  That we were no longer going to house DOC
23        prisoners at Orleans Parish Sheriff's Office.
24   Q.  Specifically related to the transfer or
25        release of DOC-sentenced individuals by OPSO
```

1     to Riverbend, was that a decision that you

2     made as part of your responsibility --

3  A. Yes.

4  Q. -- as DOC classification manager?

5  A. Yes.  And it's not -- I understand we're

6     talking about Riverbend here, but it's not

7     just Riverbend.  If you were at St. Charles

8     Parish Sheriff's Office and you were sentenced

9     from Orleans, I'm going to release you to

10    St. Charles because you're physically there,

11    if they want to physically maintain custody of

12    you.  If they do not, then it would be our

13    responsibility to get you back and send you to

14    the Department of Corrections.  So it's just

15    East Carroll we're talking about here.

16 Q. But you did agree with me that there were

17    individuals who OPSO released as DOC-sentenced

18    prisoners directly to Riverbend who, in fact,

19    were not physically housed at Riverbend at the

20    time of their sentence?

21 A. Yes.  I believe there were some runs where we

22    moved them to -- to Riverbend for housing.

23 Q. And that specific practice, was that something

24    that was your decision as the DOC

25    classification manager?

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

Deputy Corey Amacker - 7/7/2019

```
 1    A. No.  They were doing that practice prior to me
 2       being in DOC classification.
 3    Q. They were --
 4    A. Meaning the practice of releasing inmates to a
 5       facility that was -- housed DOC prisoners was
 6       longstanding long before I was ever employed
 7       at the sheriff's office.
 8    Q. How did you receive information or instruction
 9       on where to release DOC-sentenced prisoners
10       to?
11    A. Unless directed directly by the Department of
12       Corrections, any facility that houses DOC
13       inmates, I guess you could say, sentenced
14       inmates can be moved to, unless DOC objects to
15       it and says, no, we want them specifically
16       here.
17    Q. Okay.  And am I correct that that goes back to
18       because the Department of Corrections is
19       supposed to be notified or informed of the
20       location of DOC-sentenced individuals?
21    A. Yes, they are.
22    Q. And I understand your point that this is not
23       only a practice with respect to Riverbend, but
24       I think you understand that this litigation --
25    A. Yes.  I --
```

```
 1    Q. -- has to do with Riverbend?
 2    A. I just wanted to clarify that we're not just
 3       talking about Riverbend.
 4    Q. I understand.  A lot of my questions are going
 5       to be specific to East Carroll and to
 6       Riverbend.  I'm happy for you to supplement
 7       with the fact that this may exist otherwise,
 8       but I think you understand why my questions
 9       are targeted to the practice with Riverbend.
10           And to make sure I understand, to your
11       knowledge, was OPSO releasing DOC-sentenced
12       prisoners directly to Riverbend prior to the
13       2015 arrangement?
14    A. Not to my knowledge.
15    Q. Did you have conversations with other OPSO
16       personnel about the direct release of
17       DOC-sentenced prisoners to the Riverbend
18       facility?
19    A. Yes.
20    Q. Who?
21    A. It would have been multiple people back then.
22    Q. Okay.  Who would you have discussed that
23       practice with?
24    A. The same people I named at the beginning of
25       the deposition, meaning my direct supervisors
```

Deputy Corey Amacker - 7/26/17

```
 1        at the time.
 2   Q. That would have originally been Major Lee and
 3        then Major Spinney, Major Holt?
 4   A. I'm not sure if Spinney was ever -- Spinney
 5        was very, very briefly the supervisor and he
 6        was moved again.
 7   Q. Okay.  But it would have included Major Holt?
 8   A. Major Holt, yes.
 9   Q. And Captain Bierria?
10   A. Yes.
11   Q. Do you remember the content of those
12        conversations at all?
13   A. No.
14   Q. Did you have conversations with employees of
15        the East Carroll Parish Sheriff's Office about
16        the direct release of DOC-sentenced prisoners
17        to the Riverbend facility?
18   A. Yes.
19   Q. Who did you communicate with at the East
20        Carroll Parish Sheriff's Office?
21   A. The only name I can remember is the warden at
22        the time, Warden Hedgemon.  There were more
23        other -- there were others, but I can't
24        remember specific names.
25   Q. Okay.  But you do remember communicating with
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

Deputy Corey Amacker 1/27/2017

```
 1        Warden Hedgemon?
 2   A. Yes.
 3   Q. And what did you discuss with Warden Hedgemon
 4        regarding the release of DOC-sentenced
 5        prisoners to Riverbend?
 6   A. The same discussion I would have had with any
 7        other warden.  Did they have bed space, did
 8        they want to maintain custody of the DOC, or
 9        would they like them to return to a specific
10        DOC facility -- not specific -- a DOC facility
11        that -- It's confusing, again, words-wise
12        because Riverbend is a DOC facility, but it's
13        not a state-owned DOC facility.
14   Q. I understand.
15   A. So that is what I mean by that.
16   Q. Let me ask this:  For an individual who is
17        sentenced to the Department of Corrections who
18        is an Orleans prisoner, if you're not, say,
19        releasing them directly to Riverbend, what do
20        you do with those individuals as far as where
21        do they go?
22   A. That's up to the Department of Corrections.
23        Typically, Hunt Correctional.
24   Q. Okay.  What are the other options?
25   A. There are no other -- what I mean by that is,
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Deputy Corey Amacker - 1/7/2019

Page 55

```
 1         if I send a bus full of inmates to Hunt
 2         Correctional, I have no idea if they're
 3         staying at Hunt Correctional.  That is solely
 4         up to -- that's just where we drop them off
 5         at.  From that point, DOC moves them wherever
 6         they want.
 7    Q. As far as the part that you have --
 8    A. Yeah.
 9    Q. -- some control over, it's that you would be
10         sending DOC-sentenced individuals to the Hunt
11         facility?
12    A. Yes.
13    Q. Why did you choose to release DOC-sentenced
14         individuals to Riverbend rather than moving
15         them to Hunt as would be typical?
16    A. Bed space.  They already had the bed space.
17    Q. Riverbend had bed space?
18    A. Correct.
19    Q. How about for the individuals that we've
20         talked about who were not physically located
21         in East Carroll at the time that they received
22         their DOC sentence?
23    A. The same thing; bed space.  We're not going to
24         house the DOC prisoners.  If they have the
25         available beds and they're willing to take
```

```
 1        them, then we transfer them there.
 2   Q. What I'm trying to understand is why -- if
 3        what would happen otherwise is that OPSO would
 4        move DOC-sentenced individuals to Hunt, which
 5        is a Department of Corrections facility, why
 6        did OPSO transport people to Riverbend rather
 7        than to Hunt?
 8   A. There's no specific why.  I mean, it's solely
 9        we're moving DOC inmates out of our custody
10        into another facility's custody.
11   Q. I guess I'm trying to understand if there was
12        a particular benefit to OPSO or --
13   A. No.
14   Q. -- advantage to doing that?
15   A. It doesn't matter where they go from here to
16        us.
17   Q. Okay.  And we just looked at Exhibit 3 and
18        Exhibit 4, and I know that you testified that
19        you've never seen those documents before,
20        correct?
21   A. Correct, never seen those.
22   Q. Am I correct in understanding that the
23        decision to release DOC-sentenced prisoners
24        directly to East Carroll and the Riverbend
25        facility, did that fall under these
```



Deputy Corey Amacker 7/26/17

```
 1        contractual arrangements that OPSO had with
 2        East Carroll?
 3   A.  I would have to read the whole CEA to be able
 4        to answer that yes or no, which I have not.
 5   Q.  Okay.  To your knowledge, as the person who
 6        was doing the releases, did you think of that
 7        practice as part of a standing agreement --
 8   A.  No.
 9   Q.  -- between the organizations?
10   A.  No.
11   Q.  Okay.  When you were releasing or moving
12        DOC-sentenced prisoners directly to the
13        Riverbend facility, what was your
14        understanding of the responsibilities of the
15        East Carroll Parish Sheriff's Office with
16        respect to those individuals?
17   A.  You'd have to be more specific than that.  I
18        mean, their responsibilities are the same as
19        any jail's responsibilities; care, custody and
20        control of the inmate.
21   Q.  We spoke earlier about pre-classification and
22        some of the steps and documents that are
23        involved in that process, and we just talked
24        about the release or movement of DOC-sentenced
25        individuals directly from Orleans to the
```

```
1        Riverbend facility.  And at the time that OPSO
2        began releasing DOC-sentenced prisoners
3        directly to East Carroll Parish, what is your
4        understanding of how pre-classification for
5        those individuals was going to be completed?
6    A.  By East Carroll's pre-classification staff, if
7        they were physically there at the time of
8        sentencing.  If they're physically here at the
9        time of sentencing, then they would have been
10       done by myself or the staff that was working
11       with me.
12   Q.  So let's break that down into both of those
13       two situations that you just identified;
14       individuals that were physically at Riverbend
15       when they were sentenced versus individuals
16       who were physically in Orleans.  Okay?
17   A.  (Nodded head affirmatively.)
18   Q.  For the first set where we're talking about
19       individuals who were being housed pretrial at
20       Riverbend and then were sentenced to the
21       Department of Corrections, transported back to
22       East Carroll and released by OPSO to the
23       Riverbend facility, what steps had to be taken
24       by OPSO for those individuals to have their
25       pre-classification performed?
```

```
 1    A. By myself or by East Carroll?
 2    Q. Let's start by talking about what OPSO needed
 3       to do or did do.
 4    A. You're going to have to be more specific
 5       because it's getting confusing as to what you
 6       mean.
 7    Q. Okay.
 8    A. If the inmate was at East Carroll, what was
 9       the responsibility?
10    Q. Correct.
11    A. I would send the DOC sentencing paperwork and
12       the Letter of Credit to their
13       pre-classification staff.
14    Q. What is the DOC sentencing paperwork?
15    A. It's the sentence from state court.
16    Q. So you're referring to the sentencing
17       document --
18    A. Yes.
19    Q. -- that would come from the direct court here
20       in Orleans?
21    A. Yes.  Not specific to Orleans either.  We
22       receive sentencing's from -- if our inmate
23       goes to Jefferson Parish and is sentenced, we
24       receive that sentencing paperwork.
25    Q. And were you responsible as the DOC
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker Vol. 1

Page 60

```
 1        classification manager for sending the DOC
 2        sentencing paperwork and the Letter of Credit
 3        to East Carroll Parish?
 4  A.  Yes.
 5  Q.  Are there any other documents that you sent to
 6        East Carroll Parish as the classification
 7        manager when an Orleans prisoner was sentenced
 8        to the Department of Corrections?
 9  A.  No.  Sentencing, Letter of Credit.  Those are
10        the two required documents.  If I was going to
11        release them, if they weren't already there,
12        then we would send a medical form as a
13        courtesy.  If they're on meds here, then they
14        need to be notified that they would be on meds
15        there; but that didn't come from me.
16  Q.  Okay.  Did OPSO maintain a copy of these
17        documents that you sent to East Carroll Parish
18        Sheriff's Office with each of these
19        DOC-sentenced individuals?
20  A.  Yeah.  They're automatically copied when
21        they're generated.  Meaning they're generated
22        in a computer file that keeps a daily copy of
23        it.  The Letter of Credit is.  The sentence
24        must be scanned in by somebody in records.
25  Q.  Okay.
```

```
 1    A. So when they generate a Letter of Credit, it
 2       automatically generates in the computer
 3       system.  It doesn't go anywhere.
 4    Q. Okay.
 5    A. They physically print it out.
 6    Q. Am I correct that the Letter of Credit has
 7       spaces for there to be, like, a date and a
 8       signature?
 9    A. I can't remember.
10    Q. Okay.  The completion of the Letter of Credit
11       is something that is done on the computer?
12    A. Yes.
13    Q. Okay.  And then that document is printed out?
14    A. Uh-huh (affirmative response).
15    Q. Okay.  And the sentencing paperwork you
16       indicated would have to be scanned in by
17       records for there to be an electronic copy?
18    A. I'm sure they keep a copy in records in a box
19       file somewhere, but that wasn't part of my
20       responsibility.
21    Q. Okay.  How did you, as the DOC classification
22       manager, make a record of what documents you
23       had sent to --
24    A. Logbook.
25    Q. -- East Carroll?
```



Deputy Corey Amacker / 9/4/2019

```
 1   A. Handwritten logbook.
 2   Q. Okay.  And I think we are going to look at one
 3      of that in a minute.  Am I correct that the
 4      logbook that you're referencing provides for
 5      the name and the folder number of the
 6      individual?
 7   A. Yes.
 8   Q. Okay.  Does it in some way make a record of
 9      what specific documents were sent to East
10      Carroll for each individual?
11   A. No.
12   Q. When did you send the DOC sentencing paperwork
13      and the Letter of Credit for an individual who
14      was going to be moved or released to the
15      Riverbend Detention Center as a DOC-sentenced
16      prisoner?
17   A. It varied.  There's no specific time.  I mean,
18      it would have to be prior to them being
19      released to East Carroll Detention because
20      there's no specific -- in other words, the
21      paperwork we sent to DOC goes every Tuesday
22      morning because somebody has to physically
23      drive it there.
24   Q. The documents that you were sending to the
25      East Carroll Parish Sheriff's Office for
```

```
 1       DOC-sentenced prisoners that you were
 2       releasing to that facility, how were those
 3       documents being transmitted?
 4    A. Two separate ways; either scanned and e-mailed
 5       or faxed.
 6    Q. If they were scanned and e-mailed, who would
 7       have received the e-mail with those documents?
 8    A. Warden Hedgemon initially, and then there was
 9       another guy who ended up being the pre-class
10       guy that I dealt with towards the end there.
11       I can't remember his name.
12    Q. And if the documents were sent by fax, that
13       would be to a number associated with the
14       Riverbend facility?
15    A. Yes.
16    Q. Was there a way by which the East Carroll
17       Parish Sheriff's Office acknowledged receipt
18       of the documents?
19    A. By e-mail, typically.
20    Q. E-mail back to you?
21    A. Uh-huh (affirmative response).
22    Q. Would that be even if the documents had been
23       sent by a fax?
24    A. No.
25    Q. If the e-mails were sent by fax, how would you
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker - 07/30/19

```
1        know that they had been received?
2   A.  Simply by fax response transmission sheets
3        saying that it was sent, okayed, cleared.
4   Q.  For the DOC-sentenced individuals who were
5        already being housed at Riverbend, at the time
6        of their release to the facility by OPSO, what
7        documents were you, as DOC classification
8        manager, sending to the Department of
9        Corrections?
10  A.  Those same -- that packet goes to the
11       Department of Corrections, whether it comes
12       from me or East Carroll.  That completed
13       pre-class packet has to be physically driven
14       to the Department of Corrections.
15  Q.  Okay.  And I want to talk really specifically
16       about DOC-sentenced prisoners who were being
17       housed at Riverbend at the time that Orleans
18       released them directly to that facility.
19  A.  Uh-huh (affirmative response).
20  Q.  For those individuals, what documents was
21       OPSO, either you as DOC classification manager
22       or anybody else, what documents were being
23       sent directly to the Department of Corrections
24       by OPSO?
25  A.  A transfer list.
```

1   Q. Okay.  And what did that look like?

2   A. An Excel spreadsheet with names, numbers, DOC

3      numbers on it.

4   Q. DOC numbers?

5   A. Department of Corrections numbers.

6   Q. How would you get the DOC number for those

7      individuals?

8   A. Typically, in our computer, if they've already

9      been issued one.

10  Q. What about the situation when someone hadn't

11     already been in the Department of Corrections

12     custody?

13  A. You don't have to be in DOC custody.

14     Probation and parole, you still get a DOC

15     number.

16  Q. You would have to have a prior conviction to

17     the Department of Corrections?

18  A. You have to have a conviction.  You don't have

19     to be in custody, though, is what I mean.

20     Yes.  How else do you get what -- it just goes

21     blank.

22  Q. Okay.

23  A. There's nothing in the spreadsheet for them.

24  Q. If someone didn't have a prior conviction and

25     didn't have a DOC number, that would just be

```
 1      blank?
 2   A. Right.
 3   Q. Okay.  And am I correct then in understanding
 4      that an Excel spreadsheet that was a transfer
 5      list was being provided by OPSO to the
 6      Department of Corrections for these
 7      DOC-sentenced individuals that OPSO was
 8      releasing directly to East Carroll?
 9   A. I can't -- I know the ones that I was moving
10      as a transfer, DOC transfer, that list was
11      going to East Carroll and to the Department of
12      Corrections.  Outside of that, the packet that
13      East Carroll was going to do for the Orleans
14      conviction would be the physical paperwork
15      that went to the Department of Corrections,
16      but it would come from East Carroll to the
17      Department of Corrections.
18   Q. So for those individuals who were physically
19      located at Riverbend, were sentenced to the
20      Department of Corrections and OPSO released
21      them directly to Riverbend, was OPSO sending a
22      transfer list regarding those individuals?
23   A. No, not to the Department of Corrections.
24   Q. Okay.  Was OPSO providing any kind of transfer
25      notification to the Department of Corrections
```

```
 1        for those individuals?
 2    A. No.  East Carroll would notify the Department
 3        of Corrections that they're now in physical
 4        custody of a said Department of Corrections
 5        inmate as part of their billing process.
 6    Q. So OPSO was not providing notification to the
 7        Department of Corrections for those
 8        individuals who were already physically
 9        located --
10    A. Yes.
11    Q. -- at Riverbend?
12    A. Because they're no longer at the 30-day
13        interval where the bill goes to the state.
14        We're no longer billing for that inmate.  Now,
15        Riverbend Detention is.  So they have to
16        notify the state, We now have said inmate.
17    Q. Why would OPSO have ever been billing DOC for
18        that inmate?
19    A. Because the minute you're sentenced, the DOC
20        pays for you.  From the date of sentence over
21        there at the courthouse, you're a DOC inmate.
22    Q. But right now we're talking specifically about
23        those individuals who were being housed at
24        Riverbend as pretrial detainees?
25    A. Right.
```

Deputy Corey Amacker 11/7/2019

```
1    Q. OPSO would not be billing the Department of
2       Corrections for --
3    A. Correct.  That's why I said --
4    Q. -- those, correct?
5    A. -- East Carroll would have to notify the DOC
6       that they now have custody of their prisoner.
7    Q. Right.  And I just want to make sure so that I
8       understand, that for those individuals who
9       were being housed at Riverbend pretrial,
10      sentenced to the Department of Corrections and
11      then released by OPSO directly to Riverbend,
12      you, as DOC classification manager, were not
13      providing notification to the Department of
14      Corrections about the location of those
15      individuals now at Riverbend; is that correct?
16   A. Correct.  Their location would have to be
17      updated by the agency that now housed them.
18   Q. Okay.  Did OPSO have an obligation to notify
19      the Department of Corrections of the transfer
20      of a DOC-sentenced prisoner to another local
21      facility?
22          MR. MATTHEWS:
23              I'm going to object to the form of
24           the question.
25          THE WITNESS:
```

```
 1              I don't know if they have a legal
 2         obligation to make that notification.  I
 3         can't answer that question.
 4  BY MS. WASHINGTON:
 5  Q. Okay.  Are you familiar with the Basic Jail
 6     Guidelines?
 7  A. Yes.
 8  Q. What are they, generally speaking?
 9  A. Guidelines given to parish facilities by the
10     State of Louisiana in agreement to house
11     Department of Corrections prisoners at a local
12     facility.
13         MS. WASHINGTON:
14              I'm going to show you what was
15         previously marked as Exhibit 48, and I
16         want to look at one specific section
17         which is flagged by that Post-it note.
18         And I want to turn to Page 18.
19      (Document tendered.)
20         THE WITNESS:
21              Uh-huh (affirmative response).
22  BY MS. WASHINGTON:
23  Q. It's section II-A-009.  And I'm looking at the
24     bottom of the page there where it says, All
25     transfers of DPS&C offenders to other than
```

```
 1        DPS&C facilities shall be reported to the
 2        Office of Adult Services.  It then provides a
 3        telephone number and a fax number.  And it
 4        says, Such notification shall be the
 5        responsibility of the sending facility.  Do
 6        you see where I'm reading?
 7   A.   Yes.
 8   Q.   Have you seen that provision of the Basic Jail
 9        Guidelines before?
10   A.   I have not.
11   Q.   For those DOC-sentenced individuals who were
12        physically located in Orleans who you then
13        released to the East Carroll Parish Sheriff's
14        Office and moved to the Riverbend facility,
15        how was pre-classification for those
16        individuals being completed?
17   A.   Packet was completed, packet was driven to the
18        Department of Corrections, a transfer list
19        would be sent to DOC asking if we could move
20        these from Orleans to Riverbend, at which time
21        we would effect the transfer and release.
22   Q.   So OPSO was completing the pre-classification
23        packets for those individuals.
24   A.   Yes.
25   Q.   Correct?
```



```
 1    A. (Nodded head affirmatively.)
 2    Q. And that was being provided directly to the
 3       Department of Corrections?
 4    A. Yes.
 5    Q. And then a transfer list was being submitted
 6       to the Department of Corrections for those
 7       individuals; is that correct?
 8    A. Yes.
 9    Q. And upon approval by the Department of
10       Corrections --
11    A. It doesn't really go like that.
12    Q. Okay.
13    A. So basically, I could pick up the phone and
14       call DOC records and say, Hey, I've got 25
15       guys that I want to move to East Carroll.  Can
16       I move them to East Carroll or do I need to
17       send them to Hunt?  They can typically say, go
18       ahead and move them to East Carroll or they
19       say, no, we want you to move them next
20       whatever to Hunt.
21    Q. And so --
22    A. As well as agency to agency.
23    Q. Who would you be calling at the Department of
24       Corrections?
25    A. Records.
```



Deputy Corey Amacker - 1/7/2019

1   Q. Was there a particular individual that you
2      would communicate with?
3   A. No.  Well, at the time, Glynn Stassi, who's no
4      longer in that position; so yes, there was.
5   Q. And would you provide Mr. Stassi or the DOC
6      person that you spoke with a list of names of
7      who you --
8   A. Yes.
9   Q. -- were seeking to transfer?
10  A. Yes.
11  Q. Okay.  How was that provided?
12  A. E-mail.
13  Q. And am I correct that DOC would provide you
14     with some response about where you should
15     transfer the --
16  A. No.
17  Q. -- DOC-sentenced individuals?
18  A. No, you're not.
19  Q. Okay.  So what information would Mr. Stassi
20     tell you?
21  A. I just stated.  I could pick up the phone and
22     call Glynn and say, Hey, can I move these
23     individuals to this location?  He would say
24     yes or no.  If he says, Yes, send me a list, I
25     send him a list, tell him where I'm moving

```
 1        them.
 2     Q. Okay.  Would you send the list to Mr. Stassi
 3        prior to moving those individuals to that
 4        location?
 5     A. Yes.  Either prior to or the morning of.
 6     Q. And that list would be provided by e-mail?
 7     A. Yes.
 8     Q. And am I correct that separate from that list,
 9        you would also be sending the Department of
10        Corrections the pre-classification packets for
11        those individuals?
12     A. Yes.
13     Q. Would the pre-classification packets be
14        provided prior to a conversation with
15        Mr. Stassi about the physical movement of
16        those individuals?
17     A. Sometimes, yes; sometimes, no.
18     Q. Were there any written directives or
19        guidelines that outlined this
20        pre-classification process for DOC-sentenced
21        prisoners who were being released directly to
22        Riverbend?
23     A. No.  Specific to Riverbend, no.
24     Q. For the individuals where, based on your
25        testimony, East Carroll Parish Sheriff's
```

```
 1        Office was going to be responsible for
 2        completion of the pre-classification packets,
 3        those individuals who had been physically
 4        already located in Riverbend at the time that
 5        they took their sentence, what is your
 6        understanding of where the pre-classification
 7        packet would be sent from East Carroll?
 8   A.   The same place that I would send them.  DOC
 9        headquarters in Baton Rouge.
10   Q.   Okay.  Were you receiving pre-classification
11        documents back from East Carroll Parish
12        Sheriff's Office?
13   A.   No, not initially.
14   Q.   At some point, you did start receiving
15        pre-classification documents from East Carroll
16        Parish Sheriff's Office?
17   A.   Yes.
18   Q.   What changed?
19   A.   The reason we're sitting here.
20   Q.   Okay.
21   A.   I mean, East Carroll was improperly
22        pre-classifying people, at which time I drove
23        to East Carroll, trained their staff on how to
24        do it, at which time I asked them to send me a
25        copy of everything they did from that point
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker 12/30/2019

```
 1        forward.
 2    Q. Okay.  And we'll get to that.  That's late
 3        December of 2016, I believe?
 4    A. It -- I don't know specific dates, but yes,
 5        2016.  I don't know if it's late December.
 6    Q. Okay.  We'll get to some documents.
 7    A. Yeah.  That's what I'm saying.
 8    Q. Prior to the time when you physically went up
 9        to East Carroll Parish, were you receiving
10        pre-classification documents from East Carroll
11        Parish for these individuals?
12    A. That -- no.  Because it would have been their
13        responsibility to get it to DOC, just as it
14        was mine to get ours to DOC from here.
15    Q. Okay.  Was there any mechanism by which OPSO
16        was tracking if or when East Carroll Parish
17        Sheriff's Office was sending the
18        pre-classification packets to the Department
19        of Corrections for those individuals that you
20        had released to Riverbend?
21    A. I believe they were sending me an e-mail
22        stating, Hey, we have done Corey Amacker,
23        let's just use my name, and at that point is
24        when I was going to release the inmate out of
25        our computer system.  We weren't receiving
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1        documents back.  I wasn't responsible for
 2        verifying whether or not they were doing
 3        something properly to -- with the Department
 4        of Corrections, so no to the question.
 5    Q. Okay.  But you were receiving some
 6        communication from East Carroll Parish
 7        Sheriff's Office that they had completed the
 8        pre-classification process for these
 9        individuals, and it was at that time that you
10        would release --
11    A. Yes.
12    Q. -- these people from OPSO?
13    A. Yes.
14    Q. Okay.  And you indicated that was by e-mail?
15    A. Phone call a lot of times.
16    Q. Okay.
17    A. Sometimes e-mail.
18    Q. The ones that you received notification of by
19        phone call, is there a way that you recorded
20        that receipt, acknowledgment?
21    A. Probably in a notebook that I had about four
22        or five of them on my desk at the time.
23    Q. Okay.  Is that something that you still have
24        in your possession?
25    A. No, absolutely not.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker   11/7/2019

```
 1    Q. Were there communications between yourself and
 2       the East Carroll Parish Sheriff's Office about
 3       East Carroll being responsible for the
 4       pre-classification for those individuals who
 5       were DOC-sentenced physically located at
 6       Riverbend and that Orleans was going to be
 7       releasing directly to that facility?
 8    A. Well, yes, of course.
 9    Q. Okay.  Who did you have conversations with?
10    A. I don't remember specifically.
11    Q. Okay.
12    A. But, I mean, there would have had to have been
13       a conversation that said, hey, do you want to
14       pre-class these people for us or would you
15       like me to bring them back here.
16    Q. Okay.
17    A. Just as if -- and we had done that -- I'm sure
18       it still goes on with the agencies.  So if,
19       like I stated earlier, if I've got an inmate
20       here and Jefferson -- he goes to Jefferson
21       Parish and gets sentenced, JP is going to call
22       me as -- their pre-class is going to call me
23       and say, Hey, do you mind doing this
24       sentencing paperwork on this guy instead of us
25       bringing him back over here.  So it's common
```

```
 1        between state agencies to, I guess as a

 2        courtesy, complete the packet rather than

 3        moving the inmate twice for a 20-minute

 4        process.

 5   Q. Do you remember specifically having a

 6        conversation with the East Carroll Parish

 7        Sheriff's Office in which --

 8   A. Yes.

 9   Q. Okay.  And what was agreed to in that

10        conversation?

11   A. That if the -- the inmate was already in their

12        custody, that they would do the pre-class

13        packet and just maintain custody of the inmate

14        as a DOC prisoner from that point forward.

15   Q. Was that agreement memorialized in any kind of

16        way?

17   A. No.

18   Q. That would have been a phone call?

19   A. Yes.

20   Q. The notebooks you indicated you might have

21        used to keep a record of when East Carroll --

22   A. Not a record.  I just kept notebooks on my

23        desk all the time because that's what I would

24        kind of refer back to.  I kept notes all day

25        every day.  For me, not for records
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        (indicated).
 2   Q. When is the last time you would have seen
 3        those notebooks?
 4   A. When I moved to training.
 5   Q. Do you know what happened to them?
 6   A. I probably threw them in a box and threw them
 7        away.
 8            MS. WASHINGTON:
 9                  I'm going to show you what was
10            previously marked as Exhibit 54.
11        (Document tendered.)
12            THE WITNESS:
13                  Yep.
14   BY MS. WASHINGTON:
15   Q. And I will represent and you can read that
16        this is an e-mail sent by what appears to be
17        your e-mail address --
18   A. Yep.
19   Q. -- in July of 2016 to multiple individuals; is
20        that correct?
21   A. Yes.
22   Q. Do you remember or recognize this e-mail?
23   A. I don't remember specifically.  I know -- I
24        can read this e-mail and tell what it was,
25        yes.
```



Deputy Corey Amacker 11/7/2019

```
 1   Q. Okay.  Great.
 2         And the first person in the "to" line is
 3      Laura Sevier.  Who is Laura Sevier?
 4   A. To my knowledge, Laura Sevier is their billing
 5      coordinator for East Carroll Parish.  The
 6      second person is Shawne Harris, who's billing
 7      for Orleans Parish.  The third is Captain
 8      Djuana Bierria, who is the captain over
 9      records.  The fourth person is Sidney Holt,
10      who is the director of intake and processing
11      at the time.
12   Q. Why was Ms. Harris and Ms. Sevier being
13      included on this e-mail?
14   A. They send the bill to the state.
15   Q. To the Department of Corrections?
16   A. Uh-huh (affirmative response).
17   Q. In the body of the e-mail, it states, The
18      following inmates can be transferred to your
19      custody as DOC-sentenced offenders.  Laura, I
20      will get these packets to Captain Russell as
21      soon as possible for pre-class.
22   A. Yep.
23   Q. Who is Captain Russell that --
24   A. Captain Russell was --
25   Q. -- you're referring to?
```



```
 1   A. -- the guy I was talking about earlier.  I
 2       couldn't remember his name.  He's an older
 3       gentleman who was doing the pre-class packets
 4       for East Carroll.
 5   Q. Okay.  And there is an attachment to this
 6       e-mail that appears to be titled ECP DOC
 7       transfer, and then there is a small chart that
 8       is the second page of this exhibit with about
 9       eight individuals listed; is that correct?
10   A. Yes.
11   Q. And this provides for the names, the folder
12       number, a sentence date and a sentence length
13       for the listed individuals.
14   A. Yes.
15   Q. Correct?
16   A. Yes.
17   Q. And am I correct that this, based on this
18       e-mail, would have been the only document that
19       was attached to the e-mail that you sent
20       that's Exhibit 54?
21   A. Wait.  What?  State the question again.
22   Q. I'm wondering -- it only appears, based on me
23       looking at the text of this e-mail, that there
24       is one attachment and then this --
25   A. Yes, one attachment.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    Q. -- chart would have been the attachment; is
 2       that correct?
 3    A. Yes.
 4    Q. Okay.  Based on the processes that we've just
 5       been discussing regarding the release of
 6       DOC-sentenced prisoners to East Carroll, can
 7       you explain for me what's happening in this
 8       e-mail?
 9    A. Yes.  I'm notifying billing from both agencies
10       that these inmates are sentenced as -- that's
11       why the sentence date is on there because
12       that's actually the date of the billing, that
13       billing will begin to the Department of
14       Corrections, so they could be paid per inmate
15       per day, which is state law mandated on how
16       the Department of Corrections pays agencies.
17       The next two are my two immediate supervisors
18       notifying them that I'm moving said inmates to
19       East Carroll, and the second page is the list
20       of inmates with the dates and length of
21       sentence.  The verbiage in the e-mail says
22       that I'm going to give the packets -- to get
23       the packets to Captain Russell, who is their
24       pre-classification personnel.
25    Q. And by "for pre-class," as it's stated here in
```

Deputy Corey Amacker - 1/7/2019

```
 1        this e-mail, you meant for completion of the
 2        pre-classification packets?
 3   A. Yes.
 4   Q. Okay.  And I know this is just one e-mail, but
 5        I guess my question is, is this e-mail
 6        representative of how you were --
 7   A. Yes.
 8   Q. -- releasing or transferring DOC-sentenced
 9        prisoners --
10   A. Yes.
11   Q. -- to East Carroll?
12   A. Yes.
13   Q. Okay.  Were all of the transfers or releases
14        of DOC-sentenced prisoners to Riverbend
15        happening in this way?
16   A. Yes.  This would be a case where -- an e-mail
17        where these inmates were already in East
18        Carroll custody.
19   Q. How can you tell that?
20   A. Because I'm notifying Laura that she can move
21        them over on the DOC bill, and I've also
22        notified her that I'm going to send her the
23        packets so they can do the paperwork.
24   Q. Okay.  Am I correct then that there would be
25        other e-mails that you sent similar to this
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        regarding the --
 2   A. Yes.
 3   Q. -- release of DOC-sentenced prisoners?
 4   A. Yes.
 5   Q. Okay.  This litigation was filed in August of
 6        2017.  Since that time, have you looked at
 7        your e-mail for e-mails that relate either
 8        specifically to the plaintiffs in this
 9        litigation or the transfer of DOC-sentenced
10        prisoners to Riverbend?
11   A. No.
12   Q. Okay.  Do you know if anyone has searched your
13        e-mail for other --
14   A. No.
15   Q. --  responsive records?
16   A. No.
17   Q. Okay.  And the packets that you're referring
18        to in this e-mail that you are getting to
19        Captain Russell, are those the ones that you
20        testified would contain the sentencing
21        paperwork and the Letter of Credit?
22   A. Yes.
23            MS. WASHINGTON:
24                 Okay.  I'm handing you what was
25            previously marked as Exhibit 55.
```



Deputy Corey Amacker 11/7/2019

```
 1               Looking at Exhibit 55, I will represent
 2               to you that these documents were
 3               provided to the plaintiffs by OPSO in
 4               discovery in this litigation and you can
 5               flip through it.
 6       (Document tendered.)
 7   BY MS. WASHINGTON:
 8   Q. And my question is, generally speaking, do you
 9       recognize --
10   A. Yes.
11   Q. -- these types of records?
12           Okay.  And am I correct that the first
13       four pages of this exhibit appear to be from
14       AS400?
15   A. Yes.
16   Q. Which is the jail management system for OPSO?
17   A. Yes.
18   Q. And then the remaining pages in this
19       Exhibit 55 appear to be from --
20   A. A logbook.
21   Q. -- a logbook?  Okay.  Looking at the first
22       page of Exhibit 55, am I correct that this is
23       your user name, Amacker C --
24   A. Yep.
25   Q. -- who would have accessed these records?
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1   A. Yep.
 2   Q. Okay.  And the date of January 13th, 2017
 3      that's at the top, left corner, is that the
 4      date of the access of this particular record?
 5   A. I think so.
 6   Q. Okay.  I want to look at the section that's
 7      highlighted there, which I will represent to
 8      you came to me highlighted.
 9   A. Uh-huh (affirmative response).
10   Q. And it says next to reason, quote, Released to
11      ECP as DOC inmate, and that appears to be
12      followed by a date of August 8th, 2016?
13   A. Yes.
14   Q. Do you see that?
15   A. (Nodded head affirmatively.)
16   Q. And this reason that's entered there, is that
17      something that you would have entered?
18   A. Yes.
19   Q. Okay.  And can you tell that because it's your
20      user name next to the word "released"?
21   A. Yes.
22   Q. Okay.  What is the August 8th, 2016 date in
23      that reason entry; what does that mean?
24   A. That's the date that -- it could be two
25      different things; it could have been the
```

1       physical date that it was done or it could
2       have been the billing date.  So there are
3       going to be times where you're going to see an
4       AS400 where the date next to, let's say, the
5       date that it occurred, let's just use today,
6       for example.  What's today?
7    Q. The 17th?
8    A. Today is 7/17.  So if I'm going to release you
9       today to East Carroll, but you've been there
10      since 7/1, the date there is going to say
11      7/1/2019 because that is the billing date
12      because you were physically there already and
13      DOC owes East Carroll X amount of dollars
14      because you've been there as a DOC inmate.  So
15      there's two separate things:  One is going to
16      be the actual date of the entry.  That, in
17      parenthesis, is something that I'm manually
18      typing in for billing.
19   Q. Okay.  Well, then let's take this first page
20      of Exhibit 55, which has to do with Jessie
21      Crittindon, who is one of the named plaintiffs
22      in this litigation.  Next to "released," it
23      has a date of August 2nd of 2016, correct?
24   A. No.  Wait.  Where?  Yes.
25   Q. Next to "released"?

Deputy Corey Amacker - 7/26/19

Page 88

```
 1   A. 8/2/16, yes.
 2   Q. Uh-huh (affirmative response).  And then in
 3      the typed-in section next to "reason," it has
 4      August 8th of 2016?
 5   A. Yes.  It's probably a typo.
 6   Q. Okay.  I'm just trying to understand what
 7      those two dates might mean in relation to each
 8      other.
 9   A. They don't necessarily have to be in relation
10      to one another.
11   Q. Okay.
12   A. In other words, the one that says next to
13      "Released:  Amacker C," that's auto generated.
14      It's a computer date and time.  "Reason," I
15      could put 8/8 of 2030 right there if I wanted
16      to because it's manually typed in.
17   Q. When is the date that's auto generated for
18      release?
19   A. Eight --
20   Q. When is that entered?
21   A. 8/2 of 2016 at 10:50 a.m. and 22 seconds.
22   Q. And when does that get entered into the AS400?
23   A. When does --
24   Q. The released date, the auto-generated released
25      date?
```



Deputy Corey Amacker - 11/20/19

Page 89

```
 1   A. It gets entered as soon as you complete the
 2      release process.
 3   Q. Okay.  And so --
 4   A. Meaning manually hit the keys until they're
 5      released, out of the computer.
 6   Q. Okay.  Am I correct then in understanding that
 7      this date of 8/8 that is manually typed in
 8      would have had to have been typed in at the
 9      same --
10   A. Yes.
11   Q. Time?
12   A. Yes.
13   Q. Okay.  If Mr. Crittindon was housed at East
14      Carroll as a pretrial prisoner and then was
15      released directly as a DOC-sentenced prisoner
16      to Riverbend, I'm trying to understand the
17      8/8/2016 as a billing date, if he would have
18      physically --
19   A. I'm telling you what --
20   Q. -- been at Riverbend the whole time?
21   A. -- what it could be.
22   Q. Okay.  Is there anything else it could be?
23   A. Yeah.  It could be, again, the reason we're
24      sitting here.  If at some point, let's just
25      say this was done, or I was supposed to
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

Deputy Corey Amacker 6/7/2019

```
 1        release him on 8/2, it could be the date that
 2        I actually manually released him.  The only
 3        way to do that is to go to the second page
 4        that you've already so generously provided and
 5        look at the data entry from when we went to
 6        the computer.
 7   Q.  Okay.  What is that second page telling me?
 8   A.  Who logged into Jessie Crittindon's folder.
 9        Not -- not -- digital file, not physical
10        folder.
11   Q.  And it doesn't appear from this that you
12        logged in on 8/2/2016 --
13   A.  It's 8/8, --
14   Q.  -- is that correct?
15   A.  -- right.  So I'm not sure how exactly this
16        8/2 got there then.
17   Q.  Okay.
18   A.  Because this is your specified login, who
19        touched his file, and the exact time.
20   Q.  Right.
21   A.  So --
22   Q.  Okay.
23   A.  On 8/2, whoever this is, London logged in, not
24        me.
25   Q.  Do you know who that is?
```



```
 1   A. No.  You know what?  Yes, I do.  That was
 2      Ms. London that used to work in records.  I
 3      don't even know if she's still employed here.
 4   Q. Okay.  If we look at the third page of this
 5      exhibit, which has to do with Eddie Copelin?
 6   A. Uh-huh (affirmative response).
 7   Q. Another of the plaintiffs in this litigation,
 8      in looking at the same entries that we've just
 9      been talking about, the released entry and
10      then the reason entry?
11   A. Uh-huh (affirmative response).
12   Q. Again, here there's two separate dates --
13   A. Yes.
14   Q. -- next to released.  It's 10/14 of 2016 and
15      then manually typed into "reason" is 10/26 of
16      2016.  I'm looking at that in comparison to
17      now page 4 of the exhibit.
18   A. Uh-huh (affirmative response).
19   Q. Can you help me understand those dates for
20      this entry?
21   A. It's just showing -- I mean, this is a digital
22      footprint of who logged into the folder.  It's
23      a folder inquiry.  So it shows that I logged
24      in -- not logged in -- opened his file on
25      10/26 and on 10/28/2016.
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 10/17/2019

```
 1   Q. 11/28?
 2   A. Yes.  I'm sorry.  11/28.  10/26 and 11/28.
 3   Q. Okay.  But the 10/14 date that's next to your
 4      name next to "released" does not, in fact,
 5      appear to be one of the times that you would
 6      have logged in; is that correct?
 7   A. Correct.
 8   Q. Okay.  Looking at these logbook entries that
 9      are later in this exhibit, there's a photo or
10      scan of the cover it appears of the record
11      that says --
12   A. It's a copy.
13   Q. -- that says pre-class packets?
14   A. Xerox copy, yes.
15   Q. And it appears that there's an end date of
16      9/8/16 on this logbook?
17   A. Huh?  No.
18   Q. Sorry.  I'm looking --
19   A. 8/4/16.
20   Q. I'm looking at the cover.
21   A. Oh, you're looking at the cover?
22   Q. Correct.  It has the Bates-stamped number of
23      789, if you look at the little number.
24   A. Wait.  What?
25   Q. There's a Bates-stamped number of 789.
```



Page 93

```
 1    A. Yeah.
 2    Q. Are you on the same page?
 3    A. Yes.
 4    Q. Okay.  And that cover says, Pre-class packets,
 5       and has an end date of 9/8/16?
 6    A. Yes.
 7    Q. Okay.  What is that logbook?
 8    A. It's a log of pre-class packets either sent to
 9       agencies or completed by this agency.
10    Q. I'm looking at the next page of the exhibit,
11       which has Bates-stamped No. 790 on it.  The
12       handwriting that's on this page, is that your
13       handwriting?
14    A. Yes.
15    Q. Okay.  And so you maintained this logbook when
16       you were the DOC classification manager?
17    A. Yes.
18    Q. Did --
19    A. Hold up.
20    Q. Sure.
21    A. This logbook may not have been started by me.
22    Q. That was my next question.
23    A. But I've made entries -- right.
24    Q. Okay.
25    A. Because some of these logbooks, as you can see
```



```
 1        from this one, they would last for years.
 2   Q. Right.  I believe that start date --
 3   A. So this was started on 8/28/2014.
 4   Q. Okay.
 5   A. It went on for two years.
 6   Q. So there were logbooks like this, at least in
 7        existence prior to you becoming --
 8   A. Yes.
 9   Q. -- the classification manager?
10           Were you provided with instruction on what
11        to maintain in this logbook when you started
12        as the classification manager?
13   A. Yes.
14   Q. And what was that instruction?
15   A. Packets.  Log your packets that you send, that
16        you complete, or you move -- you send to
17        another agency.
18   Q. Okay.  I'm looking at that page that we were
19        just on that's Bates No. 790.  There appears
20        to be a date of 8/4/16?
21   A. Yes.
22   Q. And it says, ECP?
23   A. ECP, Jessie Crittindon.
24   Q. Okay.  What is this entry telling me?
25   A. That the packet was sent to East Carroll
```



```
 1        Parish on 8/4/2016 for said inmates.
 2   Q. Okay.  And by "packet," you're referring to
 3        the sentencing paperwork and the Letter of
 4        Credit?
 5   A. Sentencing paperwork, bill of information,
 6        however you want to call it, yes, and the
 7        Letter of Credit.
 8   Q. Okay.
 9   A. We just -- legally, a bill of information.  We
10        call it sentencing paperwork, but all of that
11        goes to DOC, meaning we get a copy of the
12        sentencing forms, bill of information.  They
13        send a separate copy from state court to the
14        Department of Corrections.  That doesn't go
15        through us, but that's what it is.
16   Q. Okay.  And so when you're referring to
17        sentencing paperwork that you were sending to
18        East Carroll Parish --
19   A. It's the sentence.
20   Q. -- it's the sentence?
21   A. It's the actual sentence.
22   Q. Okay.  Like the minute entry --
23   A. Yes.
24   Q. -- sort of from the sentence?
25   A. Yes.
```



866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker - 11/7/2019

Page 96

```
 1    Q. Okay.  That says on this date this person --
 2    A. Yes.
 3    Q. -- was sentenced to this much time in the --
 4    A. Yep.
 5    Q. -- Department of Corrections?
 6          Okay.  And you indicated that the clerk of
 7       court separately sends that paperwork to the
 8       Department of Corrections?
 9    A. They do it both.  So we get it if they're in
10       custody.  If they're not in our physical
11       custody, then they directly just -- I don't
12       know how they get to DOC, but they do.
13    Q. Okay.  But for people who are actually in
14       custody, you all receive that paperwork and
15       you --
16    A. And they, I believe, send a secondary copy to
17       DOC.
18    Q. Okay.
19    A. But we do get a physical copy, of course, with
20       the sentencing paperwork.
21    Q. Okay.  But it's your understanding that for
22       people who are in custody, both the clerk of
23       court and OPSO would be sending that
24       sentencing paperwork --
25    A. Uh-huh (affirmative response).
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 12/6/2019

Page 97

```
 1   Q. -- to the Department of Corrections?
 2   A. Yes.
 3   Q. Okay.  Flipping to Bates No. 792, which is the
 4      next page with writing on it in this exhibit.
 5   A. Uh-huh (affirmative response).
 6   Q. The top of that page says, ECP packets only,
 7      and it looks like it's received 1/9, I think
 8      that's '17, but it's a little hard to tell.
 9      Do you see where I'm reading?
10   A. It's definitely not '18 because it's before
11      the next entry, which is '17.
12   Q. Right.
13   A. So --
14   Q. Okay.  And there's a list of individuals on
15      this page with what I assume are folder
16      numbers; is that correct?
17   A. Yes.  I can simplify this and maybe eliminate
18      a few questions.
19   Q. Okay.  Sure.  Tell me what's going on.
20   A. So at this time, packets were physically going
21      to East Carroll.  That highlighted section
22      where it says "received" means I got them back
23      completed.  The next date that says 1/12/17 is
24      delivered, which is the date that I physically
25      had someone from this department drive them to
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    Baton Rouge.

2  Q. Delivered to the Department of Corrections?

3  A. Correct.

4  Q. And the packets that you would have been

5    receiving, say, for Mr. Crittindon in January

6    of 2017, what was included in those packets?

7  A. The one whenever I received?

8  Q. Correct.

9  A. It would have just been the completed

10   pre-class packet.

11 Q. Okay.

12 A. Mugshot, fingerprints, sentence, Letter of

13   Credit.

14 Q. Okay.

15 A. And interview form.

16 Q. Okay.  In the logbook that we were looking at,

17   you indicated that the entries in that are for

18   the dates on which you were sending packets

19   for the listed individuals?

20 A. Three different things could be in this book,

21   meaning the day I sent it to East Carroll, the

22   day I received it from East Carroll, and the

23   day I delivered it to the Department of

24   Corrections.

25 Q. Okay.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1   A. So all three of those types of entries go into
 2      this book.
 3           MS. WASHINGTON:
 4                Okay.  I'm showing you what I'm
 5                marking as Exhibit 71, which are other
 6                logbook entries that we received in
 7                discovery in this litigation.
 8         (Document marked and tendered.)
 9           THE WITNESS:
10                Uh-huh (affirmative response).
11   BY MS. WASHINGTON:
12   Q. Just to make sure I understand the variety of
13      entries that might be in this logbook, let's
14      look just at the first page of that, which has
15      Bates-stamped No. 1440.  There's -- on the
16      left-hand side where it says 7/13/16, ECP
17      only --
18   A. Uh-huh (affirmatively).
19   Q. -- and then has a list of names with folder
20      numbers, what does that entry mean?
21   A. That just means the packet that I sent to DOC
22      was East Carroll inmates only.
23   Q. How can you tell from this entry that those
24      were packets that you were sending to the
25      Department of Corrections?
```



Deputy Corey Amacker 9/17/2019

```
 1    A. Because I made the data entries.  I mean, I
 2       was writing in the log -- I was keeping the
 3       logbook.
 4    Q. How would this look different if it was
 5       packets that you were sending to East Carroll
 6       Parish?
 7    A. Because of what was on the previous one where
 8       it says ECP, and then I put received and
 9       delivered to DOC, as you can see on 792.
10    Q. Can we look at Exhibit 55 that you have in
11       front of you --
12    A. Uh-huh (affirmative response).
13    Q. -- with Bates-stamped No. 790?
14    A. Yes.
15    Q. We looked at this page before, but this is the
16       one where it says 8/4/16, ECP and then has
17       Jessie Crittindon under it and the folder
18       number.  Do you see that?
19    A. Yes.
20    Q. So I'm looking at that entry and I'm looking
21       at the entry on the first page of what we just
22       marked as Exhibit 71.
23    A. Uh-huh (affirmative response).
24    Q. Are those the same types of entries?
25    A. Probably not.  So this is probably something I
```

Deputy Corey Amacker 9/17/2019

```
 1        sent to East Carroll.  This is probably a
 2        packet where I indicated ECP only.  So this is
 3        probably an envelope I sent to the Department
 4        of Corrections.
 5   Q. And when you say this is probably what I sent
 6        to the Department of Corrections --
 7   A. I mean, I can't physically document to verify
 8        what it was.
 9   Q. Okay.  And you're referring to the first page
10        of Exhibit 71?
11   A. Correct.
12   Q. Okay.  The page that we were looking at in
13        Exhibit 55, you believe that these are packets
14        that you sent to East Carroll Parish?
15   A. Which number, 790 you're still looking at?
16   Q. Uh-huh (affirmative response).
17   A. Yes.
18   Q. Okay.  And how can you tell that?
19   A. Just because I remember how I was making
20        these.  I was documenting when I send them to
21        East Carroll, and then in that next book where
22        we started a new book, I was documenting
23        received from East Carroll, delivered,
24        delivered to DOC.  I was specifically -- I
25        don't remember exactly when you and I
```

Amerson White®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1       initially -- or you -- or the inmates,
 2       Mr. Copelin and Mr. Crittindon, just when we
 3       discovered there was an issue with them
 4       improperly doing it.  So as you can tell, the
 5       way entries were being made changed
 6       drastically when I was trying to figure out
 7       who East Carroll had done properly and who
 8       they had not done properly.  Because at that
 9       point, I felt it was my due diligence to
10       figure out who was done and who wasn't.
11   Q.  Okay.
12   A.  Because we made -- not we -- I made an effort
13       and went to East Carroll and retrained these
14       guys, but then I had to literally go through,
15       I couldn't even tell you, how many names and
16       files and months of trying to rectify for
17       these guys.  Because at the time, we had to
18       turn around and go back after training East
19       Carroll and have all these people redone
20       because we didn't know who had been done
21       properly and who had not.
22   Q.  Okay.  Can you flip a couple of pages ahead in
23       Exhibit 71?
24   A.  Yep.
25   Q.  I'm looking at the one that is Bates-stamped
```

```
 1        No. 1443 and the logbook has 152 and 153 at
 2        the top of it.
 3   A. Yeah.  1441?  Yeah.
 4   Q. 1443.
 5   A. Uh-huh (affirmative response).
 6   Q. It appears on the left-hand side that there's
 7        a date of 8/11/16 and on the right-hand side
 8        8/18/16.
 9   A. Uh-huh (affirmative response).
10   Q. Do you see that?
11   A. (Nodded head affirmatively.)
12   Q. And again, this has a list of a bunch of names
13        and folder numbers.  What -- let's look just
14        on the right-hand side, which is 8/18/16.
15        What is that a list of or what's being logged
16        with those entries?
17   A. At the time, probably packets that went to DOC
18        or East Carroll, one or the other.  When did I
19        start logging, writing it separately?  8/4.
20        These probably went to DOC.  But again,
21        without verifying with DOC on what date they
22        received the packet, there's no way for me to
23        specifically answer that.
24            MS. WASHINGTON:
25                 Okay.  I'm going to hand you what was
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1                  previously marked as Exhibit 56.
 2            (Document tendered.)
 3      BY MS. WASHINGTON:
 4      Q. Have you seen this document before?
 5      A. No.
 6      Q. The subject on the first page indicates that
 7         this is the Department of Corrections
 8         pre-classification policy of the Orleans
 9         Parish Sheriff's Office.
10      A. Yes.
11      Q. Do you see that?
12      A. Yes.
13      Q. Okay.  But it was your testimony that you
14         haven't seen this policy before?
15      A. I may have seen this policy, but most of this
16         policy came from an SOP that, I believe, that
17         I wrote.
18      Q. Okay.  And so we can get into that a little
19         bit, but there may have been a Standard
20         Operating Procedure?
21      A. There was no official one.  I was asked at one
22         point, I don't remember what year, to write
23         down the process, type out the process.
24      Q. Okay.
25      A. And it was probably the beginning stage of
```

Deputy Corey Amacker 9/17/2019

```
 1        whoever finished and wrote this policy.
 2   Q.  Okay.  When you -- who directed you or asked
 3        you to write down the process; do you
 4        remember?
 5   A.  I believe Jerrod Spinney.
 6   Q.  Okay.  And do you know what happened with the
 7        document that you typed up?
 8   A.  No clue.
 9   Q.  Who did you provide it to?
10   A.  Jerrod Spinney.
11   Q.  Okay.  And am I correct that he would have
12        been one of the first couple of direct
13        supervisors you had when you were the DOC
14        classification manager?
15   A.  Yes.  That was prior to moving into this
16        building.
17   Q.  Okay.  So before September of 2015?
18   A.  Yes.
19   Q.  Okay.  The SOP or writing down the
20        procedure --
21   A.  It's kind of what it was --
22   Q.  -- that you did?
23   A.  Yeah.
24   Q.  Do you know if that's something that you would
25        have e-mailed to Major Spinney or how would
```



```
 1        that have been transmitted?
 2   A. Probably printed and handed to him.
 3   Q. Okay.  It's something that you would have
 4        typed on your computer?
 5   A. The computer I had at the time, yes.
 6   Q. Okay.  You weren't physically located in this
 7        building because it wasn't open?
 8   A. No.
 9   Q. Where were you at that time?
10   A. Old lot -- old record room.
11   Q. Okay.
12   A. Across the street, which is now a --
13   Q. A lot?
14   A. -- big grass lot.
15   Q. Okay.  Fair.
16            Looking at -- it's Bates No. 7 of this
17        Exhibit 56.
18   A. Uh-huh (affirmative response).
19   Q. It appears to have the approval and
20        authorization signatures.  Do you see that?
21   A. Yes, I do.
22   Q. And this is dated July 22nd of 2016 by the
23        sheriff?
24   A. Correct.
25   Q. Okay.  Do you know if there was a
```



Deputy Corey Amacker 9/7/2019

```
 1        pre-classification policy that was in place
 2        prior to July of 2016?
 3   A. I don't think there was a departmental one.
 4        Everybody was kind of governed by DOC's
 5        guideline for it.
 6   Q. That you mentioned before?
 7   A. Yes.
 8   Q. Okay.  Aside from the written description of
 9        the process that you provided to
10        Major Spinney, were you involved in drafting
11        this policy at all?
12   A. No.
13   Q. Did you review this policy before it was
14        authorized?
15   A. No.
16   Q. Okay.
17   A. It's not how it works.
18   Q. Why is that?
19   A. I mean, a deputy is never going to review a
20        policy before a chief signs it.
21   Q. But I'm correct that you were the DOC
22        classification manager at the time, correct?
23   A. Correct.
24   Q. Okay.  I want to walk through this policy, so
25        you're going to need Exhibit 56.  Can you turn
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Deputy Corey Amacker 9/17/2019

1     to the second page of it for me?

2   A. Uh-huh (affirmative response).

3   Q. And we looked briefly at that Basic Jail

4     Guidelines earlier, and on this page 2,

5     there's a reference to the Basic Jail

6     Guidelines.  Do you see that?

7   A. Yes.

8   Q. Okay.  Do you still have Exhibit 48 in front

9     of you?

10  A. Yes.

11  Q. I want to look back at page 17 and 18.

12  A. Uh-huh (affirmative response).

13  Q. And starting on page 17, there's a Section

14    II-A-8?

15  A. Yep.

16  Q. Do you see that?

17  A. (Nodded head affirmatively.)

18  Q. Are you familiar with this section of the

19    Basic Jail Guidelines?

20  A. No.  Have I -- yes, I'm familiar with it now

21    because I work in training and we teach the

22    Basic Jail Guidelines.  Was I aware of it at

23    the time of being in the position, no.

24  Q. Okay.  So you're aware of it now in your

25    position with the training academy, but not

Deputy Corey Amacker 9/7/2019

1    when you were the DOC classification manager?

2    A. Yes.

3    Q. Okay.  Am I correct in understanding that the

4       first part of this Section II-A-8 is talking

5       about various records that are maintained by

6       the facility on persons that are housed there?

7    A. Yes.

8    Q. Okay.  And then there is a second part of that

9       same section, which talks about information

10      that shall be collected and forwarded to the

11      DPS&C pre-class coordinator?

12   A. Yes.

13   Q. And this is talking about the documents that

14      are the pre-class materials that a parish of

15      conviction is sending to the Department of

16      Corrections for someone to be classified; is

17      that correct?

18   A. Yes.

19   Q. And you just indicated that you train on the

20      Basic Jail Guidelines now; is that correct?

21   A. I don't do it anymore.  I did it when I first

22      went over there.

23   Q. Okay.

24   A. It's part of the new hire process.  It always

25      has been.

1   Q. It's part of the training academy?
2   A. It's -- there's a brief overview of BJG, Basic
3      Jail Guidelines, in the POST curriculum --
4      92-hour curriculum, but it simply has a new
5      hire -- go through stops of how to look
6      through it, how to identify things in it.
7   Q. Okay.  Can you turn to page 3 of that policy?
8   A. Yes.
9   Q. And about halfway down the page, it says, The
10     DOC pre-classification section is responsible
11     for...  Do you see where I'm reading?
12  A. Yes.
13  Q. And it talks about processing inmates
14     sentenced to state prison and collecting
15     information and completing tasks that are
16     required by --
17  A. Yes.
18  Q. -- DOC.  And it also talks about a weekly
19     transfer list?
20  A. Yes.
21  Q. Do you see that?
22  A. (Nodded head affirmatively.)
23  Q. Okay.  These were all responsibilities of the
24     pre-classification section when you were the
25     DOC classification manager?



```
 1   A. Yes.
 2   Q. Okay.  And I know we talked about the
 3      authorization date of this being July of 2016.
 4   A. Uh-huh (affirmative response).
 5   Q. The -- the responsibilities that are outlined
 6      there on page 3, this was the policy and the
 7      responsibilities of the DOC classification --
 8      pre-classification section when you were there
 9      in 2016?
10   A. Was it the stuff I was doing, yes.
11   Q. Okay.  Were you provided with any training on
12      this policy when it was authorized?
13   A. No.
14   Q. Okay.  The next pages of this policy go into
15      more specific detail about responsibilities of
16      the pre-classification deputy.
17   A. Uh-huh (affirmative response).
18   Q. Am I correct that the pre-classification
19      deputy is the DOC classification manager?
20   A. Yes.
21   Q. Okay.  And it talks about some of the
22      responsibilities that we discussed earlier,
23      such as getting the letters of credit and the
24      sentencing paperwork, correct?
25   A. Yes.
```



1   Q. And it talks about conducting an interview and

2      completing a DOC interview form?

3   A. Yes.

4   Q. Is that something that was your responsibility

5      as the classification manager?

6   A. Yes.

7   Q. Okay.

8   A. Which was previously stated when I gave all

9      the information, the process.

10   Q. Okay.  And it talks here about doing the AFIS

11      entry for each individual?

12   A. Uh-huh (affirmative response).

13   Q. I know that you indicated that there were some

14      additional people who worked with you --

15   A. Yes.

16   Q. -- who had some responsibility for the AFIS

17      input; is that correct?

18   A. Yes.

19   Q. And so the AFIS entry, was that something you

20      performed as the classification manager?

21   A. Both.  Either/or.  Anybody that was doing it

22      with me at the time could have preformed it.

23      In other words, you weren't getting moved into

24      DOC pre-class if you didn't know how to use

25      the AFIS machine; but at the time, yes, there

Amerson White®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        was somebody else doing it with me.
 2   Q. Okay.  So it could have been you or the person
 3        who was working with you?
 4   A. Correct.
 5   Q. Okay.  And I want to look on page 6, which
 6        talks about the completed packet.
 7   A. Uh-huh (affirmative response).
 8   Q. If you look under Section 8 there, it talks
 9        about scanning the DOC packet contents into
10        RVI.
11   A. Uh-huh (affirmative response).
12   Q. What is that process that's being --
13   A. Just scanning into a filing data management
14        system, I guess you would call it.  RVI is
15        just a document system that we had in records.
16   Q. Okay.  And you would scan all of the pieces of
17        paper that made up the DOC packet for an
18        individual?
19   A. Yes.
20   Q. Okay.  And that's saved by the name and folder
21        number?
22   A. Yes.
23   Q. Okay.
24   A. Mainly folder number.
25   Q. Okay.  And then it discusses the delivery of
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        the packets to the Department of Corrections
 2        headquarters at number 9 there.  Do you see
 3        that?
 4     A. Yes.
 5     Q. And this is the in-person delivery that you
 6        discussed earlier?
 7     A. Yes.
 8     Q. Was the delivery of the packets to DOC --
 9     A. Let me --  let me correct something I said
10        wrong earlier.
11     Q. Sure.
12     A. This is correct.  They were delivered on
13        Thursday.  The Hunt run was done on Tuesday.
14        I believe I said we delivered them on Tuesdays
15        earlier.
16     Q. I understand.  The packets were delivered --
17     A. Thursdays --
18     Q. -- on the Thursday?
19     A. -- yeah.
20     Q. The people were physically delivered --
21     A. Tuesdays.
22     Q. -- on the Tuesday?
23            Okay.  Do you know, was it being -- it was
24        hand delivery of the packets for the whole
25        time that you were the DOC classification
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        manager?
 2   A. Yes.
 3   Q. Okay.  Section 10 of the policy on page 6
 4        talks about the creation of a preliminary
 5        transfer list.
 6   A. Uh-huh (affirmative response).  It's the
 7        spreadsheet I referred to earlier that we sent
 8        to DOC.
 9   Q. Okay.  The Excel spreadsheet?
10   A. Yes.
11   Q. Okay.  And on page 7 at the top, it says, Once
12        a transfer list has been approved by the
13        Department of Corrections, the
14        pre-classification deputy completes a final
15        transfer list on the Hunt run list or the list
16        of DOC offenders for transfer list.  Do you
17        see that?
18   A. Yes.
19   Q. And the approval that's described in this
20        policy is that the -- how -- how does the
21        approval by the Department of Corrections
22        happen?
23   A. Typically, approval is they're going to tell
24        you who to take off the list.  So I don't know
25        how that -- that's really how the approval
```

Deputy Corey Amacker 9/17/2019

```
 1      process went.  So let's say you were
 2      sentenced, but once they did your class -- I
 3      mean, your calculation, you were due to be
 4      released in, let's say, five days.  Well,
 5      there's no point in me sending you to Hunt
 6      because they're just going to say, no, you
 7      hold onto them.  We'll send you a release.
 8          So that's kind of the approval process
 9      would be, if I sent them 25 inmates and they
10      didn't have a problem with those 25 coming, I
11      wouldn't get anything.  It just meant they
12      were good to go the next week.  If there was
13      one inmate they wanted removed, they would
14      simply send an e-mail and say, Take so and so
15      off.
16   Q. Okay.  In looking at this section at the top
17      of page 7, I read this to say that it's only
18      after the transfer list is approved by the
19      Department of Corrections that a final
20      transfer list is created by OPSO that provides
21      for where the person is actually going; is
22      that correct?
23   A. They're talking about a list for a Hunt run it
24      says specifically on "d" there.
25   Q. It says, on the Hunt run list or the list of
```



Deputy Corey Amacker   9/17/2019

```
 1       DOC offenders for transfer list.  Is that --
 2  A. Yes.
 3  Q. Those are two separate lists; is that correct?
 4  A. Yes.
 5  Q. Okay.  What is the list of DOC offenders for
 6      transfer?
 7  A. So if they weren't going to Hunt, there may be
 8      a separate list that would be -- indicate
 9      where they were going.
10  Q. Okay.  But am I correct that the policy states
11      that a final transfer list, whether that's a
12      Hunt run or this other DOC offender for
13      transfer list, is completed after the initial
14      transfer list is approved by the Department of
15      Corrections?
16  A. All it would be would just be edited to say
17      final list if they didn't take anybody off.
18      So it's not a separate list.
19  Q. Okay.  But it's finalized after you have
20      received approval by the Department of
21      Corrections?
22  A. Yes.
23  Q. Okay.  Do you know of any addendums or
24      alterations to the process that's described in
25      this policy?
```



Deputy Corey Amacker   3/7/2019

```
 1    A. No.
 2    Q. Okay.  Does this policy reflect the process
 3       that you had drafted in the --
 4    A. Yes.
 5    Q. -- SOP?
 6    A. (Nodded head affirmatively.)
 7    Q. Okay.  And so this is the -- this describes
 8       the process or the policy of
 9       pre-classification as of the time that you
10       were the DOC classification manager?
11    A. Yes.
12    Q. Okay.  Based on the discussion that we had
13       earlier about pre-classification for
14       DOC-sentenced prisoners that OPSO was
15       releasing directly to Riverbend, it does not
16       appear that the process that's described in
17       this policy was being followed or applied for
18       those individuals; is that correct?
19    A. No.
20    Q. No, that was not being followed?
21    A. There were a lot of things that were different
22       based on population management that we had to
23       do from 2015 to -- I'm not sure when we
24       stopped doing it.
25    Q. Okay.  So the --
```

```
 1    A. Because of simply we couldn't house the number
 2       of prisoners here.  So there were a lot of
 3       things, as far as movement, that were being
 4       done differently.
 5    Q. Okay.  So the process for pre-classification
 6       for those DOC-sentenced prisoners that were
 7       being released directly to Riverbend was
 8       different from what's --
 9    A. Yes.  Because --
10    Q. -- outlined in this policy?
11    A. -- as I stated earlier, they were pre-classing
12       them for us instead of bringing them back to
13       us to get right back.  At that time, we had
14       hundreds of inmates housed out.  So we didn't
15       have anywhere to put them here.  So rather
16       than have an inmate brought here where they
17       have no available bed, East Carroll was
18       completing the packet, sending it to DOC and
19       taking custody of that inmate as a sentenced
20       prisoner.
21    Q. So if someone was being housed pretrial at
22       Riverbend, came back to Orleans for court,
23       took time while they were in court --
24    A. They would get right back on a bus and go
25       right back to East Carroll.  They never
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker 9/7/2018

```
 1        touched down inside this facility.
 2   Q. And what I'm trying to understand is, it's
 3        your understanding that that's because there
 4        wouldn't have been a bed here in Orleans
 5        for --
 6   A. Correct.
 7   Q. -- you all to perform the pre-classification?
 8   A. No.  It's simply -- they were already -- if
 9        you drove down on a bus this morning from East
10        Carroll, you went to court, you got back on a
11        bus and went back to East Carroll.  So it had
12        nothing to do with the process of
13        pre-classification.
14   Q. Right.  I'm asking about your comment
15        regarding there not being bed space for those
16        individuals.
17   A. I was told that we had to house out prisoners
18        because we didn't have bed space.
19   Q. Okay.
20   A. Which went on for several years, which I
21        stated earlier was delegated to us by the
22        Department of Justice.
23        MS. WASHINGTON:
24             I'm handing you what I'm marking 72.
25      (Document marked and tendered.)
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 9/17/2019

Page 121

```
 1              THE WITNESS:
 2                    Uh-huh (affirmative response).
 3   BY MS. WASHINGTON:
 4   Q. Have you seen this document before?
 5   A. I have not.
 6   Q. Well, I will represent to you that this
 7      exhibit are your responses to the plaintiffs'
 8      interrogatories in this litigation.
 9   A. Okay.
10   Q. And I want to look at page 8 of this document.
11   A. Uh-huh (affirmative response).
12   Q. And this is the response that was provided to
13      Interrogatory No. 3, which had asked about the
14      process by which OPSO provides notice to the
15      Department of Corrections about persons
16      sentenced in Orleans Parish and also about
17      OPSO's completion of pre-classification
18      documents.
19   A. Uh-huh (affirmative response).
20   Q. And I'm looking on page 8, and particularly
21      under section "b" there where it states, The
22      OPSO provides a completed pre-classification
23      packet, including all sentencing paperwork,
24      directly to East Carroll Parish Sheriff's
25      Office and documents the transfer via logbook.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

 1   A. Correct.
 2   Q. The inmate is only released from OPSO custody
 3      once confirmation is received that ECPSO
 4      classification staff was in physical receipt
 5      of that packet.
 6   A. Yes.
 7   Q. When it states there that OPSO provides a
 8      completed pre-classification packet, what are
 9      you referring to?
10   A. It depends, as we've been discussing all
11      afternoon.  It's going to depend on where the
12      inmate was at at the time.  Meaning was it
13      completed here by me, then yes.  If it was
14      completed by East Carroll, they wouldn't be
15      released in the computer until we verified
16      that East Carroll had done a packet.
17   Q. Well, this sentence is talking about OPSO
18      providing a completed pre-classification
19      packet directly to East Carroll Parish
20      Sheriff's Office.  And so in that context,
21      what would be the completed pre-classification
22      packet?
23   A. Fingerprints, book -- booking, interview,
24      sentence, Letter of Credit.
25   Q. Okay.  So you were providing all of those

Deputy Corey Amacker 9/17/2019

```
 1        documents to the East Carroll Parish Sheriff's
 2        Office?
 3   A.   Yes.  It depended on the transfer.  I'm not
 4        trying to be vague, but I moved over 5,000
 5        inmates.  So like I -- it's everything was
 6        done differently.  Not 5,000 DOC inmates.
 7        Inmates as a whole.
 8             So there were different scenarios on a
 9        weekly basis where we would be forced to move,
10        let's say, 200 or 300 inmates in a week.  Some
11        of those would be DOCs; some of those would be
12        pretrial.  There was a multitude of documents
13        that were going up on a weekly basis, meaning
14        hundreds and hundreds of documents.
15             So it's hard for me to answer specific to
16        which run when, what went up because of the
17        sheer number of volume we did for those two or
18        three years.
19   Q.   So section "c" there says, OPSO completes all
20        necessary portions of the packet, including
21        gathering of court paperwork, a pre-sentence
22        interview, completes a credit letter for OPSO
23        time served, and completes a pre-sentence AFIS
24        booking.
25   A.   Uh-huh (affirmative response).
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Deputy Corey Amacker 9/17/2019

```
 1   Q. What I'm trying to understand is, were you
 2      sending those completed pre-classification --
 3   A. No.
 4   Q. -- packets?
 5   A. If they were completed here, it would have
 6      done straight to DOC.
 7   Q. Okay.  And if I understood your prior
 8      testimony, when you were sending packets to
 9      East Carroll Parish Sheriff's Office, that was
10      just the sentencing paperwork and the Letter
11      of Credit; is that correct?
12   A. If they were going to do them for us, yeah,
13      right.
14   Q. Okay.
15   A. If we had done it -- if I had done it or
16      somebody working with me had done it here and
17      it was complete, all the way completed, then I
18      would have just have put it with the weekly
19      delivery to go to DOC.
20   Q. Okay.  Okay.  That was my question.  Because
21      it wouldn't make a lot of sense, correct?
22   A. It wouldn't make any sense for me to send my
23      completed packet to East Carroll.
24   Q. Okay.
25   A. When it's a DOC packet.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Deputy Corey Amacker 9/7/2018

```
 1   Q. Okay.  And for just a second, I want to
 2      revisit the notification that was being
 3      provided to the Department of Corrections
 4      about DOC-sentenced prisoners that Orleans was
 5      releasing directly to Riverbend.
 6   A. Uh-huh (affirmative response).  Most of that
 7      notification was coming from the two ladies
 8      that were in the previous exhibit of my sent
 9      e-mail, not directly from me.
10   Q. Which exhibit are you referring to?
11   A. I'm trying to get back to it.
12         MR. MATTHEWS:
13             The e-mail.
14         THE WITNESS:
15             It's the e-mail.
16         MS. WASHINGTON:
17             Uh-huh (affirmative response).
18         THE WITNESS:
19             Simply because these two employees at
20          that time were responsible for sending,
21          I believe, what's referred to in BJG as
22          the master prison record to the
23          Department of Corrections every 30 days,
24          I think, every 30 days, and that's just
25          what I recall, of a bill that goes to
```

```
 1              the state saying we have these inmates
 2              and we've had them since this date, this
 3              is their sentence date, and they pay
 4              sheriffs' departments per inmate per
 5              day, which has been the same way written
 6              in the state law for I don't know how
 7              many years.  So they were doing the
 8              notification as to DOC, Ms. Laura Sevier
 9              and Shawne Harris here for us, not
10              necessarily myself because that's their
11              billing obligation.  That's what they do
12              as far as billing.
13         MS. WASHINGTON:
14              Okay.
15         THE WITNESS:
16              And that's Exhibit 54.
17    BY MS. WASHINGTON:
18    Q. Right.  The e-mail that we looked at earlier?
19    A. Uh-huh (affirmative response).
20    Q. And so for the persons who were already
21       physically located at Riverbend and took time,
22       were released by OPSO as DOC-sentenced
23       prisoners to Riverbend, you were not providing
24       any transfer notification to the Department of
25       Corrections?
```



Deputy Corey Amacker 9/17/2019

1    A. Some lists were because of what we discussed

2        earlier.  There were scenarios where I was

3        told to get rid of X number of inmates.  I

4        would call Glynn Stassi and say, Hey, look, I

5        need to move these 40 guys or girls, there

6        were scenarios where we moved females as well,

7        can I go ahead and move these here?  Here's

8        the packets.  Are they going to complete the

9        packets?  And you would get a yes or no from

10       the Department of Corrections.

11   Q. Okay.  And you indicated that sometimes that

12       was by e-mail and sometimes that was by phone?

13   A. A lot of times it was by phone simply because

14       it would be -- I would be told, look, we need

15       to move X number of inmates, and I would call

16       Glynn and say, Hey, I need this many beds.

17       Can you find them for me?  And he would say,

18       Okay.  Well, if East Carroll has them, just go

19       ahead and send them there.  If not, then I'll

20       find you another facility.

21   Q. And in that scenario that you're discussing,

22       when Glynn gave the okay to send people to

23       East Carroll, did you provide Glynn with a

24       list of who you were transferring to East

25       Carroll?

Deputy Corey Amacker  04/17/2019

```
 1    A. Yes.  In those scenarios, typically, I would
 2       give him a list.  He would ask for a list
 3       after I moved them to East Carroll or River
 4       Correctional or St. Charles Parish or
 5       whatever.  It wouldn't be done in that process
 6       of sending a preliminary and a final, because
 7       they look at those moves as population
 8       management, meaning I'm out of beds, I need to
 9       move people.  It will allow you to move the
10       people and then send documentation after.
11    Q. Okay.
12    A. As well as this 30-day bill that's done
13       statewide.
14    Q. Okay.  But even in the scenario you're talking
15       about where you spoke with someone at the
16       Department of Corrections, asked to move
17       people directly to River?
18    A. Uh-huh (affirmative response).
19    Q. You would then provide the Department of
20       Corrections with --
21    A. Typically, with the same --
22    Q. -- the names of those people?
23    A. -- spread, yes, list.
24    Q. Okay.  And that would be by e-mail?
25    A. E-mail most of the time, yes.
```


Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    Q. Okay.  Did you have any other contact other
 2       than Glynn?
 3    A. Glynn is just who I remember specifically
 4       because Glynn and I got to know each other
 5       well.  Yes, there were a multitude of people
 6       you could talk to up there for that scenario.
 7    Q. Okay.  So you have mentioned there being
 8       problems with DOC-sentenced individuals who
 9       had been released directly to East Carroll,
10       correct?
11    A. Yes.
12    Q. When --
13    A. I couldn't --
14    Q. When --
15    A. I couldn't tell you.  I know where you're
16       about to go.  I have no idea.
17           MR. CRAIG:
18               Wait until the end of the question.
19           THE WITNESS:
20               I know where you're going.  I don't
21           know when it happened.  I don't remember
22           when I was notified exactly.
23    BY MS. WASHINGTON:
24    Q. Let me just ask.  It may be that you don't
25       remember, but when did you become aware that
```

Deputy Corey Amacker 9/17/2019

```
 1        there were individuals who had been
 2        transferred to Riverbend as DOC-sentenced
 3        prisoners that hadn't had their time
 4        calculated?
 5   A. I wasn't notified that they hadn't had their
 6        time calculated.  I was notified that they
 7        weren't actively sentenced in CAJUN, which
 8        would indicate that they hadn't been
 9        calculated, but sometime at the end of 2016.
10        I don't know specifically when.
11   Q. Okay.  And when you say that they hadn't had
12        their sentence in CAJUN?
13   A. Uh-uh (negative response).  DOC system.
14   Q. Okay.  That means that there wasn't an updated
15        entry for these individuals in CAJUN?
16   A. Correct.
17   Q. Okay.  And perhaps there might not be an entry
18        at all in CAJUN?
19   A. If they didn't have a previous DOC number,
20        then there wouldn't have been an entry at all.
21   Q. Right.
22        MS. WASHINGTON:
23             Okay.  We'll mark this as Exhibit 73
24             and show it to you, which is an e-mail
25             from Laura Sevier with the East Carroll
```

```
 1            Parish Sheriff's Office to you as well
 2            as to, I believe --
 3        THE WITNESS:
 4            Glynn.
 5        MS. WASHINGTON:
 6            -- Glynn Stassi, who you've mentioned
 7            with the Department of Corrections.  The
 8            e-mail has a title of Phillip Dominick
 9            with his date of birth or possible dates
10            of birth.
11      (Document marked and tendered.)
12    BY MS. WASHINGTON:
13    Q. And please take a look at the e-mail.
14    A. (Complied.)
15    Q. But it appears to me that in it, Ms. Sevier
16        states that she is working on supplemental
17        billings for the Department of Corrections and
18        that she's unable to bill for Mr. Dominick as
19        he isn't updated --
20    A. Right.
21    Q. -- in CAJUN; is that correct?
22    A. Yes.
23    Q. Okay.  And Ms. Sevier asks you to resubmit his
24        paperwork to the Department of Corrections.
25    A. Correct.
```

Deputy Corey Amacker 9/17/2019

```
 1   Q. Do you remember this e-mail?

 2   A. No.

 3   Q. Okay.  Do you know what steps you took after

 4      receiving this e-mail?

 5   A. No.

 6   Q. Okay.  Would you have been concerned that a

 7      Department of Corrections-sentenced offender

 8      from Orleans who had been transferred to

 9      Riverbend didn't have an updated CAJUN entry?

10         MR. MATTHEWS:

11             I object to the form.

12         THE WITNESS:

13             I was going to -- feel like object

14          myself.  Concern is almost like an

15          emotion.  Would I have tried to rectify

16          this, absolutely.  I might add that this

17          is not an uncommon thing for -- as far

18          as billing goes with the Department of

19          Corrections.

20   BY MS. WASHINGTON:

21   Q. What do you mean by that?

22   A. Meaning they very often do not have their

23      records updated correctly, as to billing.

24      This is a billing e-mail, not necessarily --

25      yes.  I would need to look into it and see why
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA  70404     Fax 985.419.0799

```
 1        he wasn't updated because what she's saying
 2        is, is nobody updated him in CAJUN, meaning he
 3        doesn't appear to be sentenced, but he's on
 4        the DOC bill.
 5   Q.   Correct.  It appears to me from this e-mail
 6        that East Carroll Parish Sheriff's Office is
 7        trying to bill DOC, correct?
 8   A.   She's trying to get her money.
 9   Q.   Okay.  And it appears just from the context of
10        the e-mail that she's unable to bill for him
11        because he is not updated in CAJUN; is that
12        correct?
13   A.   Correct.
14   Q.   Okay.
15   A.   Quick question.
16   Q.   Sure.
17   A.   Do you know how much longer this is going to
18        be simply because I have to be somewhere at
19        5:30 in Ponchatoula.
20   Q.   I think probably another 45 minutes.
21   A.   All right.  That will be close.  All right.
22   Q.   Okay.  I have you for seven hours.
23   A.   Keep going.
24   Q.   Ready to keep going?
25   A.   Yeah.
```



Deputy Corey Amacker 9/17/2019

```
 1          MS. WASHINGTON:
 2              Okay.  I'm handing you Exhibit 74.
 3      (Document marked and tendered.)
 4   BY MS. WASHINGTON:
 5   Q. Do you recognize this e-mail?
 6   A. Do I recognize it, no.  Can I -- is it my
 7      e-mail, yes.
 8   Q. Okay.  It appears to be an e-mail from you to
 9      Ms. Sevier with East Carroll Parish Sheriff's
10      Office; is that correct?
11   A. Yes.
12   Q. And this is from November of 2016?
13   A. Yes.
14   Q. Related to Jessie Crittindon?
15   A. Yes.
16   Q. And in this e-mail, you state that the family
17      and DOC are indicating they received nothing
18      from pre-class and asking East Carroll to look
19      into his packet --
20   A. Yes.
21   Q. -- correct?
22   A. Yes.
23   Q. Okay.  Do you know what steps you took after
24      sending this e-mail?
25   A. I don't recall specific what steps I took, but
```

```
 1        this is probably the beginning of me trying to
 2        figure out what's going on with
 3        Mr. Crittindon.
 4   Q. Okay.  And this would be as of early
 5        November 2016?
 6   A. Yes.
 7   Q. Okay.  Do you remember steps that you took
 8        relative to Mr. Crittindon, specifically?
 9   A. I do not.  I don't remember specifically what
10        happened.  I can just tell from this, this is
11        me asking Laura, Hey, I sent you this guy in
12        August.  What's going on with him?  If I'm
13        not -- I do kind of recall.  I believe his
14        family called me and that's how I sent this
15        e-mail, because they were trying to figure
16        out -- get something to do with his Letter of
17        Credit or his sentencing or his release state
18        or something along those lines.
19   Q. Okay.
20   A. Which happened quite often, as far as families
21        calling us to figure out what was going on,
22        not us, me, with their family member because a
23        lot of these guys I would have conversations
24        with, lengthy grievances, answers, e-mails
25        from inmates; so it was pretty consistent with
```

Deputy Corey Amacker 9/17/2019

```
 1          their family calling to ask questions.
 2   Q. Okay.  Is there a way that you kept track of
 3          calls from family members that you received
 4          with concerns about time calculation?
 5   A. Down in my notebook just sitting on my desk,
 6          as I was talking about earlier.
 7   Q. Okay.
 8   A. I mean, that's what I was adamant about.  I
 9          wrote down everything in notebooks as I went.
10          That way I could refer back to them.
11   Q. Okay.  And as far as grievances that you got
12          directly from inmates, how would those be
13          received through you?
14   A. Through the kiosk machine that goes through
15          here, the sheriff's office.
16   Q. Okay.
17   A. An e-mail-based machine.  Well, I guess it's
18          e-mail based.  It doesn't go to my specific
19          e-mail, but it's a user name-based system that
20          they can write grievances to.
21   Q. That's if you're physically housed here in
22          Orleans, correct?
23   A. Correct.
24          MS. WASHINGTON:
25                  Okay.  I'm going to hand you what was
```

```
 1              previously marked as Exhibit 36, and you
 2              can actually turn to the second page of
 3              that exhibit.
 4        (Document tendered.)
 5   BY MS. WASHINGTON:
 6   Q. I want to talk about the e-mail that you sent,
 7      which is sort of the beginning of this chain.
 8   A. My paper is blank.
 9   Q. Oh, no.
10   A. It's only got my footer on it.
11   Q. Let me give you my copy.
12   A. Wait.  No, it's not.  It's on a previous page.
13      All I saw was my footing there.  I'm like why
14      is this --
15   Q. You got it?
16   A. Yeah.
17   Q. Yeah.  The double sidedness of the first page.
18   A. Yeah, yeah, yeah.
19   Q. I'm sorry.
20   A. Yes.
21   Q. And in this e-mail from you, which comes from
22      December 16 of 2016, you're sending that to
23      someone named Joseph Bordelon at the
24      Department of Corrections.
25   A. Yes.
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    Q. Who -- who is Mr. Bordelon?
 2    A. I can't remember where he falls in the chain
 3       of command, but he's way at the top of the
 4       Louisiana Department of Corrections.
 5    Q. Okay.  Was he someone that dealt with -- well,
 6       I guess it seems here from his signature --
 7       with classification or he was a pre-class guy?
 8    A. He was, but he's not somebody that I dealt
 9       with on a regular basis at all.  I dealt with
10       Angela quite a bit, who's on the top of that
11       page, Smith.
12    Q. Okay.
13    A. If I'm not mistaken, I believe he may be the
14       supervisor over a crew of the DOC of the
15       pre-class section at headquarters, DOC
16       headquarters.
17    Q. Okay.  In looking at the body of the e-mail
18       that you sent, it says, It looks like they
19       have been interviewing and fingerprinting
20       properly.  They are just failing to send the
21       sentence/LOC to you guys.
22    A. Letter of Credit.
23    Q. Right.  And then in the second paragraph
24       there, it says, I am just running into way too
25       many inmates whom are over their full-term
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1        date that we released to Riverbend.  Do you
 2        see that?
 3   A.  Yes.
 4   Q.  Okay.  And so in this e-mail in mid
 5        December 2016, you're describing a problem --
 6   A.  So --
 7   Q.  -- with the time calculation?
 8   A.  -- this is me saying, Look, I'm going to send
 9        you a duplicate of what I send to East Carroll
10        because they're way too many people indicating
11        that they are not done correctly.  This is
12        when I'm trying to rectify with DOC saying,
13        Look, I'm going to send you an additional copy
14        so that you can make sure that you get the
15        match from East Carroll.
16   Q.  Okay.
17   A.  It was just the solution that I came up with
18        to send two copies; one to DOC, one to East
19        Carroll.  You let me know if you don't get the
20        match from them.
21   Q.  Okay.  That first sentence about, It looks
22        like they have been interviewing and
23        fingerprinting properly.  They are just
24        failing to send the sentence/letter of credit
25        to you guys, do you remember what steps or
```

```
 1        investigation you had done to come to that
 2        conclusion by mid December of 2016?
 3   A.  They were sending the interview forms, so it
 4        was clearly they were doing the interview
 5        properly.  It's a fill in the blank.  Like I
 6        said, that's a demographic sheet; emergency
 7        contact, parents, are they deceased, are they
 8        not, shoe size, DOC number, sentence date.
 9        That's just a -- it's a one-page interview
10        form that every inmate gets done face to face.
11        And they were sending the fingerprint packets
12        back to me.  So I was aware that they were
13        doing the interview and they were making the
14        effort to pre-class, but they weren't getting
15        updated in Baton Rouge at DOC headquarters.
16        So there was some kind of disconnect as to --
17        I was trying to figure out what was going on
18        between Riverbend and Baton Rouge because I
19        was seeing the packet that they had done.  I
20        knew they were interviewing the people, but
21        they weren't getting to Baton Rouge.
22   Q.  How were you seeing the packet?
23   A.  Because I believe when I started investigating
24        this, I asked them to see one to make sure.
25   Q.  Okay.  Were you regularly receiving the
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 9/17/2019

1    interview form and the fingerprints that they

2    had been conducting?

3  A. No.  What should have happened -- at some

4    point after I started this whole process of

5    something is not right, we started -- I

6    started requiring them to just send me the

7    entire thing back, and I was delivering them

8    to Baton Rouge to DOC headquarters, not me

9    specifically, but OPSO was delivering them in

10   a vehicle like we had always had the process

11   of doing.  So I'm not sure if that happened

12   before or after this -- no.  This is probably

13   the very beginning where I said, Look, I'm

14   going to send you a copy of what I sent to

15   them so that you can make sure that they send

16   you the match.

17  Q. Okay.  And when you say you were running into

18   too many inmates who were over their full-term

19   date, what did you mean by that?

20  A. Meaning I was being contacted by inmates

21   saying, hey, I'm not supposed to be here.

22  Q. Okay.

23  A. Which I very adamantly used to keep up with

24   those guys sending me an inmate -- I mean, a

25   grievance because nobody wants to stay in jail



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        longer than they're supposed to.
 2            MS. WASHINGTON:
 3                 This is Exhibit 65, and I want to
 4                 look specifically at the e-mail that you
 5                 sent on December 27th, which is, again,
 6                 on the -- it starts on the second page
 7                 of that exhibit.
 8          (Document tendered.)
 9            THE WITNESS:
10                 Uh-huh (affirmative response).
11      BY MS. WASHINGTON:
12      Q. This is an e-mail that it looks like you sent
13         about ten days after the one that we just
14         looked at; is that correct?
15      A. Uh-huh (affirmative response).
16      Q. And in this situation or in this e-mail, you
17         describe the situation as a fiasco, correct?
18      A. Yes.
19      Q. What did you mean by that?
20      A. Because after the initial -- when I started
21         the investigation, I basically just started
22         going through every single inmate that I had
23         ever released to East Carroll's DOC, and then
24         tried to -- not trying -- running them in
25         CAJUN to see if there was a match, meaning
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        that they were updated.
 2   Q. Okay.  And what were you discovering?
 3   A. That they were not.
 4   Q. Okay.
 5   A. So at that point, I knew some -- they were
 6        doing something improperly at East Carroll,
 7        Riverbend.
 8   Q. And at the time of you sending this, you said
 9        that you'd found 100 so far.  As part of your
10        e-mail --
11   A. Yes.
12   Q. -- is that correct?
13   A. Yes.
14   Q. And this was based on the process that you
15        just described of --
16   A. Going through that logbook and literally
17        putting every single person we had moved in.
18   Q. Okay.  In your understanding, what had
19        happened such that individuals were not in
20        CAJUN when you looked for them?
21   A. My understanding, after going up there and
22        training them, I know exactly what they did.
23        They improperly put them in the AFIS machine.
24        So they were doing the process.  They were
25        just doing it wrong, meaning the portion of
```

Deputy Corey Amacker 9/17/2019

1    AFIS.  You have to put -- select someone as
2    DOC incarcerated in the actual AFIS machine.
3    Then underneath that you put in the case
4    number, the sentence date, the amount of time,
5    hard labor in there, and the date of sentence.
6    That is the process of pre-class.
7        They were essentially putting them in as a
8    new booking where it looked like, instead of a
9    conviction for armed robbery, let's just use
10   that for an example, it looked like an armed
11   robbery arrest.  Well, DOC doesn't get that
12   notification, the state police does, because
13   they're thinking it's a new armed robbery
14   arrest, not a DOC incarceration.
15       So the charge box in the AFIS machine, you
16   can either select a Title 14 statute, 32, or
17   you can select DOC incarceration.  So they
18   were selecting the charge itself that they had
19   been convicted of instead of DOC
20   incarceration.
21       MS. WASHINGTON:
22           I'm showing you Exhibit 57, which is
23           an e-mail that you're not on, but I will
24           represent to you, and you can read, is
25           an e-mail that then Director Maynard



Deputy Corey Amacker 9/17/2019

```
 1              sent to me, actually, on December 29th
 2              of 2016.
 3          (Document tendered.)
 4    BY MS. WASHINGTON:
 5    Q. And in this e-mail, he states that Major Holt
 6       and Lieutenant Holliday had discussed this
 7       issue related to DOC classification and time
 8       calculation, and that Major Holt had sent two
 9       of his intake deputies to ECP and that they
10       spent the day training with the staff.  Am I
11       correct that you're one of the people who was
12       sent to ECP?
13    A. Yes.
14    Q. Okay.  Do you know anything about the
15       discussions between Major Holliday or
16       Lieutenant Holliday and Major Holt that are --
17    A. No.
18    Q. -- noted in this e-mail?
19    A. No.
20    Q. Okay.  How did you receive information or
21       direction about going to East Carroll Parish
22       in December of 2016?
23    A. I didn't.  It was my doing, meaning I said I
24       was going up there and train them.  Of course,
25       I had to get approval from the department.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1   Q. Okay.  Did you go up by yourself?

2   A. No.

3   Q. Who did you go up with?

4   A. Myself and Damion Anthony, who was a very

5       senior guy with the same amount of experience

6       as I at the time.  He didn't have anything to

7       do with DOC, but he and I had both been in and

8       around lockup and booking and DOC for the past

9       ten years together.  So he had the same

10      knowledge of AFIS that I did, so he went up

11      there with me.

12  Q. What was his position at the time?

13  A. Warrants and extradition, meaning he did

14      out-of-state extraditions from here to other

15      states.

16  Q. Okay.  For OPSO?

17  A. For OPSO.

18  Q. Okay.  And you said that you had to get

19      approval for the trip and training; is that

20      correct?

21  A. Oh, yeah, of course.

22  Q. And that's approval from your supervisors here

23      at OPSO?

24  A. Yes.

25  Q. Okay.  Who did you meet with when you were in



1      East Carroll?
2  A. The sheriff, the warden, one of the
3      lieutenants, the captain that we referred to
4      earlier.
5  Q. Captain Russell?
6  A. Captain Russell was there with us.  It was a
7      lieutenant, a captain that were going to be
8      responsible, one other guy, I can't remember,
9      and one female that we trained.  And, of
10     course, we just met with the sheriff and the
11     warden.  I think, I believe, we trained four
12     staff members, and demoed and actually had
13     them do it in front of us for the duration of
14     that day.
15 Q. Okay.  And you just told me about what you
16     discovered the problems were with the process.
17 A. Uh-huh (affirmative response).
18 Q. Am I correct in understanding that the
19     training you provided was to correct the
20     problems that --
21 A. Yes.
22 Q. -- you identified?
23 A. Yes.
24 Q. Okay.  What was your meeting with the sheriff
25     and the warden regarding?



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 9/17/2019

```
 1   A. Oh, nothing.  I simply met them.  There was no
 2      meeting.
 3   Q. Okay.
 4   A. No.  It was -- no.  I met them when we got
 5      there.  I was introduced to the sheriff and
 6      the warden, and then we trained their staff
 7      for the remainder of the time we were there.
 8   Q. How long were you there for?
 9   A. Like 10, 12 hours.  We were there -- we left
10      at, like, 2:00 in the morning to drive up
11      there and then we stayed there.  It was a long
12      day.
13   Q. And then you were describing the AFIS entry
14      process?
15   A. Uh-huh (affirmative response).
16   Q. And so when the AFIS entry is checked or coded
17      for DOC-sentenced?
18   A. Uh-huh (affirmative response).
19   Q. Am I -- was it your testimony that the AFIS
20      system sends that notification directly to the
21      Department of Corrections?
22   A. It goes to the state, but it goes to the
23      state, which essentially is the Department of
24      Corrections.  So the state police gets the
25      notification, but they get the notification as
```

Deputy Corey Amacker 9/17/2019

```
 1        a -- that's a sentencing.  That's an AFIS
 2        sentencing instead of AFIS arrest, so it --
 3        it's coded differently.  I'm not sure the
 4        science behind it or whatever, the digital
 5        footprint of how it works, but it's -- instead
 6        of entering a charge, I'm entering
 7        DOC-sentenced, and then underneath that on a
 8        detail line, I'm putting the case number, the
 9        date, the amount of time they received, and
10        whether or not they are habitual offender,
11        whether or not it's flat time, and there's all
12        kind of -- whether it's a parole violation,
13        whether it's a probation violation.  All of
14        that gets entered separately in a different
15        way.
16   Q.   Okay.  I guess, I understand that once that
17        entry is made, it goes to the state.
18   A.   Uh-huh (affirmative response).
19   Q.   My question is does, to your knowledge, does
20        the Department of Corrections get notification
21        of new --
22   A.   I have no idea.
23   Q.   -- DOC-sentenced AFIS entries?
24   A.   I don't know.
25   Q.   Okay.
```



1  A. I don't know if they get it from AFIS.

2  Q. Okay.  What is your understanding of why that

3     particular AFIS entry, it being DOC-sentenced

4     versus it looking like a new arrest, matters

5     for the pre-classification process?

6  A. Because it is essentially you sentencing them

7     in AFIS, which would be the national database

8     record for their incarceration, as opposed to

9     you booking them in AFIS for an arrested

10    charge.  So that's the difference in how it's

11    coded, per se, or selected.

12 Q. Okay.  When you met with the staff at East

13    Carroll Parish, other than the AFIS entry

14    specifically, were there any other issues that

15    you identified with the pre-classification

16    process that they had been undertaking for

17    these Orleans DOC-sentenced individuals?

18 A. No.  They were pretty efficient as to getting

19    to them as soon as we sent them the stuff and

20    processing them.  Unfortunately, they were

21    just doing it the wrong way.

22 Q. Okay.  And when you say "processing them" --

23 A. Pre-classing them.

24 Q. Sure.  To your knowledge, what was the East

25    Carroll Parish Sheriff's Office staff doing

Deputy Corey Amacker 9/17/2019

1    with the pre-classification documents once

2    they had been completed?

3  A. I don't know how they were doing it.  I know

4    at the time they were -- I think they said

5    they were bringing them, but at the time they

6    were housing prisoners for Baton Rouge as

7    well.  I don't know exactly what they were

8    doing with them.  I never quite figured that

9    out.

10 Q. Do you know whether or not East Carroll Parish

11    Sheriff's Office was sending the

12    pre-classification packets to the Department

13    of Corrections?

14 A. I do not.

15 Q. Okay.  And am I correct that you testified

16    that East Carroll Parish Sheriff's Office was

17    not sending you the pre-classification that

18    they had completed on DOC-sentenced prisoners

19    that had been released from Orleans?

20 A. Say that again.  I'm sorry.

21 Q. We talked about it earlier, but I just want to

22    make sure that I understand.  For the

23    DOC-sentenced prisoners that you had released

24    from Orleans directly to Riverbend, was the

25    East Carroll Parish Sheriff's Office sending

1      you pre-classification packets that they had

2      completed prior to --

3   A. I don't think so.

4   Q. Okay.

5   A. There was -- I thought they were sending them

6      to Baton Rouge, just like every other agency

7      down there does for processing.  After that, I

8      changed a bunch of things up so that we could

9      not have this situation again, meaning they

10     were making copies.  Like I said that earlier,

11     they were sending the full packet back to me

12     and I would just deliver them on Thursday with

13     the rest of mine.  We changed a bunch of

14     stuff.  As previous e-mail, I started sending

15     DOC a copy so that they could make sure they

16     got the match.  We changed a lot of things up.

17     This was a long process to rectify.

18  Q. Right.  But prior to December --

19  A. No.  They were --

20  Q. -- when you were --

21  A. When we started this deal, I assumed that they

22     had pre-class just like everybody, us.  Every

23     parish has to have it.  I didn't have any

24     indication that they were doing it wrong.  I

25     didn't have -- the person I spoke to, they did

```
 1        the same thing as me, very evidently new what
 2        he was talking about as pre-class, I just
 3        didn't know they were doing the data entry
 4        wrong.
 5   Q.   Okay.
 6   A.   And like I said before, they were simply just
 7        doing it wrong in AFIS.  The rest of it they
 8        were doing correctly.  They were interviewing,
 9        they were fingerprinting, they were doing the
10        steps like they were supposed to.
11   Q.   The packets that you began looking at later in
12        this situation, you're saying that the rest of
13        the documents that are in there appeared to be
14        completed correctly?
15   A.   Yes.  And after we went up there, everything
16        was completed correctly once they -- we
17        continued to have them send them back to us
18        just so that we could rectify the situation.
19   Q.   So tell me about what exactly was happening
20        after your training trip to East Carroll, as
21        far as steps that you were taking and steps
22        that East Carroll was taking relative to these
23        Orleans DOC-sentenced individuals?
24   A.   At that point, once I went up there, trained
25        the staff, I just, while I was up there, I
```

```
 1        said, Look, you guys do the packet.  These
 2        guys came down seven days a week.  They had so
 3        many of our inmates, so they're -- somebody
 4        came here every day.  I said, Look, you
 5        complete the packet, put them back in a big
 6        envelope, send them back to me, and I'll just
 7        have my guy drive them up every Thursday with
 8        mine, so that I could start double logging
 9        them like you see in some of the stuff.
10        Instead of having them drive to Baton Rouge,
11        they are five hours from here, that's what we
12        did afterwards.
13   Q. Okay.
14   A. I would indicate separate log entries to the
15        logbook, when I received them, the day I drove
16        them to Baton -- not I -- we drove them to
17        Baton Rouge.  So a lot of things changed after
18        we realized there was an issue.
19   Q. Okay.  And so after you realized there was an
20        issue, East Carroll Parish Sheriff's Office
21        was still completing --
22   A. Uh-huh (affirmative response).
23   Q. -- the pre-classification packets?
24   A. They would just send the completed packet back
25        to me and OPSO would drive them over to
```

Deputy Corey Amacker 9/17/2019

```
 1        Baton Rouge.
 2   Q. Okay.  Instead of it going directly to the
 3        Department of Corrections from East Carroll?
 4   A. It was just a way for me to log that they had
 5        completed them and I had received them back in
 6        full.
 7   Q. Okay.  How -- and is -- I know that you left
 8        at some point in time, but did that become the
 9        process for the remainder of your time as the
10        DOC classification manager?
11   A. Yes.
12   Q. Okay.
13   A. Yes.
14   Q. You indicated a minute ago that it took a long
15        time to correct this situation; is that
16        correct?
17   A. Yes.
18   Q. How long was "a long time"?
19   A. I'd say probably three or four weeks.
20   Q. Okay.  And so there were additional persons
21        who came to your attention who had not been
22        updated or processed by the Department of
23        Corrections?
24   A. Correct.
25            MS. WASHINGTON:
```



```
 1              Okay.  Can we go off the record and
 2          take a break for just a few minutes, and
 3          I think we'll be close to finishing?
 4        THE WITNESS:
 5              Yeah.
 6        MS. WASHINGTON:
 7              Thank you.
 8      (Recess was taken.)
 9   BY MS. WASHINGTON:
10   Q. When did you first hear about this litigation?
11   A. I couldn't tell you, specifically.
12   Q. Do you have a general timeline?
13   A. Not really.  I don't think I was in the
14      position of DOC pre-class anymore.
15   Q. So sometime after you had moved to the
16      training academy?
17   A. Yeah.
18   Q. And I'm not asking for any privileged
19      communications with counsel, but since the
20      lawsuit has been filed, have you talked to
21      anybody about the litigation?
22   A. None other than counsel.
23   Q. Okay.  Have you spoken with anybody else
24      within OPSO regarding the litigation?
25   A. No.  I mean, we had to pull some records to
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        forward counsel, but other than that, that was
 2        basically Bierria and I.
 3   Q. Okay.  And I know that I asked you earlier,
 4        but were any of the records that you pulled
 5        related to your e-mails?
 6   A. I can't remember if I printed e-mails.  I
 7        don't think I did.  I know I pulled the
 8        logbook information, stuff like that.
 9   Q. Okay.  Do you still have the same e-mail
10        account with the sheriff's office?
11   A. Yes.
12   Q. And you're capable of searching --
13   A. Yes.
14   Q. -- that e-mail account?
15        Okay.  What steps, again, not
16        communications with counsel, but what steps
17        did you take to prepare for your deposition
18        today?
19   A. None.
20   Q. Okay.  Did you meet with counsel?
21   A. Yes, prior to coming -- today.
22   Q. Okay.  In preparation for the deposition?
23   A. Yes.
24   Q. Did you review any documents in preparation
25        for the deposition?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Deputy Corey Amacker 9/7/2015

```
 1   A. No.
 2          MS. WASHINGTON:
 3              Okay.  I do not have any further
 4          questions for you, Deputy.  Thank you
 5          for your time.  Your counsel or counsel
 6          for the Department of Corrections and
 7          East Carroll Parish Sheriff's Office,
 8          who are on the telephone, might have
 9          some questions.  So I'm going to -- I'll
10          tender you to Pete first and then over
11          to the other counsel.
12          MR. MATTHEWS:
13              I have none.  Anyone on the phone
14          have any?
15          MR. EVANS:
16              This is Gary.  I don't have any
17          questions.
18          MR. MATTHEWS:
19              Shane?
20          MR. BRYANT:
21              I have -- I have just two or three
22          very quick questions.
23   CROSS EXAMINATION BY MR. BRYANT:
24   Q. Sir, I heard you describe your work history
25      earlier.  You never worked for DOC; is that
```



Deputy Corey Amacker 9/17/2019

```
 1        right?
 2   A.  Correct.  I never worked for DOC.  It's all
 3        sheriff's department.
 4   Q.  Okay.  It's my understanding that only DOC can
 5        calculate time for a DOC-sentenced offender;
 6        is that right?
 7   A.  That is 100 percent correct.
 8   Q.  Okay.  And I know you had talked about AFIS
 9        and how they used AFIS, but would you defer to
10        someone from DOC as to what role, if any, the
11        AFIS entry plays in the time calculations?
12   A.  I know -- I do know that the sentenced date
13        and the amount of time that goes into AFIS,
14        which is part of the packet, has everything to
15        do with the sentence itself, meaning that is
16        their official time sentenced through the
17        Department of Corrections.  As to the actual
18        calculation, it's kind of like trying to read
19        hieroglyphics, as far as that goes.  It's all
20        done by computer, and it's done by different
21        sentencing guidelines, meaning what act you
22        were sentenced under, what type of crime it
23        is, how many convictions you have.  It's a
24        whole laundry list of things, so nobody is
25        hand calculating time.  It's all done by a
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        computer system.  As far as I know.
 2     Q. Okay.  And I -- and I guess that's what I'm
 3        getting at.  You say as far as you know.
 4        Would someone from DOC is the person who may
 5        be able to answer that question?
 6     A. Yes.  And there's going to be, I can tell you
 7        now, there's going to be multiple answers to
 8        that question because of Louisiana sentencing
 9        guidelines, meaning there's so many acts you
10        can be sentenced under and the calculation of
11        time varies; but yes, DOC is going to be the
12        answer to that.
13           MR. BRYANT:
14                Okay.  That's all I got.  Thank you.
15           THE WITNESS:
16                All right.
17           MR. MATTHEWS:
18                We're done.
19           MS. WASHINGTON:
20                Thank you.
21           MR. MATTHEWS:
22                Thank you.
23           MR. CRAIG:
24                Thank you very much.
25        (The deposition concluded at 4:14 p.m.)
```



```
 1                REPORTER'S CERTIFICATE
 2
 3        I, LORIE M. HOYT, Certified Court Reporter, in
      and for the State of Louisiana, as the officer
 4    before whom this testimony was taken, do hereby
      certify that DEPUTY COREY AMACKER, to whom oath
 5    was administered, after having been duly sworn by
      me upon authority of R.S. 37:2554, did testify as
 6    hereinbefore set forth in the foregoing 161
      pages; that this testimony was reported by me in
 7    the stenotype reporting method, was prepared and
      transcribed by me or under my personal direction
 8    and supervision, and is a true and correct
      transcript to the best of my ability and
 9    understanding; that the transcript has been
      prepared in compliance with transcript format
10    guidelines required by statute or by rules of the
      board, and that I am informed about the complete
11    arrangement, financial or otherwise, with the
      person or entity making arrangements for
12    deposition services; that I have acted in
      compliance with the prohibition on contractual
13    relationships, as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
14    advisory opinions of the board; that I have no
      actual knowledge of any prohibited employment or
15    contractual relationship, direct or indirect,
      between a court reporting firm and any party
16    litigant in this matter nor is there any such
      relationship between myself and a party litigant
17    in this matter.  I am not related to counsel or
      the parties herein, nor am I otherwise interested
18    in the outcome of this matter.
19
20
21
22                LORIE M. HOYT, CCR, RPR
23
24
25
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799