UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RODNEY GRANT,                          CASE NO.

          Plaintiff,                   17-cv-2797-NJB-DMD

VERSUS


MARLIN GUSMAN, et al.,

          Defendants.




          30(b)(6) DEPOSITION OF THE DEPARTMENT OF
PUBLIC SAFETY & CORRECTIONS, through its designated
representative, ANGELA GRIFFIN, given in the
above-entitled cause, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, at the Department of Corrections, 504
Mayflower Street Baton Rouge, Louisiana, on the
10th day of January, 2020.

```
 1    APPEARANCES:

 2

 3               LAW OFFICE OF WILLIAM MOST, L.L.C.
                 BY:  WILLIAM MOST,
 4               ATTORNEY AT LAW
                 201 St. Charles Avenue
 5               Suite 114-101
                 New Orleans, Louisiana  70170
 6               Representing the Plaintiff

 7

 8
                 LOUISIANA DEPARTMENT OF JUSTICE
 9               OFFICE OF THE ATTORNEY GENERAL
                 LITIGATION DIVISION, CIVIL RIGHTS SECTION
10               BY:  PHYLLIS GLAZER,
                 ATTORNEY AT LAW
11               1885 N. Third Street
                 Fourth Floor
12               Baton Rouge, Louisiana  70802
                 Representing the State of Louisiana,
13               Department of Corrections

14

15    Reported By:

16

17               Sandra P. DiFebbo
                 Certified Shorthand Reporter
18               State of Louisiana

19

20

21

22

23

24

25
```

1    E X A M I N A T I O N          I N D E X

2

3                                        Page

4    BY MR. MOST:                        5

5

6

7

8    E X H I B I T                    I N D E X

9                        Page

10

11   Exhibit 1                         11

12   Exhibit 2                         12

13   Exhibit 3                         18

14   Exhibit 4                         42

15   Exhibit 5                         43

16   Exhibit 6                         60

17   Exhibit 7                         65

18   Exhibit 8                         69

19   Exhibit 9                         81

20   Exhibit 10                        84

21   Exhibit 11                        86

22   Exhibit 12                        88

23   Exhibit 13                        107

24   Exhibit 14                        108

25   Exhibit 15                        118

1                    S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4     between Counsel for the parties hereto that the

5     deposition of THE DEPARTMENT OF PUBLIC SAFETY &

6     CORRECTIONS, through its designated representative,

7     ANGELA GRIFFIN is hereby being taken pursuant to

8     the Federal Rules of Civil Procedure for all

9     purposes in accordance with law;

10              That the formalities of reading and

11    signing are specifically reserved;

12              That the formalities of sealing,

13    certification, and filing are hereby specifically

14    waived.

15              That all objections, save those as to

16    the form of the question and responsiveness of the

17    answer are hereby reserved until such time as this

18    deposition or any part thereof is used or sought to

19    be used in evidence.

20                        * * * * *

21              Sandra P. DiFebbo, Certified Shorthand

22    Reporter, in and for the State of Louisiana,

23    officiated in administering the oath to the

24    witness.

25

1           ANGELA GRIFFIN, 504 Mayflower Street,

2      Baton Rouge, Louisiana, 70802, having been

3      first duly sworn, was examined and testified on

4      her oath as follows:

5  EXAMINATION BY MR. MOST:

6      Q.   Would you state your name for the record,

7  please.

8      A.   Angela Griffin.

9      Q.   Good morning, Angela.

10      A.   Good morning.

11      Q.   Do you mind if I call you Angela?  I will

12  also call you Ms. Griffin, if that is your

13  preference.

14      A.   No.  Angela is fine.

15      MR. MOST:

16           Phyllis, can we stipulate that this

17        deposition was properly noticed, and

18        the court reporter is duly qualified?

19      MS. GLAZER:

20           Yes.

21      MR. MOST:

22           Thank you.

23  BY MR. MOST:

24      Q.   So, Angela, I'm William Most.  We've met

25  before.  I am the attorney for Rodney Grant.  Are

```
1    you familiar with the case of Grant v. Gusman?
2    Just that it is a case?
3         A.   Yes.
4         Q.   I believe you testified as a 30(b)(6)
5    witness previously in this case, correct?
6         A.   Yes.
7              MS. GLAZER:
8                   Wait.  In this case?
9              MR. MOST:
10                  Yes.  We did those big picture
11               depositions that was for five different
12               cases.  She was one of the witnesses.
13             MS. GLAZER:
14                  Let's clarify it wasn't this --
15               Yeah, all right.
16   BY MR. MOST:
17        Q.   To clarify, you were a 30(b)6 witness in
18   a deposition that covered this case and several
19   others, correct?
20        A.   Yes.
21        Q.   You realize you are under oath today?
22        A.   Yes.
23        Q.   And that your answers here today have the
24   same force as if we were in a courtroom with a
25   judge and jury?
```

```
 1        A.    Yes.
 2        Q.    Is there anything that would prevent you
 3   from giving me your full attention today?
 4        A.    No.
 5        Q.    Are you taking any medications or
 6   suffering from any illness that would prevent you
 7   from understanding my questions or answering them
 8   fully and truthfully?
 9        A.    No.
10        Q.    Anything else that prevents you from
11   giving me complete, accurate, truthful answers?
12        A.    No.
13        Q.    And we've been through this before, but
14   if you need to take a break at any time for work
15   related reasons or to use the restroom, smoke
16   break, copy break, let me know, and we'll do that.
17        A.    Okay.
18        Q.    You are already excellent at this I know,
19   but if I ask a question, please let me finish the
20   question before you answer.  I'll do the same to
21   you.  I'll try to wait for you to finish answering
22   the question before I ask the next one.  Does that
23   sound good?
24        A.    Okay.
25        Q.    If you don't understand one of my
```

1    questions, would you agree to let me know that you

2    don't understand so that I can rephrase rather than

3    answering?

4        A.    Okay.

5        Q.    We're here today for Rodney Grant versus

6    Gusman.   That case, correct?

7        A.    Correct.

8        Q.    And you understand that today you are the

9    witness designated to speak for the Department of

10   Public Safety & Corrections, correct?

11       A.    Yes.

12       Q.    I may say today the department, the DOC,

13   or the Department of Public Safety & Corrections.

14   By those phrases, I mean all the same thing.  Will

15   you understand that?

16       A.    Yes.

17       Q.    You understand those terms all to refer

18   to the same thing?

19       A.    Yes.

20       Q.    So today you are made available to

21   represent the knowledge of the Department of

22   Corrections, right?

23       A.    Yes.

24       Q.    So when I ask the question, I may say

25   you, but I'm really asking the question of the

1   Department of Corrections.  Agreed?

2         A.    Agreed.

3         Q.    When you give an answer, you are giving

4   the answer of the Department of Corrections,

5   agreed?

6         A.    Right.

7         Q.    Unlike a normal deposition, generally, I

8   don't know won't be a sufficient answer today,

9   because the DOC has an obligation to produce

10  someone who does know.  Agreed?

11        A.    Agree.

12        Q.    When did you start preparing for this

13  deposition?

14        A.    For the deposition today, I'm trying to

15  think.  It was day before yesterday or -- I met

16  with Phyllis.

17              THE WITNESS:

18                   What day did you come?

19              MS. GLAZER:

20                   Wednesday.

21              THE WITNESS:

22                   I knew about the case and working on

23                it it's been a while, since the other

24                -- all the bulk cases.  I don't know

25                when that date is.

1    BY MR. MOST:

2        Q.    Sure.  So for this deposition, the topics

3    specific to this deposition, you started preparing

4    on Wednesday of this week?

5        A.    Correct.

6        Q.    Approximately how much time did you spend

7    preparing for this deposition?

8        A.    About an hour and a half, I guess, going

9    over it and looking at what happened.

10       Q.    Who was there when you prepared?

11       A.    Phyllis.

12            MS. GLAZER:

13                 And Beau was over the phone.

14            THE WITNESS:

15                 And Beau on the phone.

16   BY MR. MOST:

17       Q.    I'm not going to ask you to tell me

18   anything about what you discussed with them, but

19   what documents did you look at to prepare for this

20   deposition?

21       A.    The offender's complete file.

22       Q.    By the offender, you mean Rodney Grant?

23       A.    Yes.

24       Q.    Did you look over any documents that you

25   have not provided me here today?

```
 1        A.    Other than the deposition questions.

 2        Q.    The Notice of Deposition?

 3        A.    Right.

 4        Q.    Part of the packet you provided me today

 5   is some typewritten notes that says "Draft" on it.

 6   Are these your notes that you prepared for today's

 7   deposition?

 8        A.    These are the notes I prepared while

 9   going through Rodney Grant's file.

10        Q.    This week?

11        A.    Correct.

12        Q.    Did you have any other notes, perhaps

13   handwritten notes, besides these ones you provided

14   here?

15        A.    If I did, it just was the same thing, but

16   I just retyped them to better read them.

17        Q.    So if there were handwritten notes, they

18   would reflect what is typewritten here, the same

19   information?

20        A.    Correct.

21        Q.    Let's label this Exhibit 1.

22        MS. GLAZER:

23            Do you want to attach that to the

24         deposition?

25        MR. MOST:
```

```
 1                     Yeah.  Is that all right with you?
 2              MS. GLAZER:
 3                     No, that's fine.  I just want to
 4                make sure you attach it.
 5              MR. MOST:
 6                     Exhibit 1 will be attached to the
 7                deposition.
 8              MS. GLAZER:
 9                     Just for the record, that is the
10                typewritten notes that Angela prepared
11                ahead of today's deposition.
12              MR. MOST:
13                     Right.  I'll probably take a minute
14                in a few moments to read through this
15                carefully just so we're on the same
16                page.
17       BY MR. MOST:
18           Q.   So the next thing we're going to look at
19       is the notice of today's deposition, which I'm
20       going to mark as Exhibit 2 and attach to the
21       deposition.  Do you recognize this document?
22           A.   Yes.
23           Q.   Have you taken a look at this document in
24       the past?
25           A.   Yes.
```

1      Q.   So I'm going to look at each of these

2  topics.  Today we've agreed that we're only going

3  to cover Topics 1 through 6, and 7 through 12 will

4  be handled at a subsequent deposition.  So we'll

5  just look through Topics 1 through 6.  For Topic

6  Number 1, are you prepared to testify today about

7  this topic?

8      A.   Yes.

9      Q.   My understanding is you are prepared

10  today to talk about all the steps that DOC took

11  regarding Rodney Grant in 2016, correct?

12      A.   Correct.

13      Q.   Other than what we've already discussed,

14  did you look at any documents or consult with

15  anyone in preparation for this topic?

16      A.   In the past, other than in the past when

17  we did the big bulk, we did try and find out if

18  anybody had any e-mails, anything to do with these

19  cases, which was turned over to the -- I think

20  there is one in there.  Back in the past but not

21  going over it this week for this deposition.

22      Q.   Great.  Topic Number 2 is, "All steps

23  taken by any DOC personnel with regard to the post-

24  sentence obtaining of records regarding Rodney

25  Grant from the clerk of court."  Are you prepared

1    to testify today about this topic?

2         A.    I am.

3         Q.    Other than the documents you provided,

4    did you look at any documents or talk to anybody

5    this week to prepare for this topic?

6         A.    No.

7         Q.    Topic Number 3 is, "Any communications

8    between any DOC personnel and OPSO or Judge Buras

9    regarding Rodney Grant."  I'll pause there for a

10   second to say OPSO, do you understand that to refer

11   to the Orleans Parish Sheriff's Office?

12        A.    Yes.

13        Q.    Today I may say the sheriff or the

14   Orleans Sheriff or OPSO.  I'll mean all the same

15   thing.  Do you understand that I mean all the same

16   thing?

17        A.    Yes.

18        Q.    Are you prepared today to talk about this

19   Topic Number 3?

20        A.    Yes.

21        Q.    Other than what you've provided, did you

22   look at any documents or talk to anybody, other

23   than your lawyers, this week about this topic?

24        A.    No.

25        Q.    Topic Number 4 is, "Any reasons why OPSO

```
 1    cannot or does not take a person sentenced to DOC
 2    time and immediately deliver them to DOC custody
 3    after sentencing."  Are you prepared today to
 4    testify about this topic?
 5         A.   Yes.
 6         Q.   Other than what you've provided, did you
 7    look at any documents or talk to anyone other than
 8    your lawyers this week to prepare for this topic?
 9         A.   No.
10         Q.   Topic Number 5 is, "Any reasons why OPSO
11    cannot conduct its own time computation of persons
12    sentenced to the custody of the DOC."  Are you
13    prepared to testify today about this topic?
14         A.   Yes.
15         Q.   Did you look at any documents, other than
16    what you've provided, or talk to anyone, other than
17    your lawyers, this week about this topic?
18         A.   No.
19         Q.   The last one is Number 6, "Any reasons
20    why OPSO cannot release a person sentenced to the
21    custody of the DOC if OPSO knows that person's
22    sentence is complete." Are you prepared today to
23    talk about that topic?
24         A.   Yes.
25         Q.   Did you look at any documents, other than
```

```
 1    what you provided here today, or talk to anyone,
 2    other than your lawyers, to prepare this week for
 3    this topic?
 4         A.    No.
 5         Q.    Great.  Okay.
 6              MR. MOST:
 7                   Off the record.
 8              {BRIEF RECESS}.
 9    BY MR. MOST:
10         Q.    I am going through this.  "Pulled
11    criminal history, (LA, CCH & FBI)."  Is that
12    document -- is that one of the ones in here?
13         A.    Yes.
14         Q.    Is it that one?
15         A.    Correct.
16         Q.    Are you going to know who wrote these
17    handwritten notes?
18         A.    No.
19              MR. MOST:
20                   Would we be able to find out today,
21                get someone here to say whose
22                handwriting that might be?
23              MS. GLAZER:
24                   No.
25              MR. MOST:
```

```
 1              Okay.
 2         MS. GLAZER:
 3              We might be able to find out whose
 4         handwriting it is, but I'm not bringing
 5         somebody into the deposition.  Let's
 6         just be clear.
 7         MR. MOST:
 8              That's fine.
 9         MS. GLAZER:
10              Because what you said was can we get
11         somebody in here today to say, and the
12         answer to that question is no.
13         MR. MOST:
14              Oh, yeah.
15         MS. GLAZER:
16              Angela is the only deponent today,
17         but can we maybe find out?  Maybe,
18         possibly, yeah.
19         MR. MOST:
20              Yeah.  It just would be helpful to
21         know who wrote this and when they wrote
22         it, because I think that's part of the
23         timeline.  So if you want to take a
24         break and ask someone.  Maybe it will
25         take a little but while we are doing
```

```
 1                    other things, to figure that out,
 2                    that's fine with me.  Do you want to
 3                    take a break to do that?
 4             MS. GLAZER:
 5                    Do you want us to do this each time?
 6                    Is there a way you can find out who
 7                    signed that?
 8             THE WITNESS:
 9                    We're just going to be speculating,
10                    asking other employees, because this is
11                    from 2016.  Our turnover rate is so
12                    great that it's going to be a guess
13                    that another employee is going to say,
14                    well, that looks like so and so's.
15   BY MR. MOST:
16        Q.   Is Janille Townsel here?
17        A.   No.  She left in 2016.  I don't know if
18   we want to speculate just somebody guessing whose
19   it is.  I don't want to --
20        Q.   If we can't figure it out, we can't
21   figure it out.  I'm going to mark this document as
22   Exhibit 3 and attach it to the deposition record.
23   This document that I marked as Exhibit 3 is what
24   you've got here in the notes as the Criminal
25   History (LA CCH & FBI); is that right?
```

1      A.    Yes.

2      Q.    So the DOC got this on July 7, 2016?

3      A.    We actually pull it ourselves, yeah.

4      Q.    So the DOC has direct access to this

5    database?

6      A.    Correct.

7      Q.    It says here, "Requested by Danna Lawton

8    or Deanna?

9      A.    Deanna Lawton.

10      Q.    Is she someone here at the DOC?

11      A.    She works here at the DOC.

12      Q.    Is she the person who pulled this?

13      A.    She pulled it, right.

14      Q.    Angela, one thing you mention in your

15    notes, and maybe I've heard it before, but it

16    doesn't sound familiar to me, is the Oracle File

17    Capture System.  What is that?

18      A.    That's where we scan all of the

19    offenders' files.

20      Q.    So that's a computer system where you

21    store scanned versions of paper files?

22      A.    Correct.

23      Q.    Are all of the paper files in PreClass

24    for time comp scanned into this system?

25      A.    Not all files.  We started in 2013 with

1    initial, so those will be in any -- it's just

2    different ones on parole violators, and older files

3    are not, so, no, not all files are scanned.

4         Q.    For, say, 2019, would all those files be

5    scanned or most of them?

6         A.    Yes.

7         Q.    All of them?

8         A.    All of them.

9         Q.    Do you know what OCR is?  It is also

10   called Optical Character Recognition. It's when you

11   scan something, the computer sometimes looks at the

12   paper and turns what's on the page into text that

13   you can highlight and copy.  Do you know if the

14   Oracle system does that?

15        A.    I don't know, yeah.

16        Q.    That's fine.  So Angela, what is your job

17   here at the DOC?

18        A.    I oversee the PreClass Department.  I

19   oversee the managers of the PreClass Department

20   that handles -- that oversees the department that

21   does time comp and initial cases and any

22   convictions to DOC.

23        Q.    PreClass is the department that receives

24   documents as inmates are sentenced to the custody

25   of the Department of Corrections, processes them,

```
 1   calculates their time, and distributes them around
 2   the Department of Corrections system; is that
 3   right?
 4        A.   Correct.
 5        Q.   So you are the top person in that
 6   department?
 7        A.   Correct.
 8        Q.   This is something not personal to you.  I
 9   ask this of everyone.  Have you ever been arrested?
10        A.   No.
11        Q.   So we're going to get into the step by
12   step of what happened to Rodney Grant, but,
13   initially, I want to ask some background questions.
14   Part of the DOC's job is to protect the
15   constitutional rights of the person sentenced to
16   the custody of the DOC, right?
17              MS. GLAZER:
18                   Objection.  Calls for a legal
19              conclusion.  This is outside the scope
20              of the deposition notice.
21   BY MR. MOST:
22        Q.   Okay.  You can answer.
23              MS. GLAZER:
24                   No.  This is outside the scope of
25              the deposition.  Which part of this --
```

```
1              which part of -- which deposition
2              topic, 1 through 6, pertains to the
3              DOC's general obligations with regard
4              to the constitutional rights of
5              offenders in its custody?
6         MR. MOST:
7              It is not proper, however, for
8              counsel to instruct a witness not to
9              answer a question merely because it
10             isn't about the designated deposition
11             topics.
12             To the contrary, deposing attorney
13             ordinarily may question a 30(b)(6)
14             deponent as broadly as any other
15             deponent, see, e.g., King v. Pratt &
16             Whitney, 161 F.R.D. 475. in cite 476
17             Southern District of Florida 1986.
18             However, a 30(b)(6) witness' answers to
19             questions beyond the scope of the
20             30(b)6 topic will not bind the
21             corporation.  Instead, they are treated
22             as the witness' individual answers
23             only, see, e.g., Washburg v. New York
24             State Department of Education 567 F.2nd
25             513, 521 Southern District of New York,
```

```
1              2008.
2                   Are you going to continue to
3              instruct the deponent not to answer?
4         MS. GLAZER:
5                   With that stipulation, based on a
6              Southern District of Florida case, even
7              though we're in Louisiana, any answers
8              you give, to which I object as being
9              outside the scope of the 30(b)(6)
10             deposition topics that are on this
11             notice, are going to be answers of
12             yours personally and not answers on
13             behalf of the department.
14                  So answer to the extent that you are
15             able to.
16        MR. MOST:
17                  To be clear, I'm not stipulating to
18             anything.  I am just offering the state
19             of the law as I understand it.  Agreed?
20        MS. GLAZER:
21                  I don't know what you understand or
22             what your -- I understand that you are
23             not stipulating to anything.
24        MR. MOST:
25                  Right.  Okay. Let's see.  I'll
```

```
 1                restate the question, and you can just
 2                say same objection or whatever you want
 3                to.
 4   BY MR. MOST:
 5       Q.   Angela, part of the job of the DOC is  to
 6   protect the constitutional rights of all the people
 7   sentenced to the custody of the DOC, correct?
 8            MS. GLAZER:
 9                I object to that question on the
10                grounds that it is outside the scope of
11                the 30(b)(6) deposition, outside the
12                scope of Miss Griffin's designation as
13                a department representative.  Any
14                answer she is able to give is her own.
15            THE WITNESS:
16                I'm not sure about constitutional
17                rights for the offender.
18   BY MR. MOST:
19       Q.   Ms. Griffin, do you agree that no
20   individual can be held in jail or prison in the
21   absence of legal authority to keep them there?
22            MS. GLAZER:
23                Objection.  It calls for a legal
24                conclusion, and I repeat the previous
25                objection.
```

```
 1              THE WITNESS:
 2                   Again, I'm not sure of the legal
 3              part of that.
 4  BY MR. MOST:
 5       Q.   Do you agree that an incarcerated person
 6  has a right not to be in prison beyond the term of
 7  their sentence?
 8              MS. GLAZER:
 9                   I object.  It calls for a legal
10              conclusion.  I restate the previous
11              objections.
12              THE WITNESS:
13                   And my answer would be that that's
14              such a broad question that it would
15              depend on what each situation would be
16              would be a different answer.
17  BY MR. MOST:
18       Q.   What situations would there be where
19  someone would not have the right not to be in
20  prison beyond the term of their sentence?
21              MS. GLAZER:
22                   Objection.  Calls for a legal
23              conclusion, outside the scope of the
24              deposition topics.  I'm getting really
25              frustrated here.  There are six
```

```
 1                  deposition topics here.  This is a
 2                  harassment and waste of time, in
 3                  addition to the fact that you've
 4                  already, as you've stated on the record
 5                  here, taken a 30(b)(6) deposition of
 6                  the department.
 7                      If you want the department's answers
 8                  to these questions, those should have
 9                  been a topic for which a proper
10                  designee could be made.  Feel free to
11                  continue, but I'm, for the record,
12                  stating that this is starting to be
13                  harassment and a waste of time.
14               MR. MOST:
15                  Okay.
16      BY MR. MOST:
17          Q.   You want me to restate the question?
18          A.   Yes.
19          Q.   What situations would there be where an
20      incarcerated person does not have the right to not
21      be in prison beyond the term of their sentence?
22          A.   I would really need to look into some
23      things to give an answer.  I can't answer that just
24      right off.
25          Q.   You don't know any off the top of your
```

1    head?

2        A.    Yeah.  If an inmate is not DNA'd, he

3    cannot be released no matter if he has completed

4    his sentence.  That's one of them.  He has no DNA

5    done.

6        Q.    Are there any others?

7        A.    Not right off the top of my head.

8        Q.    So it sounds to me like you are saying

9    once someone's sentence is complete, there are

10   still some administrative tasks that need to be

11   completed, like DNA, before that person is

12   released; is that right?

13       A.    Correct.

14       Q.    But there would not be any reason to hold

15   someone for weeks or a month or years past the end

16   of their sentence, correct?

17            MS. GLAZER:

18                Objection to form.

19            THE WITNESS:

20                It depends on how long it takes to

21             do things that are necessary, that are

22             legally necessary.

23   BY MR. MOST:

24       Q.    Do those administrative tasks we were

25   just talking about ever take weeks or months or

```
 1   years?
 2        A.   I don't know how long they take for all
 3   of them.
 4        Q.   Have you ever seen those administrative
 5   tasks take weeks or months or years?
 6        A.    I know we've had some in the past that
 7   have taken a while, but I can't tell you exactly
 8   how long they've taken.
 9        Q.   Let's talk about Rodney Grant.  Rodney
10   Grant, on June 30, 2016, was sentenced in Orleans
11   Criminal District Court to a sentence of one year
12   with credit for time served from 9/14/08 through
13   2015, correct?
14             MS. GLAZER:
15                  Object to form.
16   BY MR. MOST:
17        Q.   Would you like to look at his sentence?
18   I can show it to you if it's helpful to refresh.
19        A.   Can you restate the question?
20        Q.   Sure.  So you are looking at Mr. Grant's
21   sentencing order in front of you, right?
22        A.   Yes.
23        Q.   Rodney Grant, on June 30th, 2016, was
24   sentenced in Orleans Criminal District Court to a
25   one-year sentence with credit for time served from
```

```
1    9/14/08 through 2015, correct?

2         A.   Yes.

3         Q.   Mr. Grant had served time in DOC custody

4    from 2008 to 2015, correct?

5         A.   I can't answer that as far as the dates

6    he served in DOC custody.

7         Q.   Would it be helpful to refresh your

8    recollection from Request for Admission Number 1

9    here?

10        A.   Okay.  I just do not have that sentence

11   back then, when he -- because he wasn't actually a

12   DOC offender from '08.  The paperwork -- what I can

13   look at today is just from when he became a DOC

14   offender, which is after '08.

15        Q.   So it's my understanding he served at

16   Dixon Correctional from '08 to '15.  Let's see if

17   we can find that.  This might be helpful.

18        A.   That's what I'm looking at.

19        Q.   Does this look like he was in DOC custody

20   at some point between '08 and 2015?

21        A.   It does.  It shows me from '09 to 2015.

22   That's why I'm saying I can't say from '08, because

23   I don't have anything showing me from '08, just

24   when he was convicted as a DOC offender from '09.

25        Q.   Would you agree that he spent multiple
```

1    years in DOC custody between 2009 and 2015?

2         A.   Yes.

3         Q.   Definitely more than one year?

4         A.   Correct.

5         Q.   So Rodney Grant was sentenced to one year

6    with credit for time served between '08 and 2015,

7    right?

8         A.   Correct.

9         Q.   He had served more than one year between

10   '08 and 2015, correct?

11        A.   Correct.

12        Q.   So his sentence was complete once he was

13   sentenced, correct?

14        A.   That could be a multiple answer, because

15   credit for time served is time served on that case

16   itself.  He was actually serving on a whole nother

17   sentence at that time.  He wasn't being haled on

18   this charge at that time, so the credit for time

19   served, he wasn't serving on it.  So, originally,

20   we would not have given it -- Orleans tells us they

21   arrested him on it on June of '16.

22        Q.   Right.  You are talking about the

23   Criminal Code of Procedure, Article 880, that says

24   that an inmate is supposed to only be given credit

25   for time served for the crime they're being

```
1    sentenced for?
2         A.   At the instant offense, right.
3         Q.   But are you familiar that cases like
4    Bodeye say that --
5              MS. GLAZER:
6                   Objection.  Calls for a legal
7                conclusion.
8              MR. MOST:
9                   Wait for me to finish the question.
10               You can object.  I'm fine with you
11               objecting.  Just wait for me to finish
12               the question.
13   BY MR. MOST:
14        Q.   Are you familiar that there is cases like
15   Bodeye that say that if the judge orders credit for
16   time served, even if it's for a different case, the
17   DOC is supposed to implement that judge's order?
18             MS. GLAZER:
19                  Objection.  Calls for a legal
20               conclusion.
21             THE WITNESS:
22                  We are familiar with the Bodeye case
23               name.
24   BY MR. MOST:
25        Q.   Were you familiar with Bodeye at the time
```

1   of -- was the DOC familiar with Bodeye at the time
2   of Rodney Grant's sentencing?
3        A.   I can't answer that.  I would have to
4   look back to see when we were familiar with Bodeye.
5        Q.   If the Bodeye case came before Rodney
6   Grant's sentencing, would the DOC have been
7   familiar with it?
8        A.   I don't know if we would have been
9   familiar with it, even if it was before.  I'm not
10  sure.
11       Q.   And I'll spell Bodeye.  It's B-O-D-E-Y-E.
12  Is that your understanding of it, too?
13       A.   Yes.
14       Q.   Rodney Grant was sentenced to one year
15  with credit for time served from '08 to 2015,
16  correct?
17            MS. GLAZER:
18                 Asked and answered.
19            THE WITNESS:
20                 Yes.
21  BY MR. MOST:
22       Q.   And he actually served for more than a
23  year within that time period, correct, on a
24  different charge?
25       A.   Okay.  Yes.

```
1        Q.   So under Bodeye, his sentence was
2   complete as of the date of sentencing, correct?
3        A.   I'm not sure at that time if Bodeye was
4   in effect or if we were processing under Bodeye at
5   that time.
6        Q.   But if Bodeye was in effect at that time,
7   his sentence would have been complete as of the
8   date of his sentencing, correct?
9             MS. GLAZER:
10                 Objection.  Calls for a legal
11              conclusion.
12            THE WITNESS:
13                 I really don't know how we would
14              have handled it in '16.  I can't say if
15              it was finished, even with Bodeye.
16   BY MR. MOST:
17        Q.   But if the DOC had known about Bodeye, if
18   they were using Bodeye, if they were applying
19   Bodeye, under those circumstances, Mr. Grant's
20   sentence would have been complete as of the date of
21   his sentencing, correct?
22            MS. GLAZER:
23                 Calls for a legal conclusion.
24            THE WITNESS:
25                 We would have given credit, the
```

```
 1                  credit that the judge ordered.
 2  BY MR. MOST:
 3       Q.   And the judge had ordered credit that was
 4  at least as much as his sentence, correct?
 5       A.   Correct.
 6       Q.   So if you had given -- if the DOC had
 7  given Mr. Grant the credit the judge ordered, his
 8  sentence would have been complete as soon as he was
 9  sentenced, correct?
10            MS. GLAZER:
11                 Objection.  Calls for a legal
12               conclusion.
13            THE WITNESS:
14                 Well, DOC, he would have been, as
15               soon as we processed him, due for
16               release.
17  BY MR. MOST:
18       Q.   He would have been what is called an
19  immediate release?
20       A.   Correct.
21       Q.   He would have been an immediate release
22  because as soon as the DOC looked at his paperwork
23  and processed him, they would have seen that his
24  sentence was complete as of the date of sentencing,
25  correct?
```

```
 1              MS. GLAZER:
 2                   Object to form.
 3              THE WITNESS:
 4                   We would have just seen that he was
 5                 due for release the date we processed
 6                 him and cleared him, did the release
 7                 process.
 8      BY MR. MOST:
 9         Q.   So when you processed him, you would have
10      seen -- the DOC would have seen his sentence is
11      over, right?
12              MS. GLAZER:
13                   Objection.  Calls for speculation.
14              THE WITNESS:
15                   And we look at it.  He is due for
16                 release.
17      BY MR. MOST:
18         Q.   Due for release because his sentence is
19      done, right?
20         A.   He would -- we just consider it due for
21      release.  We don't look at it sentence done or --
22      it's due for release.  We process a release, if
23      they are ready for release.
24         Q.   Well, you guys use -- the DOC uses the
25      phrase "full term date," right?
```

```
1        A.    Correct.
2        Q.    That's the date of which someone's
3   sentence is -- the maximum date of someone's
4   sentence.  Is that a fair characterization?
5        A.    It is the full term that -- the date we
6   are going to release him without supervision, yeah.
7        Q.    So Rodney Grant's full term date would
8   have been the date of his sentencing, if the DOC
9   applied Bodeye, correct?
10       A.    Again, it's the date we get the paperwork
11  and know he's DOC and process the case.  To us,
12  that's his full term date.  We have to know he is
13  sentenced before we can time comp him and see what
14  it would be.
15       Q.    So if I'm understanding you right, the
16  DOC doesn't try and figure out what date someone's
17  sentence was over; they just try and figure out
18  should he be released today or in the future?
19       A.    Correct, because we can't go back.
20       Q.    Because you can't go back in time and
21  release someone in the past. What date do you think
22  Rodney Grant's sentence was complete?
23       A.    To DOC, it was the date we processed his
24  time comp.  We did his time comp and released him.
25       Q.    But someone's sentence is a result of
```

1    what the judge orders, right?

2         A.   Yes.   The initial -- the instant offense

3    is what the judge orders, which could run into

4    other things that will make him serve on something

5    else, which the judge may not know about, doesn't

6    order it.   It could cause additional sentence, not

7    on that case.

8         Q.   So the release date might turn on when

9    the DOC calculates someone's time or does time

10   comp, but there is a date at which Rodney Grant's

11   sentence was over; would you agree with that?

12        A.   As far as when we calculated it, yes.

13        Q.   I'm just asking just generally.   Is there

14   a day that Rodney Grant's sentence was done,

15   independent of what the DOC did?

16        A.   It could have been in the future.   It

17   could have taken different turns on him.   He could

18   have owed more time on something else, depending on

19   what happened with this case, when he committed it,

20   different things, could have caused him to be a

21   parole violator, which he would have owed more time

22   on it.

23        Q.   But just looking -- you have looked at

24   Mr. Grant's file very thoroughly, correct?

25        A.   Uh-huh.

```
 1        Q.   So standing here today, with everything
 2   you know, not sort of trying to step into the past,
 3   but just with everything you know, can you say what
 4   day Rodney Grant's sentence was complete?
 5        A.   The date we calculated it, found out
 6   everything was -- he would not be a parole
 7   violator, when his crime was actually committed.
 8   We found that out.  That would not violate him.  We
 9   calculated his time and released him on that date.
10   That's the date he was completed.
11        Q.   So your contention is that Mr. Grant's
12   sentence continued -- the judge's sentence
13   continued until the date that y'all did the final
14   time computation?
15             MS. GLAZER:
16                  Object to form.
17             THE WITNESS:
18                  I'm not sure what you mean by that.
19   BY MR. MOST:
20        Q.   I'm not trying to trick you.  I'm asking
21   when his sentence was complete, knowing everything,
22   and you are telling me it's the date we finished
23   processing him, right?
24        A.   Right.
25        Q.   So are you saying that someone's sentence
```

1  continues until the DOC finishes processing them?

2      A.   I'm saying the offender cannot be

3  released until we find out everything that he needs

4  to serve is served.

5      Q.   Understood, right, but independent of

6  when someone should be released and when they

7  should not be released, I'm just asking, when was

8  the end of his sentence?

9      A.   For DOC, it was the date we time comped

10 and released him.

11     Q.   So to the DOC, someone's sentence

12 continues until you do time comp and release him?

13 Is that what you're saying?

14     A.   It does -- it continues to the case that

15 we release him on, that case, on that docket, until

16 we get clarification what kind of credit he gets,

17 what is going to apply, if he is going to owe more

18 time.  Because if he would not have gotten all of

19 that credit, he would not have been due for

20 release.  So once we figure that out and give it to

21 him and find out he gets it, then he gets released

22 on that day.

23     Q.   Let me ask it this way.  Does the time

24 comp department calculate what the end of someone's

25 sentence is? Is that the full-term date?

1    A.    Yes.

2    Q.    The full-term date for someone who is

3    eligible for immediate release is going to be the

4    date of the time computation?

5    A.    Correct.

6    Q.    To the DOC, someone's sentence continues

7    until the date of the time computation, if that

8    person is eligible for immediate release?

9    A.    I'm not saying his sentence continues.

10   I'm saying that we cannot process it unless we have

11   everything we need, and that becomes his full-term

12   date.  So that's when we can release him, when we

13   have everything that is needed and can calculate

14   it.  It becomes his full term date to release him.

15   Q.    But you can't say what his sentence was?

16   A.    I can say what his sentence is.  I'm not

17   -- I don't want to --

18   Q.    What was his sentence?

19   A.    -- allude.  It was a one-year sentence.

20   Q.    With credit for time served?

21   A.    Correct.

22   Q.    For time that he spent in DOC custody?

23   A.    He got credit for time served and a

24   specific amount of dates.

25   Q.    Can you say when that was over? Like when

1    the judge's -- what the judge ordered, the period

2    of time that the judge ordered, when it was done.

3    To me, it seems like the date of sentencing,

4    because he was sentenced to one year, credit for

5    time served, and he spent more than one year, so it

6    seems to me that the sentence was done on the day

7    of his sentencing, but it took longer for him to

8    actually be calculated and released.  Would you

9    agree with that?

10        A.   Yes.

11        Q.   Rodney Grant gets sentenced on June 30th,

12   2016.  I'll say if I say a date without the year,

13   I'm just going to mean 2016 for today.  Will you

14   understand that?

15        A.   Yes.

16        Q.   Rodney Grant was sentenced on June 30th,

17   2016.  When was the first that the DOC learned

18   about Rodney Grant and that sentencing?

19        A.   When we received PreClass paperwork,

20   partial PreClass paperwork, from Orleans Parish

21   Jail on July 7th.

22        Q.   So the sheriff, the Orleans sheriff,

23   drove over a bunch of packets on July 7th,

24   including a packet for Rodney Grant, right?

25        A.   I can't testify to that, because I'm not

1    sure.  I can only say that's usually what they did,

2    was driven and hand delivered, but this specific

3    one, I can't say for sure that's exactly how it

4    happened.

5         Q.   Let's look at what we'll mark as Exhibit

6    4.  Is Exhibit 4 the packet that y'all received

7    from the sheriff?

8         A.   It's part of it.

9         Q.   I see that on the second page of this

10   there is a stamp that says, "Received, July 7th,

11   2016?"

12        A.   Yes.

13        Q.   Does that stamp mean that the DOC got

14   Rodney Grant's packet from the Orleans sheriff on

15   July 7th, 2016?

16        A.   It is procedure we stamp the paperwork

17   the date it is received.

18        Q.   Would there be any circumstances in which

19   a PreClass packet might come from the Orleans

20   sheriff to the DOC and not be stamped received

21   until four or five or six days later?

22        A.   Should not be, but --

23        Q.   So if this is stamped received July 7th,

24   2016, it means it was receive that day from the

25   sheriff, correct?

43

```
 1        A.    The procedure is they stamp the date they
 2   received it.
 3        Q.    Have you ever known there to be something
 4   stamped received on a certain date, and you found
 5   out later it was actually received much earlier
 6   than that?
 7        A.    Not that I know of.  I don't recall.
 8        Q.    So this is a reliable procedure, the
 9   received stamping system?
10        A.    We pretty much rely on it.
11        Q.    I'm going to mark this as Exhibit 5.
12   Exhibit 5.  I'm attaching -- all of the things I'm
13   marking as exhibits, I'm attaching to this
14   deposition.  Exhibit 5 is this a printout from
15   CAJUN about Rodney Grant?
16        A.    Yes.
17        Q.    It says, "File received date, July 7th."
18   I'm sorry, "July 8th."
19        A.    Yes.  That looks typed in, data entry.
20              MS. GLAZER:
21                   Let the record reflect this is
22                highlighted.
23              MR. MOST:
24                   Sure.
25              MS. GLAZER:
```

```
 1                    Angela, did you highlight that?
 2            THE WITNESS:
 3                    No.
 4            MR. MOST:
 5                    William Most.  I highlighted that.
 6    BY MR. MOST:
 7        Q.   So what does jail received from clerk
 8    mean?
 9        A.   This is data entry that when we receive
10    paperwork, we're entering the information in a
11    system to know what paperwork we got, that we have,
12    that we're working with, working on.  Jail received
13    from clerk is just we've received the paperwork
14    from -- well, jail received from clerk means the
15    jail received it from the clerk of court, which the
16    jail does not give us that information, so we have
17    to put a date in there.  Whatever day we're
18    actually entering information is the date they put
19    it so it will take.  Our system will work with it.
20        Q.   So that stamped received July 7th means
21    the DOC got the PreClass packet on July 7th, and
22    then it looks like someone in PreClass got it the
23    next day and entered it into the system as July
24    8th; is that right?
25        A.   Correct.
```

```
 1        Q.    So it looks to me, and if you agree with
 2   this, that this Exhibit 5 corroborates that the
 3   PreClass packet was received around July 7th or 8th
 4   and not a week earlier?
 5        A.    Correct.
 6        Q.    Do the PreClass packets come from the
 7   Orleans sheriff in the morning or afternoon?
 8        A.    I don't recall.
 9        Q.    Mr. Grant's PreClass packet contained
10   what the DOC needed to calculate his time except
11   for the Bill of Information; is that right?
12        A.    Correct.
13        Q.    The DOC requires the sheriffs to send the
14   Bill of Information?
15        A.    Correct.
16        Q.    The PreClass packet contains Mr. Grant's
17   sentence, correct?
18        A.    Yes.
19        Q.    The DOC has in its system the time
20   Mr. Grant served between 2008 and 2015, correct?
21        A.    Meaning?
22        Q.    Yeah. I can back up. Part of Mr. Grant's
23   sentence was that he was to receive credit for time
24   served, for time he served, between 2008 and 2015,
25   right?
```

1      A.    Right.

2      Q.    The DOC, as of July 7, 2019, had in its

3  computer system information about dates of more

4  than a year that Mr. Grant served in the custody of

5  the Department of Corrections, correct?

6      A.    We had from 2009, correct.

7      Q.    So the DOC had in its system that he had

8  served more than a year between 2009 and 2015 in

9  the custody of the Department of Corrections?

10      A.    On another case, correct.

11      Q.    So as of the time of receiving the

12  PreClass packet, did the DOC have the information

13  it needed to calculate Mr. Grant's release date?

14      A.    As far as on that instant offense, that

15  charge there, we had the information.  We could

16  have calculated using the jail credit letter that

17  Orleans Parish supplied, as far as on that sentence

18  only, but because it was a new felony conviction,

19  it could have revoked a parole he was on, serving

20  time on, and that's an automatic revocation, if he

21  is convicted of a new felony while on parole, if

22  the crime was committed while he was on parole.  We

23  did not have the Bill of Information to know when

24  that crime was committed, to know if that crime was

25  going to be a revocation of a parole case he has.

1        Q.   So let me make sure I understand it.  So
2    in 2016, Mr. Grant was out on parole.  Then he gets
3    sentenced in 2016.  So the DOC is thinking, for
4    whatever he is being sentenced for, it might be a
5    violation of his parole, right?
6        A.   Correct.
7        Q.   But it's not a violation of his parole if
8    it's a really old case that predates what he is on
9    parole for, correct?
10       A.   Correct.
11       Q.   And it turns out that Mr. Grant, what he
12   was sentenced for, was from a 2000 case, 16 years
13   in the past, correct?
14       A.   Correct.
15       Q.   So it was not a violation of his parole?
16       A.   Correct.
17       Q.   And the DOC needed to know it was an old
18   case so that they would see it's not a parole
19   violation?
20       A.   Correct.
21       Q.   So once the DOC found out it's an old
22   case, it's not a violation of his parole, then the
23   DOC would have everything it needed to do his time
24   computation; is that correct?
25       A.   Correct, and get authority.  And, again,

1    in 2016, I'm not sure how we were doing the back

2    dates, the credit for time served when he wasn't

3    actually serving on the crime.  I'm not sure how we

4    did it back in 2016 at this time.  Once that was

5    clarified to give him that credit, we would have

6    everything we needed, yes.

7         Q.   So if Bodeye was being applied at that

8    time, once the DOC found out that it was a sentence

9    for an older crime that was not a violation of his

10   parole, the DOC would have everything it needed to

11   do its time computation and calculate a release

12   date, correct?

13        A.   Correct.

14        Q.   So the packet comes in July 7th, 2016.

15   That same day DOC sends a directive to the Orleans

16   sheriff to transfer Mr. Grant to the DOC on July

17   12th; is that right?

18        A.   I'm not sure.  From what I looked at

19   yesterday, he didn't transfer into a DOC facility.

20   He transferred to another local level.

21        Q.   So he, Mr. Grant, wound up at the

22   detention center in Madison, correct?

23        A.   Correct.

24        Q.   So you think he might have gone straight

25   from Orleans to Madison without going through Baton

1    Rouge? Actually, let me rephrase that.  By Baton
2    Rouge I mean Elayn Hunt.
3         A.   In '16, I know we helped them out,
4    because they do not house offenders, where they
5    would meet at Hunt for pickup, but he didn't
6    actually come into DOC.  It was just a housing
7    change, so they met at Hunt instead of traveling.
8         Q.   I see.  Mr. Grant likely would have been
9    brought by the Orleans sheriff to Hunt and then
10   immediately picked up and moved up to Madison?
11        A.   Correct.
12        Q.   The DOC told the sheriff when to do that
13   bringing to --
14        A.   I'm not sure about transfers.
15        Q.   I think we got that in the written
16   discovery requests.  On July 7th, the PreClass
17   packet comes in.  The DOC started -- on July 7th,
18   the PreClass packet comes in, and the DOC started
19   calculating Mr. Grant's sentence the next day, on
20   July 8th, correct?
21        A.   We start processing his paperwork,
22   verifying it and processing to see if he would be a
23   parole violator, the different things we have to
24   look for before time comping him.
25        Q.   One of the people who did that was

1   Janille Townsel?

2        A.   She was involved in the parole violator

3   part.

4        Q.   What was Janille's job at that time?

5        A.   She was a ARDC Correctional Specialist.

6        Q.   Is that a person within the PreClass?

7        A.   She is in the PreClass, correct.

8        Q.   This will be Exhibit 6, which is

9   correspondence between Janille Townsel at DOC

10  PreClass and Probation & Parole, correct?

11       A.   Correct.

12       Q.   So at 9:21 AM on July 8th, 2016, Janille

13  Townsel writes to Probation & Parole and says that

14  we've got a possible parole violator transferring,

15  and we didn't get his parole revocation paperwork,

16  correct?

17       A.   Correct.

18       Q.   She is trying to figure out if this guy

19  is violating his parole, correct?

20       A.   Correct.

21       Q.   Then she gets a response from Michael

22  Reese at Probation & Parole, correct?

23       A.   Correct.

24       Q.   At 10:46 AM, July 8th, 2016?

25       A.   Correct.

 1        Q.   Mr. Reese of Probation & Parole says,
 2    "This conviction is not a violation of the
 3    subject's current term of supervision.  The date of
 4    the offense is from 2000, which predates his date
 5    of release," correct?
 6        A.   Correct.
 7        Q.   Mr. Reese is a supervisor at Probation &
 8    Parole in New Orleans?
 9        A.   I know he works at New Orleans District.
10    Yes.  His e-mail says he is a supervisor, yes.
11        Q.   So Probation & Parole is telling PreClass
12    Rodney Grant is not violating his parole, correct?
13        A.   Correct.
14        Q.   And letting PreClass know that this is an
15    old case, correct?
16        A.   Correct.
17        Q.   So at this point, once the e-mail is
18    received from Michael Reese, if we're applying
19    Bodeye, the DOC had --
20            MS. GLAZER:
21                Objection.  Go ahead.  Sorry.
22    BY MR. MOST:
23        Q.   I'll start over.  Once this e-mail is
24    received from Michael Reese, if the DOC was
25    applying Bodeye, the DOC had everything it needed

```
 1    to calculate Mr. Grant's release date, correct?
 2              MS. GLAZER:
 3                   Calls for a legal conclusion.
 4              THE WITNESS:
 5                   We would still ask for a -- try and
 6                get a Bill of Information for the
 7                accurate commit date.
 8    BY MR. MOST:
 9         Q.   What is a commit date?
10         A.   The date he committed the crime.
11         Q.   So Mr. Reese is saying the date of the
12    offense is from 2000, right?
13         A.   Correct.
14         Q.   But you wanted to know the -- DOC would
15    want to know the specific date and month?
16         A.   We need the legal -- the Bill of
17    Information from the court showing that's the date
18    he committed it.  Probation & Parole usually uses
19    their criminal history, which could be an old case
20    back then, but he could have had a newer one
21    committed, the same crime.
22         Q.   I don't think I understand.  He could
23    have had a newer one -- committed the same --
24         A.   He is saying this offense is from 2000,
25    which predates his date of release.  The crime he
```

1   is convicted of, the one-year sentence -- I don't

2   remember what the crime was, but whatever the crime

3   was, he could have had it in 2000, but he was back

4   out on the street.  If this case was actually

5   sentenced now was committed after he got off the --

6   the exact same crime, he may have picked up the one

7   that he committed in 2000, but the newer one could

8   be now.  Have been committed after he released.  So

9   we go by the official paperwork when he actually

10  committed the crime.  The court documents showing

11  when he committed it.

12      Q.   So what was the purpose of reaching out

13  to Agent Reese?

14      A.   To start the revocation process.  If he

15  would have been a revocation, to start it earlier.

16  To get it started.

17      Q.   It sounds like we are finding out from

18  Michael Reese in this e-mail that it's not a

19  revocation, not a violation of his parole, correct?

20      A.   Correct.  That's his interpretation.

21  Now, once we get the Bill of Information, if he was

22  incorrect, we would have sent it back to him

23  saying, no, this one was committed now.  We need to

24  start your parole revocation process.

25      Q.   So the reason why DOC didn't have all of

1  the information it needed as of receiving

2  Mr. Reese's e-mail is because, hypothetically,

3  Mr. Reese might be incorrect?

4        A.   I don't know. It could be incorrect, or

5  he picked up the wrong information.  The offender

6  could have a crime from back then, but the reason

7  we didn't start we didn't have the -- the Bill of

8  Information was not supplied to us with his

9  PreClass packet.

10       Q.   So you needed some document showing what

11 Mr. Reese is saying is that this is an old case

12 from 2000?

13            MS. GLAZER:

14                 Object to form.

15 BY MR. MOST:

16       Q.   Is that correct?

17       A.   Correct.  To know if he is a parole

18 violator or not.

19       Q.   Exhibit 3.  What did you call Exhibit 3?

20 What is the phrase for this?

21       A.   A CCH.  His criminal history.

22       Q.   Exhibit 3 is his criminal history.  This

23 was pulled by the DOC on July 7th, 2016, correct?

24       A.   Correct.

25       Q.   This shows the various crimes he is

```
 1    convicted of, including the one that he is
 2    sentenced for here, correct?
 3         A.   It actually shows his crimes he is
 4    arrested on.
 5         Q.   You can't have a conviction without an
 6    arrest, right?
 7              MS. GLAZER:
 8                   Object to form.
 9              THE WITNESS:
10                   The way we look at it, we have a lot
11                of convictions that the arrest may not
12                be on here.  That can be answered
13                several ways.
14    BY MR. MOST:
15         Q.   Looking at the third page of this
16    document, we see an arrest in 2000, correct?
17         A.   Correct.
18         Q.   It says here, "Docket Number 417717?"
19         A.   Correct.
20         Q.   That matches his sentencing that is just
21    coming with the PreClass packet, correct?
22         A.   Correct.
23         Q.   So it looks like we're seeing this is an
24    old case from 2000, correct?
25         A.   Correct.  At the time that was written on
```

1    there.

2        Q.   So the DOC had in its possession as of

3    July 7th, 2017, paperwork corroborating what

4    Mr. Reese said, that this was an old crime from

5    2000, correct?

6        A.   No.  We had in our possession a criminal

7    history that showed an arrest in 2000, not

8    necessarily that it was the same crime that he was

9    being convicted of.

10       Q.   How do you match these crimes in this

11   criminal history report to convictions?

12       A.   We get on -- if we have all these

13   arrests, we have to call and check on all of these

14   when we are releasing someone and see what

15   happened.  With this arrest, we call the sheriff's

16   office or whoever will give us the answer, to give

17   them the arrest date and all the crimes, and they

18   have to tell us what happened to each one.

19       Q.   So if Janille Townsel wanted to check and

20   see if Mr. Reese was right, she could have called

21   the sheriff to match the criminal history she

22   received to the sentencing?

23       A.   She could have called to try and get --

24   which is procedure.  She should have called to try

25   and get a Bill of Information to show us it's --

1    the date it was committed was that sentence.

2        Q.   So she gets this e-mail from Michael

3    Reese saying it's not a violation.  She should have

4    reached out to get the Bill of Information to

5    corroborate Mr. Reese; is that right?

6        A.   Correct.

7        Q.   But she didn't do that?

8        A.   I can't say she didn't do that.  We do

9    that a lot, and we don't get -- we do contact them

10   and try and get things from them.  I can't say she

11   didn't or that she did.

12       Q.   Is there -- if she had done that, would

13   she have put it in the file?

14       A.   No, not in 2016.  I mean, the Bill of

15   Information would be in the file, not that she

16   contacted them and never got it.

17       Q.   But she definitely should have, once she

18   got this e-mail from Michael Reese, reached out to

19   the sheriff to get the Bill of Information?

20       A.   We reach out whenever we get the

21   PreClass, and it's missing paperwork.

22       Q.   Who would she reach out to?

23       A.   The sheriff's office.  We just start

24   trying to get it from different -- wherever we can.

25       Q.   You can also get it from the clerk of

1    court?

2         A.    Correct.

3         Q.    So once Janille Townsel looked at this

4    PreClass packet and saw there is no Bill of

5    Information, she should have reached out to the

6    sheriff or the clerk of court to try and get it?

7         A.    And she could have.

8         Q.    She might have, but you don't see any

9    evidence to suggest she did?

10        A.    Correct.

11        Q.    What she did do is reach out to Michael

12   Reese to see if he knew whether it was a parole

13   violation?

14        A.    She was actually letting him know it was

15   a possible parole violation so they could start

16   that process, if necessary.

17        Q.    And he responded that it's not a parole

18   violation?

19        A.    Correct.

20        Q.    Michael Reese, he works for the

21   Department of Corrections; is that right?

22        A.    For the Probation & Parole Division.

23        Q.    Which is a part of the Department of

24   Corrections?

25        A.    Correct.

```
 1        Q.   So July 8th the packet has been received.
 2   It's been processed by PreClass.   Janille Townsel
 3   has reached out to Probation & Parole, and she
 4   should have reached out to the sheriff and/or clerk
 5   to get the Bill of Information.   What happened
 6   next?
 7        A.   As far as the file goes, me trying to
 8   recreate what happened, we're still waiting on that
 9   Bill of Information to come in so we know if he is
10   going to be a parole violator or what is his case.
11   So the next thing that happened was on July 25th
12   Judge Buras sent an e-mail to one of the ARDC
13   correction specialists working for PreClass, and a
14   correction supervisor asking about the case.
15        Q.   So Mr. Grant is shipped up to Madison on
16   July 12th, right?
17        A.   Yes.
18        Q.   So Janille Townsel knows that this -- she
19   has talked to Michael Reese, so she knows that this
20   is someone who is probably an immediate release,
21   but we need to get the Bill of Information to
22   confirm?
23             MS. GLAZER:
24                  Object to the form of that entire
25                  question.   You are asking about what
```

```
 1              Janille Townsel knew and that she spoke
 2              with Michael Reese when there is no
 3              indication of that at all.  So I would
 4              respectfully request that you rephrase
 5              the question to ask what it is you
 6              actually want to ask.
 7         MR. MOST:
 8              Phyllis, I'll rephrase the question,
 9              but I would ask that we not have any
10              more speaking objections like that in
11              this deposition.
12         MS. GLAZER:
13              That's not what a speaking objection
14              is, but I'll note your response.
15    BY MR. MOST:
16         Q.   Miss Griffin, after communicating with
17    Mr. Reese and looking at the PreClass packet,
18    Janille Townsel knew that this person was likely an
19    immediate release, correct?
20         A.   No.
21         Q.   No?
22         A.   Not necessarily an immediate release.
23         Q.   Why not?
24         A.   She was basically checking to see if he
25    was a parole violator.  She was working a parole
```

1    violation packet side of it.

2         Q.   Would she have looked at his sentence?

3         A.   She may have.  I can't say if she did.

4    It was already PreClassed and given to be checked

5    for parole violation.

6         Q.   But she began the time computation,

7    correct?

8         A.   No.  The time computation is not started

9    yet, because we do not know if he is a parole

10   violator.

11        Q.   So you are saying the time computation

12   doesn't even begin until it's resolved whether

13   someone is a parole violator?

14        A.   Correct, because we are going to time

15   comp what -- his cases, his time.  A parole

16   violation would be part of his time.

17        Q.   So the DOC needed to nail down whether

18   Mr. Grant was a parole violator before they even

19   began the process of doing time computation; is

20   that right?

21        A.   Correct.

22        Q.   And so the DOC was just waiting to

23   receive a Bill of Information in order to do that;

24   is that correct?

25        A.   To find out if he is a parole violator,

1    trying to get something -- the procedure is to try

2    and get something to verify is he going to be a

3    parole violator by statute or not.

4        Q.   Janille Townsel had flagged that there

5    was missing paperwork from the PreClass packet,

6    correct?

7        A.   I'm not sure about flagged.  I'm not sure

8    what you mean by that.

9        Q.   Miss Townsel had observed that there was

10   missing paperwork from the PreClass packet; is that

11   correct?

12       A.   I can only say by reading her e-mail that

13   there is a possibility she knew that there was

14   something by saying possible parole violator,

15   because if we knew his commit date, we would know

16   he would not be possibly.  He would definitely be

17   one.  If we knew he committed it after he released.

18       Q.   She says no parole revocation paperwork

19   received.

20       A.   We don't get that in the PreClass packet.

21   That's -- the parole board sends us that packet

22   after the offender gets convicted of a new felony,

23   and they process the new felony part by using the

24   Bill of Information, seeing when he commits it.

25   They process the paper and send us to match with

1    our PreClass.

2        Q.   So the DOC wasn't going to begin

3    computing Mr. Grant's time until they received the

4    Bill of Information; is that correct?

5        A.   We would process a case if we know -- we

6    try and get that -- after a certain period of time,

7    and I'm not sure exactly how long, we would get

8    with our legal and let them make that decision,

9    what to do with it, if we cannot get it -- no way

10   -- no one will send us the information we need, we

11   go up to our legal and let them make that decision

12   what to do with the cases.

13       Q.   So with Mr. Grant, the DOC was waiting to

14   receive the Bill of Information before beginning

15   the time computation, correct?

16       A.   Correct.

17       Q.   It wouldn't have gone on forever.  You

18   are saying at some point, ultimately, we would have

19   raised it with legal?

20       A.   Correct.

21       Q.   And the DOC actually did get the Bill of

22   Information on the 26th, correct?

23       A.   Correct.

24       Q.   But they were not going to start the time

25   computation between the 7th and the 26th until they

```
1   got the time -- until they got the Bill of
2   Information, correct?
3        A.   Correct, because that could have changed
4   his time he actually had to serve.
5        Q.   Even though they've already been told by
6   Probation & Parole that this is not a violation of
7   parole?
8             MS. GLAZER:
9                  Objection.  Asked and answered.
10             THE WITNESS:
11                  And that an e-mail is not a legal
12              document for us to use to work
13              somebody's time.
14   BY MR. MOST:
15        Q.   What did the DOC do to try and get the
16   Bill of Information?
17        A.   Again, I'm not sure.  Procedure is to
18   call the jail and see if they have it, the clerk of
19   court, wherever they can get it from.  Just try and
20   order one.
21        Q.   You don't see any evidence in the file
22   that anyone reached out to the sheriff or clerk of
23   court to obtain the Bill of Information?
24        A.   In 2016, we were not making narratives to
25   the file, so there is none to know what transcribed
```

 1    over the phone or anything for this case.
 2         Q.   So on July 18th, Mr. Grant is
 3    resentenced, correct? I'll put an exhibit into the
 4    record.  It is going to be Exhibit 7, which I'm
 5    attaching to the deposition.  Are these the minutes
 6    of the court of Mr. Grant's case?
 7         A.   Yes.
 8         Q.   Do you see the last minute entry July
 9    18th, 2016?
10         A.   Yes.
11         Q.   You see that the previous sentence was
12    vacated, and there is a new sentence, simply credit
13    for time served?
14         A.   Yes.
15         Q.   Did the DOC find out about -- this is a
16    resentencing, correct?
17         A.   Actually, it's a vacated sentence.  He is
18    no longer a DOC offender as of the 18th.
19         Q.   It says, "Sentence:  As to Count 1."
20         A.   Credit for time served.  It's not a hard
21    labor sentence.  It is just saying give him credit,
22    jail credit, and they vacated his previous
23    sentence.
24         Q.   Okay.  As of the 18th, he is not a DOC
25    inmate?

```
 1         A.    As of reading this, no.
 2         Q.    So the DOC doesn't have the legal
 3    authority to hold him as of this resentencing,
 4    correct?
 5              MS. GLAZER:
 6                   Objection.  Calls for a legal
 7                conclusion.
 8              THE WITNESS:
 9                   As far as 7/18, we're not even the
10                custodial over him anymore.  They
11                vacated his sentence.
12    BY MR. MOST:
13         Q.    So no legal authority to hold him,
14    correct?
15              MS. GLAZER:
16                   Objection.  Calls for a legal
17                conclusion.
18              THE WITNESS:
19                   We wouldn't time comp him anymore.
20                It would not be a time comp.
21    BY MR. MOST:
22         Q.    So as of the 18th, from the DOC's
23    perspective, this not our inmate?
24         A.    If we would have gotten this minute
25    entry, we would have told him he is now vacated.
```

```
1    The judge did away with his sentence.
2         Q.   What would happen?  He is in Madison,
3    right?
4         A.   Uh-huh.
5              MS. GLAZER:
6                   Object to form.
7    BY MR. MOST:
8         Q.   What would have happened?
9              MS. GLAZER:
10                  Object to form.
11             THE WITNESS:
12                  A letter -- we would just issue a
13                letter to Madison saying his sentence
14                was vacated letting them know he is no
15                longer a DOC offender.
16   BY MR. MOST:
17        Q.   Got it.  So a Certificate of Release?
18        A.   Now, Orleans should have let Madison
19   know, because he was sentenced there and moved to
20   Madison.  I don't know if the offender went back or
21   not to court.
22        Q.   So your understanding of credit for time
23   served, it's not saying in the custody of the DOC
24   or in custody of the sheriff, right?
25        A.   No.  It's just giving him credit for time
```

```
 1   served.  He is not DOC, so there is no credit.
 2   There is no sentence anymore.
 3        Q.   He is not sentenced to anybody's custody
 4   --
 5        A.   There is no credit to give him.
 6        Q.   I spoke over you.  He is not sentenced to
 7   anyone's custody as of July 18, 2016, correct?
 8        A.   Correct.
 9        Q.   So no one should be holding him after
10   July 18, 2016, correct?
11        A.   Well, he still could -- if he was a
12   parole violator, or still a conviction, then it
13   would be Probation & Parole's decision to revoke
14   him or not, if it was committed after.  Still, it
15   runs into the date of commit.
16        Q.   So if he is not a parole violator after
17   July 18, 2016, no one should be holding him after
18   this vacated sentence, correct?
19        A.   Once it's confirmed that he is not a
20   parole violator.
21             MS. GLAZER:
22                  Objection.
23   BY MR. MOST:
24        Q.   Did the DOC find out about this
25   resentencing? I'm sorry.  Let me rephrase that,
```

```
1   because you are saying it's not a resentencing.
2   Did the DOC find out about this July 18th order of
3   the court?
4        A.   By looking through his file, what we
5   have, no.
6        Q.   How does the DOC find out when someone's
7   sentence is changed?
8        A.   The sheriff's office sends us amended
9   minutes or resentence minutes.  Court paperwork.
10       Q.   They should do that for a change in
11  sentence like this one on July 18, 2016?
12       A.   Yes.
13       Q.   But that didn't happen?
14       A.   As far as his files goes, no.
15       Q.   That was 7.  So as of July 25th, 2016,
16  the DOC is still waiting to receive the Bill of
17  Information before beginning the time computation
18  process, correct?
19       A.   Yes.  That is when the judge notified us.
20       Q.   I'm going to mark as Exhibit 8 these
21  e-mails between the judge and the Department of
22  Corrections, correct?
23       A.   It's a part of an e-mail.
24       Q.   It's back and front.
25       A.   I'm sorry.  Yes.
```

1         Q.   I'm trying to save on paper.  So these

2    are e-mails between the judge and the Department of

3    Corrections on July 25, 2016, correct?

4         A.   Correct.

5         Q.   You have seen these before, right?

6         A.   Yes.

7         Q.   So the judge at this point has been

8    making phone calls to figure out why Rodney Grant

9    has been not released yet, correct?

10        A.   I'm not sure about phone calls.

11        Q.   The judge has been reaching out to

12   various parties to figure out why Mr. Grant has not

13   been released yet, correct?

14        A.   He sent an e-mail to one of the

15   specialists and a supervisor.

16        Q.   He was also informed by Captain Brooks in

17   Madisonville or something?

18        A.   I don't know who that is.  Yeah.

19        Q.   The judge says, "Please advise as to what

20   might be the issue with this case as the clear

21   intention of all parties when the defendant pled

22   guilty was to have this credit for time served

23   sentence result in a release," correct?

24        A.   Correct.

25        Q.   So the judge is reaching out to the DOC

1  saying, essentially, why isn't this guy out,

2  correct?

3       A.   Correct.

4       Q.   Angela Smith writes back to the judge and

5  says, "This offender's case is being held due to

6  him being a Parole case."  Miss Smith writes that,

7  correct?

8       A.   Correct.

9       Q.   By parole case, she means parole

10  violator?

11       A.   Correct.

12       Q.   But he is not a parole violator.

13       A.   At this point, she still doesn't know

14  that.

15       Q.   She means --

16       A.   A possible parole violation, correct.

17       Q.   He is being held because maybe he has

18  violated his parole?

19       A.   Correct.

20       Q.   She then says, "When we initially

21  received his paperwork, there was nothing to

22  indicate that this was an older case," right?

23       A.   Correct.

24       Q.   But, in fact, there was something to

25  indicate that there was an older case, and that is

1   Mr. Reese's e-mail from Probation & Parole,

2   correct?

3        A.   Which is not a legal document for us to

4   take showing us it's not a parole case.

5             MS. GLAZER:

6                  Object to form.

7   BY MR. MOST:

8        Q.   Okay, but there was something to suggest

9   -- let me rephrase that.  There was something to

10  indicate this was an older case, correct?

11       A.   There was an e-mail suggesting that this

12  was an older case, possibly an older case.  Nothing

13  showing us that it was an actual case committed in

14  the past.

15       Q.   So what Miss Smith is saying to Judge

16  Buras is only partially accurate, correct?

17       A.   Well, I think what she is saying is she

18  is going by legally, the paperwork we actually use

19  to say if he is going to be a parole violator or

20  not. Someone telling us when he committed it.

21       Q.   A supervisor within the Department of

22  Corrections is not sufficient to tell someone?

23       A.   Not legal paperwork that we have to have

24  on file to show if an offender is a parole violator

25  or not, no.

1       Q.   So it says, "We do not receive Bill of
2   Information from the Orleans Sheriff's Department
3   on our offenders, we only get the Bill several
4   months later from the Clerk of Court." I'm a little
5   confused.  It says that, correct?
6       A.   Correct.
7       Q.   I'm a little confused.  She is saying we
8   don't get the Bill of Information from the sheriff
9   at that time.  You're saying, typically, the DOC
10  did get the Bill of Information from the sheriff?
11      A.   No.  We did not get the Bill of
12  Information from the sheriff.
13      Q.   For Rodney Grant?
14      A.   For Rodney Grant.  We do not get them for
15  -- Orleans Sheriff's Office does not send us Bills
16  of Informations.  We have to order them or the
17  clerk of court sends them to us months later.  We
18  will get on the phone and order to get them sooner
19  from the clerk of court.
20      Q.   So was there something missing from
21  Mr. Grant's PreClass packet that should have been
22  there?
23      A.   His Bill of Information.
24      Q.   So at that time, typically, the sheriff
25  did send Bills of Information?

1      A.   No.  Every case we get from Orleans

2   Parish is missing something, and it's the Bill of

3   Information.

4      Q.   But the sheriff is supposed to send that?

5      A.   Yes.

6      Q.   They just never did at that time?

7      A.   Correct.  They stopped sending them for

8   some reason. This one was not -- it was not in this

9   one either.

10     Q.   So the sheriff was breaking the rules

11  about what documents to send with every packet; is

12  that right?

13     A.   They didn't send us our required

14  paperwork, which is part of -- the Bill of

15  Information is part of that required paperwork.

16     Q.   So all of the sheriff's packets at that

17  time were missing required paperwork, specifically,

18  the Bill of Information?

19     A.   Correct.

20     Q.   Okay.  Did the DOC try and fix that with

21  the sheriff?

22     A.   We called pretty regular to try and get

23  them to start sending them with the packets.  We

24  still do not get them.

25     Q.   As of today?

1    A.    Correct.

2    Q.    So the packets that come in from the

3 sheriff in 2020 still don't have the Bill of

4 Information?

5    A.    When it comes from the sheriff's office.

6 We'll get that Bill of Information from the clerk

7 of court.  They send a whole different packet, so

8 we get that to get it.

9    Q.    That comes months later from the clerk of

10 court?

11    A.    It usually comes -- I think it's sooner

12 now, but it was months later.  Back then, it was

13 two, three months we'd get it.  Now, Grant, we got

14 that same month, so it leads me to believe we

15 ordered it on the phone, which we have nothing out

16 there, but to get it within that same month.  It

17 wasn't months later that we received it.

18    Q.    So if the sheriff didn't bring the Bill

19 of Information, the backup plan is to order it from

20 the clerk of court, and that takes several weeks to

21 arrive; is that right?

22    A.    Sometimes they may send it the same day,

23 maybe the next week.  It's when they can get it to

24 us.  Whoever we get on the phone, and they do it

25 and send it to us.

1        Q.   And then PreClass, in a situation like
2    Mr. Grant's, waits until they receive that before
3    starting time computation; is that right?
4        A.   To process him correctly to see what else
5    we have to do with him to do the time comp,
6    correct.
7        Q.   So waiting on the Bill of Information,
8    essentially, hits pause on the process?
9        A.   If you are a parole case on parole, and
10   you commit -- you come back in as a new conviction,
11   yes, because we have to find out if you are going
12   -- if it's going to revoke your parole that you
13   were originally serving.
14       Q.   So if someone like Mr. Grant is a
15   potential parole violator, waiting for the Bill of
16   Information hits pause on the time computation
17   process; is that right?
18       A.   Until we can get -- try and get someone
19   to send us what we need, correct.
20       Q.   Okay.  Sometimes that is days.  Sometimes
21   it is weeks, correct?
22       A.   Again, it depends on -- you know, we look
23   at it and try and keep up with all of them.  A
24   decision has to be made at some point, what do we
25   do, and, again, we go to legal and let them make

1    that decision for us.

2         Q.   That's if it takes more than a couple of

3    weeks to get it?

4         A.   It just depends on the case.  I'm not

5    sure.  Usually, we like to not wait weeks.  Of

6    course, if you had a 15-year sentence, we -- we

7    will try and try and get it, because if -- and we

8    have to go with no one will send it to us.  If we

9    have a call from the clerk saying we are sending

10   it, we'll get that to you, we have to wait and see

11   if we get it before we can actually go up the chain

12   to try and start doing anything, because the first

13   thing they say when did he commit it, and it goes

14   right back around the circle.  So it could be a

15   week, two weeks.  It just depends on the cases.

16        Q.   When you say go to legal for help, like

17   they're not getting us this document, can you help

18   me out with this?

19        A.   Legally, what is our process, what can we

20   do with it, correct.

21        Q.   That go to legal process wasn't done with

22   Mr. Grant, was it?

23        A.   I'm not sure.  There is no notification

24   if it was or not.  I'm really not sure.

25        Q.   So July 25th the judge reaches out to the

```
1    DOC and says, why hasn't this guy been released.
2    The point of his sentence was so that he could be
3    released, right?  Immediately, correct?
4         A.   It appears that that was his point,
5    trying to see why he wasn't released.
6         Q.   So I would think at this point, you've
7    got everything.  The DOC has everything it needs to
8    know to calculate Rodney Grant's sentence, correct?
9         A.   Not yet.  We still, just by his e-mail,
10   we still don't have the Bill of Information.
11        Q.   You still need to know that it's a 2000
12   case?
13        A.   Correct.
14        Q.   Do you see in Judge Buras' e-mail that
15   says it's a 2000 case?
16        A.   Yes.
17        Q.   So you've got a supervisor from Probation
18   & Parole telling you it's a 2000 case and a judge
19   telling you it's a 2000 case, but that's not
20   enough?
21        A.   It's required paperwork that we have to
22   have, by a statute, and by reg a copy of that Bill
23   of Information.
24        Q.   Do you know what that statute is?
25        A.   Is it Article 892 maybe?
```

1      Q.   I've got that.  We can take a look at it.
2    Do you know what reg that is?
3      A.   The PreClass reg, I believe.
4      Q.   Yeah.  I'm not trying to trick you.  We
5    can look at it.
6      A.   I don't know the name of it.  I'm pretty
7    sure it's in the PreClass.  BO218.
8      Q.   Do you have BO218 in front of you?
9      A.   Yes.
10      Q.   Where are you looking at BO218 that it
11    says that?
12      A.   On Page -- it starts on Page 2 and ends
13    on Page 3.
14      Q.   Where does it say that we need to have
15    the Bill of Information before we can start time
16    comp?
17      A.   Number 2, the court documentation.  Bill
18    of Information, sentencing minutes.
19      Q.   Number 2?
20      A.   It's Number 7.  On Page 3, Number 2.
21    These are -- well, 1 through 4 is the required
22    documentation.  Number 2 is the court
23    documentation, the Bill of Information, sentencing
24    minutes.
25      Q.   "If any required information is missing,

1   the ARDC specialist shall contact the appropriate

2   agency and request the information."  So if the DOC

3   doesn't have the documents it needs, it needs to

4   reach out and get them?

5        A.    Correct.

6        Q.    That's the DOC's policy, correct?

7        A.    Correct.

8        Q.    So DOC can't just sit back and wait; it

9   has to go out and get the documents, if it needs

10  the documents, in order to calculate someone's

11  release date, correct?

12       A.    Correct.  We attempt to get what we need

13  to calculate.

14       Q.    Even a judge telling you the information

15  won't be sufficient, if the DOC doesn't have the

16  documents in hand; is that correct?

17       A.    Correct.  That's just an e-mail him

18  saying what it was, but it's not actual legal

19  documents.

20       Q.    So then the next day the judge sends over

21  the actual Bill of Information on July 26th, 2016,

22  correct?

23       A.    Correct.  We also received it from the

24  clerk of court the same day.

25       Q.    The same day, really?

1        A.    Yes.

2        Q.    What document shows that?

3        A.    It is the one the judge gave us.  I don't

4    even know if the copy is on this file, because it

5    was a picture with his phone, but the one that is

6    in -- this is the one from the clerk.

7        Q.    Then the notation.  Let's mark that as --

8        A.    This is Angela Smith, who is the manager,

9    who, instead of stamping received, she initialed it

10   and put the date on it.

11       Q.    Okay.  That is the exhibit I'm marking as

12   Exhibit 9 and attaching to this deposition,

13   correct?

14       A.    Correct.

15       Q.    So this is signed by the clerk's office

16   on July 26th.  So the clerk's office must have

17   faxed or e-mailed it over?

18       A.    (Witness nods head.)

19             MS. GLAZER:

20                 Make sure you answer out loud.

21             THE WITNESS:

22                 Yes.

23   BY MR. MOST:

24       Q.    This is signed by the clerk's office on

25   July 26th, correct?

1       A.   Yes.

2       Q.   It's received by the DOC on the 26th,

3  correct?

4       A.   Correct.

5       Q.   So the clerk must have faxed it over or

6  e-mailed it over?

7       A.   Correct.

8       Q.   Would they have faxed it?

9       A.   Sometimes they fax.  Sometimes they send

10 by e-mail.  It just depends on which person we're

11 dealing with.

12      Q.   So it's possible to get the Bill of

13 Information from the clerk's office same day,

14 generally?

15      A.   If they'll do it, yeah.  I mean, I would

16 think it's possible, yes.

17      Q.   So on the 26th, the DOC gets from both

18 the judge and the clerk of court the Bill of

19 Information, correct?

20      A.   Correct.

21      Q.   So now the DOC has everything it needs to

22 calculate Mr. Grant's release date?

23      A.   Correct.

24      Q.   And they do calculate his release date on

25 the 26th, correct?

```
 1          A.    Correct.
 2          Q.    And they see that he is eligible for
 3     immediate release, correct?
 4          A.    Correct.
 5               MS. GLAZER:
 6                    Do you have much more?
 7               MR. MOST:
 8                    Probably at least 30 minutes. Do you
 9                 want to take a break?
10               MS. GLAZER:
11                    Yes.
12               MR. MOST:
13                    Let's go off the record.
14                    {BRIEF RECESS, 12:59-1:05}
15     BY MR. MOST:
16          Q.    We're talking about July 26, 2016, when
17     the DOC gets the Bill of Information from both the
18     judge and the clerk of court, correct?
19          A.    Correct.
20          Q.    From the judge, it came in at 10:52 AM;
21     is that right?
22          A.    It's right here.  It's attached to that
23     one.
24          Q.    From the judge, the Bill of Information
25     came in at 10:52 AM, correct?
```

84

1          A.    Correct.  A picture of the bill.

2          Q.    Do you know when it came in from the

3    clerk of court?

4          A.    I do not.  I just know that date it was

5    received the manager wrote on it received that

6    date.  She didn't put a time.

7          Q.    You talked a couple of times about

8    needing to have the official legal paperwork.

9    Would this image from the judge of the Bill of

10   Information be sufficient?

11         A.    We would have printed it and brought it

12   to legal to okay it, because we can see it's that

13   docket.  The dates on it, things like that.

14         Q.    Do you have any reason to think that this

15   would not be a legal or sufficient document?

16         A.    No.  We wouldn't have no reason to not

17   believe it.

18         Q.    So then marking as Exhibit 10, this is a

19   document that reflects the time computation from

20   July 26, 2016?

21         A.    Yes.

22         Q.    It says, "FTD" in the upper left.  July

23   26, 2016.

24         A.    Correct.

25         Q.    That's full-term date?

```
1        A.    Correct.
2        Q.    So once his time has been calculated,
3   they say his full-term date is complete as of
4   today.  He is eligible for immediate release,
5   correct?
6        A.    Correct.  He is eligible for release once
7   we clear him.
8        Q.    So except for the administrative steps,
9   he can be released as soon as the administrative
10  steps are complete, correct?
11       A.    Yes.
12       Q.    PED.  What does that stand for?
13       A.    Parole eligible.
14       Q.    What does that mean?
15       A.    He would have been eligible to be seen by
16  the parole board to be possibly released on parole
17  on that date.
18       Q.    And DS. What does that stand for?
19       A.    That I'm not sure.  It's diminution of
20  sentence.  It's his good time date.
21       Q.    So my understanding is his full-term date
22  is -- that's the end of his sentence, not taking
23  into account good time and other things, and the DS
24  is, if you calculate everything, that's the date
25  that the person is eligible for release?
```

1      A.   Will be released, correct.  Should be.

2      Q.   Here it's the same, because his sentence

3   is done as of this day?

4      A.   Correct.  It's the date he was time

5   comped, so it would come out to be the same as

6   that, yeah.

7      Q.   So if I'm looking at a time computation

8   sheet, and I'm looking for the date that the DOC

9   thinks someone should be released, I'm looking for

10  the DS date, correct?

11     A.   That is the date that -- yes.  DOC will

12  process the release for that day with no -- unless

13  he has other stuff that would change that date.

14     Q.   Right.  Like he commits an infraction and

15  loses some good time or something?

16     A.   Or has a new sentence out there that we

17  don't know about yet.

18     Q.   I'm going to mark this as Exhibit 11.

19  This is Mr. Grant's -- Exhibit 11 attached to this

20  deposition is Mr. Grant's time computation

21  worksheet from CAJUN; is that right?

22     A.   Yes.

23     Q.   So this is sort of the worksheet on the

24  computer that allows the time computation person to

25  compute someone's time and figure out what their

1    release date should be?

2         A.    Correct.

3         Q.    Must Serve is the days that the person

4    still must serve in incarceration, correct?

5         A.    Must Serve would be his -- I'm trying to

6    see how to -- his sentence less his good time, good

7    time rate.

8         Q.    So it's the days you've got left to spend

9    in prison?

10        A.    Right.

11        Q.    Here Mr. Grant has -- it's been input

12   that he has a sentence length of one year, correct?

13        A.    Correct.

14        Q.    And he has jail credit of 2,475 days?

15        A.    Correct.

16        Q.    And that's for all of that time he has

17   been incarcerated from 2009 to 2015?

18        A.    It was actually 2008 to 2015.

19        Q.    That's why we get a negative must serve

20   date, because his jail credit is thousands of days

21   longer than his sentence, correct?

22        A.    Correct.

23        Q.    So anyone with a negative must serve

24   number is eligible for immediate release?

25        A.    Correct.

```
 1        Q.    But Mr. Grant was not released on the
 2    26th, correct?
 3        A.    Correct.
 4        Q.    I'm going to mark as Exhibit 12 another
 5    document from Mr. Grant's time computation from
 6    July 26, 2016, correct?
 7        A.    Yes.  It's his master record.
 8        Q.    This one says that his DS date and his
 9    full-term date are July 27th, correct?
10        A.    Correct.
11        Q.    So why is that different than what we
12    were looking at before, July 26th?
13        A.    Whenever we calculate someone's time, and
14    they're due to go home, immediately, we have to
15    clear them for release.  We pull another criminal
16    history.  We look for any detainers, warrants,
17    clear all his arrests that he has that we don't
18    know what happened to them to make sure he did not
19    get sentenced in the same parish, another
20    jurisdiction, and have another sentence out there
21    that we need to add to him so we don't release him
22    in error, and he still has another hard labor
23    sentence out there.  So we have to clear him all
24    the way through and make sure he has DNA on file.
25    If he has -- we clear any victim information.  We
```

1    have to send letters or call if it's immediate

2    release.  So there is things that have to happen

3    before we can actually issue a certificate to

4    release him.

5            If we do the time comp, and we don't get

6    all of that clearing in, we can't release him until

7    we get everything we need to make sure he can be

8    released.  Sometimes it does go into the evening.

9    We don't get what we need, and it may change to the

10   next day.  We work them as late as we can and try

11   and release them.  If we get him released, and the

12   jail won't release him because there is no bus

13   travel or anything, we will hold and let them

14   release the next morning and catch a bus.  So with

15   this one, I can't say positively, but clearing him

16   for release and then processing him once that's all

17   cleared.

18       Q.   How many hours does that administrative

19   process of clearing someone for release usually

20   take?

21       A.   It just depends on who we're trying to

22   call and who we're dealing with to get the -- that

23   we can call and ask, and they say, we can't give it

24   to you right now, we'll call you back, or we fax it

25   to them and get them to fill out a form saying it's

1    cleared.  He got sentenced on this or dismissed or

2    whatever, and they send it back to us.  It's just

3    we -- it could take -- some of them, if he only has

4    a few, one or two arrests, it could take --

5    sometimes it could take a few minutes.  Sometimes

6    it could take a whole day or two.  We're depending

7    on others to give us that information.

8         Q.   Does it ever take more than two days?

9         A.   I can't say positively, but probable,

10   yes.

11        Q.   How long did it take to do that for

12   Mr. Grant?

13        A.   I mean, just looking at the paperwork, it

14   took from the 25th to the 26th.  I mean the 26th to

15   the 27th.  We received everything on the 26th.  We

16   released him on the 27th, but I can't say how long

17   it took.

18        Q.   Why would -- so Miss Smith put this in as

19   full-term date July 27th, 2016 into CAJUN?

20        A.   Whenever we do not release someone, we go

21   back in and recalculate it to show that he served

22   another day, because we can't back date his

23   release.  We have to get the date that we're

24   actually -- when we're ready and have everything.

25   We have to have the date on his paper when we truly

1     releasing him.

2          Q.   So on the 26th, someone in PreClass saw

3     that he wasn't going to -- all of that wasn't going

4     to get done on the 26th, so they added one day to

5     the full-term date?

6          A.   We don't really add a date.  We just

7     transmit through the time comp.  It's going to add

8     a date, because now it's the -- this was -- if --

9     well, let me rephrase that, because if it gets to

10    late in the evening, they will, because no one

11    works that late.  Just so his date doesn't look

12    like -- and at night someone sees he should have

13    went home today and just releases him, and we

14    didn't have him cleared yet, we will modify that

15    date to the next day so it's not sitting out there,

16    and the offender did not release on that date.

17         Q.   So it looks like -- so this says amended

18    on the 26th, and they put a full-term date of the

19    27th.  So it looks like someone in PreClass at the

20    end of the day said, oh, it looks like we're not

21    going to get the administrative tasks done today.

22    We need to -- we don't want him to be released, so

23    let's add a date so we can finish it, and he can be

24    released tomorrow.  Is that what we are looking at?

25         A.   Yes, because they've changed it, knowing

1    we could not release him.  He was not going to

2    release on the 26th and trying to clear the case

3    out, his arrests.

4         Q.   Is there any reason why someone can't be

5    released, and then you have them come back to do

6    the administrative tasks?

7         A.   Because if he actually had a -- say --

8    this is just an example, not on this offender

9    himself.  Let's say he had a sex offense crime that

10   we didn't know that we find out about, and if we

11   had already released him, and then we find out he

12   has a sex offense sentence, he should not have been

13   released.  Even if he had reached his release date

14   on that, he should not have been released until we

15   do all of the paperwork, by law, on a sex offender.

16           There is different reasons.  If he wasn't

17   DNA'd, we would have to get that.  We would have to

18   pick him back up or get warrants to pick him back

19   up if they have something out there that they

20   didn't have on his file at the time this sentence

21   was complete.

22        Q.   So if someone is released too early,

23   there is a procedure for getting them back, to put

24   out warrants?

25        A.   Yeah.  We would have to get warrants and

1    get them arrested, yeah.

2        Q.   Then on July 27th, 2016, DOC finishes

3    everything it needs to do and sends a Certificate

4    of Release to Madison, right?

5        A.   Correct.

6        Q.   Madison releases him and puts him on a

7    bus back to New Orleans, correct?

8        A.   I'm not sure.

9        Q.   Are there any steps that the DOC

10   employees took to ensure the timely release of

11   Rodney Grant that we have not covered yet?

12            MS. GLAZER:

13                 Object to the form of the question.

14            THE WITNESS:

15                 Again, I'm not -- I can only say

16              what I see in the record as far as --

17              you know, we didn't do narratives what

18              was done, ordered over the phone, or

19              things like that in 2016.

20   BY MR. MOST:

21        Q.   Speaking for the DOC, you don't have

22   anything to suggest that any additional steps

23   besides what we've discussed already today were

24   taken by any DOC employee to ensure the timely

25   release of Rodney Grant, correct?

```
1              MS. GLAZER:

2                   Object to the form.

3              THE WITNESS:

4                   I don't understand. Still, my answer

5              would be the same.  I don't have

6              anything showing that it was -- you

7              know, anybody --

8    BY MR. MOST:

9         Q.   So you don't have any information or

10   evidence of any additional steps besides the ones

11   we've talked about today that DOC employees took to

12   ensure the timely release of Rodney Grant, correct?

13             MS. GLAZER:

14                  Object to the form.

15             THE WITNESS:

16                  We did not make narratives at that

17             time saying what we did each minute of

18             what we did with a case at that time,

19             so I can't say if they did or not.

20   BY MR. MOST:

21        Q.   I understand, but I'm just asking, you

22   don't have any evidence or documents to suggest

23   that there were any steps taken by DOC employees to

24   ensure the timely release of Rodney Grant that we

25   have not covered today, correct?
```

```
 1              MS. GLAZER:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Correct.  We did not make narratives
 5            at that time.
 6   BY MR. MOST:
 7       Q.   So who at the DOC -- whose job was it at
 8   the DOC to ensure that Mr. Grant had a timely
 9   release?
10              MS. GLAZER:
11                   Object to the form.
12              THE WITNESS:
13                   PreClass has a procedure on our
14                 releases, how they're handled and what
15                 to do, and in case of whatever, missing
16                 paperwork, what you do and how releases
17                 are handled.  We have submittals that
18                 are pulled and the supervisors and
19                 managers check to make sure these
20                 offenders are released within the
21                 parameter of us getting the legal
22                 paperwork that is necessary to release
23                 them.
24   BY MR. MOST:
25       Q.   It sounded to me, like you testified
```

1   earlier, that it was Janille Townsel's job

2   initially to get any missing documents, correct?

3             MS. GLAZER:

4                  Object to the form.

5             THE WITNESS:

6                  No.  Janille was actually trying to

7                get the parole packet, which is from

8                our parole board, not from jail or

9                anywhere else.  I'm not sure who

10                processed it before the parole violator

11                got it and started the parole violation

12                part.

13   BY MR. MOST:

14        Q.   So someone at the DOC saw that the Bill

15   of Information was missing from the packet and

16   should have reached out to get it, correct?

17        A.   And could have except we didn't make

18   narratives back then to say if we did or not.

19        Q.   But it was someone's job to do that,

20   right?

21        A.   Correct.

22        Q.   Do you know whose job that was?

23        A.   Not in 2016, no.

24        Q.   How many people were there that did that

25   job? Were there a bunch of people?  Was it two

1    people?

2         A.   We have -- I'm not sure exactly how many

3    employees we had then.  I have 53 employees.

4         Q.   Fifty-three people who see a packet, see

5    if there is something missing and then --

6         A.   We get thousands of cases a month, and at

7    that point, everybody was working parish and

8    getting paperwork, and there is a process of what

9    is necessary.

10        Q.   So you can't say who should have done it

11   back then?

12        A.   No.

13        Q.   So we looked at the time computation

14   worksheet where Mr. Grant got negative 2,000

15   something days, right?

16        A.   Yes.

17        Q.   So he was getting credit for this

18   sentence for time he spent on a different charge,

19   as the judge ordered, correct?

20        A.   Correct.

21        Q.   That's the Bodeye rule that we talked

22   about earlier?

23             MS. GLAZER:

24                  Objection.

25             THE WITNESS:

```
 1                     As far as it is today.  I don't know
 2                 about in 2016.
 3    BY MR. MOST:
 4         Q.   Right.  But Miss Smith actually did apply
 5    the time from that other charge to Mr. Grant, as
 6    the judge ordered, right?
 7         A.   Yes.
 8         Q.   So Miss Smith was applying the Bodeye
 9    rule to Mr. Grant, correct?
10              MS. GLAZER:
11                   Objection.
12              THE WITNESS:
13                   I don't know at that point if it was
14                 considered Bodeye or not.  I don't know
15                 if that was in effect at that point.
16    BY MR. MOST:
17         Q.   But Miss Smith was doing the thing where
18    if a judge orders it, you apply credit from a
19    different charge regardless, if that's what the
20    rules of criminal procedure require, correct?
21         A.   She did apply the credit that the judge
22    ordered him get.
23         Q.   That's the way the DOC understood it was
24    supposed to do things at the time of Mr. Grant's
25    time calculation?
```

1     A.   Not necessarily.  It's due to -- the

2  wording.  I don't know if she actually got with

3  legal to decide to give it.  Credit for time served

4  means he was actually serving on that sentence.

5  The jail credit letter from Orleans Parish did not

6  show he was serving on this sentence in 2008 to

7  2015, so I can't say why she gave it to him.  It

8  may have been a decision from legal that since the

9  judge ordered it and gave specific dates, which we

10  will do at some point, if they gave from this date

11  to this date, and even though the judge left out an

12  actual date in 2015, it was decided to give it to

13  him.

14     Q.   So Miss Smith was doing the thing that

15  Bodeye requires, whether it was coming from that

16  case or coming from some other directive, correct?

17          MS. GLAZER:

18              Object to the form.

19          THE WITNESS:

20              He got credit for time he spent on

21           another docket.

22  BY MR. MOST:

23     Q.   So yes?

24     A.   Yes.

25     Q.   So without getting into the question of

```
 1   whose fault it was, the judge gave an order
 2   regarding Mr. Grant that should have resulted in
 3   him being released as soon as possible, correct?
 4             MS. GLAZER:
 5                  Object to the form of the question.
 6             THE WITNESS:
 7                  He gave an order to give him credit.
 8   BY MR. MOST:
 9        Q.   And the amount of credit that the judge
10   gave was more than the sentence, correct?
11        A.   On this instant offense, yes.
12        Q.   So the judge was giving an order of more
13   credit than a sentence, and so it should have
14   resulted in immediate release, correct?
15             MS. GLAZER:
16                  Object to the form of the question.
17             THE WITNESS:
18                  Not if it would have made him a
19               parole violator.
20   BY MR. MOST:
21        Q.   But he wasn't a parole violator?
22        A.   Correct.  After we found that out.
23        Q.   So not getting into fault, who knew what,
24   Mr. Grant should have gotten out right away, if
25   everything had been done right, correct?
```

```
 1              MS. GLAZER:
 2                   Object to the form of the question.
 3              THE WITNESS:
 4                   I can't say if he would have,
 5              because it didn't happen that way, so I
 6              don't know.  I can't say he would have
 7              gotten out right away, because it
 8              didn't happen that way.  I can't
 9              speculate what would have happened had
10              something happened differently.
11    BY MR. MOST:
12         Q.   We know what the judge wanted, correct?
13         A.   We know he gave him a one-year sentence
14    and credit for time served on another sentence.
15    Again, I don't know if at that point if Bodeye was
16    in effect or was it a decision made at that point
17    just to give it to him.  I can't say backwards what
18    happened, why he got that much credit, but he did
19    on that date, and it made him an immediate release,
20    giving him all of that credit.
21         Q.   So from the DOC's perspective, Mr. Grant
22    was eligible for immediate release as soon as they
23    did his time computation; is that correct?
24         A.   Correct.
25         Q.   Topic Number 2 of the 30(b)(6) notice is,
```

1    "All steps taken by any DOC personnel with regard
2    to the post-sentence obtaining of records regarding
3    Rodney Grant from the clerk of court."  We know the
4    DOC got the Bill of Information from the clerk of
5    court, correct?
6         A.    Correct.
7         Q.    We know they got it on the 26th, correct?
8         A.    Correct.
9         Q.    But we don't know when the DOC asked for
10   it, correct?
11        A.    Correct.
12        Q.    So you don't have any information about
13   what steps DOC personnel took to obtain records
14   regarding Mr. Grant from the clerk of court?
15        A.    No.
16        Q.    The next topic is, "Any communications
17   between any DOC personnel and the sheriff's office
18   or Judge Buras regarding Rodney Grant."  I'm going
19   to break that down.  Were there any communications
20   between DOC personnel and Judge Buras regarding
21   Rodney Grant other than the e-mails we looked at
22   today?
23        A.    Not that I'm aware of or what is in his
24   file.
25        Q.    Were there any communications between DOC

1  personnel and the sheriff's office, the Orleans

2  Parish Sheriff's Office, regarding Rodney Grant

3  other than what we've looked at today?

4      A.   Not that I'm aware of.  There is nothing

5  in his file.

6      Q.   So the next topic is, "Any reasons why

7  OPSO cannot or does not conduct its own time

8  computation of persons sentenced to the custody of

9  the DOC."  So the sheriff's office generally has

10  documents before the DOC gets it, right?

11      A.   Correct.

12      Q.   So they could do their own time comp to

13  see who might be eligible for immediate release,

14  correct?

15      A.   I can't say if they could or couldn't,

16  because I don't know if they know the laws or

17  anything.  I can just speak for DOC's side why we

18  do the time computation on hard labor DOC

19  offenders.

20      Q.   But the DOC has not ordered the sheriff's

21  office, you can't do that, have they?

22      A.   Not that I'm aware of.

23      Q.   They have not -- the DOC has not told the

24  sheriff's office you shouldn't do that, have they?

25      A.   Not that I'm aware of.

104

1      Q.   You are speaking on behalf of the DOC,
2  right?
3      A.   Right.
4      Q.   The way things are now, and the way
5  things were in 2016, is that the sheriff sends
6  PreClass packets to the DOC, and then the DOC says,
7  bring that inmate to us on such and such a date,
8  correct?
9      A.   I'm not sure.  I can only say I have seen
10  the things where they do move them into DOC.  I
11  don't know if they move them all in or how that is
12  exactly handled.  I'm not over transfers, but we do
13  move some of them in once they -- once they e-mail
14  the paperwork, it is handled at a different
15  facility now, and they are worked and processed,
16  and then they move them in.
17      Q.   But is there anything stopping the
18  sheriff's office from just bringing people as soon
19  as they are sentenced to the DOC?
20      A.   We don't allow them to just drop them
21  off.  That's an order, because we have to know they
22  are DOC offenders.  They have to be verified that
23  they're a DOC offender and verified who the
24  offender is and things like that before they can
25  actually bring them.  It's not something where they

1    can just bring them in.  Once everything is

2    verified, and they are a DOC offender, then an

3    order saying, okay, now you can bring them, because

4    we verified they are DOC, but it not like -- I know

5    they can't just bring them.

6         Q.   By they are DOC meaning like a sentencing

7    order sentencing this person to the custody of the

8    Department of Corrections?

9         A.   Correct.

10        Q.   Is there any reason the sheriff's office

11   couldn't bring the person at the same time as the

12   packet with that information?

13        A.   I can't say there is a reason why they

14   couldn't.  I can give you the reason why we can't

15   do it that way.

16        Q.   Let me rephrase it.  Has the DOC ever

17   told the sheriff's office not to bring the inmate

18   along with their PreClass paperwork?

19        A.   Not that I'm aware of.  They were not

20   told that.  Usually, if they're moving them,

21   wanting to move them in today, they e-mail it to

22   us.  We update all our system, give them a DOC

23   number, and they move them in.

24        Q.   So it is possible to sometimes send the

25   paperwork over and then take the inmate from the

```
 1   sheriff's office to the DOC the same day?
 2        A.   It's possible.
 3        Q.   That sometimes happens?
 4        A.   Yes.
 5        Q.   When the sheriff brings inmates sentenced
 6   to the custody of the Department of Corrections
 7   physically to the Department of Corrections, they
 8   don't bring their paperwork along with them,
 9   correct?
10        A.   No.  At this time, it's already sent in.
11   It's e-mailed in to the facility that handles them,
12   and they working them, and they have set days they
13   bring them in, so they are already processed in our
14   system when they get there.
15        Q.   I believe the Orleans sheriff's policy is
16   that they send inmates once a week on Thursdays?
17        A.   It is once a week.  I'm not positive what
18   day.
19        Q.   But that's the sheriff's policy.  The DOC
20   didn't tell them to do that, did they?
21        A.   There was probably an arrangement, when
22   can you bring them, yeah.
23        Q.   But the once a week on Thursdays thing,
24   that wasn't an order from the DOC?
25        A.   It was just an arrangement with the two.
```

```
 1         Q.   Are you familiar with the Basic Jail --
 2    let me back up.  The Basic Jail Guideline, are you
 3    familiar with what that is?
 4         A.   Somewhat I know, right.
 5         Q.   Those are instructions from the DOC of
 6    how sheriffs are supposed to handle inmates
 7    sentenced to the custody of the DOC?
 8         A.   There is -- I'm not familiar with exactly
 9    what is in it, but I know it is giving them what
10    they are to have on them and different things.
11         Q.   I'm going to mark as Exhibit 13 what
12    appear to be pages from the DOC's Basic Jail
13    Guidelines.
14         A.   Yes.
15         Q.   Looking at Page 17 under Section
16    II-A-008, you see this talks about the offender's
17    case record and certain documents in that?
18         A.   Yes.
19         Q.   You see that the offender record shall be
20    transferred with the offender at such time the
21    offender is transferred to another local or DPS&C
22    facility?
23         A.   Yes.
24         Q.   So it looks to me like the sheriff's
25    office is not following this rule that they're
```

1   supposed to take the records with the inmate,

2   correct?

3        A.   This is if a copy -- if the offender --

4   population management is the housing of offenders,

5   so if they transfer from parish to parish, they

6   want them to send a file with what the offender is

7   serving time, who he is, things like that.  I don't

8   know if Orleans is following that or not when they

9   transfer the offenders.  It's not the actual

10  PreClass part of it.

11       Q.   You mentioned earlier criminal code --

12  you mentioned earlier Code of Criminal Procedure

13  892, which I'm going to mark as Exhibit 14.  Is

14  this that code section you were talking about

15  before?

16       A.   Yes.

17       Q.   Did you see under C it says, "All

18  statements and documents required by this Article

19  shall physically accompany any defendant when said

20  defendant is transferred to a penal institution or

21  a mental institution or mental hospital?"

22       A.   Yes.

23       Q.   So it looks like this law requires the

24  sheriff to bring some documentation with the inmate

25  when they transfer them to a penal institution,

1    correct?

2         A.    Correct.  Yes.

3         Q.    And the sheriff doesn't do that, correct?

4         A.    I'm not sure if they bring any type of

5    paperwork when they move into the penal -- that

6    would be like when they receive them at a penal

7    institution.  The intake facility, I'm not sure

8    what paperwork they bring with the offender

9    himself.

10        Q.    When they come to Baton Rouge -- I'm

11   sorry.  When they come to Elayn Hunt for

12   processing, the sheriff doesn't send paperwork with

13   them, correct?

14        A.    I'm not sure.

15        Q.    You're not sure.  Okay.  Finally, Topic

16   6, "Any reasons why OPSO cannot release a person

17   sentenced to the custody of the DOC if OPSO knows

18   that person's sentence is complete." Generally, if

19   a jailer knows someone should be free, they should

20   release them, right?

21             MS. GLAZER:

22                  Object to the form of the question.

23             THE WITNESS:

24                  I can see reasons why they should

25                not release them, especially because of

```
 1              the offenders that have other sentences
 2              at other places that they may not know
 3              about, as we talked earlier with other
 4              jurisdictions, convictions that he may
 5              have a larger sentence that he still
 6              owes on.  Sex offender information.
 7              DNA needs to be taken, by law, before
 8              he releases.  That's DOC's obligation
 9              to make sure that's carried out before
10              he is released.
11  BY MR. MOST:
12      Q.   Generally, if you have looked at
13  everything, and you see that someone should be
14  free, they should be released, you know,
15  acknowledging that there may be some administrative
16  tasks before they physically walk out of the door,
17  correct?
18              MS. GLAZER:
19                 Object to the form of the question.
20              THE WITNESS:
21                 Again, once everything is cleared,
22              and all of the information is gathered
23              that he can be released, then we
24              release him. We can release him.
25  BY MR. MOST:
```

1      Q.   So the answer is yes?

2      A.   Yes, after all the paperwork is received

3  and processed, and we are sure he can be released.

4      Q.   I'm talking now about the sheriff.  Let's

5  say the sheriff has someone in their jail sentenced

6  to the custody of the DOC, and the sheriff knows

7  that this person should be free.

8         MS. GLAZER:

9            Calls for speculation.  Outside the

10         scope of -- I'm sorry.  I thought you

11         were done.  You did stop.

12         MR. MOST:

13            You are right.  I did pause.  I took

14         a breath, so I don't blame you for

15         jumping in.

16  BY MR. MOST:

17      Q.   Let's say the sheriff has someone in

18  their jail sentenced to the custody of the DOC, and

19  the sheriff knows that person's sentence is

20  complete.  They should be free.  Does the sheriff

21  have the power to let them go?

22      A.   Again, I think it's DOC's obligation to

23  clear the offender, make sure he is due for

24  release, and that all the proper notifications, all

25  the proper laws, that are needed before he is

1    released is handled, and the Department of

2    Corrections handle the release.

3          Q.   Is there any reason you know of that the

4    sheriff can't release someone they know should be

5    free?

6          A.   If he is a parish jail offender, he is

7    their offender.  If he is a DOC hard labor

8    sentence, he is actually a DOC offender.  They're

9    just housing him for DOC.  So it's our obligation

10   to handle the release and make sure everything is

11   in order for him to be released.

12         Q.   So you don't think the sheriff can

13   release someone sentenced to the custody of the

14   DOC, even if the sheriff knows they should be free

15   until they hear word from the DOC?

16         A.   Again, I don't -- I mean, it is the DOC's

17   obligation to make sure it's carried out that he

18   serves his sentence and releases when we find out

19   everything we need to know that he can be released.

20         Q.   But has the DOC ever instructed sheriffs,

21   you can't release someone who you know to be free

22   if they are sentenced to the custody of the

23   Department of Corrections until you hear from us?

24   Has that order ever gone from the DOC to the

25   sheriff's offices?

1          MS. GLAZER:

2              Object to the form.

3          THE WITNESS:

4              I'm not sure if anything has gone to

5              the sheriff's office.  We have notified

6              them that DOC offenders will be

7              released by the Department of

8              Corrections, and a certificate will be

9              issued to release him from custody.

10   BY MR. MOST:

11      Q.   But you don't know of any order from the

12   DOC to the sheriff saying you cannot release

13   someone, even if you know they should be free,

14   until you hear from us; is that correct?

15      A.   I don't know of an order.

16      Q.   Okay.  Thank you.  Let me flip through.

17   We may be at the end.  I want to double-check here.

18   So everything that happened to Mr. Grant proceeded

19   according to DOC policy, correct?

20          MS. GLAZER:

21              Object to the form of the question.

22              It is awfully broad.  Everything that

23              happened.

24   BY MR. MOST:

25      Q.   I can rephrase it.  Did the steps that

1   the DOC took with regard to Mr. Grant follow DOC

2   policy?

3        A.   From what I have in his file, yes.

4        Q.   So you don't see any evidence in the file

5   that any DOC employees violated DOC policy,

6   correct?

7        A.   Correct.

8        Q.   So the actions that the people in the

9   PreClass Department took with regard to Mr. Grant

10  flowed from the DOC policies approved by Secretary

11  LeBlanc, correct?

12       A.   From what I see in his file, yes.

13       Q.   I want to ask you about a couple of

14  individuals.  Janille Townsel.  She looked at --

15  what was her role with regard to Mr. Grant?

16       A.   From looking at what is in his file, it

17  appears she was the person the paperwork was given

18  to as a parole violator, to work him as a parole

19  violator.  To figure out if he would be a parole

20  violator and work him as a parole violator.  That

21  is about as far as I got with what is in his file.

22       Q.   It was Janille Townsel's job to figure

23  out whether this new sentence of Mr. Grant violated

24  his parole, correct?

25       A.   Or if we received the parole revocation

1    paperwork and order it, correct.

2         Q.   Part of her job was to figure out whether

3    this new sentence was a violation of his parole,

4    correct?

5         A.   Yes.

6         Q.   Figuring out whether his new sentence was

7    a violation of his parole was the thing that was

8    postponing his time computation, correct?

9         A.   From what I see in here, that, and

10   possibly, and I can't say for sure, because it is

11   not noted, again, in the file that, and if he gets

12   the credit for time he served on another sentence.

13        Q.   So the things that DOC was waiting to do,

14   the time computation, was figuring out whether his

15   new sentence violated his parole, and maybe, but

16   you don't know for sure, whether he was entitled to

17   the credit for time served on a different charge,

18   correct?

19        A.   Correct.

20        Q.   So if it was clear at the time he should

21   get that credit, then the only thing that the DOC

22   was waiting to do time computation on was figuring

23   out whether this new sentence violated his parole,

24   correct?

25        A.   Correct.  At that point, the only thing

```
 1    we were waiting on is that bill of Information to
 2    figure that out.
 3         Q.   Kenedra Burton.  What was her role
 4    regarding Rodney Grant?
 5         A.   I really don't know if that was just that
 6    someone gave her name as a contact.  I don't see
 7    her name on anything else.
 8         Q.   She is mentioned in one of the discovery
 9    responses.
10         A.   I think she was included on one of the
11    e-mails.  I think -- again, I don't know, but
12    sometimes they just include several people they
13    know work here so someone gets it.
14         Q.   Right.  She was the person that Judge
15    Buras e-mailed, but you don't know why --
16         A.   One of the clerks may have knew her
17    because she orders stuff and just gave it to her.
18         Q.   Then Angela Smith's role was to actually
19    do the time computation?
20         A.   Angela Smith was actually a supervisor.
21    She did do the time computation.  It's not her role
22    to do it, but, obviously, she was involved trying
23    to get it going, because she, at the end, did do
24    the time -- she is the one who did the time
25    computation.
```

1          Q.   Kelly Weaver managed Mr. Grant's release

2    from custody? Is that right?  You can refresh from

3    these interrogatory responses, if that is helpful.

4          A.   I think she is the one who cleared --

5    started the process clearing the release.

6          Q.   Doing the administrative tasks?

7          A.   Right.  Getting the clearances and

8    things.

9          Q.   And then what was -- I note that you are

10   also mentioned here, Angela Griffin.  What was your

11   role regarding Mr. Grant?

12         A.   I'm over the department that handles the

13   time computation.

14         Q.   You were not personally involved in

15   handling anything with regard to Mr. Grant, but you

16   are the boss of the department?

17         A.   Correct.

18         Q.   So you were only involved insofar as you

19   are responsible for the people who work under you,

20   correct?

21         A.   Correct.

22         Q.   Were you consulted about Mr. Grant's case

23   at any point?

24         A.   I can't say.  I don't remember.  I don't

25   see anything in here, but in 2016, I don't -- yeah.

1      Q.   Let me just flip through these things you

2   gave me.  So the minutes of the court, those are an

3   official legal document, correct?

4      A.   Correct.

5      Q.   Those show up in Orleans Parish on

6   something called Docket Master?

7      A.   Yes.

8      Q.   The PreClass Department can look things

9   up on Docket Master?

10      A.   We can now, and a few people could, and I

11   don't know what years it's changed where we could.

12   It was random, but now we can look it up.  I can't

13   say for sure in '16, but I'm pretty sure we had

14   access in '16.

15      Q.   So Docket Master would show whether

16   Mr. Grant's case was an old case or a new case,

17   right? Is that ambiguous?  Do you want me to

18   rephrase that?

19      A.   I'm not sure what Docket Master shows.

20      Q.   Sure.  I'm going to mark this as Exhibit

21   15 and attach it to this deposition.  Does this

22   appear to be a Docket Master printout for

23   Mr. Grant?

24      A.   Yes.

25      Q.   It shows that this is an old 2000 case?

1      A.   Yes.

2      Q.   So if PreClass had had access to Docket

3  Master in 2016, they would have been able to look

4  up and see that this was an old case?

5      A.   Yes.  We could have seen when the bill

6  was filed.

7      Q.   Would you be able to work with people in

8  your department to figure out if, in 2016, at the

9  time of Mr. Grant's sentencing, PreClass had access

10  to that Docket Master?

11      A.   I think so.

12      Q.   Going back to a document we looked at

13  early on, the criminal history, which is Exhibit 3,

14  we noted that on Page 3 someone at the DOC made

15  handwritten notations matching this 2000 arrest to

16  the Docket Master that Mr. Grant -- I'm sorry, to

17  the docket number that Mr. Grant was sentenced

18  under in 2016, correct?

19      A.   Correct.

20      Q.   What does it take to link those two, the

21  arrest to a docket entry?

22      A.   We would actually call the jail to see

23  what happened with these charges, because he was

24  fingerprinted here in 2016 for the one year on that

25  docket number, but it doesn't say for this arrest.

1    So even though he's got a one-year hard labor

2    sentence showing for this docket here, we don't

3    know when he committed it, which one of these

4    crimes in this criminal history is for this.  So we

5    would have to call, and, usually, that's done at

6    release time, because we know he's got a one-year

7    sentence.  Just don't know when, you know, but we'd

8    start clearing this to see if he got additional

9    sentences for all these crimes that's on this

10   criminal history, that we may have to hold him and

11   get new paperwork for on it.

12        Q.   So if you wanted to figure out whether

13   Mr. Grant was being held on an old charge or a new

14   one, another way to do it would be to look at this

15   criminal history and call the jail about these

16   entries?

17        A.   All of the entries, correct.

18        Q.   Or you could look up on Docket Master his

19   name to pull these up as well, correct?

20        A.   But it only gives this one charge, so we

21   wouldn't know what happened to all of these others.

22        Q.   But it could be matched through Docket

23   Master?  You could link the case to the arrest?

24        A.   No.  This doesn't show.  That would be

25   putting us making -- saying that is the only arrest

```
 1    he had on that day.  We don't do that, because we
 2    don't know how many times, what charges, or if
 3    Orleans even fingerprinted him for the rest or any
 4    parish.  We let them tell us, because they have the
 5    records.  They're the ones who did this.  What
 6    these were for, what cases they fall under instead
 7    of us trying to match them up.
 8         Q.   Anything else you think I should know
 9    about what happened with Mr. Grant?
10         A.   Not that I can think of.  That pretty
11    much --
12              MR. MOST:
13                   Phyllis, would you like to ask any
14                questions?
15              MS. GLAZER:
16                   No.
17              MR. MOST:
18                   The sheriff's office was noticed
19                about this deposition but did not show
20                up, so I'll note that they are not in
21                the room.  Of course, they're not going
22                to be asking any questions.
23              MS. GLAZER:
24                   Did you get a response from Blake?
25              MR. MOST:
```

1              Oh, yes.  I texted Blake Arcuri at

2       11:09.  I texted him that we're going

3       to start the DOC depo, unless y'all are

4       nearly here, and he responded, "Start

5       without us."

6            [End of deposition, 2:05.]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    WITNESS CERTIFICATE

 2

 3

 4

 5              I, ANGELA GRIFFIN, have read or have

 6   had the foregoing testimony read to me pursuant to

 7   Rule 30(e) of the Federal Rules of Civil Procedure

 8   and do hereby certify that to the best of my

 9   ability and understanding, it is a true and correct

10   transcription of my testimony.

11

12

13   Please check one:

14   _____Without corrections

15

16

17   _____With corrections (see errata sheet)

18

19

20   _____    _____

21   ANGELA GRIFFIN              Date

22

23

24

25
```

                      C E R T I F I C A T E


              This certification is valid only for
a transcript accompanied by my original signature
and original required seal on this page.

              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
as the officer before whom this testimony was
taken, do hereby certify that ANGELA GRIFFIN, after
having been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth in
the foregoing 123 pages;

              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
or under my personal direction and supervision, and
is a true and correct transcript to the best of my
ability and understanding;

              That the transcript has been
prepared in compliance with transcript format
guidelines required by statute or by rules of the
board, that I have acted in compliance with the
prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
and in rules and advisory opinions of the board;

              That I am not related to Counsel or
to the parties herein, nor am I otherwise
interested in the outcome of this matter.




_____
Sandra P. DiFebbo,
Certified Shorthand Reporter

Date:  _____