UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RODNEY GRANT,                          CASE NO.

      Plaintiff,                    17-cv-2797-NJB-DMD

VERSUS


MARLIN GUSMAN, et al.,

      Defendants.




      30(b)(6) DEPOSITION OF THE DEPARTMENT OF
PUBLIC SAFETY & CORRECTIONS, through its designated
representative, ANGELA GRIFFIN, given in the
above-entitled cause, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, at the Department of Corrections, 504
Mayflower Street Baton Rouge, Louisiana, on the
10th day of January, 2020.

```
 1    APPEARANCES:

 2

 3              LAW OFFICE OF WILLIAM MOST, L.L.C.
                BY:  WILLIAM MOST,
 4              ATTORNEY AT LAW
                201 St. Charles Avenue
 5              Suite 114-101
                New Orleans, Louisiana  70170
 6              Representing the Plaintiff

 7

 8
                LOUISIANA DEPARTMENT OF JUSTICE
 9              OFFICE OF THE ATTORNEY GENERAL
                LITIGATION DIVISION, CIVIL RIGHTS SECTION
10              BY:  PHYLLIS GLAZER,
                ATTORNEY AT LAW
11              1885 N. Third Street
                Fourth Floor
12              Baton Rouge, Louisiana  70802
                Representing the State of Louisiana,
13              Department of Corrections

14

15    Reported By:

16

17              Sandra P. DiFebbo
                Certified Shorthand Reporter
18              State of Louisiana

19

20

21

22

23

24

25
```

E X A M I N A T I O N         I N D E X

Page

BY MR. MOST:                    5


E X H I B I T          I N D E X

                Page

Exhibit 1                       11
Exhibit 2                       12
Exhibit 3                       18
Exhibit 4                       42
Exhibit 5                       43
Exhibit 6                       60
Exhibit 7                       65
Exhibit 8                       69
Exhibit 9                       81
Exhibit 10                      84
Exhibit 11                      86
Exhibit 12                      88
Exhibit 13                      107
Exhibit 14                      108
Exhibit 15                      118

1                S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of THE DEPARTMENT OF PUBLIC SAFETY &

6    CORRECTIONS, through its designated representative,

7    ANGELA GRIFFIN is hereby being taken pursuant to

8    the Federal Rules of Civil Procedure for all

9    purposes in accordance with law;

10              That the formalities of reading and

11   signing are specifically reserved;

12              That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived.

15              That all objections, save those as to

16   the form of the question and responsiveness of the

17   answer are hereby reserved until such time as this

18   deposition or any part thereof is used or sought to

19   be used in evidence.

20                     * * * * *

21              Sandra P. DiFebbo, Certified Shorthand

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the

24   witness.

25

```
 1          ANGELA GRIFFIN, 504 Mayflower Street,
 2      Baton Rouge, Louisiana, 70802, having been
 3      first duly sworn, was examined and testified on
 4      her oath as follows:
 5  EXAMINATION BY MR. MOST:
 6      Q.   Would you state your name for the record,
 7  please.
 8      A.   Angela Griffin.
 9      Q.   Good morning, Angela.
10      A.   Good morning.
11      Q.   Do you mind if I call you Angela?  I will
12  also call you Ms. Griffin, if that is your
13  preference.
14      A.   No.  Angela is fine.
15          MR. MOST:
16              Phyllis, can we stipulate that this
17           deposition was properly noticed, and
18            the court reporter is duly qualified?
19          MS. GLAZER:
20              Yes.
21          MR. MOST:
22              Thank you.
23  BY MR. MOST:
24      Q.   So, Angela, I'm William Most.  We've met
25  before.  I am the attorney for Rodney Grant.  Are
```

1  you familiar with the case of Grant v. Gusman?
2  Just that it is a case?
3       A.   Yes.
4       Q.   I believe you testified as a 30(b)(6)
5  witness previously in this case, correct?
6       A.   Yes.
7            MS. GLAZER:
8                 Wait.  In this case?
9            MR. MOST:
10                Yes.  We did those big picture
11             depositions that was for five different
12             cases.  She was one of the witnesses.
13            MS. GLAZER:
14                Let's clarify it wasn't this --
15             Yeah, all right.
16  BY MR. MOST:
17       Q.   To clarify, you were a 30(b)6 witness in
18  a deposition that covered this case and several
19  others, correct?
20       A.   Yes.
21       Q.   You realize you are under oath today?
22       A.   Yes.
23       Q.   And that your answers here today have the
24  same force as if we were in a courtroom with a
25  judge and jury?

```
1          A.    Yes.
2          Q.    Is there anything that would prevent you
3    from giving me your full attention today?
4          A.    No.
5          Q.    Are you taking any medications or
6    suffering from any illness that would prevent you
7    from understanding my questions or answering them
8    fully and truthfully?
9          A.    No.
10         Q.    Anything else that prevents you from
11   giving me complete, accurate, truthful answers?
12         A.    No.
13         Q.    And we've been through this before, but
14   if you need to take a break at any time for work
15   related reasons or to use the restroom, smoke
16   break, copy break, let me know, and we'll do that.
17         A.    Okay.
18         Q.    You are already excellent at this I know,
19   but if I ask a question, please let me finish the
20   question before you answer.  I'll do the same to
21   you.  I'll try to wait for you to finish answering
22   the question before I ask the next one.  Does that
23   sound good?
24         A.    Okay.
25         Q.    If you don't understand one of my
```

1   questions, would you agree to let me know that you

2   don't understand so that I can rephrase rather than

3   answering?

4        A.   Okay.

5        Q.   We're here today for Rodney Grant versus

6   Gusman.  That case, correct?

7        A.   Correct.

8        Q.   And you understand that today you are the

9   witness designated to speak for the Department of

10  Public Safety & Corrections, correct?

11       A.   Yes.

12       Q.   I may say today the department, the DOC,

13  or the Department of Public Safety & Corrections.

14  By those phrases, I mean all the same thing.  Will

15  you understand that?

16       A.   Yes.

17       Q.   You understand those terms all to refer

18  to the same thing?

19       A.   Yes.

20       Q.   So today you are made available to

21  represent the knowledge of the Department of

22  Corrections, right?

23       A.   Yes.

24       Q.   So when I ask the question, I may say

25  you, but I'm really asking the question of the

```
1    Department of Corrections.  Agreed?
2         A.   Agreed.
3         Q.   When you give an answer, you are giving
4    the answer of the Department of Corrections,
5    agreed?
6         A.   Right.
7         Q.   Unlike a normal deposition, generally, I
8    don't know won't be a sufficient answer today,
9    because the DOC has an obligation to produce
10   someone who does know.  Agreed?
11        A.   Agree.
12        Q.   When did you start preparing for this
13   deposition?
14        A.   For the deposition today, I'm trying to
15   think.  It was day before yesterday or -- I met
16   with Phyllis.
17             THE WITNESS:
18                  What day did you come?
19             MS. GLAZER:
20                  Wednesday.
21             THE WITNESS:
22                  I knew about the case and working on
23                it it's been a while, since the other
24                -- all the bulk cases.  I don't know
25                when that date is.
```

```
 1   BY MR. MOST:
 2       Q.   Sure.  So for this deposition, the topics
 3   specific to this deposition, you started preparing
 4   on Wednesday of this week?
 5       A.   Correct.
 6       Q.   Approximately how much time did you spend
 7   preparing for this deposition?
 8       A.   About an hour and a half, I guess, going
 9   over it and looking at what happened.
10       Q.   Who was there when you prepared?
11       A.   Phyllis.
12           MS. GLAZER:
13               And Beau was over the phone.
14           THE WITNESS:
15               And Beau on the phone.
16   BY MR. MOST:
17       Q.   I'm not going to ask you to tell me
18   anything about what you discussed with them, but
19   what documents did you look at to prepare for this
20   deposition?
21       A.   The offender's complete file.
22       Q.   By the offender, you mean Rodney Grant?
23       A.   Yes.
24       Q.   Did you look over any documents that you
25   have not provided me here today?
```

```
 1          A.    Other than the deposition questions.

 2          Q.    The Notice of Deposition?

 3          A.    Right.

 4          Q.    Part of the packet you provided me today

 5    is some typewritten notes that says "Draft" on it.

 6    Are these your notes that you prepared for today's

 7    deposition?

 8          A.    These are the notes I prepared while

 9    going through Rodney Grant's file.

10          Q.    This week?

11          A.    Correct.

12          Q.    Did you have any other notes, perhaps

13    handwritten notes, besides these ones you provided

14    here?

15          A.    If I did, it just was the same thing, but

16    I just retyped them to better read them.

17          Q.    So if there were handwritten notes, they

18    would reflect what is typewritten here, the same

19    information?

20          A.    Correct.

21          Q.    Let's label this Exhibit 1.

22          MS. GLAZER:

23              Do you want to attach that to the

24          deposition?

25          MR. MOST:
```

```
1                    Yeah.  Is that all right with you?
2            MS. GLAZER:
3                    No, that's fine.  I just want to
4              make sure you attach it.
5            MR. MOST:
6                    Exhibit 1 will be attached to the
7              deposition.
8            MS. GLAZER:
9                    Just for the record, that is the
10             typewritten notes that Angela prepared
11             ahead of today's deposition.
12           MR. MOST:
13                   Right.  I'll probably take a minute
14             in a few moments to read through this
15             carefully just so we're on the same
16             page.
17   BY MR. MOST:
18       Q.   So the next thing we're going to look at
19   is the notice of today's deposition, which I'm
20   going to mark as Exhibit 2 and attach to the
21   deposition.  Do you recognize this document?
22       A.   Yes.
23       Q.   Have you taken a look at this document in
24   the past?
25       A.   Yes.
```

1       Q.    So I'm going to look at each of these

2   topics.   Today we've agreed that we're only going

3   to cover Topics 1 through 6, and 7 through 12 will

4   be handled at a subsequent deposition.   So we'll

5   just look through Topics 1 through 6.   For Topic

6   Number 1, are you prepared to testify today about

7   this topic?

8       A.    Yes.

9       Q.    My understanding is you are prepared

10  today to talk about all the steps that DOC took

11  regarding Rodney Grant in 2016, correct?

12      A.    Correct.

13      Q.    Other than what we've already discussed,

14  did you look at any documents or consult with

15  anyone in preparation for this topic?

16      A.    In the past, other than in the past when

17  we did the big bulk, we did try and find out if

18  anybody had any e-mails, anything to do with these

19  cases, which was turned over to the -- I think

20  there is one in there.   Back in the past but not

21  going over it this week for this deposition.

22      Q.    Great.   Topic Number 2 is, "All steps

23  taken by any DOC personnel with regard to the post-

24  sentence obtaining of records regarding Rodney

25  Grant from the clerk of court."   Are you prepared

1    to testify today about this topic?

2         A.    I am.

3         Q.    Other than the documents you provided,

4    did you look at any documents or talk to anybody

5    this week to prepare for this topic?

6         A.    No.

7         Q.    Topic Number 3 is, "Any communications

8    between any DOC personnel and OPSO or Judge Buras

9    regarding Rodney Grant."  I'll pause there for a

10   second to say OPSO, do you understand that to refer

11   to the Orleans Parish Sheriff's Office?

12        A.    Yes.

13        Q.    Today I may say the sheriff or the

14   Orleans Sheriff or OPSO.  I'll mean all the same

15   thing.  Do you understand that I mean all the same

16   thing?

17        A.    Yes.

18        Q.    Are you prepared today to talk about this

19   Topic Number 3?

20        A.    Yes.

21        Q.    Other than what you've provided, did you

22   look at any documents or talk to anybody, other

23   than your lawyers, this week about this topic?

24        A.    No.

25        Q.    Topic Number 4 is, "Any reasons why OPSO

```
 1    cannot or does not take a person sentenced to DOC
 2    time and immediately deliver them to DOC custody
 3    after sentencing."  Are you prepared today to
 4    testify about this topic?
 5         A.   Yes.
 6         Q.   Other than what you've provided, did you
 7    look at any documents or talk to anyone other than
 8    your lawyers this week to prepare for this topic?
 9         A.   No.
10         Q.   Topic Number 5 is, "Any reasons why OPSO
11    cannot conduct its own time computation of persons
12    sentenced to the custody of the DOC."  Are you
13    prepared to testify today about this topic?
14         A.   Yes.
15         Q.   Did you look at any documents, other than
16    what you've provided, or talk to anyone, other than
17    your lawyers, this week about this topic?
18         A.   No.
19         Q.   The last one is Number 6, "Any reasons
20    why OPSO cannot release a person sentenced to the
21    custody of the DOC if OPSO knows that person's
22    sentence is complete." Are you prepared today to
23    talk about that topic?
24         A.   Yes.
25         Q.   Did you look at any documents, other than
```

```
 1   what you provided here today, or talk to anyone,

 2   other than your lawyers, to prepare this week for

 3   this topic?

 4        A.   No.

 5        Q.   Great.  Okay.

 6             MR. MOST:

 7                  Off the record.

 8             {BRIEF RECESS}.

 9   BY MR. MOST:

10        Q.   I am going through this.  "Pulled

11   criminal history, (LA, CCH & FBI)."  Is that

12   document -- is that one of the ones in here?

13        A.   Yes.

14        Q.   Is it that one?

15        A.   Correct.

16        Q.   Are you going to know who wrote these

17   handwritten notes?

18        A.   No.

19             MR. MOST:

20                  Would we be able to find out today,

21               get someone here to say whose

22               handwriting that might be?

23             MS. GLAZER:

24                  No.

25             MR. MOST:
```

```
 1              Okay.
 2         MS. GLAZER:
 3              We might be able to find out whose
 4           handwriting it is, but I'm not bringing
 5           somebody into the deposition.  Let's
 6           just be clear.
 7         MR. MOST:
 8              That's fine.
 9         MS. GLAZER:
10              Because what you said was can we get
11           somebody in here today to say, and the
12           answer to that question is no.
13         MR. MOST:
14              Oh, yeah.
15         MS. GLAZER:
16              Angela is the only deponent today,
17           but can we maybe find out?  Maybe,
18           possibly, yeah.
19         MR. MOST:
20              Yeah.  It just would be helpful to
21           know who wrote this and when they wrote
22           it, because I think that's part of the
23           timeline.  So if you want to take a
24           break and ask someone.  Maybe it will
25           take a little but while we are doing
```

```
1                    other things, to figure that out,
2                    that's fine with me.  Do you want to
3                    take a break to do that?
4              MS. GLAZER:
5                    Do you want us to do this each time?
6                    Is there a way you can find out who
7                    signed that?
8              THE WITNESS:
9                    We're just going to be speculating,
10                   asking other employees, because this is
11                   from 2016.  Our turnover rate is so
12                   great that it's going to be a guess
13                   that another employee is going to say,
14                   well, that looks like so and so's.
15       BY MR. MOST:
16            Q.   Is Janille Townsel here?
17            A.   No.  She left in 2016.  I don't know if
18       we want to speculate just somebody guessing whose
19       it is.  I don't want to --
20            Q.   If we can't figure it out, we can't
21       figure it out.  I'm going to mark this document as
22       Exhibit 3 and attach it to the deposition record.
23       This document that I marked as Exhibit 3 is what
24       you've got here in the notes as the Criminal
25       History (LA CCH & FBI); is that right?
```

1       A.   Yes.

2       Q.   So the DOC got this on July 7, 2016?

3       A.   We actually pull it ourselves, yeah.

4       Q.   So the DOC has direct access to this

5   database?

6       A.   Correct.

7       Q.   It says here, "Requested by Danna Lawton

8   or Deanna?

9       A.   Deanna Lawton.

10      Q.   Is she someone here at the DOC?

11      A.   She works here at the DOC.

12      Q.   Is she the person who pulled this?

13      A.   She pulled it, right.

14      Q.   Angela, one thing you mention in your

15   notes, and maybe I've heard it before, but it

16   doesn't sound familiar to me, is the Oracle File

17   Capture System.  What is that?

18      A.   That's where we scan all of the

19   offenders' files.

20      Q.   So that's a computer system where you

21   store scanned versions of paper files?

22      A.   Correct.

23      Q.   Are all of the paper files in PreClass

24   for time comp scanned into this system?

25      A.   Not all files.  We started in 2013 with

1    initial, so those will be in any -- it's just

2    different ones on parole violators, and older files

3    are not, so, no, not all files are scanned.

4         Q.   For, say, 2019, would all those files be

5    scanned or most of them?

6         A.   Yes.

7         Q.   All of them?

8         A.   All of them.

9         Q.   Do you know what OCR is?  It is also

10   called Optical Character Recognition. It's when you

11   scan something, the computer sometimes looks at the

12   paper and turns what's on the page into text that

13   you can highlight and copy.  Do you know if the

14   Oracle system does that?

15        A.   I don't know, yeah.

16        Q.   That's fine.  So Angela, what is your job

17   here at the DOC?

18        A.   I oversee the PreClass Department.  I

19   oversee the managers of the PreClass Department

20   that handles -- that oversees the department that

21   does time comp and initial cases and any

22   convictions to DOC.

23        Q.   PreClass is the department that receives

24   documents as inmates are sentenced to the custody

25   of the Department of Corrections, processes them,

```
 1    calculates their time, and distributes them around
 2    the Department of Corrections system; is that
 3    right?
 4         A.   Correct.
 5         Q.   So you are the top person in that
 6    department?
 7         A.   Correct.
 8         Q.   This is something not personal to you.  I
 9    ask this of everyone.  Have you ever been arrested?
10         A.   No.
11         Q.   So we're going to get into the step by
12    step of what happened to Rodney Grant, but,
13    initially, I want to ask some background questions.
14    Part of the DOC's job is to protect the
15    constitutional rights of the person sentenced to
16    the custody of the DOC, right?
17              MS. GLAZER:
18                   Objection.  Calls for a legal
19              conclusion.  This is outside the scope
20              of the deposition notice.
21    BY MR. MOST:
22         Q.   Okay.  You can answer.
23              MS. GLAZER:
24                   No.  This is outside the scope of
25              the deposition.  Which part of this --
```

1      which part of -- which deposition

2      topic, 1 through 6, pertains to the

3      DOC's general obligations with regard

4      to the constitutional rights of

5      offenders in its custody?

6   MR. MOST:

7          It is not proper, however, for

8      counsel to instruct a witness not to

9      answer a question merely because it

10     isn't about the designated deposition

11     topics.

12         To the contrary, deposing attorney

13     ordinarily may question a 30(b)(6)

14     deponent as broadly as any other

15     deponent, see, e.g., King v. Pratt &

16     Whitney, 161 F.R.D. 475. in cite 476

17     Southern District of Florida 1986.

18     However, a 30(b)(6) witness' answers to

19     questions beyond the scope of the

20     30(b)6 topic will not bind the

21     corporation.  Instead, they are treated

22     as the witness' individual answers

23     only, see, e.g., Washburg v. New York

24     State Department of Education 567 F.2nd

25     513, 521 Southern District of New York,

1          2008.

2               Are you going to continue to

3          instruct the deponent not to answer?

4     MS. GLAZER:

5               With that stipulation, based on a

6          Southern District of Florida case, even

7          though we're in Louisiana, any answers

8          you give, to which I object as being

9          outside the scope of the 30(b)(6)

10         deposition topics that are on this

11         notice, are going to be answers of

12         yours personally and not answers on

13         behalf of the department.

14              So answer to the extent that you are

15         able to.

16    MR. MOST:

17              To be clear, I'm not stipulating to

18         anything.  I am just offering the state

19         of the law as I understand it.  Agreed?

20    MS. GLAZER:

21              I don't know what you understand or

22         what your -- I understand that you are

23         not stipulating to anything.

24    MR. MOST:

25              Right.  Okay. Let's see.  I'll

```
 1                  restate the question, and you can just
 2                  say same objection or whatever you want
 3                  to.
 4  BY MR. MOST:
 5       Q.   Angela, part of the job of the DOC is  to
 6  protect the constitutional rights of all the people
 7  sentenced to the custody of the DOC, correct?
 8            MS. GLAZER:
 9                  I object to that question on the
10                  grounds that it is outside the scope of
11                  the 30(b)(6) deposition, outside the
12                  scope of Miss Griffin's designation as
13                  a department representative.  Any
14                  answer she is able to give is her own.
15            THE WITNESS:
16                  I'm not sure about constitutional
17                  rights for the offender.
18  BY MR. MOST:
19       Q.   Ms. Griffin, do you agree that no
20  individual can be held in jail or prison in the
21  absence of legal authority to keep them there?
22            MS. GLAZER:
23                  Objection.  It calls for a legal
24                  conclusion, and I repeat the previous
25                  objection.
```

```
 1              THE WITNESS:
 2                   Again, I'm not sure of the legal
 3              part of that.
 4  BY MR. MOST:
 5      Q.   Do you agree that an incarcerated person
 6  has a right not to be in prison beyond the term of
 7  their sentence?
 8              MS. GLAZER:
 9                   I object.  It calls for a legal
10              conclusion.  I restate the previous
11              objections.
12              THE WITNESS:
13                   And my answer would be that that's
14              such a broad question that it would
15              depend on what each situation would be
16              would be a different answer.
17  BY MR. MOST:
18      Q.   What situations would there be where
19  someone would not have the right not to be in
20  prison beyond the term of their sentence?
21              MS. GLAZER:
22                   Objection.  Calls for a legal
23              conclusion, outside the scope of the
24              deposition topics.  I'm getting really
25              frustrated here.  There are six
```

```
 1                 deposition topics here.  This is a
 2                 harassment and waste of time, in
 3                 addition to the fact that you've
 4                 already, as you've stated on the record
 5                 here, taken a 30(b)(6) deposition of
 6                 the department.
 7                     If you want the department's answers
 8                 to these questions, those should have
 9                 been a topic for which a proper
10                 designee could be made.  Feel free to
11                 continue, but I'm, for the record,
12                 stating that this is starting to be
13                 harassment and a waste of time.
14             MR. MOST:
15                 Okay.
16     BY MR. MOST:
17         Q.   You want me to restate the question?
18         A.   Yes.
19         Q.   What situations would there be where an
20     incarcerated person does not have the right to not
21     be in prison beyond the term of their sentence?
22         A.   I would really need to look into some
23     things to give an answer.  I can't answer that just
24     right off.
25         Q.   You don't know any off the top of your
```

1  head?

2       A.   Yeah.  If an inmate is not DNA'd, he

3  cannot be released no matter if he has completed

4  his sentence.  That's one of them.  He has no DNA

5  done.

6       Q.   Are there any others?

7       A.   Not right off the top of my head.

8       Q.   So it sounds to me like you are saying

9  once someone's sentence is complete, there are

10  still some administrative tasks that need to be

11  completed, like DNA, before that person is

12  released; is that right?

13       A.   Correct.

14       Q.   But there would not be any reason to hold

15  someone for weeks or a month or years past the end

16  of their sentence, correct?

17            MS. GLAZER:

18                 Objection to form.

19            THE WITNESS:

20                 It depends on how long it takes to

21              do things that are necessary, that are

22              legally necessary.

23  BY MR. MOST:

24       Q.   Do those administrative tasks we were

25  just talking about ever take weeks or months or

1    years?

2         A.   I don't know how long they take for all

3    of them.

4         Q.   Have you ever seen those administrative

5    tasks take weeks or months or years?

6         A.   I know we've had some in the past that

7    have taken a while, but I can't tell you exactly

8    how long they've taken.

9         Q.   Let's talk about Rodney Grant.  Rodney

10   Grant, on June 30, 2016, was sentenced in Orleans

11   Criminal District Court to a sentence of one year

12   with credit for time served from 9/14/08 through

13   2015, correct?

14             MS. GLAZER:

15                  Object to form.

16   BY MR. MOST:

17        Q.   Would you like to look at his sentence?

18   I can show it to you if it's helpful to refresh.

19        A.   Can you restate the question?

20        Q.   Sure.  So you are looking at Mr. Grant's

21   sentencing order in front of you, right?

22        A.   Yes.

23        Q.   Rodney Grant, on June 30th, 2016, was

24   sentenced in Orleans Criminal District Court to a

25   one-year sentence with credit for time served from

 1    9/14/08 through 2015, correct?

 2         A.   Yes.

 3         Q.   Mr. Grant had served time in DOC custody

 4    from 2008 to 2015, correct?

 5         A.   I can't answer that as far as the dates

 6    he served in DOC custody.

 7         Q.   Would it be helpful to refresh your

 8    recollection from Request for Admission Number 1

 9    here?

10         A.   Okay.  I just do not have that sentence

11    back then, when he -- because he wasn't actually a

12    DOC offender from '08.  The paperwork -- what I can

13    look at today is just from when he became a DOC

14    offender, which is after '08.

15         Q.   So it's my understanding he served at

16    Dixon Correctional from '08 to '15.  Let's see if

17    we can find that.  This might be helpful.

18         A.   That's what I'm looking at.

19         Q.   Does this look like he was in DOC custody

20    at some point between '08 and 2015?

21         A.   It does.  It shows me from '09 to 2015.

22    That's why I'm saying I can't say from '08, because

23    I don't have anything showing me from '08, just

24    when he was convicted as a DOC offender from '09.

25         Q.   Would you agree that he spent multiple

```
 1    years in DOC custody between 2009 and 2015?
 2         A.   Yes.
 3         Q.   Definitely more than one year?
 4         A.   Correct.
 5         Q.   So Rodney Grant was sentenced to one year
 6    with credit for time served between '08 and 2015,
 7    right?
 8         A.   Correct.
 9         Q.   He had served more than one year between
10    '08 and 2015, correct?
11         A.   Correct.
12         Q.   So his sentence was complete once he was
13    sentenced, correct?
14         A.   That could be a multiple answer, because
15    credit for time served is time served on that case
16    itself.  He was actually serving on a whole nother
17    sentence at that time.  He wasn't being haled on
18    this charge at that time, so the credit for time
19    served, he wasn't serving on it.  So, originally,
20    we would not have given it -- Orleans tells us they
21    arrested him on it on June of '16.
22         Q.   Right.  You are talking about the
23    Criminal Code of Procedure, Article 880, that says
24    that an inmate is supposed to only be given credit
25    for time served for the crime they're being
```

1   sentenced for?

2        A.   At the instant offense, right.

3        Q.   But are you familiar that cases like

4   Bodeye say that --

5             MS. GLAZER:

6                  Objection.  Calls for a legal

7             conclusion.

8             MR. MOST:

9                  Wait for me to finish the question.

10            You can object.  I'm fine with you

11            objecting.  Just wait for me to finish

12            the question.

13  BY MR. MOST:

14       Q.   Are you familiar that there is cases like

15  Bodeye that say that if the judge orders credit for

16  time served, even if it's for a different case, the

17  DOC is supposed to implement that judge's order?

18            MS. GLAZER:

19                 Objection.  Calls for a legal

20            conclusion.

21            THE WITNESS:

22                 We are familiar with the Bodeye case

23            name.

24  BY MR. MOST:

25       Q.   Were you familiar with Bodeye at the time

```
 1    of -- was the DOC familiar with Bodeye at the time
 2    of Rodney Grant's sentencing?
 3         A.   I can't answer that.  I would have to
 4    look back to see when we were familiar with Bodeye.
 5         Q.   If the Bodeye case came before Rodney
 6    Grant's sentencing, would the DOC have been
 7    familiar with it?
 8         A.   I don't know if we would have been
 9    familiar with it, even if it was before.  I'm not
10    sure.
11         Q.   And I'll spell Bodeye.  It's B-O-D-E-Y-E.
12    Is that your understanding of it, too?
13         A.   Yes.
14         Q.   Rodney Grant was sentenced to one year
15    with credit for time served from '08 to 2015,
16    correct?
17              MS. GLAZER:
18                   Asked and answered.
19              THE WITNESS:
20                   Yes.
21    BY MR. MOST:
22         Q.   And he actually served for more than a
23    year within that time period, correct, on a
24    different charge?
25         A.   Okay.  Yes.
```

1      Q.   So under Bodeye, his sentence was
2   complete as of the date of sentencing, correct?
3      A.   I'm not sure at that time if Bodeye was
4   in effect or if we were processing under Bodeye at
5   that time.
6      Q.   But if Bodeye was in effect at that time,
7   his sentence would have been complete as of the
8   date of his sentencing, correct?
9            MS. GLAZER:
10               Objection.  Calls for a legal
11            conclusion.
12            THE WITNESS:
13               I really don't know how we would
14            have handled it in '16.  I can't say if
15            it was finished, even with Bodeye.
16   BY MR. MOST:
17      Q.   But if the DOC had known about Bodeye, if
18   they were using Bodeye, if they were applying
19   Bodeye, under those circumstances, Mr. Grant's
20   sentence would have been complete as of the date of
21   his sentencing, correct?
22            MS. GLAZER:
23               Calls for a legal conclusion.
24            THE WITNESS:
25               We would have given credit, the

```
 1                  credit that the judge ordered.
 2    BY MR. MOST:
 3         Q.    And the judge had ordered credit that was
 4    at least as much as his sentence, correct?
 5         A.    Correct.
 6         Q.    So if you had given -- if the DOC had
 7    given Mr. Grant the credit the judge ordered, his
 8    sentence would have been complete as soon as he was
 9    sentenced, correct?
10              MS. GLAZER:
11                   Objection.  Calls for a legal
12                conclusion.
13              THE WITNESS:
14                   Well, DOC, he would have been, as
15                soon as we processed him, due for
16                release.
17    BY MR. MOST:
18         Q.    He would have been what is called an
19    immediate release?
20         A.    Correct.
21         Q.    He would have been an immediate release
22    because as soon as the DOC looked at his paperwork
23    and processed him, they would have seen that his
24    sentence was complete as of the date of sentencing,
25    correct?
```

```
 1            MS. GLAZER:
 2                  Object to form.
 3            THE WITNESS:
 4                  We would have just seen that he was
 5               due for release the date we processed
 6               him and cleared him, did the release
 7               process.
 8    BY MR. MOST:
 9       Q.   So when you processed him, you would have
10    seen -- the DOC would have seen his sentence is
11    over, right?
12            MS. GLAZER:
13                  Objection.  Calls for speculation.
14            THE WITNESS:
15                  And we look at it.  He is due for
16               release.
17    BY MR. MOST:
18       Q.   Due for release because his sentence is
19    done, right?
20       A.   He would -- we just consider it due for
21    release.  We don't look at it sentence done or --
22    it's due for release.  We process a release, if
23    they are ready for release.
24       Q.   Well, you guys use -- the DOC uses the
25    phrase "full term date," right?
```

1      A.   Correct.

2      Q.   That's the date of which someone's

3  sentence is -- the maximum date of someone's

4  sentence.  Is that a fair characterization?

5      A.   It is the full term that -- the date we

6  are going to release him without supervision, yeah.

7      Q.   So Rodney Grant's full term date would

8  have been the date of his sentencing, if the DOC

9  applied Bodeye, correct?

10     A.   Again, it's the date we get the paperwork

11 and know he's DOC and process the case.  To us,

12 that's his full term date.  We have to know he is

13 sentenced before we can time comp him and see what

14 it would be.

15     Q.   So if I'm understanding you right, the

16 DOC doesn't try and figure out what date someone's

17 sentence was over; they just try and figure out

18 should he be released today or in the future?

19     A.   Correct, because we can't go back.

20     Q.   Because you can't go back in time and

21 release someone in the past. What date do you think

22 Rodney Grant's sentence was complete?

23     A.   To DOC, it was the date we processed his

24 time comp.  We did his time comp and released him.

25     Q.   But someone's sentence is a result of

1    what the judge orders, right?

2         A.   Yes.   The initial -- the instant offense

3    is what the judge orders, which could run into

4    other things that will make him serve on something

5    else, which the judge may not know about, doesn't

6    order it.   It could cause additional sentence, not

7    on that case.

8         Q.   So the release date might turn on when

9    the DOC calculates someone's time or does time

10   comp, but there is a date at which Rodney Grant's

11   sentence was over; would you agree with that?

12        A.   As far as when we calculated it, yes.

13        Q.   I'm just asking just generally.   Is there

14   a day that Rodney Grant's sentence was done,

15   independent of what the DOC did?

16        A.   It could have been in the future.   It

17   could have taken different turns on him.   He could

18   have owed more time on something else, depending on

19   what happened with this case, when he committed it,

20   different things, could have caused him to be a

21   parole violator, which he would have owed more time

22   on it.

23        Q.   But just looking -- you have looked at

24   Mr. Grant's file very thoroughly, correct?

25        A.   Uh-huh.

1      Q.   So standing here today, with everything

2  you know, not sort of trying to step into the past,

3  but just with everything you know, can you say what

4  day Rodney Grant's sentence was complete?

5      A.   The date we calculated it, found out

6  everything was -- he would not be a parole

7  violator, when his crime was actually committed.

8  We found that out.  That would not violate him.  We

9  calculated his time and released him on that date.

10 That's the date he was completed.

11     Q.   So your contention is that Mr. Grant's

12 sentence continued -- the judge's sentence

13 continued until the date that y'all did the final

14 time computation?

15          MS. GLAZER:

16               Object to form.

17          THE WITNESS:

18               I'm not sure what you mean by that.

19 BY MR. MOST:

20     Q.   I'm not trying to trick you.  I'm asking

21 when his sentence was complete, knowing everything,

22 and you are telling me it's the date we finished

23 processing him, right?

24     A.   Right.

25     Q.   So are you saying that someone's sentence

1    continues until the DOC finishes processing them?

2         A.   I'm saying the offender cannot be

3    released until we find out everything that he needs

4    to serve is served.

5         Q.   Understood, right, but independent of

6    when someone should be released and when they

7    should not be released, I'm just asking, when was

8    the end of his sentence?

9         A.   For DOC, it was the date we time comped

10   and released him.

11        Q.   So to the DOC, someone's sentence

12   continues until you do time comp and release him?

13   Is that what you're saying?

14        A.   It does -- it continues to the case that

15   we release him on, that case, on that docket, until

16   we get clarification what kind of credit he gets,

17   what is going to apply, if he is going to owe more

18   time.  Because if he would not have gotten all of

19   that credit, he would not have been due for

20   release.  So once we figure that out and give it to

21   him and find out he gets it, then he gets released

22   on that day.

23        Q.   Let me ask it this way.  Does the time

24   comp department calculate what the end of someone's

25   sentence is? Is that the full-term date?

1      A.   Yes.

2      Q.   The full-term date for someone who is

3  eligible for immediate release is going to be the

4  date of the time computation?

5      A.   Correct.

6      Q.   To the DOC, someone's sentence continues

7  until the date of the time computation, if that

8  person is eligible for immediate release?

9      A.   I'm not saying his sentence continues.

10  I'm saying that we cannot process it unless we have

11  everything we need, and that becomes his full-term

12  date.  So that's when we can release him, when we

13  have everything that is needed and can calculate

14  it.  It becomes his full term date to release him.

15      Q.   But you can't say what his sentence was?

16      A.   I can say what his sentence is.  I'm not

17  -- I don't want to --

18      Q.   What was his sentence?

19      A.   -- allude.  It was a one-year sentence.

20      Q.   With credit for time served?

21      A.   Correct.

22      Q.   For time that he spent in DOC custody?

23      A.   He got credit for time served and a

24  specific amount of dates.

25      Q.   Can you say when that was over? Like when

```
 1    the judge's -- what the judge ordered, the period
 2    of time that the judge ordered, when it was done.
 3    To me, it seems like the date of sentencing,
 4    because he was sentenced to one year, credit for
 5    time served, and he spent more than one year, so it
 6    seems to me that the sentence was done on the day
 7    of his sentencing, but it took longer for him to
 8    actually be calculated and released.  Would you
 9    agree with that?
10         A.   Yes.
11         Q.   Rodney Grant gets sentenced on June 30th,
12    2016.  I'll say if I say a date without the year,
13    I'm just going to mean 2016 for today.  Will you
14    understand that?
15         A.   Yes.
16         Q.   Rodney Grant was sentenced on June 30th,
17    2016.  When was the first that the DOC learned
18    about Rodney Grant and that sentencing?
19         A.   When we received PreClass paperwork,
20    partial PreClass paperwork, from Orleans Parish
21    Jail on July 7th.
22         Q.   So the sheriff, the Orleans sheriff,
23    drove over a bunch of packets on July 7th,
24    including a packet for Rodney Grant, right?
25         A.   I can't testify to that, because I'm not
```

1    sure.  I can only say that's usually what they did,

2    was driven and hand delivered, but this specific

3    one, I can't say for sure that's exactly how it

4    happened.

5        Q.   Let's look at what we'll mark as Exhibit

6    4.  Is Exhibit 4 the packet that y'all received

7    from the sheriff?

8        A.   It's part of it.

9        Q.   I see that on the second page of this

10   there is a stamp that says, "Received, July 7th,

11   2016?"

12       A.   Yes.

13       Q.   Does that stamp mean that the DOC got

14   Rodney Grant's packet from the Orleans sheriff on

15   July 7th, 2016?

16       A.   It is procedure we stamp the paperwork

17   the date it is received.

18       Q.   Would there be any circumstances in which

19   a PreClass packet might come from the Orleans

20   sheriff to the DOC and not be stamped received

21   until four or five or six days later?

22       A.   Should not be, but --

23       Q.   So if this is stamped received July 7th,

24   2016, it means it was receive that day from the

25   sheriff, correct?

1      A.   The procedure is they stamp the date they
2  received it.
3      Q.   Have you ever known there to be something
4  stamped received on a certain date, and you found
5  out later it was actually received much earlier
6  than that?
7      A.   Not that I know of.  I don't recall.
8      Q.   So this is a reliable procedure, the
9  received stamping system?
10     A.   We pretty much rely on it.
11     Q.   I'm going to mark this as Exhibit 5.
12  Exhibit 5.  I'm attaching -- all of the things I'm
13  marking as exhibits, I'm attaching to this
14  deposition.  Exhibit 5 is this a printout from
15  CAJUN about Rodney Grant?
16     A.   Yes.
17     Q.   It says, "File received date, July 7th."
18  I'm sorry, "July 8th."
19     A.   Yes.  That looks typed in, data entry.
20          MS. GLAZER:
21               Let the record reflect this is
22            highlighted.
23          MR. MOST:
24               Sure.
25          MS. GLAZER:

```
 1                    Angela, did you highlight that?
 2           THE WITNESS:
 3                    No.
 4           MR. MOST:
 5                    William Most.  I highlighted that.
 6   BY MR. MOST:
 7      Q.   So what does jail received from clerk
 8   mean?
 9      A.   This is data entry that when we receive
10   paperwork, we're entering the information in a
11   system to know what paperwork we got, that we have,
12   that we're working with, working on.  Jail received
13   from clerk is just we've received the paperwork
14   from -- well, jail received from clerk means the
15   jail received it from the clerk of court, which the
16   jail does not give us that information, so we have
17   to put a date in there.  Whatever day we're
18   actually entering information is the date they put
19   it so it will take.  Our system will work with it.
20      Q.   So that stamped received July 7th means
21   the DOC got the PreClass packet on July 7th, and
22   then it looks like someone in PreClass got it the
23   next day and entered it into the system as July
24   8th; is that right?
25      A.   Correct.
```

1     Q.   So it looks to me, and if you agree with

2  this, that this Exhibit 5 corroborates that the

3  PreClass packet was received around July 7th or 8th

4  and not a week earlier?

5     A.   Correct.

6     Q.   Do the PreClass packets come from the

7  Orleans sheriff in the morning or afternoon?

8     A.   I don't recall.

9     Q.   Mr. Grant's PreClass packet contained

10  what the DOC needed to calculate his time except

11  for the Bill of Information; is that right?

12     A.   Correct.

13     Q.   The DOC requires the sheriffs to send the

14  Bill of Information?

15     A.   Correct.

16     Q.   The PreClass packet contains Mr. Grant's

17  sentence, correct?

18     A.   Yes.

19     Q.   The DOC has in its system the time

20  Mr. Grant served between 2008 and 2015, correct?

21     A.   Meaning?

22     Q.   Yeah. I can back up.  Part of Mr. Grant's

23  sentence was that he was to receive credit for time

24  served, for time he served, between 2008 and 2015,

25  right?

1    A.    Right.

2    Q.    The DOC, as of July 7, 2019, had in its

3  computer system information about dates of more

4  than a year that Mr. Grant served in the custody of

5  the Department of Corrections, correct?

6    A.    We had from 2009, correct.

7    Q.    So the DOC had in its system that he had

8  served more than a year between 2009 and 2015 in

9  the custody of the Department of Corrections?

10    A.    On another case, correct.

11    Q.    So as of the time of receiving the

12  PreClass packet, did the DOC have the information

13  it needed to calculate Mr. Grant's release date?

14    A.    As far as on that instant offense, that

15  charge there, we had the information.  We could

16  have calculated using the jail credit letter that

17  Orleans Parish supplied, as far as on that sentence

18  only, but because it was a new felony conviction,

19  it could have revoked a parole he was on, serving

20  time on, and that's an automatic revocation, if he

21  is convicted of a new felony while on parole, if

22  the crime was committed while he was on parole.  We

23  did not have the Bill of Information to know when

24  that crime was committed, to know if that crime was

25  going to be a revocation of a parole case he has.

1      Q.   So let me make sure I understand it.  So

2   in 2016, Mr. Grant was out on parole.  Then he gets

3   sentenced in 2016.  So the DOC is thinking, for

4   whatever he is being sentenced for, it might be a

5   violation of his parole, right?

6      A.   Correct.

7      Q.   But it's not a violation of his parole if

8   it's a really old case that predates what he is on

9   parole for, correct?

10      A.   Correct.

11      Q.   And it turns out that Mr. Grant, what he

12   was sentenced for, was from a 2000 case, 16 years

13   in the past, correct?

14      A.   Correct.

15      Q.   So it was not a violation of his parole?

16      A.   Correct.

17      Q.   And the DOC needed to know it was an old

18   case so that they would see it's not a parole

19   violation?

20      A.   Correct.

21      Q.   So once the DOC found out it's an old

22   case, it's not a violation of his parole, then the

23   DOC would have everything it needed to do his time

24   computation; is that correct?

25      A.   Correct, and get authority.  And, again,

1    in 2016, I'm not sure how we were doing the back

2    dates, the credit for time served when he wasn't

3    actually serving on the crime.  I'm not sure how we

4    did it back in 2016 at this time.  Once that was

5    clarified to give him that credit, we would have

6    everything we needed, yes.

7         Q.   So if Bodeye was being applied at that

8    time, once the DOC found out that it was a sentence

9    for an older crime that was not a violation of his

10   parole, the DOC would have everything it needed to

11   do its time computation and calculate a release

12   date, correct?

13        A.   Correct.

14        Q.   So the packet comes in July 7th, 2016.

15   That same day DOC sends a directive to the Orleans

16   sheriff to transfer Mr. Grant to the DOC on July

17   12th; is that right?

18        A.   I'm not sure.  From what I looked at

19   yesterday, he didn't transfer into a DOC facility.

20   He transferred to another local level.

21        Q.   So he, Mr. Grant, wound up at the

22   detention center in Madison, correct?

23        A.   Correct.

24        Q.   So you think he might have gone straight

25   from Orleans to Madison without going through Baton

1  Rouge? Actually, let me rephrase that.  By Baton

2  Rouge I mean Elayn Hunt.

3       A.   In '16, I know we helped them out,

4  because they do not house offenders, where they

5  would meet at Hunt for pickup, but he didn't

6  actually come into DOC.  It was just a housing

7  change, so they met at Hunt instead of traveling.

8       Q.   I see.  Mr. Grant likely would have been

9  brought by the Orleans sheriff to Hunt and then

10 immediately picked up and moved up to Madison?

11      A.   Correct.

12      Q.   The DOC told the sheriff when to do that

13 bringing to --

14      A.   I'm not sure about transfers.

15      Q.   I think we got that in the written

16 discovery requests.  On July 7th, the PreClass

17 packet comes in.  The DOC started -- on July 7th,

18 the PreClass packet comes in, and the DOC started

19 calculating Mr. Grant's sentence the next day, on

20 July 8th, correct?

21      A.   We start processing his paperwork,

22 verifying it and processing to see if he would be a

23 parole violator, the different things we have to

24 look for before time comping him.

25      Q.   One of the people who did that was

50

```
 1   Janille Townsel?
 2        A.   She was involved in the parole violator
 3   part.
 4        Q.   What was Janille's job at that time?
 5        A.   She was a ARDC Correctional Specialist.
 6        Q.   Is that a person within the PreClass?
 7        A.   She is in the PreClass, correct.
 8        Q.   This will be Exhibit 6, which is
 9   correspondence between Janille Townsel at DOC
10   PreClass and Probation & Parole, correct?
11        A.   Correct.
12        Q.   So at 9:21 AM on July 8th, 2016, Janille
13   Townsel writes to Probation & Parole and says that
14   we've got a possible parole violator transferring,
15   and we didn't get his parole revocation paperwork,
16   correct?
17        A.   Correct.
18        Q.   She is trying to figure out if this guy
19   is violating his parole, correct?
20        A.   Correct.
21        Q.   Then she gets a response from Michael
22   Reese at Probation & Parole, correct?
23        A.   Correct.
24        Q.   At 10:46 AM, July 8th, 2016?
25        A.   Correct.
```

1      Q.   Mr. Reese of Probation & Parole says,

2    "This conviction is not a violation of the

3    subject's current term of supervision.  The date of

4    the offense is from 2000, which predates his date

5    of release," correct?

6      A.   Correct.

7      Q.   Mr. Reese is a supervisor at Probation &

8    Parole in New Orleans?

9      A.   I know he works at New Orleans District.

10   Yes.  His e-mail says he is a supervisor, yes.

11     Q.   So Probation & Parole is telling PreClass

12   Rodney Grant is not violating his parole, correct?

13     A.   Correct.

14     Q.   And letting PreClass know that this is an

15   old case, correct?

16     A.   Correct.

17     Q.   So at this point, once the e-mail is

18   received from Michael Reese, if we're applying

19   Bodeye, the DOC had --

20            MS. GLAZER:

21                Objection.  Go ahead.  Sorry.

22   BY MR. MOST:

23     Q.   I'll start over.  Once this e-mail is

24   received from Michael Reese, if the DOC was

25   applying Bodeye, the DOC had everything it needed

1    to calculate Mr. Grant's release date, correct?

2              MS. GLAZER:

3                    Calls for a legal conclusion.

4              THE WITNESS:

5                    We would still ask for a -- try and

6                get a Bill of Information for the

7                accurate commit date.

8    BY MR. MOST:

9        Q.    What is a commit date?

10       A.    The date he committed the crime.

11       Q.    So Mr. Reese is saying the date of the

12   offense is from 2000, right?

13       A.    Correct.

14       Q.    But you wanted to know the -- DOC would

15   want to know the specific date and month?

16       A.    We need the legal -- the Bill of

17   Information from the court showing that's the date

18   he committed it.  Probation & Parole usually uses

19   their criminal history, which could be an old case

20   back then, but he could have had a newer one

21   committed, the same crime.

22       Q.    I don't think I understand.  He could

23   have had a newer one -- committed the same --

24       A.    He is saying this offense is from 2000,

25   which predates his date of release.  The crime he

```
 1    is convicted of, the one-year sentence -- I don't
 2    remember what the crime was, but whatever the crime
 3    was, he could have had it in 2000, but he was back
 4    out on the street.  If this case was actually
 5    sentenced now was committed after he got off the --
 6    the exact same crime, he may have picked up the one
 7    that he committed in 2000, but the newer one could
 8    be now.  Have been committed after he released.  So
 9    we go by the official paperwork when he actually
10    committed the crime.  The court documents showing
11    when he committed it.
12        Q.    So what was the purpose of reaching out
13    to Agent Reese?
14        A.    To start the revocation process.  If he
15    would have been a revocation, to start it earlier.
16    To get it started.
17        Q.    It sounds like we are finding out from
18    Michael Reese in this e-mail that it's not a
19    revocation, not a violation of his parole, correct?
20        A.    Correct.  That's his interpretation.
21    Now, once we get the Bill of Information, if he was
22    incorrect, we would have sent it back to him
23    saying, no, this one was committed now.  We need to
24    start your parole revocation process.
25        Q.    So the reason why DOC didn't have all of
```

1    the information it needed as of receiving

2    Mr. Reese's e-mail is because, hypothetically,

3    Mr. Reese might be incorrect?

4         A.   I don't know. It could be incorrect, or

5    he picked up the wrong information.  The offender

6    could have a crime from back then, but the reason

7    we didn't start we didn't have the -- the Bill of

8    Information was not supplied to us with his

9    PreClass packet.

10        Q.   So you needed some document showing what

11   Mr. Reese is saying is that this is an old case

12   from 2000?

13             MS. GLAZER:

14                  Object to form.

15   BY MR. MOST:

16        Q.   Is that correct?

17        A.   Correct.  To know if he is a parole

18   violator or not.

19        Q.   Exhibit 3.  What did you call Exhibit 3?

20   What is the phrase for this?

21        A.   A CCH.  His criminal history.

22        Q.   Exhibit 3 is his criminal history.  This

23   was pulled by the DOC on July 7th, 2016, correct?

24        A.   Correct.

25        Q.   This shows the various crimes he is

1  convicted of, including the one that he is

2  sentenced for here, correct?

3         A.   It actually shows his crimes he is

4  arrested on.

5         Q.   You can't have a conviction without an

6  arrest, right?

7              MS. GLAZER:

8                   Object to form.

9              THE WITNESS:

10                  The way we look at it, we have a lot

11              of convictions that the arrest may not

12              be on here.  That can be answered

13              several ways.

14  BY MR. MOST:

15         Q.   Looking at the third page of this

16  document, we see an arrest in 2000, correct?

17         A.   Correct.

18         Q.   It says here, "Docket Number 417717?"

19         A.   Correct.

20         Q.   That matches his sentencing that is just

21  coming with the PreClass packet, correct?

22         A.   Correct.

23         Q.   So it looks like we're seeing this is an

24  old case from 2000, correct?

25         A.   Correct.  At the time that was written on

1    there.

2         Q.   So the DOC had in its possession as of

3    July 7th, 2017, paperwork corroborating what

4    Mr. Reese said, that this was an old crime from

5    2000, correct?

6         A.   No.  We had in our possession a criminal

7    history that showed an arrest in 2000, not

8    necessarily that it was the same crime that he was

9    being convicted of.

10        Q.   How do you match these crimes in this

11   criminal history report to convictions?

12        A.   We get on -- if we have all these

13   arrests, we have to call and check on all of these

14   when we are releasing someone and see what

15   happened.  With this arrest, we call the sheriff's

16   office or whoever will give us the answer, to give

17   them the arrest date and all the crimes, and they

18   have to tell us what happened to each one.

19        Q.   So if Janille Townsel wanted to check and

20   see if Mr. Reese was right, she could have called

21   the sheriff to match the criminal history she

22   received to the sentencing?

23        A.   She could have called to try and get --

24   which is procedure.  She should have called to try

25   and get a Bill of Information to show us it's --

1   the date it was committed was that sentence.

2       Q.   So she gets this e-mail from Michael

3   Reese saying it's not a violation.  She should have

4   reached out to get the Bill of Information to

5   corroborate Mr. Reese; is that right?

6       A.   Correct.

7       Q.   But she didn't do that?

8       A.   I can't say she didn't do that.  We do

9   that a lot, and we don't get -- we do contact them

10  and try and get things from them.  I can't say she

11  didn't or that she did.

12      Q.   Is there -- if she had done that, would

13  she have put it in the file?

14      A.   No, not in 2016.  I mean, the Bill of

15  Information would be in the file, not that she

16  contacted them and never got it.

17      Q.   But she definitely should have, once she

18  got this e-mail from Michael Reese, reached out to

19  the sheriff to get the Bill of Information?

20      A.   We reach out whenever we get the

21  PreClass, and it's missing paperwork.

22      Q.   Who would she reach out to?

23      A.   The sheriff's office.  We just start

24  trying to get it from different -- wherever we can.

25      Q.   You can also get it from the clerk of

```
 1   court?
 2        A.   Correct.
 3        Q.   So once Janille Townsel looked at this
 4   PreClass packet and saw there is no Bill of
 5   Information, she should have reached out to the
 6   sheriff or the clerk of court to try and get it?
 7        A.   And she could have.
 8        Q.   She might have, but you don't see any
 9   evidence to suggest she did?
10        A.   Correct.
11        Q.   What she did do is reach out to Michael
12   Reese to see if he knew whether it was a parole
13   violation?
14        A.   She was actually letting him know it was
15   a possible parole violation so they could start
16   that process, if necessary.
17        Q.   And he responded that it's not a parole
18   violation?
19        A.   Correct.
20        Q.   Michael Reese, he works for the
21   Department of Corrections; is that right?
22        A.   For the Probation & Parole Division.
23        Q.   Which is a part of the Department of
24   Corrections?
25        A.   Correct.
```

 1        Q.    So July 8th the packet has been received.
 2   It's been processed by PreClass.   Janille Townsel
 3   has reached out to Probation & Parole, and she
 4   should have reached out to the sheriff and/or clerk
 5   to get the Bill of Information.   What happened
 6   next?
 7        A.    As far as the file goes, me trying to
 8   recreate what happened, we're still waiting on that
 9   Bill of Information to come in so we know if he is
10   going to be a parole violator or what is his case.
11   So the next thing that happened was on July 25th
12   Judge Buras sent an e-mail to one of the ARDC
13   correction specialists working for PreClass, and a
14   correction supervisor asking about the case.
15        Q.    So Mr. Grant is shipped up to Madison on
16   July 12th, right?
17        A.    Yes.
18        Q.    So Janille Townsel knows that this -- she
19   has talked to Michael Reese, so she knows that this
20   is someone who is probably an immediate release,
21   but we need to get the Bill of Information to
22   confirm?
23             MS. GLAZER:
24                  Object to the form of that entire
25              question.   You are asking about what

```
 1              Janille Townsel knew and that she spoke
 2              with Michael Reese when there is no
 3              indication of that at all.  So I would
 4              respectfully request that you rephrase
 5              the question to ask what it is you
 6              actually want to ask.
 7         MR. MOST:
 8              Phyllis, I'll rephrase the question,
 9              but I would ask that we not have any
10              more speaking objections like that in
11              this deposition.
12         MS. GLAZER:
13              That's not what a speaking objection
14              is, but I'll note your response.
15    BY MR. MOST:
16         Q.   Miss Griffin, after communicating with
17    Mr. Reese and looking at the PreClass packet,
18    Janille Townsel knew that this person was likely an
19    immediate release, correct?
20         A.   No.
21         Q.   No?
22         A.   Not necessarily an immediate release.
23         Q.   Why not?
24         A.   She was basically checking to see if he
25    was a parole violator.  She was working a parole
```

1  violation packet side of it.

2          Q.   Would she have looked at his sentence?

3          A.   She may have.  I can't say if she did.

4  It was already PreClassed and given to be checked

5  for parole violation.

6          Q.   But she began the time computation,

7  correct?

8          A.   No.  The time computation is not started

9  yet, because we do not know if he is a parole

10 violator.

11         Q.   So you are saying the time computation

12 doesn't even begin until it's resolved whether

13 someone is a parole violator?

14         A.   Correct, because we are going to time

15 comp what -- his cases, his time.  A parole

16 violation would be part of his time.

17         Q.   So the DOC needed to nail down whether

18 Mr. Grant was a parole violator before they even

19 began the process of doing time computation; is

20 that right?

21         A.   Correct.

22         Q.   And so the DOC was just waiting to

23 receive a Bill of Information in order to do that;

24 is that correct?

25         A.   To find out if he is a parole violator,

1    trying to get something -- the procedure is to try

2    and get something to verify is he going to be a

3    parole violator by statute or not.

4         Q.    Janille Townsel had flagged that there

5    was missing paperwork from the PreClass packet,

6    correct?

7         A.    I'm not sure about flagged.  I'm not sure

8    what you mean by that.

9         Q.    Miss Townsel had observed that there was

10   missing paperwork from the PreClass packet; is that

11   correct?

12        A.    I can only say by reading her e-mail that

13   there is a possibility she knew that there was

14   something by saying possible parole violator,

15   because if we knew his commit date, we would know

16   he would not be possibly.  He would definitely be

17   one.  If we knew he committed it after he released.

18        Q.    She says no parole revocation paperwork

19   received.

20        A.    We don't get that in the PreClass packet.

21   That's -- the parole board sends us that packet

22   after the offender gets convicted of a new felony,

23   and they process the new felony part by using the

24   Bill of Information, seeing when he commits it.

25   They process the paper and send us to match with

1    our PreClass.

2        Q.   So the DOC wasn't going to begin

3    computing Mr. Grant's time until they received the

4    Bill of Information; is that correct?

5        A.   We would process a case if we know -- we

6    try and get that -- after a certain period of time,

7    and I'm not sure exactly how long, we would get

8    with our legal and let them make that decision,

9    what to do with it, if we cannot get it -- no way

10   -- no one will send us the information we need, we

11   go up to our legal and let them make that decision

12   what to do with the cases.

13       Q.   So with Mr. Grant, the DOC was waiting to

14   receive the Bill of Information before beginning

15   the time computation, correct?

16       A.   Correct.

17       Q.   It wouldn't have gone on forever.  You

18   are saying at some point, ultimately, we would have

19   raised it with legal?

20       A.   Correct.

21       Q.   And the DOC actually did get the Bill of

22   Information on the 26th, correct?

23       A.   Correct.

24       Q.   But they were not going to start the time

25   computation between the 7th and the 26th until they

1   got the time -- until they got the Bill of

2   Information, correct?

3       A.   Correct, because that could have changed

4   his time he actually had to serve.

5       Q.   Even though they've already been told by

6   Probation & Parole that this is not a violation of

7   parole?

8           MS. GLAZER:

9               Objection.  Asked and answered.

10          THE WITNESS:

11              And that an e-mail is not a legal

12              document for us to use to work

13              somebody's time.

14  BY MR. MOST:

15      Q.   What did the DOC do to try and get the

16  Bill of Information?

17      A.   Again, I'm not sure.  Procedure is to

18  call the jail and see if they have it, the clerk of

19  court, wherever they can get it from.  Just try and

20  order one.

21      Q.   You don't see any evidence in the file

22  that anyone reached out to the sheriff or clerk of

23  court to obtain the Bill of Information?

24      A.   In 2016, we were not making narratives to

25  the file, so there is none to know what transcribed

1    over the phone or anything for this case.

2        Q.   So on July 18th, Mr. Grant is

3    resentenced, correct? I'll put an exhibit into the

4    record.  It is going to be Exhibit 7, which I'm

5    attaching to the deposition.  Are these the minutes

6    of the court of Mr. Grant's case?

7        A.   Yes.

8        Q.   Do you see the last minute entry July

9    18th, 2016?

10        A.   Yes.

11        Q.   You see that the previous sentence was

12   vacated, and there is a new sentence, simply credit

13   for time served?

14        A.   Yes.

15        Q.   Did the DOC find out about -- this is a

16   resentencing, correct?

17        A.   Actually, it's a vacated sentence.  He is

18   no longer a DOC offender as of the 18th.

19        Q.   It says, "Sentence:  As to Count 1."

20        A.   Credit for time served.  It's not a hard

21   labor sentence.  It is just saying give him credit,

22   jail credit, and they vacated his previous

23   sentence.

24        Q.   Okay.  As of the 18th, he is not a DOC

25   inmate?

```
 1        A.   As of reading this, no.
 2        Q.   So the DOC doesn't have the legal
 3   authority to hold him as of this resentencing,
 4   correct?
 5             MS. GLAZER:
 6                  Objection.  Calls for a legal
 7               conclusion.
 8             THE WITNESS:
 9                  As far as 7/18, we're not even the
10               custodial over him anymore.  They
11               vacated his sentence.
12   BY MR. MOST:
13        Q.   So no legal authority to hold him,
14   correct?
15             MS. GLAZER:
16                  Objection.  Calls for a legal
17               conclusion.
18             THE WITNESS:
19                  We wouldn't time comp him anymore.
20               It would not be a time comp.
21   BY MR. MOST:
22        Q.   So as of the 18th, from the DOC's
23   perspective, this not our inmate?
24        A.   If we would have gotten this minute
25   entry, we would have told him he is now vacated.
```

```
 1   The judge did away with his sentence.
 2        Q.    What would happen?  He is in Madison,
 3   right?
 4        A.    Uh-huh.
 5             MS. GLAZER:
 6                  Object to form.
 7   BY MR. MOST:
 8        Q.    What would have happened?
 9             MS. GLAZER:
10                  Object to form.
11             THE WITNESS:
12                  A letter -- we would just issue a
13                letter to Madison saying his sentence
14                was vacated letting them know he is no
15                longer a DOC offender.
16   BY MR. MOST:
17        Q.    Got it.  So a Certificate of Release?
18        A.    Now, Orleans should have let Madison
19   know, because he was sentenced there and moved to
20   Madison.  I don't know if the offender went back or
21   not to court.
22        Q.    So your understanding of credit for time
23   served, it's not saying in the custody of the DOC
24   or in custody of the sheriff, right?
25        A.    No.  It's just giving him credit for time
```

```
 1   served.  He is not DOC, so there is no credit.
 2   There is no sentence anymore.
 3        Q.   He is not sentenced to anybody's custody
 4   --
 5        A.   There is no credit to give him.
 6        Q.   I spoke over you.  He is not sentenced to
 7   anyone's custody as of July 18, 2016, correct?
 8        A.   Correct.
 9        Q.   So no one should be holding him after
10   July 18, 2016, correct?
11        A.   Well, he still could -- if he was a
12   parole violator, or still a conviction, then it
13   would be Probation & Parole's decision to revoke
14   him or not, if it was committed after.  Still, it
15   runs into the date of commit.
16        Q.   So if he is not a parole violator after
17   July 18, 2016, no one should be holding him after
18   this vacated sentence, correct?
19        A.   Once it's confirmed that he is not a
20   parole violator.
21             MS. GLAZER:
22                  Objection.
23   BY MR. MOST:
24        Q.   Did the DOC find out about this
25   resentencing? I'm sorry.  Let me rephrase that,
```

```
 1    because you are saying it's not a resentencing.
 2    Did the DOC find out about this July 18th order of
 3    the court?
 4         A.   By looking through his file, what we
 5    have, no.
 6         Q.   How does the DOC find out when someone's
 7    sentence is changed?
 8         A.   The sheriff's office sends us amended
 9    minutes or resentence minutes.  Court paperwork.
10         Q.   They should do that for a change in
11    sentence like this one on July 18, 2016?
12         A.   Yes.
13         Q.   But that didn't happen?
14         A.   As far as his files goes, no.
15         Q.   That was 7.  So as of July 25th, 2016,
16    the DOC is still waiting to receive the Bill of
17    Information before beginning the time computation
18    process, correct?
19         A.   Yes.  That is when the judge notified us.
20         Q.   I'm going to mark as Exhibit 8 these
21    e-mails between the judge and the Department of
22    Corrections, correct?
23         A.   It's a part of an e-mail.
24         Q.   It's back and front.
25         A.   I'm sorry.  Yes.
```

1    Q.    I'm trying to save on paper.  So these

2  are e-mails between the judge and the Department of

3  Corrections on July 25, 2016, correct?

4    A.    Correct.

5    Q.    You have seen these before, right?

6    A.    Yes.

7    Q.    So the judge at this point has been

8  making phone calls to figure out why Rodney Grant

9  has been not released yet, correct?

10    A.    I'm not sure about phone calls.

11    Q.    The judge has been reaching out to

12  various parties to figure out why Mr. Grant has not

13  been released yet, correct?

14    A.    He sent an e-mail to one of the

15  specialists and a supervisor.

16    Q.    He was also informed by Captain Brooks in

17  Madisonville or something?

18    A.    I don't know who that is.  Yeah.

19    Q.    The judge says, "Please advise as to what

20  might be the issue with this case as the clear

21  intention of all parties when the defendant pled

22  guilty was to have this credit for time served

23  sentence result in a release," correct?

24    A.    Correct.

25    Q.    So the judge is reaching out to the DOC

1    saying, essentially, why isn't this guy out,

2    correct?

3         A.   Correct.

4         Q.   Angela Smith writes back to the judge and

5    says, "This offender's case is being held due to

6    him being a Parole case."  Miss Smith writes that,

7    correct?

8         A.   Correct.

9         Q.   By parole case, she means parole

10   violator?

11        A.   Correct.

12        Q.   But he is not a parole violator.

13        A.   At this point, she still doesn't know

14   that.

15        Q.   She means --

16        A.   A possible parole violation, correct.

17        Q.   He is being held because maybe he has

18   violated his parole?

19        A.   Correct.

20        Q.   She then says, "When we initially

21   received his paperwork, there was nothing to

22   indicate that this was an older case," right?

23        A.   Correct.

24        Q.   But, in fact, there was something to

25   indicate that there was an older case, and that is

```
 1   Mr. Reese's e-mail from Probation & Parole,
 2   correct?
 3        A.   Which is not a legal document for us to
 4   take showing us it's not a parole case.
 5             MS. GLAZER:
 6                  Object to form.
 7   BY MR. MOST:
 8        Q.   Okay, but there was something to suggest
 9   -- let me rephrase that.  There was something to
10   indicate this was an older case, correct?
11        A.   There was an e-mail suggesting that this
12   was an older case, possibly an older case.  Nothing
13   showing us that it was an actual case committed in
14   the past.
15        Q.   So what Miss Smith is saying to Judge
16   Buras is only partially accurate, correct?
17        A.   Well, I think what she is saying is she
18   is going by legally, the paperwork we actually use
19   to say if he is going to be a parole violator or
20   not. Someone telling us when he committed it.
21        Q.   A supervisor within the Department of
22   Corrections is not sufficient to tell someone?
23        A.   Not legal paperwork that we have to have
24   on file to show if an offender is a parole violator
25   or not, no.
```

1       Q.   So it says, "We do not receive Bill of

2   Information from the Orleans Sheriff's Department

3   on our offenders, we only get the Bill several

4   months later from the Clerk of Court." I'm a little

5   confused.  It says that, correct?

6       A.   Correct.

7       Q.   I'm a little confused.  She is saying we

8   don't get the Bill of Information from the sheriff

9   at that time.  You're saying, typically, the DOC

10  did get the Bill of Information from the sheriff?

11      A.   No.  We did not get the Bill of

12  Information from the sheriff.

13      Q.   For Rodney Grant?

14      A.   For Rodney Grant.  We do not get them for

15  -- Orleans Sheriff's Office does not send us Bills

16  of Informations.  We have to order them or the

17  clerk of court sends them to us months later.  We

18  will get on the phone and order to get them sooner

19  from the clerk of court.

20      Q.   So was there something missing from

21  Mr. Grant's PreClass packet that should have been

22  there?

23      A.   His Bill of Information.

24      Q.   So at that time, typically, the sheriff

25  did send Bills of Information?

1          A.    No.   Every case we get from Orleans

2     Parish is missing something, and it's the Bill of

3     Information.

4          Q.    But the sheriff is supposed to send that?

5          A.    Yes.

6          Q.    They just never did at that time?

7          A.    Correct.   They stopped sending them for

8     some reason. This one was not -- it was not in this

9     one either.

10         Q.    So the sheriff was breaking the rules

11    about what documents to send with every packet; is

12    that right?

13         A.    They didn't send us our required

14    paperwork, which is part of -- the Bill of

15    Information is part of that required paperwork.

16         Q.    So all of the sheriff's packets at that

17    time were missing required paperwork, specifically,

18    the Bill of Information?

19         A.    Correct.

20         Q.    Okay.  Did the DOC try and fix that with

21    the sheriff?

22         A.    We called pretty regular to try and get

23    them to start sending them with the packets.  We

24    still do not get them.

25         Q.    As of today?

1       A.    Correct.

2       Q.    So the packets that come in from the

3  sheriff in 2020 still don't have the Bill of

4  Information?

5       A.    When it comes from the sheriff's office.

6  We'll get that Bill of Information from the clerk

7  of court.  They send a whole different packet, so

8  we get that to get it.

9       Q.    That comes months later from the clerk of

10  court?

11       A.    It usually comes -- I think it's sooner

12  now, but it was months later.  Back then, it was

13  two, three months we'd get it.  Now, Grant, we got

14  that same month, so it leads me to believe we

15  ordered it on the phone, which we have nothing out

16  there, but to get it within that same month.  It

17  wasn't months later that we received it.

18       Q.    So if the sheriff didn't bring the Bill

19  of Information, the backup plan is to order it from

20  the clerk of court, and that takes several weeks to

21  arrive; is that right?

22       A.    Sometimes they may send it the same day,

23  maybe the next week.  It's when they can get it to

24  us.  Whoever we get on the phone, and they do it

25  and send it to us.

1      Q.   And then PreClass, in a situation like

2  Mr. Grant's, waits until they receive that before

3  starting time computation; is that right?

4      A.   To process him correctly to see what else

5  we have to do with him to do the time comp,

6  correct.

7      Q.   So waiting on the Bill of Information,

8  essentially, hits pause on the process?

9      A.   If you are a parole case on parole, and

10  you commit -- you come back in as a new conviction,

11  yes, because we have to find out if you are going

12  -- if it's going to revoke your parole that you

13  were originally serving.

14      Q.   So if someone like Mr. Grant is a

15  potential parole violator, waiting for the Bill of

16  Information hits pause on the time computation

17  process; is that right?

18      A.   Until we can get -- try and get someone

19  to send us what we need, correct.

20      Q.   Okay.  Sometimes that is days.  Sometimes

21  it is weeks, correct?

22      A.   Again, it depends on -- you know, we look

23  at it and try and keep up with all of them.  A

24  decision has to be made at some point, what do we

25  do, and, again, we go to legal and let them make

 1   that decision for us.

 2        Q.   That's if it takes more than a couple of

 3   weeks to get it?

 4        A.   It just depends on the case.  I'm not

 5   sure.  Usually, we like to not wait weeks.  Of

 6   course, if you had a 15-year sentence, we -- we

 7   will try and try and get it, because if -- and we

 8   have to go with no one will send it to us.  If we

 9   have a call from the clerk saying we are sending

10   it, we'll get that to you, we have to wait and see

11   if we get it before we can actually go up the chain

12   to try and start doing anything, because the first

13   thing they say when did he commit it, and it goes

14   right back around the circle.  So it could be a

15   week, two weeks.  It just depends on the cases.

16        Q.   When you say go to legal for help, like

17   they're not getting us this document, can you help

18   me out with this?

19        A.   Legally, what is our process, what can we

20   do with it, correct.

21        Q.   That go to legal process wasn't done with

22   Mr. Grant, was it?

23        A.   I'm not sure.  There is no notification

24   if it was or not.  I'm really not sure.

25        Q.   So July 25th the judge reaches out to the

```
1   DOC and says, why hasn't this guy been released.
2   The point of his sentence was so that he could be
3   released, right?  Immediately, correct?
4        A.   It appears that that was his point,
5   trying to see why he wasn't released.
6        Q.   So I would think at this point, you've
7   got everything.  The DOC has everything it needs to
8   know to calculate Rodney Grant's sentence, correct?
9        A.   Not yet.  We still, just by his e-mail,
10  we still don't have the Bill of Information.
11       Q.   You still need to know that it's a 2000
12  case?
13       A.   Correct.
14       Q.   Do you see in Judge Buras' e-mail that
15  says it's a 2000 case?
16       A.   Yes.
17       Q.   So you've got a supervisor from Probation
18  & Parole telling you it's a 2000 case and a judge
19  telling you it's a 2000 case, but that's not
20  enough?
21       A.   It's required paperwork that we have to
22  have, by a statute, and by reg a copy of that Bill
23  of Information.
24       Q.   Do you know what that statute is?
25       A.   Is it Article 892 maybe?
```

```
 1        Q.    I've got that.  We can take a look at it.
 2   Do you know what reg that is?
 3        A.    The PreClass reg, I believe.
 4        Q.    Yeah.  I'm not trying to trick you.  We
 5   can look at it.
 6        A.    I don't know the name of it.  I'm pretty
 7   sure it's in the PreClass.  BO218.
 8        Q.    Do you have BO218 in front of you?
 9        A.    Yes.
10        Q.    Where are you looking at BO218 that it
11   says that?
12        A.    On Page -- it starts on Page 2 and ends
13   on Page 3.
14        Q.    Where does it say that we need to have
15   the Bill of Information before we can start time
16   comp?
17        A.    Number 2, the court documentation.  Bill
18   of Information, sentencing minutes.
19        Q.    Number 2?
20        A.    It's Number 7.  On Page 3, Number 2.
21   These are -- well, 1 through 4 is the required
22   documentation.  Number 2 is the court
23   documentation, the Bill of Information, sentencing
24   minutes.
25        Q.    "If any required information is missing,
```

1   the ARDC specialist shall contact the appropriate

2   agency and request the information."  So if the DOC

3   doesn't have the documents it needs, it needs to

4   reach out and get them?

5       A.   Correct.

6       Q.   That's the DOC's policy, correct?

7       A.   Correct.

8       Q.   So DOC can't just sit back and wait; it

9   has to go out and get the documents, if it needs

10  the documents, in order to calculate someone's

11  release date, correct?

12      A.   Correct.  We attempt to get what we need

13  to calculate.

14      Q.   Even a judge telling you the information

15  won't be sufficient, if the DOC doesn't have the

16  documents in hand; is that correct?

17      A.   Correct.  That's just an e-mail him

18  saying what it was, but it's not actual legal

19  documents.

20      Q.   So then the next day the judge sends over

21  the actual Bill of Information on July 26th, 2016,

22  correct?

23      A.   Correct.  We also received it from the

24  clerk of court the same day.

25      Q.   The same day, really?

1          A.    Yes.

2          Q.    What document shows that?

3          A.    It is the one the judge gave us.  I don't

4    even know if the copy is on this file, because it

5    was a picture with his phone, but the one that is

6    in -- this is the one from the clerk.

7          Q.    Then the notation.  Let's mark that as --

8          A.    This is Angela Smith, who is the manager,

9    who, instead of stamping received, she initialed it

10   and put the date on it.

11         Q.    Okay.  That is the exhibit I'm marking as

12   Exhibit 9 and attaching to this deposition,

13   correct?

14         A.    Correct.

15         Q.    So this is signed by the clerk's office

16   on July 26th.  So the clerk's office must have

17   faxed or e-mailed it over?

18         A.    (Witness nods head.)

19              MS. GLAZER:

20                   Make sure you answer out loud.

21              THE WITNESS:

22                   Yes.

23   BY MR. MOST:

24         Q.    This is signed by the clerk's office on

25   July 26th, correct?

```
 1        A.    Yes.
 2        Q.    It's received by the DOC on the 26th,
 3   correct?
 4        A.    Correct.
 5        Q.    So the clerk must have faxed it over or
 6   e-mailed it over?
 7        A.    Correct.
 8        Q.    Would they have faxed it?
 9        A.    Sometimes they fax.  Sometimes they send
10   by e-mail.  It just depends on which person we're
11   dealing with.
12        Q.    So it's possible to get the Bill of
13   Information from the clerk's office same day,
14   generally?
15        A.    If they'll do it, yeah.  I mean, I would
16   think it's possible, yes.
17        Q.    So on the 26th, the DOC gets from both
18   the judge and the clerk of court the Bill of
19   Information, correct?
20        A.    Correct.
21        Q.    So now the DOC has everything it needs to
22   calculate Mr. Grant's release date?
23        A.    Correct.
24        Q.    And they do calculate his release date on
25   the 26th, correct?
```

```
 1        A.    Correct.
 2        Q.    And they see that he is eligible for
 3   immediate release, correct?
 4        A.    Correct.
 5              MS. GLAZER:
 6                   Do you have much more?
 7              MR. MOST:
 8                   Probably at least 30 minutes. Do you
 9                want to take a break?
10              MS. GLAZER:
11                   Yes.
12              MR. MOST:
13                   Let's go off the record.
14                   {BRIEF RECESS, 12:59-1:05}
15   BY MR. MOST:
16        Q.    We're talking about July 26, 2016, when
17   the DOC gets the Bill of Information from both the
18   judge and the clerk of court, correct?
19        A.    Correct.
20        Q.    From the judge, it came in at 10:52 AM;
21   is that right?
22        A.    It's right here.  It's attached to that
23   one.
24        Q.    From the judge, the Bill of Information
25   came in at 10:52 AM, correct?
```

1      A.   Correct.  A picture of the bill.

2      Q.   Do you know when it came in from the

3  clerk of court?

4      A.   I do not.  I just know that date it was

5  received the manager wrote on it received that

6  date.  She didn't put a time.

7      Q.   You talked a couple of times about

8  needing to have the official legal paperwork.

9  Would this image from the judge of the Bill of

10 Information be sufficient?

11     A.   We would have printed it and brought it

12 to legal to okay it, because we can see it's that

13 docket.  The dates on it, things like that.

14     Q.   Do you have any reason to think that this

15 would not be a legal or sufficient document?

16     A.   No.  We wouldn't have no reason to not

17 believe it.

18     Q.   So then marking as Exhibit 10, this is a

19 document that reflects the time computation from

20 July 26, 2016?

21     A.   Yes.

22     Q.   It says, "FTD" in the upper left.  July

23 26, 2016.

24     A.   Correct.

25     Q.   That's full-term date?

1      A.    Correct.

2      Q.    So once his time has been calculated,

3  they say his full-term date is complete as of

4  today.  He is eligible for immediate release,

5  correct?

6      A.    Correct.  He is eligible for release once

7  we clear him.

8      Q.    So except for the administrative steps,

9  he can be released as soon as the administrative

10  steps are complete, correct?

11      A.    Yes.

12      Q.    PED.  What does that stand for?

13      A.    Parole eligible.

14      Q.    What does that mean?

15      A.    He would have been eligible to be seen by

16  the parole board to be possibly released on parole

17  on that date.

18      Q.    And DS. What does that stand for?

19      A.    That I'm not sure.  It's diminution of

20  sentence.  It's his good time date.

21      Q.    So my understanding is his full-term date

22  is -- that's the end of his sentence, not taking

23  into account good time and other things, and the DS

24  is, if you calculate everything, that's the date

25  that the person is eligible for release?

1        A.    Will be released, correct.   Should be.

2        Q.    Here it's the same, because his sentence

3    is done as of this day?

4        A.    Correct.   It's the date he was time

5    comped, so it would come out to be the same as

6    that, yeah.

7        Q.    So if I'm looking at a time computation

8    sheet, and I'm looking for the date that the DOC

9    thinks someone should be released, I'm looking for

10   the DS date, correct?

11       A.    That is the date that -- yes.   DOC will

12   process the release for that day with no -- unless

13   he has other stuff that would change that date.

14       Q.    Right.   Like he commits an infraction and

15   loses some good time or something?

16       A.    Or has a new sentence out there that we

17   don't know about yet.

18       Q.    I'm going to mark this as Exhibit 11.

19   This is Mr. Grant's -- Exhibit 11 attached to this

20   deposition is Mr. Grant's time computation

21   worksheet from CAJUN; is that right?

22       A.    Yes.

23       Q.    So this is sort of the worksheet on the

24   computer that allows the time computation person to

25   compute someone's time and figure out what their

1    release date should be?

2         A.   Correct.

3         Q.   Must Serve is the days that the person

4    still must serve in incarceration, correct?

5         A.   Must Serve would be his -- I'm trying to

6    see how to -- his sentence less his good time, good

7    time rate.

8         Q.   So it's the days you've got left to spend

9    in prison?

10        A.   Right.

11        Q.   Here Mr. Grant has -- it's been input

12   that he has a sentence length of one year, correct?

13        A.   Correct.

14        Q.   And he has jail credit of 2,475 days?

15        A.   Correct.

16        Q.   And that's for all of that time he has

17   been incarcerated from 2009 to 2015?

18        A.   It was actually 2008 to 2015.

19        Q.   That's why we get a negative must serve

20   date, because his jail credit is thousands of days

21   longer than his sentence, correct?

22        A.   Correct.

23        Q.   So anyone with a negative must serve

24   number is eligible for immediate release?

25        A.   Correct.

1    Q.   But Mr. Grant was not released on the

2  26th, correct?

3    A.   Correct.

4    Q.   I'm going to mark as Exhibit 12 another

5  document from Mr. Grant's time computation from

6  July 26, 2016, correct?

7    A.   Yes.  It's his master record.

8    Q.   This one says that his DS date and his

9  full-term date are July 27th, correct?

10    A.   Correct.

11    Q.   So why is that different than what we

12  were looking at before, July 26th?

13    A.   Whenever we calculate someone's time, and

14  they're due to go home, immediately, we have to

15  clear them for release.  We pull another criminal

16  history.  We look for any detainers, warrants,

17  clear all his arrests that he has that we don't

18  know what happened to them to make sure he did not

19  get sentenced in the same parish, another

20  jurisdiction, and have another sentence out there

21  that we need to add to him so we don't release him

22  in error, and he still has another hard labor

23  sentence out there.  So we have to clear him all

24  the way through and make sure he has DNA on file.

25  If he has -- we clear any victim information.  We

1    have to send letters or call if it's immediate

2    release.  So there is things that have to happen

3    before we can actually issue a certificate to

4    release him.

5           If we do the time comp, and we don't get

6    all of that clearing in, we can't release him until

7    we get everything we need to make sure he can be

8    released.  Sometimes it does go into the evening.

9    We don't get what we need, and it may change to the

10   next day.  We work them as late as we can and try

11   and release them.  If we get him released, and the

12   jail won't release him because there is no bus

13   travel or anything, we will hold and let them

14   release the next morning and catch a bus.  So with

15   this one, I can't say positively, but clearing him

16   for release and then processing him once that's all

17   cleared.

18       Q.   How many hours does that administrative

19   process of clearing someone for release usually

20   take?

21       A.   It just depends on who we're trying to

22   call and who we're dealing with to get the -- that

23   we can call and ask, and they say, we can't give it

24   to you right now, we'll call you back, or we fax it

25   to them and get them to fill out a form saying it's

1    cleared.  He got sentenced on this or dismissed or

2    whatever, and they send it back to us.  It's just

3    we -- it could take -- some of them, if he only has

4    a few, one or two arrests, it could take --

5    sometimes it could take a few minutes.  Sometimes

6    it could take a whole day or two.  We're depending

7    on others to give us that information.

8         Q.   Does it ever take more than two days?

9         A.   I can't say positively, but probable,

10   yes.

11        Q.   How long did it take to do that for

12   Mr. Grant?

13        A.   I mean, just looking at the paperwork, it

14   took from the 25th to the 26th.  I mean the 26th to

15   the 27th.  We received everything on the 26th.  We

16   released him on the 27th, but I can't say how long

17   it took.

18        Q.   Why would -- so Miss Smith put this in as

19   full-term date July 27th, 2016 into CAJUN?

20        A.   Whenever we do not release someone, we go

21   back in and recalculate it to show that he served

22   another day, because we can't back date his

23   release.  We have to get the date that we're

24   actually -- when we're ready and have everything.

25   We have to have the date on his paper when we truly

1    releasing him.

2         Q.   So on the 26th, someone in PreClass saw

3    that he wasn't going to -- all of that wasn't going

4    to get done on the 26th, so they added one day to

5    the full-term date?

6         A.   We don't really add a date.  We just

7    transmit through the time comp.  It's going to add

8    a date, because now it's the -- this was -- if --

9    well, let me rephrase that, because if it gets to

10   late in the evening, they will, because no one

11   works that late.  Just so his date doesn't look

12   like -- and at night someone sees he should have

13   went home today and just releases him, and we

14   didn't have him cleared yet, we will modify that

15   date to the next day so it's not sitting out there,

16   and the offender did not release on that date.

17        Q.   So it looks like -- so this says amended

18   on the 26th, and they put a full-term date of the

19   27th.  So it looks like someone in PreClass at the

20   end of the day said, oh, it looks like we're not

21   going to get the administrative tasks done today.

22   We need to -- we don't want him to be released, so

23   let's add a date so we can finish it, and he can be

24   released tomorrow.  Is that what we are looking at?

25        A.   Yes, because they've changed it, knowing

1    we could not release him.  He was not going to

2    release on the 26th and trying to clear the case

3    out, his arrests.

4        Q.   Is there any reason why someone can't be

5    released, and then you have them come back to do

6    the administrative tasks?

7        A.   Because if he actually had a -- say --

8    this is just an example, not on this offender

9    himself.  Let's say he had a sex offense crime that

10   we didn't know that we find out about, and if we

11   had already released him, and then we find out he

12   has a sex offense sentence, he should not have been

13   released.  Even if he had reached his release date

14   on that, he should not have been released until we

15   do all of the paperwork, by law, on a sex offender.

16            There is different reasons.  If he wasn't

17   DNA'd, we would have to get that.  We would have to

18   pick him back up or get warrants to pick him back

19   up if they have something out there that they

20   didn't have on his file at the time this sentence

21   was complete.

22       Q.   So if someone is released too early,

23   there is a procedure for getting them back, to put

24   out warrants?

25       A.   Yeah.  We would have to get warrants and

```
 1  get them arrested, yeah.
 2       Q.   Then on July 27th, 2016, DOC finishes
 3  everything it needs to do and sends a Certificate
 4  of Release to Madison, right?
 5       A.   Correct.
 6       Q.   Madison releases him and puts him on a
 7  bus back to New Orleans, correct?
 8       A.   I'm not sure.
 9       Q.   Are there any steps that the DOC
10  employees took to ensure the timely release of
11  Rodney Grant that we have not covered yet?
12            MS. GLAZER:
13                 Object to the form of the question.
14            THE WITNESS:
15                 Again, I'm not -- I can only say
16                what I see in the record as far as --
17                you know, we didn't do narratives what
18                was done, ordered over the phone, or
19                things like that in 2016.
20  BY MR. MOST:
21       Q.   Speaking for the DOC, you don't have
22  anything to suggest that any additional steps
23  besides what we've discussed already today were
24  taken by any DOC employee to ensure the timely
25  release of Rodney Grant, correct?
```

```
 1              MS. GLAZER:
 2                   Object to the form.
 3              THE WITNESS:
 4                   I don't understand. Still, my answer
 5              would be the same.  I don't have
 6              anything showing that it was -- you
 7              know, anybody --
 8    BY MR. MOST:
 9         Q.   So you don't have any information or
10    evidence of any additional steps besides the ones
11    we've talked about today that DOC employees took to
12    ensure the timely release of Rodney Grant, correct?
13              MS. GLAZER:
14                   Object to the form.
15              THE WITNESS:
16                   We did not make narratives at that
17              time saying what we did each minute of
18              what we did with a case at that time,
19              so I can't say if they did or not.
20    BY MR. MOST:
21         Q.   I understand, but I'm just asking, you
22    don't have any evidence or documents to suggest
23    that there were any steps taken by DOC employees to
24    ensure the timely release of Rodney Grant that we
25    have not covered today, correct?
```

```
 1              MS. GLAZER:
 2                   Object to the form.
 3              THE WITNESS:
 4                   Correct.  We did not make narratives
 5           at that time.
 6   BY MR. MOST:
 7        Q.   So who at the DOC -- whose job was it at
 8   the DOC to ensure that Mr. Grant had a timely
 9   release?
10              MS. GLAZER:
11                   Object to the form.
12              THE WITNESS:
13                   PreClass has a procedure on our
14              releases, how they're handled and what
15              to do, and in case of whatever, missing
16              paperwork, what you do and how releases
17              are handled.  We have submittals that
18              are pulled and the supervisors and
19              managers check to make sure these
20              offenders are released within the
21              parameter of us getting the legal
22              paperwork that is necessary to release
23              them.
24   BY MR. MOST:
25        Q.   It sounded to me, like you testified
```

1   earlier, that it was Janille Townsel's job

2   initially to get any missing documents, correct?

3                MS. GLAZER:

4                     Object to the form.

5                THE WITNESS:

6                     No.  Janille was actually trying to

7                  get the parole packet, which is from

8                  our parole board, not from jail or

9                  anywhere else.  I'm not sure who

10                 processed it before the parole violator

11                 got it and started the parole violation

12                 part.

13  BY MR. MOST:

14       Q.   So someone at the DOC saw that the Bill

15  of Information was missing from the packet and

16  should have reached out to get it, correct?

17       A.   And could have except we didn't make

18  narratives back then to say if we did or not.

19       Q.   But it was someone's job to do that,

20  right?

21       A.   Correct.

22       Q.   Do you know whose job that was?

23       A.   Not in 2016, no.

24       Q.   How many people were there that did that

25  job? Were there a bunch of people?  Was it two

1   people?

2          A.   We have -- I'm not sure exactly how many

3   employees we had then.  I have 53 employees.

4          Q.   Fifty-three people who see a packet, see

5   if there is something missing and then --

6          A.   We get thousands of cases a month, and at

7   that point, everybody was working parish and

8   getting paperwork, and there is a process of what

9   is necessary.

10         Q.   So you can't say who should have done it

11  back then?

12         A.   No.

13         Q.   So we looked at the time computation

14  worksheet where Mr. Grant got negative 2,000

15  something days, right?

16         A.   Yes.

17         Q.   So he was getting credit for this

18  sentence for time he spent on a different charge,

19  as the judge ordered, correct?

20         A.   Correct.

21         Q.   That's the Bodeye rule that we talked

22  about earlier?

23              MS. GLAZER:

24                   Objection.

25              THE WITNESS:

```
 1                    As far as it is today.  I don't know
 2               about in 2016.
 3    BY MR. MOST:
 4         Q.   Right.  But Miss Smith actually did apply
 5    the time from that other charge to Mr. Grant, as
 6    the judge ordered, right?
 7         A.   Yes.
 8         Q.   So Miss Smith was applying the Bodeye
 9    rule to Mr. Grant, correct?
10              MS. GLAZER:
11                   Objection.
12              THE WITNESS:
13                   I don't know at that point if it was
14               considered Bodeye or not.  I don't know
15               if that was in effect at that point.
16    BY MR. MOST:
17         Q.   But Miss Smith was doing the thing where
18    if a judge orders it, you apply credit from a
19    different charge regardless, if that's what the
20    rules of criminal procedure require, correct?
21         A.   She did apply the credit that the judge
22    ordered him get.
23         Q.   That's the way the DOC understood it was
24    supposed to do things at the time of Mr. Grant's
25    time calculation?
```

1      A.   Not necessarily.  It's due to -- the
2  wording.  I don't know if she actually got with
3  legal to decide to give it.  Credit for time served
4  means he was actually serving on that sentence.
5  The jail credit letter from Orleans Parish did not
6  show he was serving on this sentence in 2008 to
7  2015, so I can't say why she gave it to him.  It
8  may have been a decision from legal that since the
9  judge ordered it and gave specific dates, which we
10 will do at some point, if they gave from this date
11 to this date, and even though the judge left out an
12 actual date in 2015, it was decided to give it to
13 him.
14     Q.   So Miss Smith was doing the thing that
15 Bodeye requires, whether it was coming from that
16 case or coming from some other directive, correct?
17          MS. GLAZER:
18              Object to the form.
19          THE WITNESS:
20              He got credit for time he spent on
21            another docket.
22 BY MR. MOST:
23     Q.   So yes?
24     A.   Yes.
25     Q.   So without getting into the question of

```
 1   whose fault it was, the judge gave an order
 2   regarding Mr. Grant that should have resulted in
 3   him being released as soon as possible, correct?
 4              MS. GLAZER:
 5                   Object to the form of the question.
 6              THE WITNESS:
 7                   He gave an order to give him credit.
 8   BY MR. MOST:
 9        Q.   And the amount of credit that the judge
10   gave was more than the sentence, correct?
11        A.   On this instant offense, yes.
12        Q.   So the judge was giving an order of more
13   credit than a sentence, and so it should have
14   resulted in immediate release, correct?
15              MS. GLAZER:
16                   Object to the form of the question.
17              THE WITNESS:
18                   Not if it would have made him a
19                parole violator.
20   BY MR. MOST:
21        Q.   But he wasn't a parole violator?
22        A.   Correct.  After we found that out.
23        Q.   So not getting into fault, who knew what,
24   Mr. Grant should have gotten out right away, if
25   everything had been done right, correct?
```

```
 1            MS. GLAZER:
 2                 Object to the form of the question.
 3            THE WITNESS:
 4                 I can't say if he would have,
 5            because it didn't happen that way, so I
 6            don't know.  I can't say he would have
 7            gotten out right away, because it
 8            didn't happen that way.  I can't
 9            speculate what would have happened had
10            something happened differently.
11   BY MR. MOST:
12       Q.   We know what the judge wanted, correct?
13       A.   We know he gave him a one-year sentence
14   and credit for time served on another sentence.
15   Again, I don't know if at that point if Bodeye was
16   in effect or was it a decision made at that point
17   just to give it to him.  I can't say backwards what
18   happened, why he got that much credit, but he did
19   on that date, and it made him an immediate release,
20   giving him all of that credit.
21       Q.   So from the DOC's perspective, Mr. Grant
22   was eligible for immediate release as soon as they
23   did his time computation; is that correct?
24       A.   Correct.
25       Q.   Topic Number 2 of the 30(b)(6) notice is,
```

1    "All steps taken by any DOC personnel with regard

2    to the post-sentence obtaining of records regarding

3    Rodney Grant from the clerk of court."  We know the

4    DOC got the Bill of Information from the clerk of

5    court, correct?

6         A.    Correct.

7         Q.    We know they got it on the 26th, correct?

8         A.    Correct.

9         Q.    But we don't know when the DOC asked for

10   it, correct?

11        A.    Correct.

12        Q.    So you don't have any information about

13   what steps DOC personnel took to obtain records

14   regarding Mr. Grant from the clerk of court?

15        A.    No.

16        Q.    The next topic is, "Any communications

17   between any DOC personnel and the sheriff's office

18   or Judge Buras regarding Rodney Grant."  I'm going

19   to break that down.  Were there any communications

20   between DOC personnel and Judge Buras regarding

21   Rodney Grant other than the e-mails we looked at

22   today?

23        A.    Not that I'm aware of or what is in his

24   file.

25        Q.    Were there any communications between DOC

1    personnel and the sheriff's office, the Orleans

2    Parish Sheriff's Office, regarding Rodney Grant

3    other than what we've looked at today?

4         A.   Not that I'm aware of.  There is nothing

5    in his file.

6         Q.   So the next topic is, "Any reasons why

7    OPSO cannot or does not conduct its own time

8    computation of persons sentenced to the custody of

9    the DOC."  So the sheriff's office generally has

10   documents before the DOC gets it, right?

11        A.   Correct.

12        Q.   So they could do their own time comp to

13   see who might be eligible for immediate release,

14   correct?

15        A.   I can't say if they could or couldn't,

16   because I don't know if they know the laws or

17   anything.  I can just speak for DOC's side why we

18   do the time computation on hard labor DOC

19   offenders.

20        Q.   But the DOC has not ordered the sheriff's

21   office, you can't do that, have they?

22        A.   Not that I'm aware of.

23        Q.   They have not -- the DOC has not told the

24   sheriff's office you shouldn't do that, have they?

25        A.   Not that I'm aware of.

1        Q.    You are speaking on behalf of the DOC,

2    right?

3        A.    Right.

4        Q.    The way things are now, and the way

5    things were in 2016, is that the sheriff sends

6    PreClass packets to the DOC, and then the DOC says,

7    bring that inmate to us on such and such a date,

8    correct?

9        A.    I'm not sure.  I can only say I have seen

10   the things where they do move them into DOC.  I

11   don't know if they move them all in or how that is

12   exactly handled.  I'm not over transfers, but we do

13   move some of them in once they -- once they e-mail

14   the paperwork, it is handled at a different

15   facility now, and they are worked and processed,

16   and then they move them in.

17       Q.    But is there anything stopping the

18   sheriff's office from just bringing people as soon

19   as they are sentenced to the DOC?

20       A.    We don't allow them to just drop them

21   off.  That's an order, because we have to know they

22   are DOC offenders.  They have to be verified that

23   they're a DOC offender and verified who the

24   offender is and things like that before they can

25   actually bring them.  It's not something where they

```
1   can just bring them in.  Once everything is
2   verified, and they are a DOC offender, then an
3   order saying, okay, now you can bring them, because
4   we verified they are DOC, but it not like -- I know
5   they can't just bring them.
6       Q.   By they are DOC meaning like a sentencing
7   order sentencing this person to the custody of the
8   Department of Corrections?
9       A.   Correct.
10      Q.   Is there any reason the sheriff's office
11  couldn't bring the person at the same time as the
12  packet with that information?
13      A.   I can't say there is a reason why they
14  couldn't.  I can give you the reason why we can't
15  do it that way.
16      Q.   Let me rephrase it.  Has the DOC ever
17  told the sheriff's office not to bring the inmate
18  along with their PreClass paperwork?
19      A.   Not that I'm aware of.  They were not
20  told that.  Usually, if they're moving them,
21  wanting to move them in today, they e-mail it to
22  us.  We update all our system, give them a DOC
23  number, and they move them in.
24      Q.   So it is possible to sometimes send the
25  paperwork over and then take the inmate from the
```

1  sheriff's office to the DOC the same day?

2      A.   It's possible.

3      Q.   That sometimes happens?

4      A.   Yes.

5      Q.   When the sheriff brings inmates sentenced

6  to the custody of the Department of Corrections

7  physically to the Department of Corrections, they

8  don't bring their paperwork along with them,

9  correct?

10     A.   No.  At this time, it's already sent in.

11 It's e-mailed in to the facility that handles them,

12 and they working them, and they have set days they

13 bring them in, so they are already processed in our

14 system when they get there.

15     Q.   I believe the Orleans sheriff's policy is

16 that they send inmates once a week on Thursdays?

17     A.   It is once a week.  I'm not positive what

18 day.

19     Q.   But that's the sheriff's policy.  The DOC

20 didn't tell them to do that, did they?

21     A.   There was probably an arrangement, when

22 can you bring them, yeah.

23     Q.   But the once a week on Thursdays thing,

24 that wasn't an order from the DOC?

25     A.   It was just an arrangement with the two.

1    Q.   Are you familiar with the Basic Jail --

2    let me back up.  The Basic Jail Guideline, are you

3    familiar with what that is?

4    A.   Somewhat I know, right.

5    Q.   Those are instructions from the DOC of

6    how sheriffs are supposed to handle inmates

7    sentenced to the custody of the DOC?

8    A.   There is -- I'm not familiar with exactly

9    what is in it, but I know it is giving them what

10   they are to have on them and different things.

11   Q.   I'm going to mark as Exhibit 13 what

12   appear to be pages from the DOC's Basic Jail

13   Guidelines.

14   A.   Yes.

15   Q.   Looking at Page 17 under Section

16   II-A-008, you see this talks about the offender's

17   case record and certain documents in that?

18   A.   Yes.

19   Q.   You see that the offender record shall be

20   transferred with the offender at such time the

21   offender is transferred to another local or DPS&C

22   facility?

23   A.   Yes.

24   Q.   So it looks to me like the sheriff's

25   office is not following this rule that they're

 1   supposed to take the records with the inmate,

 2   correct?

 3        A.   This is if a copy -- if the offender --

 4   population management is the housing of offenders,

 5   so if they transfer from parish to parish, they

 6   want them to send a file with what the offender is

 7   serving time, who he is, things like that.  I don't

 8   know if Orleans is following that or not when they

 9   transfer the offenders.  It's not the actual

10   PreClass part of it.

11        Q.   You mentioned earlier criminal code --

12   you mentioned earlier Code of Criminal Procedure

13   892, which I'm going to mark as Exhibit 14.  Is

14   this that code section you were talking about

15   before?

16        A.   Yes.

17        Q.   Did you see under C it says, "All

18   statements and documents required by this Article

19   shall physically accompany any defendant when said

20   defendant is transferred to a penal institution or

21   a mental institution or mental hospital?"

22        A.   Yes.

23        Q.   So it looks like this law requires the

24   sheriff to bring some documentation with the inmate

25   when they transfer them to a penal institution,

1    correct?

2        A.    Correct.  Yes.

3        Q.    And the sheriff doesn't do that, correct?

4        A.    I'm not sure if they bring any type of

5    paperwork when they move into the penal -- that

6    would be like when they receive them at a penal

7    institution.  The intake facility, I'm not sure

8    what paperwork they bring with the offender

9    himself.

10       Q.    When they come to Baton Rouge -- I'm

11   sorry.  When they come to Elayn Hunt for

12   processing, the sheriff doesn't send paperwork with

13   them, correct?

14       A.    I'm not sure.

15       Q.    You're not sure.  Okay.  Finally, Topic

16   6, "Any reasons why OPSO cannot release a person

17   sentenced to the custody of the DOC if OPSO knows

18   that person's sentence is complete." Generally, if

19   a jailer knows someone should be free, they should

20   release them, right?

21            MS. GLAZER:

22                Object to the form of the question.

23            THE WITNESS:

24                I can see reasons why they should

25              not release them, especially because of

```
 1                    the offenders that have other sentences
 2                    at other places that they may not know
 3                    about, as we talked earlier with other
 4                    jurisdictions, convictions that he may
 5                    have a larger sentence that he still
 6                    owes on.  Sex offender information.
 7                    DNA needs to be taken, by law, before
 8                    he releases.  That's DOC's obligation
 9                    to make sure that's carried out before
10                    he is released.
11   BY MR. MOST:
12       Q.   Generally, if you have looked at
13   everything, and you see that someone should be
14   free, they should be released, you know,
15   acknowledging that there may be some administrative
16   tasks before they physically walk out of the door,
17   correct?
18                    MS. GLAZER:
19                        Object to the form of the question.
20                    THE WITNESS:
21                        Again, once everything is cleared,
22                    and all of the information is gathered
23                    that he can be released, then we
24                    release him. We can release him.
25   BY MR. MOST:
```

```
 1        Q.   So the answer is yes?
 2        A.   Yes, after all the paperwork is received
 3   and processed, and we are sure he can be released.
 4        Q.   I'm talking now about the sheriff.  Let's
 5   say the sheriff has someone in their jail sentenced
 6   to the custody of the DOC, and the sheriff knows
 7   that this person should be free.
 8             MS. GLAZER:
 9                  Calls for speculation.  Outside the
10                  scope of -- I'm sorry.  I thought you
11                  were done.  You did stop.
12             MR. MOST:
13                  You are right.  I did pause.  I took
14                  a breath, so I don't blame you for
15                  jumping in.
16   BY MR. MOST:
17        Q.   Let's say the sheriff has someone in
18   their jail sentenced to the custody of the DOC, and
19   the sheriff knows that person's sentence is
20   complete.  They should be free.  Does the sheriff
21   have the power to let them go?
22        A.   Again, I think it's DOC's obligation to
23   clear the offender, make sure he is due for
24   release, and that all the proper notifications, all
25   the proper laws, that are needed before he is
```

```
 1    released is handled, and the Department of
 2    Corrections handle the release.
 3         Q.   Is there any reason you know of that the
 4    sheriff can't release someone they know should be
 5    free?
 6         A.   If he is a parish jail offender, he is
 7    their offender.  If he is a DOC hard labor
 8    sentence, he is actually a DOC offender.  They're
 9    just housing him for DOC.  So it's our obligation
10    to handle the release and make sure everything is
11    in order for him to be released.
12         Q.   So you don't think the sheriff can
13    release someone sentenced to the custody of the
14    DOC, even if the sheriff knows they should be free
15    until they hear word from the DOC?
16         A.   Again, I don't -- I mean, it is the DOC's
17    obligation to make sure it's carried out that he
18    serves his sentence and releases when we find out
19    everything we need to know that he can be released.
20         Q.   But has the DOC ever instructed sheriffs,
21    you can't release someone who you know to be free
22    if they are sentenced to the custody of the
23    Department of Corrections until you hear from us?
24    Has that order ever gone from the DOC to the
25    sheriff's offices?
```

```
 1              MS. GLAZER:

 2                   Object to the form.

 3              THE WITNESS:

 4                   I'm not sure if anything has gone to

 5                the sheriff's office.  We have notified

 6                them that DOC offenders will be

 7                released by the Department of

 8                Corrections, and a certificate will be

 9                issued to release him from custody.

10   BY MR. MOST:

11        Q.   But you don't know of any order from the

12   DOC to the sheriff saying you cannot release

13   someone, even if you know they should be free,

14   until you hear from us; is that correct?

15        A.   I don't know of an order.

16        Q.   Okay.  Thank you.  Let me flip through.

17   We may be at the end.  I want to double-check here.

18   So everything that happened to Mr. Grant proceeded

19   according to DOC policy, correct?

20              MS. GLAZER:

21                   Object to the form of the question.

22                It is awfully broad.  Everything that

23                happened.

24   BY MR. MOST:

25        Q.   I can rephrase it.  Did the steps that
```

1  the DOC took with regard to Mr. Grant follow DOC

2  policy?

3       A.   From what I have in his file, yes.

4       Q.   So you don't see any evidence in the file

5  that any DOC employees violated DOC policy,

6  correct?

7       A.   Correct.

8       Q.   So the actions that the people in the

9  PreClass Department took with regard to Mr. Grant

10 flowed from the DOC policies approved by Secretary

11 LeBlanc, correct?

12      A.   From what I see in his file, yes.

13      Q.   I want to ask you about a couple of

14 individuals.  Janille Townsel.  She looked at --

15 what was her role with regard to Mr. Grant?

16      A.   From looking at what is in his file, it

17 appears she was the person the paperwork was given

18 to as a parole violator, to work him as a parole

19 violator.  To figure out if he would be a parole

20 violator and work him as a parole violator.  That

21 is about as far as I got with what is in his file.

22      Q.   It was Janille Townsel's job to figure

23 out whether this new sentence of Mr. Grant violated

24 his parole, correct?

25      A.   Or if we received the parole revocation

1    paperwork and order it, correct.

2         Q.   Part of her job was to figure out whether

3    this new sentence was a violation of his parole,

4    correct?

5         A.   Yes.

6         Q.   Figuring out whether his new sentence was

7    a violation of his parole was the thing that was

8    postponing his time computation, correct?

9         A.   From what I see in here, that, and

10   possibly, and I can't say for sure, because it is

11   not noted, again, in the file that, and if he gets

12   the credit for time he served on another sentence.

13        Q.   So the things that DOC was waiting to do,

14   the time computation, was figuring out whether his

15   new sentence violated his parole, and maybe, but

16   you don't know for sure, whether he was entitled to

17   the credit for time served on a different charge,

18   correct?

19        A.   Correct.

20        Q.   So if it was clear at the time he should

21   get that credit, then the only thing that the DOC

22   was waiting to do time computation on was figuring

23   out whether this new sentence violated his parole,

24   correct?

25        A.   Correct.  At that point, the only thing

 1    we were waiting on is that bill of Information to
 2    figure that out.
 3           Q.    Kenedra Burton.  What was her role
 4    regarding Rodney Grant?
 5           A.    I really don't know if that was just that
 6    someone gave her name as a contact.  I don't see
 7    her name on anything else.
 8           Q.    She is mentioned in one of the discovery
 9    responses.
10           A.    I think she was included on one of the
11    e-mails.  I think -- again, I don't know, but
12    sometimes they just include several people they
13    know work here so someone gets it.
14           Q.    Right.  She was the person that Judge
15    Buras e-mailed, but you don't know why --
16           A.    One of the clerks may have knew her
17    because she orders stuff and just gave it to her.
18           Q.    Then Angela Smith's role was to actually
19    do the time computation?
20           A.    Angela Smith was actually a supervisor.
21    She did do the time computation.  It's not her role
22    to do it, but, obviously, she was involved trying
23    to get it going, because she, at the end, did do
24    the time -- she is the one who did the time
25    computation.

1      Q.   Kelly Weaver managed Mr. Grant's release

2  from custody?  Is that right?  You can refresh from

3  these interrogatory responses, if that is helpful.

4      A.   I think she is the one who cleared --

5  started the process clearing the release.

6      Q.   Doing the administrative tasks?

7      A.   Right.  Getting the clearances and

8  things.

9      Q.   And then what was -- I note that you are

10 also mentioned here, Angela Griffin.  What was your

11 role regarding Mr. Grant?

12     A.   I'm over the department that handles the

13 time computation.

14     Q.   You were not personally involved in

15 handling anything with regard to Mr. Grant, but you

16 are the boss of the department?

17     A.   Correct.

18     Q.   So you were only involved insofar as you

19 are responsible for the people who work under you,

20 correct?

21     A.   Correct.

22     Q.   Were you consulted about Mr. Grant's case

23 at any point?

24     A.   I can't say.  I don't remember.  I don't

25 see anything in here, but in 2016, I don't -- yeah.

1      Q.   Let me just flip through these things you

2   gave me.  So the minutes of the court, those are an

3   official legal document, correct?

4      A.   Correct.

5      Q.   Those show up in Orleans Parish on

6   something called Docket Master?

7      A.   Yes.

8      Q.   The PreClass Department can look things

9   up on Docket Master?

10      A.   We can now, and a few people could, and I

11   don't know what years it's changed where we could.

12   It was random, but now we can look it up.  I can't

13   say for sure in '16, but I'm pretty sure we had

14   access in '16.

15      Q.   So Docket Master would show whether

16   Mr. Grant's case was an old case or a new case,

17   right? Is that ambiguous?  Do you want me to

18   rephrase that?

19      A.   I'm not sure what Docket Master shows.

20      Q.   Sure.  I'm going to mark this as Exhibit

21   15 and attach it to this deposition.  Does this

22   appear to be a Docket Master printout for

23   Mr. Grant?

24      A.   Yes.

25      Q.   It shows that this is an old 2000 case?

1      A.    Yes.

2      Q.    So if PreClass had had access to Docket

3   Master in 2016, they would have been able to look

4   up and see that this was an old case?

5      A.    Yes.  We could have seen when the bill

6   was filed.

7      Q.    Would you be able to work with people in

8   your department to figure out if, in 2016, at the

9   time of Mr. Grant's sentencing, PreClass had access

10  to that Docket Master?

11     A.    I think so.

12     Q.    Going back to a document we looked at

13  early on, the criminal history, which is Exhibit 3,

14  we noted that on Page 3 someone at the DOC made

15  handwritten notations matching this 2000 arrest to

16  the Docket Master that Mr. Grant -- I'm sorry, to

17  the docket number that Mr. Grant was sentenced

18  under in 2016, correct?

19     A.    Correct.

20     Q.    What does it take to link those two, the

21  arrest to a docket entry?

22     A.    We would actually call the jail to see

23  what happened with these charges, because he was

24  fingerprinted here in 2016 for the one year on that

25  docket number, but it doesn't say for this arrest.

```
 1    So even though he's got a one-year hard labor
 2    sentence showing for this docket here, we don't
 3    know when he committed it, which one of these
 4    crimes in this criminal history is for this.  So we
 5    would have to call, and, usually, that's done at
 6    release time, because we know he's got a one-year
 7    sentence.  Just don't know when, you know, but we'd
 8    start clearing this to see if he got additional
 9    sentences for all these crimes that's on this
10    criminal history, that we may have to hold him and
11    get new paperwork for on it.
12         Q.   So if you wanted to figure out whether
13    Mr. Grant was being held on an old charge or a new
14    one, another way to do it would be to look at this
15    criminal history and call the jail about these
16    entries?
17         A.   All of the entries, correct.
18         Q.   Or you could look up on Docket Master his
19    name to pull these up as well, correct?
20         A.   But it only gives this one charge, so we
21    wouldn't know what happened to all of these others.
22         Q.   But it could be matched through Docket
23    Master?  You could link the case to the arrest?
24         A.   No.  This doesn't show.  That would be
25    putting us making -- saying that is the only arrest
```

1   he had on that day.  We don't do that, because we

2   don't know how many times, what charges, or if

3   Orleans even fingerprinted him for the rest or any

4   parish.  We let them tell us, because they have the

5   records.  They're the ones who did this.  What

6   these were for, what cases they fall under instead

7   of us trying to match them up.

8         Q.   Anything else you think I should know

9   about what happened with Mr. Grant?

10        A.   Not that I can think of.  That pretty

11  much --

12             MR. MOST:

13                  Phyllis, would you like to ask any

14             questions?

15             MS. GLAZER:

16                  No.

17             MR. MOST:

18                  The sheriff's office was noticed

19             about this deposition but did not show

20             up, so I'll note that they are not in

21             the room.  Of course, they're not going

22             to be asking any questions.

23             MS. GLAZER:

24                  Did you get a response from Blake?

25             MR. MOST:

1              Oh, yes.  I texted Blake Arcuri at

2        11:09.  I texted him that we're going

3        to start the DOC depo, unless y'all are

4        nearly here, and he responded, "Start

5        without us."

6              [End of deposition, 2:05.]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WITNESS CERTIFICATE

I, ANGELA GRIFFIN, have read or have had the foregoing testimony read to me pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and do hereby certify that to the best of my ability and understanding, it is a true and correct transcription of my testimony.

Please check one:

_____Without corrections

_____With corrections (see errata sheet)

_____          _____
ANGELA GRIFFIN                Date

```
 1              C E R T I F I C A T E

 2

 3              This certification is valid only for
    a transcript accompanied by my original signature
 4  and original required seal on this page.

 5              I, SANDRA P. DIFEBBO, Certified
    Court Reporter, in and for the State of Louisiana,
 6  as the officer before whom this testimony was
    taken, do hereby certify that ANGELA GRIFFIN, after
 7  having been duly sworn by me upon authority of R.S.
    37:2554, did testify as hereinbefore set forth in
 8  the foregoing 123 pages;

 9              That the testimony was reported by
    me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
    is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
    prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
    board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
    by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
    to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25
```