```
                 UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF LOUISIANA
DE'JUAN THOMAS,
      Plaintiff

      V.                      3:17-cv-01595-SDD-EWD

SALLY GRYDER, JAMES LEBLANC,
JERRY GOODWIN, DOES 1-10
      Defendants
_____
BRIAN McNEAL,
      Plaintiff

      V.                      No. 18-cv-00736-JWD-EWD

LOUISIANA DPS&C, et al
      Defendants
_____
ELLIS RAY HICKS,
      Plaintiff

      V.                      No. 19-108-SDD-RLB

LOUISIANA DPS&C, et al
      Defendants
_____
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
RODNEY GRANT,
      Plaintiff

      V.                      Case No.17-cv-2797-NJB-DEK

MARLIN GUSMAN, et al
      Defendants
```

1          DEPOSITION OF SECRETARY JAMES LEBLANC,

2    given in the above-entitled causes, pursuant to

3    the following stipulation, before Raynel E.

4    Schule, Certified Shorthand Reporter in and for

5    the State of Louisiana, at the Louisiana

6    Department of Public Safety and Correction, 604

7    Mayflower Street, Baton Rouge, Louisiana, 70802,

8    commencing at 10:00 o'clock a.m., on Thursday,

9    the 23rd day of May, 2019.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    I N D E X

2                                        Page

3   Caption                          1

4   Appearances                      3

5   Agreement of Counsel             4

6   Examination

7        MR. MOST                     5

8   Reporter's Certificate         108

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES:
2    For the Plaintiffs:
3    WILLIAM MOST, ESQ.
     Attorney at Law
4    201 St. Charles Avenue, Suite 114#101
     New Orleans, Louisiana   70170
5
6    For the Defendants:
7    TUNDE M. ANIMASHAUN
     Assistant Attorney General
8    Section Chief, Civil Rights
     Litigation Division
9    P.O. Box 94005
     Baton Rouge, Louisiana   70804
10
     and
11
     JAMES "GARY" EVANS
12   Assistant Attorney General
     Litigation Division
13   P.O. Box 94005
     Baton Rouge, Louisiana  70804
14
     and
15
     JEFFERY A. "BEAU" WHEELER, II
16   Assistant Attorney General
     Litigation Division
17   P.O. Box 94005
     Baton Rouge, Louisiana   70804
18
     And
19
     JONATHAN R. VINING
20   General Counsel
     Louisiana Department of Public Safety  &
21       Corrections
     P.O. Box 94304
22   Baton Rouge, Louisiana   70804
23   Also Present:  Stephen Geist
24   Reported By:  Raynel E. Schule
                   Certified Shorthand Reporter
25                 State of Louisiana
26
```

1              S T I P U L A T I O N

2              It is stipulated and agreed by and

3      among Counsel for the parties hereto that the

4      deposition of SECRETARY JAMES LEBLANC is hereby

5      being taken pursuant to the Federal Rules of

6      Civil Procedure for all purposes in accordance

7      with law;

8              That the formalities of reading and

9      signing are not specifically waived;

10             That the formalities of sealing,

11     certification, and filing are hereby

12     specifically waived.

13             That all objections, save those as to

14     the form of the question and responsiveness of

15     the answer, are hereby reserved until such time

16     as this deposition or any part thereof is used

17     or sought to be used in evidence.

18                     * * * * *

19             Raynel E. Schule, Certified

20     Shorthand Reporter in and for the State of

21     Louisiana, officiated in administering the oath

22     to the witness.

23

24

25

```
 1              SECRETARY JAMES LEBLANC, having been
 2       first duly sworn by Raynel E. Schule, was
 3       examined and testified on his oath as
 4       follows:
 5                      EXAMINATION
 6   BY MR. MOST:
 7   Q.   Good morning, Secretary.
 8   A.   Good morning.  How are you?
 9   Q.   I'm doing well, thanks.  Yeah.  My name as
10       you know is William Most.  I represent the
11       Plaintiffs in the four cases that we're
12       here for today, which is Thomas v Gryder,
13       McNeal v Louisiana Department of Public
14       Safety & Corrections, Hicks v Louisiana
15       Department of Public Safety & Corrections,
16       and Grant v Gusman.
17              MR. MOST:
18              Mr. Evans, can we stipulate that
19          the deposition was properly noticed,
20          and the court reporter is duly
21          qualified?
22              MR. EVANS:
23              We can -- we can stipulate that it
24          was properly noticed; however, for the
25          -- for the document requests other than
```

```
 1              the emails, I'll just note the -- the
 2              Rule that -- that it has to be a formal
 3              30 -- Rule 34 request just -- just in
 4              case that comes up.
 5                   MR. MOST:
 6                   Sure.  Great.
 7                   MR. EVANS:
 8                   But other than that, yes.
 9                   MR. MOST:
10                   Thank you.
11    BY MR. MOST:
12    Q.   Secretary, would you give me your name and
13         title, please.
14    A.   It's Jimmy LeBlanc.  James LeBlanc is my
15         official name, but I go by Jimmy LeBlanc,
16         and my title is Secretary of the Department
17         of Public Safety & Corrections.
18    Q.   And I strongly suspect you've given a
19         deposition before?
20    A.   I have.
21    Q.   All right.  Approximately how many would
22         you just ballpark estimate?
23    A.   I would say in the neighborhood of 20 to 25
24         depositions over my career.
25    Q.   So you understand that you're under oath
```

```
1        today?
2    A.   I do.
3    Q.   That your answers here have the same force
4         as if we're in a courtroom with a Judge and
5         Jury?
6    A.   I do.
7    Q.   Is there anything that would prevent you
8         from giving me your full attention today?
9    A.   No.
10   Q.   Are you taking any medications, suffering
11        from any illness that would prevent you
12        from understanding my questions or
13        answering them fully?
14   A.   No.
15   Q.   If you need to take a break at any point,
16        just let me know --
17   A.   Okay.
18   Q.   -- let your counsel know.  We'll do that.
19   A.   All right.
20   Q.   If you have to go to the GOHSEP meeting,
21        hopefully we'll have it wrapped up by then
22        but --
23   A.   All right.
24   Q.   -- we'll work around your needs.
25   A.   Okay.  Thank you.
```

```
1   Q.   And so I don't really need to go into what
2        I tell first-time deponents.  I'll try and
3        wait for you to finish answering the
4        question.  To make a clean record, you can
5        wait for me to finish asking it.  Let me
6        ask you, when did you begin preparing for
7        this deposition?
8   A.   You know, I -- I've read through documents
9        over the last few weeks.  So, you know,
10       that has been off and on here and there.
11  Q.   What kind of documents did you read
12       through?
13  A.   Well, things that I've done and -- and
14       basically information that I've received.
15       I put together a summary of kind of the --
16       the immediate releases that I've done, and
17       I went through that, went back through
18       that, which was some personal documents.
19       That's about it.  I read through some audit
20       reports, legislative audit reports, that
21       kind of stuff.
22  Q.   Okay.  So you said you -- you put together
23       a summary of immediate releases?
24  A.   Huh-huh.  Well, I mean, a summary of -- of
25       the -- what has happened over the last few
```

```
 1         years, yeah.
 2    Q.   Did you type that up?
 3    A.   No.  It's handwritten notes.
 4    Q.   All right.  Is it here in your office?
 5    A.   Yeah.
 6    Q.   Okay.  I just ask that you preserve that
 7         and not throw it away because we'll
 8         probably request it.
 9    A.   All right.
10    Q.   So you looked at your handwritten summary
11         of immediate releases.  You looked at --
12    A.   It's not of immediate releases.  It's of --
13    Q.   Oh.
14    A.   -- of the topic immediate releases.
15    Q.   I see.
16    A.   Not individual names.
17    Q.   And -- and what do you mean when you say,
18         "immediate releases"?
19    A.   You know, when -- when someone is -- is --
20         is immediately released.  I mean, the
21         definition is that they've -- they're ready
22         to be released that day.
23    Q.   Either because their sentence is complete
24         that day or their sentence was complete
25         sometime in the past?
```

1    A.    Correct.

2    Q.    A term I use is over detention to describe

3          people who were held past the completion of

4          their sentence.  Will you understand me if

5          I use that term?

6    A.    Sure.

7    Q.    So in your understanding, immediate

8          releases contains people who have been over

9          detained?

10   A.    Well, immediate releases to me are those

11         that by no -- no fault of the department

12         that they became immediately eligible to be

13         released.  Over detention to me is when

14         we've made a mistake on our end, and he has

15         been over -- you know, for those reasons on

16         my end, that he's -- he's eligible to be

17         released.  So I have those two ways to

18         where -- is how I look at it.

19   Q.    Okay.  So immediate release contains people

20         whose sentence is complete that day.

21         That's one category within immediate

22         release?

23   A.    Huh-huh.

24   Q.    And then another category within immediate

25         release is people that have been held past

```
 1         the point of their sentence being complete,
 2         whoever's fault it is?
 3    A.   Huh-huh.
 4    Q.   Okay, great.  Secretary, would you give me
 5         just a brief nutshell version of your
 6         educational and professional background.
 7    A.   I have a Bachelors Degree from
 8         Southeastern.  My -- my professional
 9         background is I've been in the department
10         for -- since 1973 and started out in the
11         business area of the department and worked
12         my way up through the department, and here
13         I am.  You know, I've been a warden.  I've
14         been Under Secretary.  I've been Director
15         of Probation and Parole.  I've been a
16         Director of Prison Enterprises, been over
17         the budget operations for the department
18         for a few years.  So I've had an array of
19         experiences throughout my -- my career.
20    Q.   And how long have you been Secretary?
21    A.   Since -- 12 years, going on 12 years, 11
22         and a half years.
23    Q.   And in that role, you operationally oversee
24         everything at the Department of Public
25         Safety & Corrections except State Police
```

```
 1          and Pardon and Parole Board.  Is that
 2          right?
 3     A.   That's correct, and -- and Juvenile
 4          Services -- OJJ, Juvenile Services.
 5     Q.   So what you operationally over -- oversee
 6          includes corrections, probation and parole,
 7          Prison Enterprises, correct?
 8     A.   Correct.
 9     Q.   Okay.  As Secretary, you're responsible for
10          the inmates sentenced to the custody of the
11          DOC, correct?
12     A.   Correct.
13     Q.   Whether or not they're in a state-run
14          facility, a parish-run facility, or
15          private-facility.  Is that correct?
16     A.   Correct.  That's correct.
17     Q.   And if the Department of Corrections has a
18          legal duty to do something with regards to
19          an inmate, it's your job as Secretary to
20          make sure that happens, correct?
21     A.   Correct.
22     Q.   For example, the Department of Corrections
23          has a legal duty to feed its inmates,
24          right?
25                    MR. EVANS:
```

```
 1                    Object to form.
 2                    You can answer.
 3                    THE WITNESS:
 4                    Yeah, that's correct.
 5   BY MR. MOST:
 6   Q.   At any point you need to take a phone call
 7        --
 8   A.   No.  I'm good.
 9   Q.   Okay.  So you have to make sure that
10        policies and procedures are in place to
11        make sure inmates get food, correct?
12   A.   Correct.
13   Q.   And if the right policies and procedures
14        aren't in place and inmates don't get food,
15        that's your responsibility, correct?
16   A.   Correct.  I mean, yeah, I mean, ultimately,
17        it's -- everything in the department is my
18        responsibility.
19   Q.   Right.
20   A.   But I do delegate, okay.
21   Q.   And one of the primary jobs of the
22        department is to hold inmates for the
23        length of their sentence, correct?
24   A.   Correct.
25   Q.   That falls within the responsibilities of
```

```
 1        you as Secretary?
 2   A.    It -- yeah, it does, and but there are
 3        other parties that are involved in that
 4        responsibility.
 5   Q.    It's the Department of Corrections' duty to
 6        timely release inmates, correct?
 7                 MR. EVANS:
 8                 Object to form.
 9                 You can answer.
10                 THE WITNESS:
11                 It -- yeah, it is.  It's -- it's
12            our responsibility along with the Clerk
13            of Courts, along with the Judges, and
14            along with the Sheriffs Association.
15   BY MR. MOST:
16   Q.    And the department is -- of corrections is
17        legally bound to release inmates on their
18        release date, correct?
19                 MR. EVANS:
20                 Object to form.
21                 You can answer.
22                 THE WITNESS:
23                 Yes.
24   BY MR. MOST:
25   Q.    For example, the Department can't release
```

```
 1          inmates too early, right?
 2    A.    Correct.
 3    Q.    That would be illegal?
 4    A.    Correct.
 5                MR. EVANS:
 6                Object to form.
 7                You can answer.
 8    BY MR. MOST:
 9    Q.   When the DOC releases someone too early,
10         it's not the inmate's fault; it's the
11         Department of Corrections' fault, right?
12                MR. EVANS:
13                Object to form.
14                You can answer.
15                THE WITNESS:
16                As I said earlier, it could be the
17            Department of Corrections' fault, but
18            there are other parties that are
19            involved in -- in people's time
20            computation, so it could be the Judge's
21            fault; could be the Sheriff's fault, or
22            it could be the Clerk of Court's fault.
23    BY MR. MOST:
24    Q.   For example, when Inmate Nicholas
25         Marchiafava was released too early last
```

```
 1        year, you told the Advocate, "It's not his
 2        fault.  It's our fault."  Do you recall
 3        that?
 4   A.   No.  I mean, I'm sure I did if you -- if
 5        you got it out of the Advocate.  Not that I
 6        recall it.
 7   Q.   Sure.  Does it sometimes happen that people
 8        are released too early?
 9   A.   It does.
10   Q.   Are you informed when people are released
11        too early?
12   A.   Not in every case.  There are some cases
13        that -- that we don't know maybe, you know,
14        but normally I am.
15   Q.   So you are normally informed of incidents
16        when people are released too early when the
17        Department of Corrections knows about it?
18   A.   Correct.
19   Q.   Have you asked to be informed when people
20        are released too early and the Department
21        of Corrections knows about it?
22   A.   Have I asked?  I don't think I've -- no, I
23        don't think I've officially asked.  I think
24        they understand that I'm to be notified.
25   Q.   So you expect to be notified when people
```

```
 1        are released too early if the Department of
 2        Corrections knows about it?
 3  A.    Yes.
 4  Q.    Okay.  So releasing someone too early we've
 5        established is illegal, right?
 6              MR. EVANS:
 7              Object to form.
 8              You can answer.
 9              THE WITNESS:
10              I -- I don't know what the
11          definition of "illegal" is here, but as
12          I said earlier, I mean, you know, it's
13          -- yeah, it's a problem.  I don't -- I
14          don't know about illegal.  I mean,
15          you're the attorneys so you-all decide
16          that.
17  BY MR. MOST:
18  Q.    Sure, but the Department of Corrections
19        isn't supposed to release people too early?
20  A.    No.  I mean, that's obviously.  We're not
21        supposed to, no.
22  Q.    And likewise, they're not supposed to
23        release people too late, correct?
24  A.    That's correct.
25  Q.    Are you informed when people are released
```

```
 1          too late if the DOC knows about it?
 2     A.   Not in every case, no.
 3     Q.   Do you expect to be informed when the DOC
 4          releases people too late if the DOC knows
 5          about it?
 6     A.   No, not really.  I mean, I -- I haven't --
 7          I'm not on the notification list, but I do
 8          get informed occasionally.
 9     Q.   But it's not your expectation to be so
10          informed?
11     A.   No, and understanding that, you know, there
12          are, like, three or four people between me
13          and the Preclass operation that -- that
14          handle that.  Our Chief of Operations is
15          basically responsible for our prison
16          operations throughout the department.
17     Q.   And an inmate's correct release date is
18          determined by the sentence of the Judge,
19          good time credit laws, et cetera, correct?
20     A.   Correct.
21     Q.   It's not up to the DOC to decide how long
22          someone is to spend in prison, correct?
23     A.   No, that's correct.
24     Q.   The Department of Corrections is just
25          supposed to implement the sentence and the
```

```
 1        relevant laws, correct?
 2   A.   Correct.
 3   Q.   There's people here at the DOC whose job it
 4        is to calculate people's release date,
 5        correct?
 6   A.   Correct.  There's people throughout the
 7        department, not just here but --
 8   Q.   Yeah.
 9   A.   -- throughout the department.
10   Q.   Right, some of them are here at
11        headquarters; some of them are at David
12        Wade, et cetera?
13   A.   Right, and each individual prison.
14   Q.   Those people fall within that
15        Classifications Department.  Is that right?
16   A.   Correct.  Called Preclass at Headquarters.
17   Q.   Sometimes those people calculate an
18        inmate's sentence and find out that the
19        inmate is passed their release date,
20        correct?
21   A.   I would think occasionally that happens,
22        yes.
23   Q.   Those --
24   A.   Not -- you know, the --the issue of
25        calculating an issue of maybe finding
```

```
 1              something out in the minutes or -- or, you
 2              know, it may change the date of some sort,
 3              but yeah, I mean, they do occasionally.
 4       Q.    And those people are then called immediate
 5              releases, correct?
 6       A.    As I described earlier, immediate releases
 7              are those -- in my definition are those
 8              that no fault of our own that -- that, for
 9              example, if somebody gets a GED and earns a
10              90 days of good time and that automatically
11              makes him overdue, then that immediate
12              release is not -- I mean, that's -- that's
13              not anybody's fault.  He wouldn't have got
14              out had he not been in that program.
15       Q.    So completely setting fault aside for a
16              moment --
17       A.    Okay.
18       Q.    -- when a time calculation person in the
19              Preclass or Class Department calculates
20              someone's time and finds out that they're
21              passed their complete sentence, that's --
22              that person is an immediate release,
23              correct?
24       A.    Yes.
25       Q.    While you have worked at the DOC, has there
```

```
 1         been a problem with releasing people
 2         earlier than their release dates?
 3                   MR. EVANS:
 4                   Object to form.
 5                   You can answer.
 6                   THE WITNESS:
 7                   Earlier than their release dates,
 8            no.
 9    BY MR. MOST:
10    Q.   Has there been a problem with releasing
11         people later than their release dates?
12    A.   There -- there has been issues, yes.
13    Q.   When did you first learn about those
14         issues?
15    A.   Well, I think 2012 probably would be the --
16         the start of it, and when I was approached
17         by Governor Jindal's group that were doing
18         the Lean Six Sigma and -- so they came to
19         us and asked us what -- you know, what
20         areas is probably your biggest challenge
21         and -- and, you know, time comp has been a
22         real complicated issue throughout our
23         department.  It's a -- I call it a living
24         document, because it changes every year
25         depending on legislation that's changed.
```

```
1        So I said that's one of our challenges.
2        That's an area probably we need to look at.
3   Q.   Huh-huh.
4   A.   And so that -- that kind of surfaced the
5        issue of -- of immediate releases, and so
6        that -- to me that brought it to light, and
7        so we began the process of how based on
8        that report they did and how we do address
9        that, and one of them was centralizing our
10       -- our Preclass operations that was
11       decentralized out in -- in departments
12       throughout the department.  That was one of
13       the recommendations in that report, and
14       we've done that.  I think we have
15       approximately 140 to 50 people that work in
16       Preclass and some -- some part of the
17       department, not just at Headquarters.
18       Headquarters probably has 40, 50 people
19       that work in Preclass.  So we did that, and
20       -- and we have seen some improvement.  You
21       know, the other thing was turnover in those
22       operations, and -- and we had turnover, and
23       in probably around 2014, '13 or '14, we --
24       we put a $2.00 premium pay for that group
25       so they could -- maybe we could keep -- you
```

1          know, settle the turnover down, and we're

2          still -- we're still dealing with that.

3          Funding is always an issue.  You know, a

4          lot of things came out of that, you know,

5          that -- that we've tried to address, and,

6          you know, I -- I think about the Felony

7          Task Force effect, the Class Task Force

8          that was developed out of the -- out of the

9          Justice Reinvestment Task Force, which I

10         chaired.  We recommended that we -- we

11         establish a Felony Class Task Force, which

12         was done, and that report was done and --

13         and part of that responsibility was

14         simplifying the way we do things in the

15         department and the way we class our -- our

16         felonies.  So it simplifies the way we have

17         to calculate time, and I -- I've testified

18         to that fact a few times during the task

19         force meetings.  I wasn't on the task

20         force, that task force, but I was asked to

21         testify.  So that -- you know, that was

22         another approach on -- on the way how can

23         we address this issue.  You know, here

24         lately, you know, I -- I mean, I think and

25         I -- I've asked a representative to -- to

```
 1         -- to do the resolution, and she did.  I
 2    don't know.  I'm trying to think of her
 3    name, and I can't think of her name.
 4              MR. VINING:
 5              Katrina Jackson?
 6              THE WITNESS:
 7              Katrina Jackson to -- to -- and,
 8         in fact, I talked to her at the
 9         Sheriffs Association, at one of their
10         gatherings over there for the
11         Legislature, and she said she would, so
12         we -- we -- we moved in that direction
13         as far as trying to get the other
14         parties involved.  I -- I've met with
15         the clerk of courts.  I've met with
16         Debbie Hudnall.  I met with the Chief
17         Justice.  I met with -- I've met with
18         the Sheriffs Association, all
19         throughout this time trying to help
20         them understand the complications that
21         -- that are involved in figuring time,
22         and, you know, and I -- I hate to say
23         this, but it's liking herding cats.  I
24         mean, that's -- that's how I describe
25         it.  Everybody has got their own little
```

```
 1              -- clerk of courts have their own, you
 2         know, parish.  The sheriffs have their
 3         own parish, and the Judges have their
 4         own districts and -- and then getting
 5         them all on the same page is not an
 6         easy thing to do, and we're learning
 7         that just on the reinvestment side with
 8         trying to organize our reform efforts
 9         with -- with our communities and our --
10         our different segments of the criminal
11         justice system.  So you know, you know,
12         we were working in different areas to
13         try to -- try to -- to -- to make ends
14         meet with this issue.  I think the
15         resolution is good.  I think it -- it
16         -- you know, that we'll be able to
17         express our concerns and what the
18         issues are in this department and why.
19         You know, we made an attempt at a data
20         modernization project that would have
21         helped us, and, you know, it fell on
22         its face.  When we turned it on, it --
23         it was -- I don't think they
24         anticipated the number of users that
25         were going to be -- be partaking into
```

```
 1              that -- that system, and it just
 2              couldn't handle it, and so I made a
 3              decision to shut it down because it was
 4              becoming a public safety issue,
 5              especially on the probation parole
 6              side.
 7    BY MR. MOST:
 8    Q.   And when you say, "this issue" -- a few
 9         moments ago, you said, "working on this
10         issue" --
11    A.   Huh-huh.
12    Q.   -- you're talking about issues with time
13         computation, correct?
14    A.   Yes, yeah, on -- on immediate releases, on
15         how can we eliminate immediate releases,
16         what -- what do we need to do.
17    Q.   Right, and the problem with immediate
18         releases is that people are being held past
19         the end of their sentence, correct?
20    A.   Correct.
21    Q.   All right.  So that problem with people
22         being --
23    A.   People -- well, people are being held past
24         their release date.
25    Q.   Okay.
```

```
1    A.   Their sentence in most cases still exists,
2         because they're on parole.  They're not
3         being held past their sentence.
4    Q.   Okay.
5    A.   They're being held past their release date.
6    Q.   Their release date, which is the date that
7         they should be released from prison?
8    A.   Yes, yeah.
9    Q.   Okay.
10   A.   But it's not past their sentence.
11   Q.   Fair enough.
12              MR. EVANS:
13              Hey, William, let's go off the
14        record for just one second.  Sorry.
15              MR. MOST:
16              Yeah, sure.
17              (Off the record.)
18   BY MR. MOST:
19   Q.   So this issue of people being held past
20        their release date was part of what
21        prompted the 2012 Lean Six Sigma Process,
22        right?
23   A.   Well, no.  I think basically it started out
24        as a complication of calculating time.
25   Q.   Huh-huh.
```

```
 1   A.    Not -- we didn't know that that problem
 2         existed.  I didn't know that problem
 3         existed at the time.  I was more concerned
 4         about simplifying the way we calculate
 5         time, automating, doing whatever we have to
 6         do to make it simpler, and -- and then it
 7         revolved in as they looked into this,
 8         that's when we realized that there were
 9         some -- there were immediate releases that
10         were taking place and -- and, look, the
11         other thing with this, and I -- you know,
12         I'm kind of getting off subject here, but,
13         I -- I mean, the other thing that -- that
14         we all need to understand, and I think has
15         amplified the immediate releases is what
16         we're doing at the local level now that we
17         weren't doing in 2012 with programs.  We
18         have in the neighborhood of -- of 60 jails
19         now that are participating in programs and
20         re-entry centers with our educational,
21         basic education programs, our vocational
22         programs, re-entry centers that -- that are
23         preparing people to return.  They're all
24         earning good time now, and they weren't
25         earning good time before.  So that -- that
```

```
 1        to me has -- has -- has -- has -- has kept
 2        us from eliminating the problem, because it
 3        has kind of added to the problem, but these
 4        are people that are getting out earlier
 5        than they would -- they couldn't have got
 6        out that early had we not began these
 7        programs.  I -- I kind of laugh at this.  I
 8        get -- I get sued on the front end for --
 9        for releasing people too early.  Now, I'm
10        getting sued for -- for keeping them too
11        long, you know, and -- and, you know, my
12        philosophy is I want to -- I -- I want them
13        out.  I don't want to keep them in prison.
14        You know, I mean, I think it's -- it's
15        something that we're striving for in this
16        department, and it's kind of ironic that
17        here I am, you know, but anyway, I -- I
18        wanted to say that.  I think it needs to be
19        said that --
20   Q.   Sure.
21   A.   -- that of the good things that we're doing
22        with the reinvestment is really creating a
23        problem of people getting out early, and --
24        and let me say this, people aren't -- when
25        people get sentenced to the department,
```

```
 1        unfortunately, they'll go from the Baton
 2        Rouge Courthouse to Catahoula, and don't go
 3        through reception center.  So we're
 4        changing that.  Now, everybody in the first
 5        five parishes that we are investing in will
 6        go to Raymond LaBorde and go through a
 7        reception center, and we're going to be
 8        chasing the paper.
 9   Q.   Huh-huh.
10   A.   Now, whereas, the sheriffs, you know, they
11        -- they're not -- they don't have -- they
12        don't have to chase the paper.  They're not
13        worried about the paper.  We're worrying
14        about the paper, so changing that is going
15        to help us an awful lot in that we're going
16        to -- we're going to be chasing the paper
17        when it come to the -- to the reception
18        centers, and ultimately, we're bringing on
19        seven or eight more parishes come to July
20        1st.  So we're going to get it to 70 to 80
21        percent of our local prison population by
22        the end of next fiscal year.
23   Q.   So the idea there is that the Department of
24        Corrections won't wait for the sheriff to
25        bring them an inmate's paperwork; they'll
```

```
 1        go out and get it themselves.  Is that
 2        right?
 3   A.   Basically that's -- that's -- that's right,
 4        yeah.  I mean, and there's a -- look,
 5        there's a lot of ins and outs of the
 6        paperwork, which I don't understand
 7        honestly.  I mean, I -- I know they have to
 8        wait on jail credit; they have to wait on
 9        -- on the documents from -- from the court,
10        and so there's a lot of -- lot of back and
11        forth with what they need, you know.
12   Q.   Right.
13   A.   And they -- you know, a lot of it is credit
14        for time served, and they have to get the
15        jail credit, and they have to get the
16        official document.  I think that creates
17        problems, but again, that -- that's
18        something that I think we're improving on
19        and --
20   Q.   So going back to 2012 --
21   A.   Huh-huh.
22   Q.   -- the Governor's Office came to you and
23        said, what kind of issues are you having
24        that we can take a look at --
25   A.   Huh-huh, it's actually the Division of
```

33

```
 1        Administration.  It wasn't the Governor's
 2        Office.
 3   Q.   Yeah.
 4   A.   It was the Commissioner's Office at the
 5        time.
 6   Q.   The Commissioner's Office came to you and
 7        said what are some issues that we can look
 8        into, you suggested time computation.  They
 9        did the Six Sigma Process, and it was
10        through that Six Sigma Process that you
11        learned there was a problem with people
12        being held past their release dates,
13        correct?
14   A.   Correct.
15   Q.   Okay.  So let's take a look at that Six
16        Sigma document.
17   A.   Okay.
18   Q.   Okay.  Let's mark this as "Exhibit A."
19        (Counsel hands document to witness.)  Okay.
20        So is this the document about the Six Sigma
21        thing you were just describing?
22   A.   Correct.
23   Q.   You've seen this document before?
24   A.   I have.
25   Q.   Okay.  On the third page it lists you as
```

```
 1        one of the Project Champions of the Six
 2        Sigma Project.
 3   A.   Yeah, and I -- I mean, that's a little bit
 4        -- a champion.
 5   Q.   Right.
 6   A.   I mean, I wasn't involved in the project.
 7        I -- you know, they -- they gave -- I think
 8        they gave us a yellow belt or a green belt
 9        for I think for being a champion.
10   Q.   But you were somehow involved in this
11        process?
12   A.   Yeah, but, I mean, you know, they called us
13        champions, because we allowed them to do it
14        --
15   Q.   Sure.
16   A.   -- when they came to us.  I think that was
17        the reason why they championed us.
18   Q.   But you saw the results of that?
19   A.   Yeah, that's right.
20   Q.   Okay.  So if you'll look at Page 4, which
21        is the page that says, "Business Case" at
22        the top --
23   A.   Okay.
24   Q.   -- this looks to be what they found out was
25        the baseline of where things stood in
```

```
 1         January 2012, correct?
 2    A.   Yeah, that's what it looks like.
 3    Q.   And they found that there was a backlog of
 4         cases to have time computed of 1,446?
 5    A.   That's -- yeah, that's what it says.
 6    Q.   With an average processing delay of 110
 7         days from -- I assume that's from
 8         conviction to processing?
 9    A.   I -- honestly, I don't know.
10    Q.   Okay.  We -- we can -- it says that later.
11         We'll find out.  And it says that 25
12         percent of the cases in the backlog
13         exceeded 123 days in process time from
14         conviction to time computation.  Is that
15         right?
16    A.   Yeah, that's what it says.
17    Q.   Huh-huh, and 83.44 percent of these had an
18         immediate release upon processing due to an
19         earlier release date, right?
20    A.   Correct.
21    Q.   Okay.  It seems like a big problem to me.
22         You've got about 1446 inmates, and 83
23         percent of them were found to have been
24         held past an earlier release date.
25              MR. EVANS:
```

```
 1                    I just object to the form, but you
 2              can answer.
 3                    THE WITNESS:
 4                    Yeah, I mean, I would say that.  I
 5              think that's the reason why we were
 6              trying to address the issues.
 7    BY MR. MOST:
 8    Q.   Yes.
 9    A.   Because it -- we realized that.
10    Q.   It's a problem for one inmate to be held
11         past their release date?
12    A.   Yeah.  No question.
13    Q.   So the next page says process -- "Project
14         Goals," correct?
15    A.   Huh-huh.
16    Q.   And the -- the fourth bullet point says, it
17         looks like one of the rules was to reduce
18         the percentage of immediate releases by 80
19         percent from 2252 to 450 per year.  Do you
20         see that?
21    A.   I do.
22    Q.   That was one of the goals of the Six Sigma
23         Project?
24    A.   Correct.
25    Q.   Why was the goal to get it down to just 450
```

```
 1        per year rather than zero?
 2   A.   Honestly, I don't know.  I don't know what
 3        -- why that -- that's there.  I think, you
 4        know, eliminating the backlog to zero is --
 5        is a -- is a first step, and I guess within
 6        a year, you know, I think they were just
 7        trying to give us some goals to attain --
 8   Q.   Huh-huh.
 9   A.   -- ultimately getting it to zero I would
10        assume.
11   Q.   Huh-huh.
12   A.   I mean, I would -- obviously, we want to
13        get it to zero.  I mean --
14   Q.   Right.
15   A.   -- that's where we're headed, but in a --
16        in a timeframe that maybe that we were
17        working with here, that's probably what --
18        what they meant, and again, you know, you
19        look at the definition of immediate
20        releases, my definition of immediate
21        releases, you know, maybe the 450 of those
22        that earned a GED that -- that -- in other
23        words, you're going to have -- you can't
24        eliminate those.  You cannot eliminate
25        somebody that's in a program and doesn't --
```

```
1         and they go -- they go -- they're in the
2         program, and in other words, their release
3         date is well beyond the program, but once
4         they finish the program, then their release
5         date drops behind where they are, so you
6         can't -- you can't eliminate those.
7    Q.   But that's -- those programs are considered
8         CTRP credit, right?
9    A.   Correct.
10   Q.   And this is --
11   A.   Of -- of the 360.
12   Q.   Right.  And this says excludes them --
13        excludes the immediate releases due to
14        CTRP.
15   A.   Okay.
16   Q.   It looks like they've already set that
17        aside.
18   A.   All right.  Okay.  I didn't see that.
19   Q.   All right, because I -- I agree with you.
20        That would be a different formula.
21   A.   Yeah, I mean.
22   Q.   Different, yeah, okay.  Okay.  So let's
23        look at Page 17, which is --
24   A.   Is yours -- yours numbered?
25   Q.   No, but it says, "Statewide Vitals Pre &
```

```
 1         Post LSS."  Next page right there.  I'm
 2         sorry, the next page.  One more than that.
 3          Okay.  So we're looking at the second page
 4         that is entitled, "Statewide Vitals Pre &
 5         Post LSS," correct?
 6  A.    Huh-huh, correct.
 7  Q.    And it has got some baselines, goal, and
 8         then some interventions were done to see if
 9         they could improve things, right?
10  A.    Yes, that's what it looks like.
11  Q.    And we've got the results from that?
12  A.    Improvement, the -- the last column is what
13         --
14  Q.    Yeah, exactly.
15  A.    Yeah.
16  Q.    Okay.  So looking at the second column, it
17         says, "Baseline May."  So it looks like
18         this investigation found a baseline of
19         2,252 immediate releases per year, right?
20  A.    Correct.
21  Q.    With an average of overdue days, 71.7 each,
22         right?
23  A.    Correct.
24  Q.    Okay.  So we've got a couple of thousand
25         inmates each year who are being held more
```

```
1          -- on an average more than two months each,
2          right?
3     A.   Yeah, I don't know.  Are they exempting the
4          -- the CTR credit in that?
5     Q.   It has been exempted earlier in this
6          document.
7     A.   But I'm not sure that it is here.
8     Q.   Okay.
9     A.   I mean, that would be my question is how
10         many of those are involved in programming.
11         I mean, that -- that's what comes to mind
12         for me.  It might change that baseline.
13    Q.   So if you go back and look at the Project
14         Goals page --
15    A.   Huh-huh.
16    Q.   -- it says 2 -- 2252 excludes the immediate
17         releases due to CTRP credit, and that's the
18         same number we're looking at here, right?
19    A.   Yeah.
20    Q.   So it looks like this 2,252 number excludes
21         CTRP credit?
22    A.   Yeah.
23    Q.   That's a big problem, right?
24              MR. EVANS:
25              Object to form.
```

```
 1                  You can answer.
 2                  THE WITNESS:
 3                  It's -- it's a problem.
 4    BY MR. MOST:
 5    Q.   Okay.  Thousands of inmates being held past
 6         their release date.  Do you not think it's
 7         a big problem?
 8    A.   I think I just said it's a problem.
 9    Q.   It's a problem.  Do you think it's a big
10         problem?
11    A.   I -- I think -- yeah, I mean, I think it's
12         a problem.  I -- I mean, I don't know how
13         you define "big."
14    Q.   In your opinion is this a big problem?
15    A.   What's big?
16    Q.   Just in your own -- in your own belief?
17    A.   I think it's -- yeah, it's a big problem.
18    Q.   Okay.  So look at the next page, which is
19         entitled, "Financial Impact of Reducing
20         Immediate Releases & Transfers."  You see
21         that?
22    A.   Yep.
23    Q.   And you see it says, "The # of Immediate
24         Releases has been reduced to a rate of 1612
25         per year," right?
```

```
 1   A.    Right.
 2   Q.    The average number of days has been reduced
 3         to 60.52 days?
 4   A.    Right.
 5   Q.    So by my math, and you can check me if
 6         you'd like --
 7                   MR. EVANS:
 8                   I'm not good at math so --
 9   BY MR. MOST:
10   Q.    -- 1612 times 60.52 is 97,558, okay?  Do
11         you want to check my math?
12                   MR. EVANS:
13                   Say -- say that again.
14                   MR. MOST:
15                   Yeah, sure.
16                   MR. MOST:
17                   Yeah, sure.  1612 --
18                   MR. EVANS:
19                   Huh-huh.
20                   MR. MOST:
21                   -- times 60.52 --
22                   MR. EVANS:
23                   Okay.
24                   MR. MOST:
25                   -- that's 97,558.24, right?
```

```
 1               MR. EVANS:
 2               Got it.
 3               MR. MOST:
 4               And divide that by 365, you get
 5          267.28, right, Gary?
 6               MR. EVANS:
 7               Correct.
 8   BY MR. MOST:
 9   Q.   You've got any reason to think we're
10        getting the math wrong?
11   A.   Well, I mean, it's 612 cases, but you don't
12        know that all turned 65.  You divided --
13        I'm trying to understand.
14   Q.   Right.  So if we have the number of --
15   A.   It might been two days, I mean.
16   Q.   Right.
17   A.   Cases might have been just two days, not a
18        whole year.  So you're amplifying it by
19        multiplying it by I think.
20   Q.   So this says the number of immediate
21        releases is -- is 1612 after the
22        interventions of the Six Sigma.
23   A.   Yeah, and I -- I think this number is
24        exaggerated too, because of the fact that
25        they're using a whole year I guess to
```

```
 1        figure the 2.4 million, that every one of
 2        them was a whole year of -- I don't know
 3        what -- I don't -- I haven't spent any time
 4        with these numbers --
 5   Q.   Okay.
 6   A.   -- but --
 7   Q.   So this says --
 8   A.   -- to me when I look at that, it looks like
 9        they've taken a whole year and saying
10        everybody was -- was over -- overdue for a
11        whole year.
12   Q.   It looks to me like it's saying these
13        people were overdue by an average of 60.52
14        days.
15   A.   Okay.
16   Q.   Yeah, and an average of 60.52 days times
17        612 people per year equals a little more
18        than 97,000 --
19   A.   Okay.  Got you.
20   Q.   And so if we're trying to figure out how
21        much people have been in total held past
22        their release dates, that's about 267 years
23        each year.  Does that make sense?
24   A.   Yeah, it makes sense.
25   Q.   Okay.  So this is 2012.  After the Six
```

```
 1          Sigma Interventions, we've still got people
 2          being held an average of about two months
 3          past their release date, correct?
 4    A.    Correct.
 5    Q.    Okay.  Now, flip a couple of pages in to
 6          the topic that says, "Lessons Learned."
 7          The third bullet point says,
 8          "Inconsistencies in the quality of the work
 9          today requires 100% review by the
10          Supervisor."  You see that?
11    A.    I do.
12    Q.    So through this Six Sigma investigation,
13          you found out there were problems with the
14          work -- that the quality of the work that
15          the time calculation people were doing,
16          correct?
17    A.    That's what it looks like, yeah.
18    Q.    Okay.  Is that what you learned from this
19          investigation?
20    A.    Well, if it was in there, but remember now,
21          this -- this -- the Chief of Operations,
22          the Deputy Assistants, there's -- I mean,
23          they're more involved in these reports than
24          me.
25    Q.    Sure.
```

```
1    A.   Okay.  So I would assume that that's what
2         they -- you know, that they -- I think they
3         had supervisor, and they -- and they
4         improved that -- that area.  I think that's
5         what they did.
6    Q.   But you learned when you read this document
7         back in approximately 2012, that there was
8         an issue with inconsistencies in the
9         quality of the work of the time computation
10        people, correct?
11   A.   Yes.
12   Q.   Okay.  Flip to the page that's entitled,
13        "Recommendations."  It's about four or five
14        pages later.
15   A.   Okay.
16   Q.   These are recommendations from the Six
17        Sigma team to the Department of
18        Corrections.  Is that right?
19   A.   Correct.
20   Q.   Which of these did you implement?
21   A.   The first bullet, the second bullet, third
22        bullet, fourth bullet, and the fifth
23        bullet.  All of them.
24   Q.   What did you do to provide consistency of
25        procedures and training, which is the third
```

```
 1        bullet?
 2   A.   They -- I mean, they established a training
 3        procedure that's in our department
 4        regulation to train people when they come
 5        on.  I mean, they developed a -- I forget
 6        the name of it.  It's a -- it's a training
 7        manual.
 8   Q.   That has been created?
 9   A.   Yes, sir.
10   Q.   When was that created?
11   A.   I don't know the date.  I'm sorry.
12   Q.   Okay.  Was it within the last year?
13   A.   No.  It was before that.
14   Q.   Okay.  So from this investigation back in
15        2012, you learned that thousands of people
16        are being held by the Department of
17        Corrections past their release date, right?
18   A.   I learned that there was a problem in the
19        system.  I didn't learn that the Department
20        of Corrections was holding them past their
21        release date.  I learned that there was
22        some problems between the Judges, the DAs,
23        and the Sheriffs in providing adequate
24        documentation that we could release people,
25        and if I didn't have that adequate
```

```
 1        documentation, I can't release them.
 2        That's what I learned.
 3   Q.   But you learned that thousands of people in
 4        the custody of the Department of
 5        Corrections for whatever reason were being
 6        held past their release date, correct?
 7   A.   I did.
 8   Q.   Did anyone get fired at the Department of
 9        Corrections because of that?
10   A.   No, because it -- it wasn't -- you know,
11        people have been fired over time because of
12        -- of miscalculations, but no, nobody got
13        fired over that because it wasn't just our
14        fault.
15   Q.   Did anyone get demoted?
16   A.   Not that I'm aware of.
17   Q.   Anyone get their dock -- their pay docked?
18   A.   I mean, since -- you're -- you're talking
19        about that day?
20   Q.   As a result of this investigation.
21   A.   No, no, not -- that wasn't an
22        investigation.
23   Q.   What do you call the --
24   A.   That's a study.
25   Q.   Okay.  Did anyone get their pay docked as a
```

```
 1       result of this study?
 2  A.   No.
 3  Q.   A reprimand of any kind?
 4  A.   No.
 5  Q.   Okay.
 6  A.   Again, not that I'm aware of.  There's --
 7  Q.   Sure.
 8  A.   -- four people between me and -- and that
 9       group, so if they did, I wasn't aware of
10       it.
11  Q.   Okay.
12  A.   That's probably a better answer.  I'm not
13       aware of anybody being --
14  Q.   Yep, and I can only ask you what you're
15       aware of so.  Okay.  So let's try and
16       figure out from this document where the
17       delay came from.  Will you look at that
18       page that says, "Statewide Vitals Pre &
19       Post LSS."
20  A.   Where are you in the document?
21  Q.   It's sort of in the -- the middle.  It's --
22  A.   Statewide Vitals again?
23  Q.   Yeah, the first page that says, "Statewide
24       Vitals."
25  A.   All right.
```

```
 1   Q.   And do you see where it says the baseline
 2        was cycle times days, conviction to time
 3        computation completed, 110 days?
 4   A.   Huh-huh.
 5   Q.   Okay.
 6   A.   Yes.
 7   Q.   Okay.  So this study figured out that the
 8        average from when a person got sentenced or
 9        convicted to when their time was calculated
10        by the Department of Corrections was an
11        average of 110 days, right?
12   A.   Yes.
13   Q.   Okay.  Will you turn to the page that says,
14        "Process Map & Cycle Time," and I'm going
15        to supplement this with -- you can't see it
16        on this, the comments that were also in the
17        PDF, which is right here (indicating).
18        Okay.  So we learned that the total time is
19        110 days, and you can see that this process
20        map looks at the different pieces of that
21        time, although you can see from the
22        comments, it leaves out one thing, which is
23        it says on this page here, on the comments
24        page, it says, "This does not include the
25        time it sat in the 'inbox' waiting to be
```

```
 1        worked on."  Do you see that?
 2   A.   I do.
 3   Q.   Okay.  So this process map --
 4   A.   Who's Darryl?
 5   Q.   Do you know who Darryl is?
 6   A.   Unh-unh.
 7   Q.   I don't either.
 8   A.   Okay.  I was just -- okay, I mean, can we
 9        depend on Darryl for these comments?
10   Q.   I can't answer that question.
11   A.   No, I can't either so I'm -- I mean, I'm --
12   Q.   Sure.
13   A.   This is --
14   Q.   So this process map shows that the Six
15        Sigma investigation found it took 19.6 days
16        to get from the clerk of court --
17   A.   Which -- you're back on this document
18        (indicating)?
19   Q.   Yeah.
20   A.   Okay.
21   Q.   19.6 days to get from the clerk of court to
22        the jail, right?
23   A.   Huh-huh.
24   Q.   And then from the jail to the Preclass
25        facility 11 days, right?
```

```
1   A.    Correct.
2   Q.    So that's -- that's about 30 days before it
3         gets to the Department of Corrections,
4         right?
5   A.    Huh-huh, correct.
6   Q.    So the Department of Corrections is
7         responsible for the time after that at --
8         at least, right?
9   A.    Correct.
10  Q.    Okay, and we know that the total is 110
11        days, right?
12  A.    Yeah, I think that's what it said.
13  Q.    Okay.  So the majority of the -- the time
14        is in the hands of the Department of
15        Corrections?
16  A.    Well, what is the 7.27 days?
17  Q.    From my read of this document, that appears
18        to be from the time they actually start
19        working on a case to when they complete it.
20        Does that look right to you?
21  A.    Yeah.  I don't quite get the -- I -- I
22        mean, yeah, that's what it looks like to me
23        it takes 7.2 days to get them ready.
24  Q.    Huh-huh, okay.  Okay.  I think we're done
25        with this document, which is great.  Okay.
```

```
1         So 2012, this study is done.  It discovers
2         that there is a big problem with thousands
3         of inmates being held past their release
4         date for whatever reason, right?
5    A.   Huh-huh.
6    Q.   Okay.  Some things are changed right?  You
7         -- you implemented some recommendations,
8         right?
9    A.   Correct.
10   Q.   What happened after that?
11   A.   What happened after that?
12   Q.   Yeah.
13   A.   I mean, things improved.  I mean, things
14        got better and -- and but it -- it wasn't
15        -- it wasn't a cure-all in the
16        recommendations obviously.
17   Q.   Right.
18   A.   Because we still were having paperwork
19        problems and getting the paperwork in a
20        timely fashion, and that's when we began,
21        and actually as I mentioned earlier with
22        the -- with the Felony Class Task Force,
23        that was -- that was part of the issue of
24        trying -- trying to fix the problem.  You
25        know, what we did with -- with -- with the
```

```
 1            -- with the modernization project, which we
 2            have gotten off the ground again, you know,
 3            is -- is going to help resolve the problem,
 4            and, you know, we're working on -- on --
 5            still continuing to work on improving the
 6            system and -- and hopefully this resolution
 7            will help us get to where we need to be.
 8      Q.    And by the modernization pro -- thing, are
 9            you describing the effort to replace CAJUN
10            with a new computer system around 2015?
11      A.    Correct.  Well, I mean, it -- now, it's --
12            it's off the ground again.  We have --
13            they've assigned -- the division has
14            assigned seven or eight people to us to --
15            to start that project again.
16      Q.    So in approximately 2015, a couple of
17            million dollars was spent to get a new
18            computer system to replace CAJUN?
19      A.    Right.
20      Q.    The new computer system didn't work, and so
21            the Department went back to CAJUN, correct?
22      A.    Correct.
23      Q.    The next data point I have about this issue
24            comes in 2017, and I'll have you look at
25            this document, which we're going to mark as
```

55

```
 1        "Exhibit C."  (Counsel hands document to
 2        witness.)  This appears to me to be a grant
 3        application from the Department of
 4        Corrections to the Federal Government.
 5        Have you seen this before?
 6   A.   You -- you know, I -- I have.  I've -- I've
 7        looked at it.
 8   Q.   Okay.  Is it a grant application from the
 9        Department of Corrections --
10   A.   Yes.
11   Q.   -- to the Federal Government?
12   A.   It -- it is -- it is, right.  Is this the
13        complete document?
14   Q.   There is the first --
15   A.   I have 15 of 19 --
16   Q.   Okay.
17   A.   -- so I don't have the whole document.
18   Q.   Exactly.  Okay.  Does this appear to be the
19        first 15 pages?
20   A.   Yeah, yeah.
21   Q.   I'm not trying to hide anything.  I'm --
22   A.   No, no, I know you're not.  I -- I just --
23   Q.   -- trying to save on printed paper.
24   A.   -- I just -- I was wondering if I had
25        signed this as an applicant.  That's why I
```

```
 1         was looking for the last page.
 2    Q.   Got it.  Okay, but you reviewed it at some
 3         point?
 4    A.   Yeah, I'm sure I did.  I don't -- I mean, I
 5         don't -- we have a Grant Application
 6         Section that -- that spends the time doing
 7         this --
 8    Q.   Huh-huh.
 9    A.   -- and ultimately, I -- you know, I don't
10         always have the time to read verbatim every
11         grant application.  Knowing the gist of
12         this is to develop a web portal --
13    Q.   Huh-huh.
14    A.   -- for the department to communicate with
15         those people that we have a hard time
16         communicating with.
17    Q.   Right.  So if you look at Page 4 --
18    A.   Okay.
19    Q.   -- in the second paragraph, it says, "In
20         2017 the Department of Public Safety &
21         Corrections had an average of 200 cases per
22         month considered an 'immediate release' due
23         to these deficiencies," correct?
24    A.   Correct.
25    Q.   Two sentences later it says, "A review of
```

```
 1            these releases indicate the offenders were
 2            held in custody an average of 49 days past
 3            the date they would have been eligible for
 4            diminution of sentence release," right?
 5   A.   Correct.
 6   Q.   So -- so in 2017 at least there were about
 7            200 people per month or about 2400 per year
 8            being held past their release date for an
 9            average of 49 days, correct?
10   A.   Correct, but I -- I don't know whether this
11            is eliminating the -- the good time
12            credits.
13   Q.   Okay.
14   A.   I mean, I -- I think we, you know -- I'm
15            not sure if it does or not.
16   Q.   Sure.  And by "good time credit," you mean
17            CTRP credit, not statutory good time,
18            right?
19   A.   Yeah.  I'm sorry.  That's it.
20   Q.   Yeah.  I just want to make sure we're on
21            the same page.
22   A.   Yeah, that's correct.
23   Q.   Okay.  So this is about five years after
24            the Six Sigma report, this -- this
25            testiment, right?
```

```
 1    A.    Huh-huh.

 2    Q.    And it seems to me the issue is better than

 3          it was in 2012?

 4    A.    It is better, and I -- I would hope that

 5          that doesn't -- that doesn't -- that

 6          includes the -- the -- you know, the good

 7          time or the certification time earned for

 8          program time in that, which would make it

 9          even better.

10    Q.    Right, because if this figure excludes CTRP

11          credit, it's still a big problem, right?

12    A.    Yeah, it's a problem, yeah.  I mean, I'm

13          not sure where they pulled the informa --

14          you know, I don't know where -- how they --

15          the 2017 data, I'm not sure where they got

16          that from, but I'm assuming they got it

17          right, but I would think they looked at all

18          immediate releases.  I don't think they

19          eliminated the -- but we can find that out.

20    Q.    The next sentence says, "immediate releases

21          are costing the state $239,022 per month,"

22          right?

23    A.    Yes.

24    Q.    So that suggests that these are people who

25          should be out, correct?
```

```
 1   A.   Correct.
 2   Q.   Okay.  These -- and did -- did you know
 3        about this back in 2017?
 4   A.   About the grant?
 5   Q.   No.  About these -- these figures or are
 6        you just seeing these now through the --
 7        this?
 8   A.   No.  Well, I mean, I saw it through the
 9        grant.
10   Q.   Okay.
11   A.   I didn't -- I didn't know the exact numbers
12        until I saw this.
13   Q.   Did you have a -- a sense of this even if
14        it wasn't the exact numbers in 2017?
15   A.   Actually, I -- you know, I -- I assumed
16        that things were improving based on all the
17        -- everything that we had done to improve
18        the system.  So I -- you know, I guess it
19        was a little bit of a surprise to me that
20        the numbers were still high as they are.
21   Q.   Yeah.
22   A.   But again, I -- I would -- I would have to
23        check on those numbers to make sure that
24        they didn't include the people that are in
25        the -- the good time credits and programs.
```

```
 1   Q.   Huh-huh.

 2   A.   Which would reduce that considerably.

 3   Q.   But the fact that it's talking about how

 4        much this is costing the State suggests

 5        that these people are who shouldn't be in

 6        prison for that period of time, correct?

 7   A.   Yeah, I mean, you don't need that to know

 8        that they shouldn't be in prison anyway.

 9        You don't need the numbers.

10   Q.   Okay.  So also in 2017, the Louisiana

11        Legislative Auditor came out with a report

12        entitled -- I'll just -- I'll get it.  How

13        about that?  We'll mark this as "Exhibit

14        D."

15             MR. EVANS:

16             William, are these our copies?

17             MR. MOST:

18             Yeah, oh, yeah.

19             MR. EVANS:

20             Okay.

21             MR. MOST:

22             These are for the --

23             MR. EVANS:

24             I just wanted to make sure it's

25        ours.
```

61

```
 1              MR. MOST:

 2                  If you need electronic copies of

 3              any of this, let me know.  I think I

 4              got it all from you guys.

 5      BY MR. MOST:

 6      Q.   So Secretary LeBlanc, in 2017, the

 7           Louisiana Legislative Auditor came out with

 8           a report entitled, "Management of Offender

 9           Data:  Processes for Ensuring Accuracy

10           Department of Corrections," correct?

11      A.   Correct.

12      Q.   And this is excerpts of that report,

13           correct?

14      A.   Yes.

15      Q.   Did you see this report when it came out in

16           2017?

17      A.   I did.

18      Q.   All right, and you were part of the back-

19           and-forth with the auditor providing

20           information, et cetera?

21      A.   Correct.  I was -- you know, ultimately, I

22           met with the auditors, you know,

23           occasionally.  I mean, our staff were

24           meeting with them more -- you know, on more

25           occasions than -- than I.
```

```
 1   Q.   If you look at Page 3, which is the second
 2        page --
 3   A.   Okay.
 4   Q.   -- these are some of the top line findings
 5        of the Legislative Auditor; is that right?
 6   A.   Correct.
 7   Q.   It says, "Among other things" --
 8   A.   Now, the definition of findings sometimes
 9        is a little -- you've got to be careful on
10        how you use that word.
11   Q.   Sure.
12   A.   So anyway, these -- they don't refer to
13        these as findings.
14   Q.   You are correct.  It says, "We identified
15        the following issues."
16   A.   Right.
17   Q.   So these are issues the auditor identified.
18        Is that fair?
19   A.   Correct.
20   Q.   Okay.  As a lawyer, I appreciate --
21        appreciate the precision.  That's good.
22        One of the identified issues is "DOC's
23        process for calculating offender release
24        dates is inconsistent, which can result in
25        errors," right?
```

```
 1   A.   Correct.
 2   Q.   And it says, "DOC does not have any
 3        policies, procedures, manuals or
 4        agency-wide guidance that details the
 5        correct ways to calculate release dates,"
 6        correct?
 7   A.   Correct.
 8   Q.   Okay.
 9   A.   Now, if I can, I -- I would refer to our
10        response to those, and I don't have that in
11        front of me, but I would ask that that at
12        least be included in the statements that
13        we're talking about right now, because when
14        you look at -- at the error rate in our
15        department, one thing they looked at was
16        the error rate, and they didn't understand
17        that it was a hundred entries in every file
18        and ended up being an error rate of .26 of
19        one percent, and I know I think we all
20        probably admit that we make errors
21        occasionally, you know, so it was a pretty
22        good -- pretty good percentage in my -- in
23        my opinion of the error rate that we were
24        calculating.  They didn't -- they didn't
25        understand the process in my opinion.
```

```
 1   Q.   Huh-huh.
 2   A.   And so there -- therefore, they -- they
 3        threw out numbers that didn't make a whole
 4        lot of sense, just like they said that they
 5        had two people calculate time, and it was
 6        different, but they wouldn't tell us who
 7        they talked to or who calculated the time.
 8        Probably picked out somebody that was in
 9        training or didn't have the experience to
10        calculate time, and used them as an example
11        of being inconsistent, but they wouldn't --
12        they -- they didn't know who they talked to
13        or who -- who that person was that figured
14        the time.
15   Q.   Huh-huh.
16   A.   So I -- I just bring out as how
17        inconsistent they were in these findings
18        and not really understanding the process.
19   Q.   Do you have any reason to doubt that the
20        legislative auditor had two employees
21        calculate time, and they came up with
22        different answers?
23   A.   Had who?
24   Q.   So it sounds like you're referring to --
25   A.   Two of our employees --
```

```
 1   Q.    Yes.
 2   A.    -- they had calculating time, and it came
 3         out with different figures.
 4   Q.    Yeah, that's what it says in this report.
 5   A.    Right, and but they didn't know who
 6         calculated the time in our department.
 7   Q.    Do you have any reason to doubt that that
 8         actually happened?
 9   A.    I have reason, yeah, because they didn't --
10         first of all, they couldn't tell us who did
11         it.  It may have happened, but what I'm
12         telling you is that they probably gave it
13         to somebody, an employee, who isn't through
14         training.  I mean, we didn't know.  They
15         couldn't tell us who -- who did the
16         calculation of time.  So we took exception
17         to that finding based on that.
18   Q.    Did you have a training program at the time
19         for time calculation of --
20   A.    I -- I'm not sure if it was -- I'm -- I'm
21         -- you know, I think it was.  I think in
22         our response, we indicated that we have a
23         training manual, and we referenced three or
24         four different regulations that we have
25         that reference calculating time.
```

```
 1    Q.   So let's look at this document which I've
 2         marked "Exhibit E."  This is your response
 3         that you're describing, correct?  (Counsel
 4         hands document to witness.)
 5    A.   Huh-huh.
 6    Q.   So if you look at Page A.4 --
 7    A.   Okay.
 8    Q.   -- in the third paragraph from the bottom,
 9         it says, "DPS&C has implemented a plan to
10         provide a basic Pre-Class and Time
11         Calculation training program for all new
12         hires in that Department."
13    A.   Where are you?
14    Q.   I'm sorry.
15    A.   Are you in the middle of it somewhere?
16         Okay, yeah.
17    Q.   "DPS" -- "DPS&C has implemented a plan" --
18         do you see where I am?
19    A.   Huh-huh.
20    Q.   -- "to provide basic Pre-Class and Time
21         Calculation training program for all new
22         hires in that Department."  So that -- do
23         you see where it says that?
24    A.   Yes.
25    Q.   So that was a new training program that had
```

```
 1          been developed at the time?
 2    A.    Actually, I think they were implementing a
 3          new plan.  I mean, I think they had a plan.
 4          They didn't -- they were updating a plan,
 5          but again, I'm -- you know, I'd have to
 6          refer to Seth and Derrick to -- and Angela
 7          for -- to give you that -- that response
 8          and why it was worded like that, but yeah.
 9    Q.    Do you know if there was a training program
10          before that?
11    A.    I -- I'm sure there was.  I -- I may be
12          wrong, but I can't imagine they weren't.
13    Q.    So I -- I will tell you that people have
14          been testifying that there wasn't a
15          training program.
16    A.    There wasn't any training program?
17    Q.    That -- that I --
18    A.    So they -- so they would just sit somebody
19          in the chair to calculate time with no
20          training?
21    Q.    They would just watch by -- watch by
22          watching other people -- learn by watching
23          other people.  That's what people have
24          testified to.
25    A.    So -- so -- so what -- what is that?  You
```

```
 1          don't -- you're not saying that's training?
 2          When you say, "watching," I'm not sure what
 3          "watching" means, but if they're training
 4          them and working alongside of them, we do
 5          that with cadets in our corrections
 6          officers.  That's how they train.  So, I
 7          mean, that's part of the training process.
 8          There should be a little more obviously,
 9          but I think if somebody is working with
10          somebody, that's how you learn.
11     Q.   Huh-huh.  So it wouldn't bother you if
12          there was no formalized training for time
13          computation people?
14     A.   It -- it -- yeah, it bothers me if there
15          was no training.  You know, I -- I just --
16          I have a hard time imagining that, but if
17          that's the case, it does bother me.
18     Q.   Okay.  If you look at Page 13 of the -- of
19          the Louisiana Legislative -- okay, so if
20          you look at Page 10 of the Legislative
21          Auditor's report --
22     A.   All right.
23     Q.   -- you see where it says, "Summary of
24          Management's Response" at the top?
25     A.   Huh-huh.
```

```
1    Q.   And a couple of sentencing -- couple of
2         sentences in, it says, "A training booklet
3         has been started."  Do you see that?
4    A.   Yes.
5    Q.   Okay.  It says, "A training booklet has
6         been started to step an employee through
7         that" -- "through the time computation
8         process to determine if the offender needs
9         recalculating and what Time Computation Act
10        the offender will fall under."  So do you
11        see that?
12   A.   I do.
13   Q.   And then it says, "Additionally, DOC plans
14        to provide a basic Pre-Class and Time
15        Computation training program to all new
16        hires in that department," right?
17   A.   Correct.
18   Q.   So the fact that it says "DOC plans to"
19        suggests that there wasn't previously a
20        training program provided to all new hires?
21   A.   It does.
22   Q.   Any reason to believe this statement is
23        false?
24   A.   No.  If we said it, then obviously it
25        isn't.
```

1    Q.   Do you know if this training booklet that
2         says was -- had been started has been
3         completed?
4    A.   No.
5    Q.   I'm going to pop over to a newspaper
6         article, which I'm going to label "Exhibit
7         F."  (Counsel hands document to witness.)
8         And if you'll look at page -- well, look at
9         the last page.  It says at the top, "In
10        addition to their attempts to replace
11        CAJUN," and this is an article dated
12        February 17, 2019, correct?
13   A.   Yes.
14   Q.   "In addition to their attempts to replace
15        CAJUN, LeBlanc wrote that DOC was working
16        on a new training manual for the time
17        computation staff.  More than a year later,
18        that manual remains unfinished."  It has
19        got a quote from Pastorick, "While not
20        fully completed, we anticipate completion
21        in the near future," correct?
22   A.   Correct.
23   Q.   So in 2017 the DOC says it was starting
24        this training document, and in 2019, it's
25        not fully completed, correct?

```
1    A.   Yeah, that's what this says, yeah.

2    Q.   Do you have any reason to -- to believe

3         what Pastorick said here is not true?

4    A.   No, I don't have any reason to believe it's

5         not true.

6    Q.   Without a training manual you can expect

7         people to make errors, correct?

8                    MR. EVANS:

9                    Object to the form.

10                   You can answer.

11                   THE WITNESS:

12                   Yeah.

13   BY MR. MOST:

14   Q.   And some of those errors might include

15        people being held past their release date,

16        correct?

17                   MR. EVANS:

18                   Same objection.

19                   You can answer.

20                   THE WITNESS:

21                   It could.

22   BY MR. MOST:

23   Q.   Do you know what the status of that

24        training manual is today?

25   A.   I don't.  I'll know by the end of the day.
```

```
 1              MR. MOST:
 2              Can we go off the record for a
 3        moment.
 4              MR. EVANS:
 5              Huh-huh.
 6              (Off the record.)
 7    BY MR. MOST:
 8    Q.   In 2018 in an op-ed in the Advocate, Jeff
 9         Landry and Senator Kennedy wrote, and I can
10         quote it if you'd like to -- would you like
11         to read it?
12    A.   No, I don't have to read it.  I mean, you
13         don't have to read it.
14    Q.   I think you know what I'm talking about.
15    A.   Yeah, I do.
16    Q.   The quote was, "Underneath all that is a
17         layer of incompetence so deep that the
18         Corrections Department doesn't know where a
19         prisoner is on any given day of the week or
20         when he should actually be released from
21         prison."  That sound familiar to you?
22    A.   Yeah, I -- I mean, the quote is familiar,
23         yeah.
24    Q.   Yeah, and one of the authors of that quote
25         is Attorney General Jeff Landry, correct?
```

1   A.   Correct.

2   Q.   One of -- who is your attorney in this

3        case, correct?

4   A.   Yeah.

5   Q.   Yeah.  So your attorney is out there saying

6        the DOC doesn't know when prisoners should

7        be actually released from prison, right?

8   A.   He is, yeah, so --

9   Q.   If -- if my lawyer was out there saying

10       things about that -- things like that about

11       me, I would -- that would raise a red flag

12       for me.  Did that raise a red flag for you?

13  A.   Not really.  I mean, and the reason it

14       didn't is it's -- just it's politics.  I

15       mean, that's all politics.  There's nothing

16       more than, you know, just like Kennedy.

17       I've never met either one of those

18       gentleman, Kennedy or Landry, and none of

19       them were willing to take part on anything

20       that we were doing in order to change the

21       face of the criminal justice system, never

22       got involved, never asked any questions,

23       have never met me or have never been in

24       this department, and have no idea of the

25       staff that works so hard in this department

```
 1         to make things work.  So, you know, just to
 2         carte blanche make an -- it -- it -- yeah,
 3         I mean, it concerns me obviously, but I --
 4         I can't focus in on those kind of things,
 5         because I have too many other things going
 6         on.
 7  Q.    Okay.  Going back to the grant application,
 8         which is here, the last paragraph -- or I'm
 9         sorry, the last sentence of this first
10         paragraph says, "Functional processes
11         remain as antiquated as they were in 1996,"
12         and this is around the relationship between
13         the Department of Corrections and the
14         sheriffs, right?
15  A.    Correct.  Yeah, I mean, the sheriffs and --
16         and the judges.  I mean, the whole -- it's
17         all -- it's the whole system really, I
18         mean.  Yeah, I mean, you know, and look, I
19         mean, in a grant you probably going to
20         maybe overstate a few things here and there
21         to try to get the funding, and, you know, I
22         don't -- you know, antiquated, you know, I
23         guess that's what it has to be called, but
24         --
25  Q.    But it's not wrong.  I mean, the DOC --
```

A.    Yeah.

Q.    -- is still using the CAJUN system?

A.    Yeah, I mean, but -- but, I mean, we do a
      lot of things differently now.  I mean, it
      -- the -- the system has changed to -- to
      some degree to make it better, but it's --
      yeah, I mean, the CAJUN System is obviously
      antiquated.

Q.    And some documents are driven by van from
      the sheriffs to the Department of
      Corrections, right?

A.    Yeah.

Q.    Okay.  Okay.  So the next data point I have
      is from this year.  We'll mark this as
      "Exhibit G."  (Counsel hands document to
      witness.)  Is this an article from the
      Times-Picayune entitled, "Edwards, prison
      officials pledge to fix to stop people
      being detained past their release date,"
      dated March 28th, 2019?

A.    Yes.

Q.    Okay.  If you look on the third page,
      fourth paragraph down, it says, "Last
      month, the department of corrections said,
      231 people across the state were affected.

```
 1        Those people waited an average 44 days to
 2        be released after a judge ordered them
 3        free, with most of the delay coming from"
 4        -- "coming while DOC waited on paperwork
 5        from local officials according to Vining."
 6        You see that?
 7   A.   I do.
 8   Q.   The next sentence is, "It took DOC an
 9        average of 10 days to process a release on
10        their end once they received the paperwork,
11        he said," correct?
12   A.   Huh-huh, correct.
13   Q.   And Vining refers to Jonathan Vining, your
14        -- one of the attorneys at the Department
15        of Corrections.  Is that right?
16   A.   I don't know.
17             THE WITNESS:
18             Jonathan, is that right?
19             MR. VINING:
20             That's correct.
21             MR. MOST:
22             Yeah.
23             MR. VINING:
24             I wish it said Pastorick.
25             THE WITNESS:
```

```
 1              Where do you get these numbers
 2         from, Jonathan?  That's what I want to
 3         know.
 4   BY MR. MOST:
 5   Q.   Do you have any reason to believe these
 6        numbers are not correct?
 7   A.   No.  I mean, I -- no.
 8   Q.   Did you read this article when it came out?
 9   A.   I don't -- I don't know that I did
10        honestly.
11   Q.   So it sounds like there's -- there's still
12        a problem with this.  Is that fair to say?
13   A.   According to Jonathan, yeah.
14   Q.   Okay.  If these numbers are correct, is
15        there still a problem?
16   A.   Yep, there is.  I think that's why we're
17        doing what we're doing, and look, the other
18        thing -- and I -- things come to mind
19        occasionally, and I -- I have to mention it
20        is that one thing I failed to mention in
21        what we -- is the Uniform Commitment Order.
22        We spent many, many, many, many manhours
23        reformatting the Uniform Commitment Order
24        to help us in that -- and that be the
25        document that we use to calculate time.
```

```
1    Q.   Huh-huh.
2    A.   Rather than waiting on all the -- in fact,
3         we changed -- we changed legislation to
4         help us do that, but nobody, no judge,
5         nobody will use it.  I mean, they'll -- or
6         they'll change the document to accommodate
7         what they want to do.  I mean, that's --
8         that's the kind of -- that's what we're
9         dealing with.  You know, we had what we
10        thought was a good way to address this.
11        Well, you know, and -- and -- and the
12        Supreme Court adopted it as I appreciate
13        it, and they just don't -- they don't
14        listen.  I mean, the judges just don't.  I
15        don't know what the deal is with that, but
16        anyway, I mean, that was another -- we -- I
17        mean, we spent a lot of time in meeting
18        with judges and going through that Uniform
19        Commitment Order to -- to get it to where
20        you could figure time from it and not have
21        to have the sentencing minutes, have those
22        things so we could go ahead and do this,
23        and it fell right on its face.
24   Q.   Huh-huh.
25   A.   You know, I mean, everywhere we turn to try
```

```
 1          to fix it, it falls on its face, but
 2          outside of our authority, and -- and, you
 3          know, I -- I don't know how else to say it.
 4          I mean, I -- you know, it's not that we're
 5          ignoring the problem.  We're -- we're
 6          fighting every avenue to make -- to fix
 7          this, and we just run into walls, and --
 8          and finally, you know, you know, in talking
 9          to Katrina, I said, "Katrina, can you help
10          me with this.  Let's" -- "Let's at least
11          put a resolution together."  A resolution
12          is what it is, a resolution, but and get --
13          get the judiciary and -- and I think it's
14          Jud C, one of the -- one of the -- I think
15          it's Jud C or Jud B, one of them involved,
16          and let's -- let's have some hearings.
17     Q.   Yeah.
18     A.   You know, it's -- it's not anything we're
19          putting under the table.  I mean, Six Sigma
20          was -- I mean, that brought it to light,
21          but we were trying to fix things then to --
22          to make it better on how you calculate time
23          to make it easier for us and -- and more
24          efficient, but I -- you know, and -- and
25          remembering, William, that, you know, we
```

```
 1        were dealing -- during -- during between
 2        2008 and 2016, '17, we -- we were taking
 3        200 million dollars in cuts and lost four
 4        prisons and 2000 employees.  My focus is --
 5        is surviving, you know, and, you know,
 6        there's a lot of things going on besides
 7        figuring time for me.  I mean, you know,
 8        you have -- I hope you understand that, and
 9        but, you know, it's not like we -- we're
10        trying to avoid this issue.  We want to --
11        we want to fix this issue, and we -- we
12        have made every attempt at -- at fixing
13        this issue so --
14   Q.   And one thing you said that you may do in
15        the future, but haven't done in the past is
16        send -- is actually go out and get the
17        paperwork --
18   A.   Yeah.
19   Q.   -- the Department of Corrections itself?
20   A.   Yeah, that's right.  That's right, and --
21        and we -- we need reception centers to do
22        that.  I opened a new reception center to
23        -- to take in the five, but there -- it
24        wasn't just about the paperwork.  It was
25        about bringing people in and evaluating who
```

1          they are and what they need --

2     Q.   Huh-huh.

3     A.   -- and -- and get them in programs and the

4          things that they need before they discharge

5          them back to our communities, but

6          ultimately it resulted in -- in the

7          paperwork issue, and it -- it addressed

8          that issue, and we got Orleans, Jefferson,

9          and St. Tammany on board.  Now, they all

10         come through that reception center.  So

11         that's three big parishes.

12    Q.   And if Vining is correct in this article,

13         even once the DOC gets the documents, it

14         takes an average of ten days to process the

15         release, correct?

16    A.   I'm -- I'm assuming that's right, yeah, I

17         mean.

18    Q.   So I want to talk about one particular kind

19         of over detention, and I'm skipping past

20         chunks of what I had for today because of

21         what we talked about.

22    A.   Thank you.

23    Q.   So when someone gets convicted in

24         Louisiana, the Judge issues them a

25         sentence, right?

```
1   A.   Correct.
2   Q.   And they sentence that person either to the
3        custody of the sheriff or the Department of
4        Corrections, right?
5   A.   Well, actually, they just sentence them to
6        -- to DOC and -- and, I mean, this is --
7        this is -- I mean, again this is a part of
8        the problem with our system is that they go
9        -- they can go to a parish jail or they can
10       come into us depending on -- most of them
11       go straight to jail and spend time in jail
12       doing DOC time.
13  Q.   Huh-huh.
14  A.   But again as I said earlier, those are
15       things that we're changing.  So it's not --
16       the judge doesn't assign them a bed.
17  Q.   Huh-huh.
18  A.   We assign them a bed.
19  Q.   Right.  Since the department -- the custody
20       of the Department of Corrections --
21  A.   Yeah.
22  Q.   -- the DOC is responsible whether or not
23       they're physically at a state --
24  A.   Well, yeah, yeah.  No question.
25  Q.   -- or parish facility?
```

```
 1   A.   No question.
 2   Q.   Okay.  So the paperwork goes from the clerk
 3        of court to the sheriff, and then the
 4        sheriff to the DOC, right?
 5   A.   I think that varies.
 6   Q.   Okay.
 7   A.   I think some clerk of courts -- and look,
 8        I'm -- I'm not in the weeds with that.
 9   Q.   Yeah.
10   A.   But my understanding is that it -- that it
11        varies depending on the parish how the --
12   Q.   Sure.
13   A.   -- how the paperwork flows, and some clerk
14        of courts may send directly to us; some to
15        the sheriff, some -- and the sheriff sends
16        everything to us.  So I -- that's what I
17        think that -- I wish it was more
18        consistent, but I think some -- that's
19        another issue is that it is inconsistent
20        actually.
21   Q.   But there's a process by which the
22        paperwork --
23   A.   Yeah.
24   Q.   -- gets to the DOC, correct?
25   A.   Yeah, yeah, correct.
```

```
1   Q.   And some people in Louisiana are sentenced
2        to credit for time served, right?
3   A.   Correct.
4   Q.   Which means that their sentences equal or
5        less than the time they've spent in jail
6        before that sentence, correct?
7   A.   Say that again, I'm sorry.
8   Q.   Sure.  When someone is sentenced to credit
9        for time served, it means that their
10       sentence is less than or equal to the time
11       they've already been incarcerated?
12  A.   Well --
13              MR. EVANS:
14              Object to form.
15              You can answer.
16              THE WITNESS:
17              -- I don't --  I don't know if
18           it's less than or equal to.  It could
19           -- I mean, they still may have to do
20           more time.  In other words, if the guy
21           gets 20 years, he might have been in
22           jail for two.
23  BY MR. MOST:
24  Q.   I see.
25  A.   You know, and he gets credit for two, but
```

```
 1          he still has 18 to do if I'm -- if I'm
 2          following you.  Maybe I'm not.
 3     Q.   I see what you're saying.
 4     A.   Yeah.
 5     Q.   So there are some people who, let's say,
 6          they're --
 7     A.   And look, the other thing too on this time
 8          calculation thing, the time calculation is
 9          -- is based on people who are -- you know,
10          may have a whole -- a whole lot of time to
11          do, not people that are immediately
12          releasing, so, you know, that -- that --
13          when you look at the time that it takes, I
14          mean, some -- some of them -- if a guy has
15          20 or 30, I'm sure that's what they do.
16          They put them on a back burner and do the
17          immediate, you know, people that are
18          getting out.  I think you spend an average
19          of now if you get a year's sentence, you do
20          four months.  So I -- I -- I don't want to
21          confuse things.
22     Q.   I -- I think that's the way it should be.
23          I don't know if that's the way it is
24          frankly.
25     A.   Well.
```

```
 1   Q.   Okay, but there are people who their
 2        sentence is less than the time they've
 3        already spent in jail, right?
 4   A.   Yes.
 5   Q.   Yeah.  So there's people who are eligible
 6        for immediate release on the day of their
 7        sentencing?
 8   A.   Correct.
 9   Q.   Okay.
10   A.   And they may be overdue on the day of their
11        sentencing, you know, so --
12   Q.   Right.
13   A.   Yeah, that happens.
14   Q.   So they're -- they're -- so if it takes a
15        week for the DOC to calculate their
16        sentence, they've been held past the end of
17        their sentence for a week, correct?
18   A.   Correct.  If it takes a week that's what
19        will happen.
20   Q.   If it takes ten days, they've been held ten
21        days past when they were eligible for
22        immediate release, right?
23   A.   Yeah, correct.
24   Q.   Okay.
25   A.   I -- I -- you know, that's a whole another
```

```
 1        issue that we've talked about in trying to
 2        fix that legislatively that we got -- we --
 3        we need to be doing some time to figure
 4        time.  You know, I mean, we can probably do
 5        it better than ten days, but it's going to
 6        take days to do it, and we ought to -- we
 7        ought to get relief from the judge, saying,
 8        you know, you get, you know, some relief
 9        for figuring time and not his release date
10        be when you complete the time computation.
11   Q.   Do you know what the -- the courts have
12        settled on as a -- a time limit?
13   A.   No, no.  No, we haven't talked -- I mean,
14        that's something that we've talked about
15        internally in that, you know, that's always
16        going to be an issue if we don't fix it.
17   Q.   Right.  Yeah, this is just me saying so
18        this isn't testimony, but the case law that
19        I've seen says that it's a reasonable time
20        not to exceed two days so.
21   A.   Okay.
22   Q.   Okay.  So we're going to look at -- this is
23        "Exhibit H."  (Counsel hands document to
24        witness.)  We're doing good on time.  I
25        think we're -- we're moving quickly.
```

```
 1   A.   Good.
 2   Q.   And we'll definitely have you out of here
 3        for your GOHSEP meeting for sure with time
 4        to spare.
 5   A.   Couple of these I've circled I want.
 6                 MR. EVANS:
 7                 Well, these are our copies.
 8                 MR. VINING:
 9                 We -- we can talk when it's over.
10                 THE WITNESS:
11                 Yeah.
12   BY MR. MOST:
13   Q.   Okay.  So this is a document that says,
14        "Frequently Asked" corrections, right --
15        "Questions."
16   A.   Okay.
17   Q.   Does this appear to be the frequently asked
18        questions webpage from the Department of
19        Public Safety's website?
20   A.   It does, but let me say this that we are
21        developing a new website.
22   Q.   Okay.
23   A.   It's being rebuilt as we speak.  We have
24        hired somebody, and we're hoping this is
25        going to be a much improved website once we
```

```
 1          finish it, even though Senator Claitor
 2          always brags on our -- our website, but --
 3          he brags on information that he get's off
 4          of our website.
 5     Q.   Huh-huh.
 6     A.   But anyway, I'm -- I'm sorry, go ahead.
 7     Q.   So Page 3, at the top of Page 3 --
 8     A.   Yeah.
 9     Q.   -- it says, "If a person has recently been
10          sentenced to DOC custody, it can take up to
11          12 weeks to calculate a date as the
12          Department has to receive official
13          paperwork from the sentencing court in
14          order to calculate the offender's release
15          date."  Do you see that?
16     A.   I do.
17     Q.   Do you have any reason to believe that's
18          wrong?
19     A.   Well, I have reason to believe that's in
20          there because it's -- it's for those people
21          that might have 20 years to do and that we
22          get the phone calls from family members
23          that just over -- you know, just inundates
24          us with -- with requests for when they're
25          going to get out, and I'm not sure that
```

```
 1        that -- that -- 12 weeks is ridiculous.  I
 2        mean, I -- I saw this somewhere.  I -- I've
 3        seen this before, and I haven't fixed that
 4        yet, but that's something we need to
 5        address too.  I mean, that's just absurd.
 6   Q.   Do you have any reason to believe that
 7        short timers' time computation is
 8        prioritized a lot of times?
 9   A.   You know, I -- I -- I thought it was.  I
10        mean, to my understanding that it is, but I
11        -- you know, again, I -- I have to defer to
12        Chief and -- and Derrick the assistant --
13        the Deputy Assistant Secretary and them.
14   Q.   And if it's not prioritized, that would be
15        a problem?
16   A.   Yeah, I mean, I think it is.  Yeah, I mean,
17        obviously they -- those are the ones that
18        we need to put on top the stack if you
19        will.
20   Q.   Okay.  That was part of the problem in the
21        Six Sigma report is that you had a stack
22        that was 1400 inmates high, right?
23   A.   Yeah.
24   Q.   Okay.  Okay.  Do you recall that in 2003,
25        the State of louisiana paid $125,000 to an
```

```
 1        inmate who alleged he had been held about
 2        1200 days past his release date?
 3   A.   No.
 4   Q.   Okay.  Would you have known about it, a
 5        six-figure settlement related to being held
 6        past a release date?
 7              MR. EVANS:
 8              Object to form, but you can
 9           answer.
10              THE WITNESS:
11              2003?
12   BY MR. MOST:
13   Q.   Huh-huh.
14   A.   No.
15   Q.   You wouldn't have known about it?
16   A.   No.
17   Q.   Okay.  You -- you weren't Secretary at the
18        time?
19   A.   No.  I was -- I was a warden.
20   Q.   When did you become Secretary?
21   A.   2012 unfortunately maybe.  I think.  Is
22        that right?
23              MR. VINING:
24              Wait, 2008.
25              THE WITNESS:
```

```
 1                     That's right.  I'm sorry.  2008.
 2               MR. MOST:
 3               Okay.
 4               MR. VINING:
 5               Trying to shave off four years.
 6               THE WITNESS:
 7               Yeah.  Time goes so fast.
 8  BY MR. MOST:
 9  Q.   Well, speaking of 2008, do you recall that
10       in 2008 35,000 was paid to Raphael Smith,
11       Inmate Raphael Smith regarding improper
12       calculation of release date?
13  A.   No, I don't remember -- remember that.
14  Q.   Would you known about a five-figure
15       payment?
16  A.   I probably was -- I probably was, but I
17       don't -- I don't remember it, but that was
18       when I first got started, so I was probably
19       trying to get my feet on the ground too.
20  Q.   Do you remember if any steps were taken to
21       prevent that from happening again?
22  A.   No.
23  Q.   Okay.  Do you recall then in 2014 the Sate
24       of Louisiana paid an inmate $6500 for being
25       held past their release date?
```

93

```
 1   A.   No.
 2   Q.   Okay.  Do you recall a case from '08, I'm
 3        not sure when it settled, but a settlement
 4        of $130,000 to Plaintiff Kenneth Owens, who
 5        was over detained for about 1200 days?  Do
 6        you recall that one?
 7   A.   No, I don't.
 8   Q.   What about a case Chowns v. LeBlanc that
 9        settled last year for $120,000?
10   A.   I should remember that.
11   Q.   Do you recall that?
12   A.   No, I don't.  No relationship.
13   Q.   Oh, you were the defendant in that case.
14   A.   Oh, I'm sorry.
15   Q.   Yeah.
16   A.   I was.
17   Q.   It was a state court case in the Parish of
18        Caldwell and --
19   A.   Yeah.
20   Q.   -- and he was -- the Court had denied
21        Summary Judgment on --
22   A.   Yeah, that was the one that they settled,
23        and we didn't know about it.
24             THE WITNESS:
25             Is that it, Jonathan?  Can I ask
```

```
 1           Jonathan?
 2               MR. MOST:
 3               Yes, sure.
 4               THE WITNESS:
 5               Is it?
 6               MR. VINING:
 7               Yeah, it's in the paper, yeah.
 8         That is that one.
 9               THE WITNESS:
10               Okay.
11  BY MR. MOST:
12  Q.   Okay.  So you do -- you do know about it?
13  A.   Yeah, I do know about that case.
14  Q.   Right, and when you said you didn't know
15       about it, you didn't know about the
16       settlement;  you didn't know about the case
17       or --
18  A.   I didn't know about the settlement.
19  Q.   Got it.  Do you know what, if any things,
20       were done to prevent what happened to Mr.
21       Chowns from happening again?
22  A.   I'm not sure what happened to him honestly.
23       I mean, occasionally we're going to make a
24       mistake on figuring time, so I -- if that's
25       what it is, then -- and then, you know, we
```

```
 1          have -- I mean, we've -- we've disciplined
 2          people over the last couple of years on --
 3          on time comp and mainly on -- on early
 4          releases.
 5     Q.   How would you find who has been
 6          disciplined?
 7     A.   I'd have to go -- I mean, that -- we'd have
 8          to go to Personnel.  We could find it
 9          there.
10     Q.   Because in your discovery responses, you've
11          said that nobody has been disciplined, but
12          we can get that?
13     A.   Yeah, no.  I -- I said I didn't -- I wasn't
14          aware of it, because those people work --
15          they don't work -- I mean, I don't -- I
16          don't see that discipline.  I don't see it.
17          It doesn't come to my level.  It's -- it's
18          the Chief of Operations, Derrick and
19          Angela, those people at that -- you know,
20          where the water hits the wheel.  I wouldn't
21          know if they've gotten written up.  I
22          wouldn't know if they were fired.  It
23          didn't come to me.
24     Q.   But you know that some people have been
25          disciplined?
```

```
1    A.   Yeah, I know there has been some
2         disciplined.  I know people have been
3         fired.
4    Q.   Okay.  Do you know of any other settlements
5         of -- related to people being held past
6         their release dates?
7    A.   No.
8    Q.   Any other verdicts?
9    A.   No.
10   Q.   Does the Department of Corrections have a
11        retirement system like a pension plan?
12   A.   Yeah.  I mean, yeah, it's through the State
13        retirement.  It's not an individual
14        Corrections.  It's -- it's part of the
15        retirement system, the State Retirement
16        System.
17   Q.   And so that system requires keeping track
18        of -- of when employees are eligible and
19        when they should get paid, things like
20        that?
21   A.   Yeah.  I mean, that's done at the
22        retirement system, though.  I mean, that's
23        --
24   Q.   Does it work pretty good?
25   A.   Well, yeah, I mean, I'm assuming everybody
```

```
 1        gets their retirement check.
 2   Q.   Huh-huh.
 3   A.   Yeah, I know everybody gets money deducted
 4        out of their check every month, so yeah, I
 5        think it's pretty good.
 6   Q.   So the State has the capacity to keep track
 7        of thousands of people?
 8   A.   Yeah, but remember now, it's the retirement
 9        system.  It's not the department.  They
10        have plenty of money, and their resource --
11        obviously, you know, I mean, our resources
12        are an issue --
13   Q.   Huh-huh.
14   A.   -- you know to do things.  Funding is
15        always an issue in this business today.
16   Q.   So part of the reason why this immediate
17        release issue is still an issue is because
18        resources haven't been devoted to it.  Is
19        that what you're saying?
20   A.   No, I wouldn't -- I wouldn't -- I think we
21        can -- I think we can improve internally,
22        but I -- you know, obviously people, adding
23        people to the process could help, but I --
24        you know, sometimes, you can add people,
25        and it's not going to help in -- in some of
```

```
 1        the things we've already been through today
 2        that we -- we -- we need to -- a few things
 3        I need to check on when I leave here that
 4        -- that need attention.
 5    Q.   Could this process be helped by adding
 6        people?
 7    A.   Can -- I'm sorry.  Can what?
 8    Q.   Could -- could this issue be helped by
 9        adding people?
10    A.   It could.
11    Q.   Yeah.  Let me go back through this.  One of
12        the findings of the Louisiana Legislative
13        Auditor was --
14    A.   Finding?  I'm sorry, finding?
15    Q.   Yeah, thank -- thank you.  One of the
16        issues identified by the Louisiana
17        Legislative Auditor was --
18    A.   These are -- the reason why, these are
19        program audits.  These are not the -- the
20        financial audits where they have findings.
21    Q.   Yeah.
22    A.   They're program so --
23    Q.   I -- I see, yeah.  I'm -- I'm happy to use
24        whichever terminology --
25    A.   Yeah, yeah.
```

```
 1   Q.   -- that's most accurate.  Okay.  One of the
 2        issues identified --
 3   A.   Huh-huh.
 4   Q.   -- by the Legislative Auditor was that they
 5        reviewed a hundred files and found 11
 6        percent were at a facility other than what
 7        was in CAJUN.  Do you recall that?
 8   A.   I -- I -- I don't recall the 11 percent in
 9        --
10   Q.   Right.
11   A.   -- in particular, but I do recall that,
12        yeah, that that was -- like, there's 3500
13        transfers every month at the local level,
14        3500, and -- and we have changed the basic,
15        you know, guidelines to notify us in
16        advance, 24 hours in advance when
17        practical.
18   Q.   Huh-huh.
19   A.   If it's an emergency, then they notify us
20        within 24 hours after, but there's a lot of
21        Court Order transfers; there's a lot of
22        hospital transfers.  So, you know, in the
23        middle of all that, you've got -- you have
24        to depend on the jails to know that they're
25        either, you know, in one jail or other, and
```

```
 1        they -- they try to say that we were -- but
 2        we -- we -- we balance that every month
 3        paying wise.  When we pay our bills, we
 4        make sure we're not double paying, and --
 5        and so all that's reconciled at -- at some
 6        point, but it is -- it's -- it's a
 7        challenge to keep up with them at the local
 8        level, and I think we have a handle on it.
 9   Q.   So it's relatively common that the
10        Department of Corrections thinks an inmate
11        is in one place, but actually they're in
12        another, correct?
13   A.   Well, I mean, I -- you know, I'm not sure
14        that we're thinking about where an inmate
15        is at the local level.  We know that he's
16        in a jail somewhere and locked up.  I mean,
17        he's -- he's okay.  It's not a public
18        safety issue.  So, you know, yeah, I mean,
19        I guess the answer to that question would
20        be yes, but it's not something that we
21        perceive as a major problem.
22   Q.   Okay.  So one of the things you mentioned
23        today that the DOC could do to mitigate the
24        problem of people being held past their
25        release date is for the DOC to go out and
```

```
1         get the paperwork itself rather than just
2         waiting to receive it, right?
3    A.   For DOC to get it versus a sheriff, not
4         really concerned about it.  You know, and
5         that's -- that's -- that's the difference.
6    Q.   Right.
7    A.   Yeah.  So yes.
8    Q.   What other things could be done to mitigate
9         this problem?
10                 MR. EVANS:
11                 Object to form, but you can
12             answer.
13                 THE WITNESS:
14                 Well, I -- I think the
15             modernization of our system is -- is --
16             is going to help a great deal.  I think
17             the Uniform Commitment Order, I -- I
18             think that -- I mean, to me that's the
19             way to resolve this if we could get
20             everybody on the same page, and we get
21             a Uniform Commitment Order, not have to
22             worry about what the sentencing minutes
23             say and what this says and trying to
24             compare, and they don't ever agree
25             seems like most of the time, and that's
```

```
 1              what our staff gets confused about.
 2              This says one thing and -- the Judge
 3              says one thing, and the minutes say
 4              something else.  You know, so if we
 5              could get rid of that and let's get a
 6              Uniform Commitment Order that we can
 7              figure time from, personally I think
 8              that would -- that's the resolution --
 9    BY MR. MOST:
10    Q.   Huh-huh.
11    A.   -- in this situation, you know, and -- and
12         that's what -- look, when we get -- when
13         this resolution gets heard and we get to
14         committee, that's what they're going to
15         hear from me, and I think somehow we have
16         to legislatively mandate judges and clerk
17         of courts that this is the way it's going
18         to happen, you know, and -- you know, I've
19         sat down with Debbie Hudnall I don't want
20         to tell you how many times trying to
21         resolve this, you know, at least four or
22         five different times over the last two or
23         three years with her, with the judges'
24         association, going to the judges'
25         conferences, speaking to the judges.  You
```

```
 1        know, I mean, to me that -- that -- that --
 2        that's -- that's a -- that's part of the
 3        resolution, and -- and I think this web
 4        portal with this grant where we can
 5        communicate, where, you know, everybody
 6        right now is on different systems, and you
 7        know that better than I do probably, but --
 8        but getting everybody in a portal, and I
 9        don't understand web-based portals, but if
10        everybody can communicate electronically to
11        us, then that along with the Uniform
12        Commitment Order, I think that would be a
13        -- a -- a fix in my opinion.
14   Q.   Do you talk to other heads of other states'
15        departments of corrections?
16   A.   You know, I haven't -- the -- the issue
17        with, and -- and I'm -- no, I haven't and
18        -- and -- and we are looking at -- right
19        now we are looking at what software is
20        being used in other states.  We -- we --
21        we've began that process, and we probably
22        maybe should have started that a little
23        sooner, but their -- their issues are not
24        nearly as complex or challenging as ours
25        because of the local jail situation.  I
```

```
 1          think Kentucky is the closest one to us
 2          that has people in local jails, but
 3          ultimately they end up in a state facility.
 4          They don't leave them there and discharge
 5          from there.  So our -- our challenges with
 6          time computation is so much different than
 7          -- than the other states, but there's no
 8          reason why we can't at least see what's
 9          going on and -- and if we can't -- I think
10          this web portal thing is maybe when we
11          start looking around, and -- and finding
12          out what's going on, but I don't know how
13          much information we've gotten so far, but
14          we are looking at other states right now.
15     Q.   Do you know of any other state that has the
16          magnitude of an issue with people being
17          held past their release dates that
18          Louisiana has?
19     A.   No, and I -- I think -- I think the
20          majority of these cases is going to be in
21          local jails.
22     Q.   Okay.
23     A.   And that's -- that's -- that's the
24          difference.
25     Q.   You had a meeting on March 25th with the
```

```
 1        Louisiana Sheriff's Association, Clerks of
 2        Court Association, Supreme Court.  Is that
 3        right?
 4   A.   Correct.
 5   Q.   Did you take notes?
 6   A.   No, I don't think we did.
 7   Q.   Did anyone else take notes?
 8   A.   I don't believe.  I -- I'll have to check.
 9   Q.   Okay.
10   A.   I -- I don't think we did, and maybe I had
11        someone in there taking notes, but if I
12        did, I certainly, we'll -- we'll see if we
13        can get them to you.
14   Q.   Was there an agenda?
15   A.   No, no, they -- I -- I let everybody know
16        ahead of time, you know, I want to talk
17        about the issue with time computation, but
18        I don't mind sharing anything with, you
19        know, we have.
20   Q.   Okay.  I think that's all my questions.
21             MR. MOST:
22             Gary, do you want to jump in?
23             MR. EVANS:
24             No, I think -- I think we will
25          reserve.
```

1          MR. MOST:

2          Okay.  We can off the record.

3     We're done.

4          (Whereupon, the taking of the

5     witness' testimony was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              WITNESS' CERTIFICATE

2

3          I, SECRETARY JAMES LeBLANC, have read

4    or have had the foregoing testimony read to me

5    pursuant to Rule 30(e) of the Federal Rules of

6    Civil Procedure and/or Article 1445 of the

7    Louisiana Code of Civil Procedure and do hereby

8    certify that to the best of my ability and

9    understanding, it is a true and correction

10   transcription of my testimony.

11

12

13   Please check one:

14

15   _____Without corrections

16

17   _____With correction (see errata sheet)

18

19   _____      _____

20   WITNESS' SIGNATURE                  DATE

21

22

23

24

25

1              C E R T I F I C A T E
2              THIS CERTIFICATION IS VALID ONLY FOR
   A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
   PAGE.
4
              I, RAYNEL E. SCHULE, Certified Court
5  Reporter, #77005, in good standing, in and for
   the State of Louisiana, as the officer before
6  whom this testimony was taken, do hereby certify
   that SECRETARY JAMES LeBLANC, after having been
7  duly sworn by me upon authority of R.S. 37:2554,
   did testify as hereinbefore set forth in the
8  foregoing 106 pages; that this testimony was
   reported by me in stenotype reporting method,
9  was prepared and transcribed by me or under my
   personal direction and supervision, and is a
10 true and correct transcript to the best of my
   ability and understanding; that the transcript
11 has been prepared in compliance with transcript
   format guidelines required by statute or by
12 rules of the Board, that I have acted in
   compliance with the prohibition on contractual
13 relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
14 advisory opinions of the Board; that I am not of
   counsel, not related to counsel or to the
15 parties herein, nor am I otherwise interested in
   the outcome of this matter.

16

17

18 _____        _____
   Date                    Raynel E. Schule, CSR
19                         Certified Shorthand Reporter
                           State of Louisiana
20

21

22

23

24

25

SOUTHERN COURT REPORTERS, INC.
(504)488-1112